**IN THE UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| IN RE: ) | Case No. 09-0389-jw |
| ) | Chapter 11 |
| **DAUFUSKIE ISLAND PROPERTIES, LLC,** ) | |
| ) | |
| **Debtor.** ) | |

**MOTION AND MEMORANDUM TO INCUR DEBT AND FOR APPROVAL OF POST-PETITION DEBTOR IN POSSESSION FINANCING AND ASSOCIATED RELIEF**

The Debtor respectfully moves this Court for to incur debt and for approval of the attached **COMMITMENT FOR POST-PETITION DEBTOR IN POSSESSION FINANCING**, and for such other and further relief as this Court deems appropriate.

The Debtor filed this case on January 20, 2009. The Debtor is involved with and owns, manages and/or operates a multitude of real estate parcels, personal properties, services and businesses (the "Assets") on Daufuskie Island, SC. The Assets, which were acquired primarily in 2002, include golf courses, an equestrian center, a marina, a boat landing, the Melrose Inn, various restaurants and amenities, as well as vacant land for future development.

This Court has jurisdiction of this matter pursuant to 28 U.S.C. Section 157, 1334, and is a core proceeding under 28 U.S.C. Section 157(b)(2).

The Debtor is in a severe cash deficit position, due to the general market place and the inability to sell certain assets. Prior to the case filing, the Debtor took steps to minimize its negative cash exposure by, inter alia, leasing certain Assets to third parties and causing certain operations to be suspended. It still is in charge of operating the Melrose Inn, Jack's Restaurant, and other businesses and services.

The Debtor has been unable to secure credit post-petition. After pursuing and considering several debtor-in-possession lenders, the Debtor has entered into a Commitment ("Commitment") dated February 26, 2009 with **Petrus Private Investment, L.P. or an affiliate ("Lender")** for post-petition financing ("Loan") in the maximum Loan Amount of $3,000,000, as evidenced by the attached Exhibit which is incorporated herein by reference. The Debtor asserts that this Loan is in the best interests of the estate and parties in interest, and will result in immediate and needed cash. Reference the attached Budget, also attached as an Exhibit and incorporated herein by reference.

Among the terms of the Commitment are the following:

An Expense Deposit of $25,000 to cover the Lender's out-of-pocket expenses, which has been prepaid by William R. Dixon, Jr. from his own funds;

An interim Loan facility of $750,000, of which $500,000 is for operations, $150,000 (5%) for escrow of the Lender's Commitment Fee, and $75,000 for the Lender's due diligence expenses;

Monthly draw advances (once the full loan is approved by the Court) based on an approved budget;

Interest at LIBOR plus 1,000 basis points with a LIBOR floor of 6%, with an additional 300 basis points added in the event of default;

1

An Exit Fee of 2% of the Loan Amount upon any reduction of the Loan amount or repayment of the Loan;

A Break-Up Fee of 5% of the Commitment if Debtor fails to consummate the transaction;

A Collateral Administration Fee of $5,000 per month throughout the term of the Interim Financing and Loan;

Payment of a fee of 2% of the Loan Amount upon issuance of a Final Order approving the loan, to the firm of Marcus & Millichap Real Estate Investment Services for its services in obtaining the Loan.

In exchange for making this Loan, the Lender seeks certain stated relief and rights including, but not limited to, perfected first priority liens on all personal and real estate holdings of the Debtor pursuant to Section 364(c)(1) of the Bankruptcy Code, as well as a superpriority first-lien administrative claim under Sections 364(c)(2), (c)(3) and Section 364(d) of the Bankruptcy Code (subject to stated limitations and/or carve-outs for professional fees and other administrative expenses as agreed to by the Lender). Provisions for the lifting of the automatic stay in the case of stated defaults or other trigger events are also provided in detail.

Among the secured creditors whose liens would be primed are: AFG, LLC (real estate); BeachFirst National Bank (real estate); Carolina Shores, LLC (real estate); William R. Dixon, Jr. (real estate); Caterpillar Financial Services (Caterpillar equipment); Citicapital Commercial Leasing (Bobcat equipment); Textron Business Services (multiple golf cars, utility vehicles); Turf Equipment Leasing Company (Toro equipment); Coastal Connections Inc. (mechanics lien on real estate); The Greenery Inc. (mechanics lien on real estate). In addition, the lien of AFG, LLC on cash collateral would remain intact but primed by the Lender's lien. Further, the Commitment requires that the rights of the Debtor, its affiliates and subsidiaries, and all existing third parties "including specifically the rights claimed in the Melrose Club litigation" shall be subordinate to the liens, claims and interests of the Lender.

Section 364(d)(1) of the Bankruptcy Code provides in general that after notice and a hearing, the Court may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:

(A)   the trustee[1] is unable to obtain such credit otherwise; and
(B)   there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

In this case, as stated, the Debtor is unable to obtain funding or credit from other sources. In addition, the secured creditors with liens upon the real properties are adequately protected primarily by the equity cushion of their values of the various parcels. On information and belief, the collective value of the parcels is approximately $87,680,000, against total mortgage debt of approximately $72,300,000. Each of the secured lenders with liens on real estate are over-secured as to value, and therefore are adequately protected if their lien priorities are primed by the new Loan.[2] The mortgages of Carolina Shores, LLC and William R. Dixon, Jr., according to available records, are junior and subordinate to the aforementioned liens, and therefore are

---

[1]  The Debtor, as Debtor-in-Possession, acts with the same powers as a trustee in this case.

[2]  The Debtor has included in its Budget interest payments on the AFG loan as well, and dependent on the economic forecast for forthcoming months, will attempt to include interest payments to BeachFirst.

2

more than covered by the equity cushion provided by the parcels' values. Even so, Mr. Dixon has consented to the new Loan, and it is expected that Carolina Shores, LLC will consent as well.

The Debtor affirms to this Court that the need to approve the Commitment in its entirety on an expedited basis is critical to its continuance, and that without the same, the estate and the parties in interest will incur immediate and irreparable harm to their claims. The Debtor is prepared to have this Court approve the Commitment on an interim basis, to be followed with as many hearings as it deems necessary to provide assurance of its need and compliance.

Bankruptcy Rules 4001(b) and (c) permit a court to approve a debtor's request to obtain post-petition financing during the period following the filing of a motion requesting such relief "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bank. P. 400l(b)(2) and (c)(2). Those rules also provide that a final hearing on a motion to obtain financing pursuant to Section 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after service of such motion.

Upon request, however, a court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of financing to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions and a debtor should be entitled to borrow those amounts that it believes prudent in the operation of its business. See e.g. Simasko, 47 B.R. at 449; see also Ames Dep't Stores, 115 B.R. at 36, 38.

Pending a final hearing, the Debtor requires immediate financing. Without immediate access to financing, the Debtor will be unable to pay critical obligations or other costs associated with its continued operations as a going concern. It is imperative that the Debtor have immediate use of borrowings under the Commitment to pay its operating costs, and funds are urgently needed to meet all of the Debtor's liquidity needs and to administer its Chapter 11 case in an orderly manner. In the absence of immediate post-petition financing, the Debtor's ability to preserve the value of its business and assets will be immediately and irreparably jeopardized, resulting in significant harm to the estate and creditors.

Thus, the Debtor requests that the Court (i) conduct an expedited hearing on the Motion, (ii) grant the relief sought in this Motion on an interim basis and enter an Order authorizing the Debtor to loan under the Commitment, (iii) schedule a final hearing on this Motion ("Final Hearing"), and (iv) establish notice and objection procedures in respect thereof in accordance with Bankruptcy Rules 4001(b) and (c).

Wherefore, the Debtor prays for the stated relief, on an interim and/or a final basis at a hearing to be scheduled, and such other and further relief as this Court deems appropriate.

|  |  |
|---|---|
|  | **/s/ Ivan Nossokoff** |
| 03/02/2009 | **Ivan N. Nossokoff** |
|  | **IVAN N. NOSSOKOFF, LLC** |
|  | **District Court I.D. #2556** |
|  | **Attorney for the Debtor** |
|  | **1470 Tobias Gadson Blvd, Ste 107** |
|  | **Charleston, SC  29407** |
|  | **843-571-5442** |

February 26th, 2009

Daufuskie Island Properties, LLC
c/o Mr. Andrew Glinski
Marcus and Millichap
1225 17th Street
Suite 1800
Denver, CO 80202

Dear Mr. Glinski:

Subject to the terms and conditions set forth herein, Petrus Private Investments, L.P. is willing to provide the following Terms and Conditions pursuant to which Petrus Private Investments, L.P. or an affiliate (collectively, "Lender") would consider providing an underwritten commitment for up to $3,000,000 (Three million dollars) in Debtor in Possession Financing Facilities to be provided to Daufuskie Island Properties, LLC as further described below. The conduct of the parties hereunder shall be governed by a commercially reasonable standard.

Debtor in Possession Financing -- Summary of Principal Terms and Conditions ("Term Sheet")

| | |
|---|---|
| Borrower: | Daufuskie Island Properties, LLC and all subsidiaries and affiliates |
| Lender: | Petrus Private Investments, L.P. or designated affiliate |
| The DIP Financing: | Lender shall provide a commitment to Borrower for up to $3,000,000 in the aggregate of Debtor in Possession Financing in conjunction with the Borrower's filing of a Chapter 11 petition for bankruptcy protection. The Commitment shall consist of an interim facility (the "Interim Financing") of $750,000 ($500,000 to cover operations, and $150,000 for escrow of Commitment Fee, $75,000 to Lender for due diligence expenses and $25,000 for other bankruptcy expenses) and a permanent loan facility, each subject to court approval, consisting of (1) initial funding of $500,000 upon entry of the Final Order (as defined below) approved by the bankruptcy court and (2) subsequent monthly draw advances subject to an approved budget (the "Loan"). |
| Expenses: | Borrower shall pay all customary costs associated with the Chapter 11 process. Borrower shall provide Lender with an initial Expense Deposit of $25,000 upon execution of Term Sheet to cover its out-of-pocket expense (including reasonable attorney fees). Upon the funding of the Interim Financing, $75,000 will be paid to Lender to cover expenses and will be financed through the Interim Financing. In addition, Borrower agrees to deliver to Lender upon two (2) business days written request from time to time such additional deposits as may be necessary to cover expenses. |
| Loan Amount: | $3,000,000 (the "Commitment") |

Page 2

| | |
|---|---|
| Use of Proceeds: | The proceeds shall be used to pay approved and budgeted operating expenses, working capital needs of Borrower and to pay any costs associated with this financing. No proceeds will be advanced while any event of default has occurred and has not been cured, or unless and until the conditions precedent have been fulfilled. |
| Interest Rate: | LIBOR plus 1,000 basis points per annum with a LIBOR floor of 6% but not greater than the maximum rate provided by applicable law. |
| Default Rate: | Upon the occurrence of an Event of Default, the Interest Rate shall be increased by 300 basis points but not greater than the maximum rate provided by applicable law. |
| Mandatory Prepayments: | Proceeds of issuances of equity or indebtedness, any insurance or condemnation recoveries, and 100% of net asset sale proceeds shall be applied first to the Loan and the Interim Financing unless otherwise agreed to by Lender and bankruptcy court. |
| Closing Date: | Each of the Interim Financing and Loan shall be funded upon approval thereof by the bankruptcy court in the form of orders entered by the bankruptcy court and acceptable to Lender in its sole discretion, completion of all conditions precedent to the satisfaction of Lender, and Lender's receipt of the Commitment Fee. |
| Maturity Date: | The earlier of (a) February 28, 2010 (b) the date which is 12 months from the date of entry of the "Interim Financing Order (as hereafter defined), (c) the effective date of a plan of reorganization which has been confirmed by an order of the confirmation of the United States Bankruptcy Court, or (d) the date upon which a final order is entered by the Bankruptcy Court either (i) converting the Borrower's Chapter 11 case to a case under Chapter 7 or (ii) approving the 363 sale of some or substantially all of the Borrowers' assets (unless agreed to by Lender), or (iii) appointing a trustee or examiner in the Borrower's Chapter 11 case or (iv) dismissal of any of the Borrowers' bankruptcy cases or (v) the occurrence of an event of default under the DIP facility. |
| Acceptance Date: | Borrower must accept this term sheet by 5:00 p.m. CST on February 27th, 2009. |
| Commitment Fee: | 5% of the Commitment, which fee shall be fully earned, non-refundable, and payable upon issuance of a commitment letter. |
| Exit Fee: | 2% of the Loan Amount, payable upon any reduction of the Loan Amount or repayment of the Loan |

Page 3

| | |
|---|---|
| Break-Up Fee: | Subject to approval by the Court, if Lender issues a commitment letter and Borrower fails to consummate the transaction, Borrower shall pay Lender a Break-Up Fee of 5% of the Commitment which amount shall be immediately due and payable by Borrower to Lender. |
| Collateral: | All indebtedness and obligations under the Interim Financing and Loan will be secured by a court-ordered priming lien and first priority senior security interests in all assets and proceeds thereof of the Borrower ~~(including the Eigelberger property)~~ and its affiliates and subsidiaries, tangible and intangible, including but not limited to accounts receivable, contract rights, inventory (growing and grown), real property, plant, equipment, fixtures, vehicles, boats and marine craft, and intangibles (i.e., trademarks, patents, proprietary seed cultures, etc.); Lender would also receive a pledge of 100% of the stock of Borrower, its subsidiaries and affiliates and assignment of all material leases, contracts, licenses and permits (all of the foregoing being referred to as the "Collateral"). The Collateral shall have no permitted encumbrances except as may be specifically agreed to by Lender in its sole discretion. |
| Collateral Administration Fee: | Borrower will pay a Collateral Administration Fee in the amount of $5,000 per month throughout the term of the Interim Financing and Loan. |
| DIP Provisions: | Borrower shall file or have filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") and obtain (a) an order of the United States Bankruptcy Court (the "Interim Order" and the date upon which such Interim Order is entered shall be the "DIP Funding Date") approving the Interim Financing and Loan on an emergency interim basis, which Interim Order shall not have been reversed, modified, amended, stayed or vacated and (b) obtain within thirty (30) days after the entry of the DIP Funding Date a "Final Order" of the Bankruptcy Court approving the Interim Financing and Loan on a final basis, which Final Order shall not have been reversed, modified, amended, stayed or vacated. The Interim and Final Orders shall provide that the Interim Financing and Loan shall be secured by super-priority administrative claims under Section 364(c)(1) of the Bankruptcy Code and secured by a super-priority first lien on all now owned or hereafter acquired assets and property of the Borrower's estate (as defined by the Bankruptcy Code) pursuant to Sections 364(c)(2), and (c)(3) and 364(d) of the Bankruptcy Code (subject only to such "carve-outs" for professional fees and other administrative expenses as agreed to by Lender). The Interim and Final Orders shall, at a minimum, contain provisions granting all such senior and |

Page 4

| | |
|---|---|
| | priming liens and claims to Lender for all monies actually advanced even if such Interim and Final Orders are subsequently vacated, modified or set aside and providing for the lifting of the 362 automatic stay and any other stay to permit Lender to immediately realize upon the Collateral should any event of default remain uncured after the expiration of any applicable grace period. All liens and claims granted to Lender shall have cross default and cross collateral provisions. |
| Other Conditions Precedent: | Standard for loans and customary for transactions of this type to Lender's sole satisfaction, including but not limited to the following:<br><br>Lender's completion of due diligence to its satisfaction; Lender's due diligence will include, but not be limited to, review of interim financial statements and documentation, appraisals and Phase I reports on the Borrower's real estate, appropriate insurance coverage, examination of accounts receivable and inventory, etc., and additional due diligence related to the Borrower's business, industry, legal, environmental and technical related matters<br><br>Completion of legal due diligence investigation by the Lender's counsel, with results satisfactory to the Lender and its counsel<br><br>Intercreditor and subordination agreements with existing creditors holding funded debt acceptable to the Lender<br><br>Formal forbearance and intercreditor agreement or other resolution to Lender's satisfaction or waiver of this condition by Lender in its sole discretion<br><br>Receipt by the Lender of final 2009 budget and business plan from the Borrower satisfactory to the Lender in both form and substance. Deviations of actual expenditures from budget of greater than 10% will not be allowed absent prior written consent of Lender.<br><br>Borrower shall have executed and delivered such documents and instruments as are customary in connection with DIP financing and such other documentation required by and acceptable to Lender and its counsel including, without limitation, a release of all claims through the time of funding, and Borrower shall fully cooperate in the recordation of any liens or documents as required to perfect the Lender's liens and claims<br><br>Reasonable and customary opinions of counsel to the Borrower as to the transactions contemplated hereby which opinions are satisfactory to the Lender |

Daufuskie Term Sheet                                                                              Daufuskie.doc

Page 5

Corporate resolutions, certificates and other documents as the Lender shall reasonably request

All necessary consents and approvals to the financing shall have been obtained

The Lender must be satisfied that any financial statements delivered to it fairly present the business and financial condition of the Borrower and its subsidiaries

No material misstatements in or omissions from the materials previously furnished to the Lender for its review

No previously undisclosed intercompany transactions shall have occurred

The absence of any litigation or other proceeding the result of which might have a material adverse effect on the Borrower and its affiliates and subsidiaries other than the disclosure of the Melrose Club lis pendens that has been filed.

The absence of any default of any material contract or agreement of the Borrower

The proposed financing is subject to the condition that no material changes in governmental regulations or policies affecting the Borrower or the Lender involved in this transaction occur prior to the Closing Date

Borrower shall be in good standing in its state of incorporation and qualified to do business in other states in which Collateral is located

All liens and claims granted to Lender in connection with the Interim Financing and Loan shall be priming, first priority liens and claims, and all existing liens, contract rights, rights of redemption, and all existing third party and Borrower (and its affiliates and subsidiaries) rights and obligations of any type (including specifically the rights claimed in the Melrose Club litigation) shall be subordinate to the liens, claims and interests of Lender.

All DIP Financing motions, orders and bankruptcy court documentation shall be acceptable in form and substance to Lender.

Until all Borrower obligations are paid in full to Lender, Borrower shall provide to Lender not less than two business days notice of any filings made in the bankruptcy case(s) of Borrower, its subsidiaries and affiliates. Lender shall be

Page 6

|  |  |
|---|---|
|  | given not less than five business days notice of any hearing regarding the DIP Financing. |
|  | Such other conditions precedent as the Lender may require in its discretion. |
| Collateral Monitoring | Ongoing Collateral monitoring; Lender shall have customary rights to enter the premises, interview employees, examine books and records, etc., with reasonable notice to the Borrower. The Borrower shall provide Lender with all reports provided to any third party as well as such financial reports as Lender may request on a periodic basis. |
| Guarantees: | The Facilities shall be jointly and severally guaranteed by all of the Borrower's existing and future subsidiaries and affiliates |
| Marcus & Millichap: | Borrower recognizes that Marcus & Millichap consulted on this transaction and upon Final Order approved by the Bankruptcy Court, Borrower shall pay Marcus & Millichap a fee of 2% of the Loan Amount. Borrower represents and warrants that no other broker has been used in this transaction |
| Representations and Warranties: | Customary for transactions of this nature |
| Covenants: | Definitive documentation to contain affirmative and negative covenants acceptable to Lender and customary for transactions of this type including but not limited to: |

1. Loan to value at funding
2. Limitations on capital expenditures
3. Limitations on additional indebtedness
4. Restricted payments and related party transactions prohibited without Lender's consent
5. Restriction on the Borrower's ability to transfer or sell assets without Lender's consent (including pursuant to sale/leaseback transactions), unless required by the Noteholders in conjunction with their consent to this Financing, with such proceeds used first to repay the Lender
6. Limitation on incurrence of liens subject to Lender's reasonable consent
7. Restriction on subsidiaries' ability to issue or sell capital stock
8. Restriction on the Borrower's ability to consolidate, merge or transfer all or substantially all of assets and the assets of its subsidiaries or affiliates
9. Annual budget and business plan must be submitted to Lender at least 5 business days prior to closing and shall

Page 7

             be reasonably satisfactory to the Lender in both form and substance
          10. Maintain adequate insurance coverage satisfactory to Lender in its sole discretion
          11. Annual updates to real estate and personal property appraisals demonstrating 2.5x coverage

Events of Default:  Customary for transactions of this nature and such other Events of Default Lender requires in its sole discretion

Expenses and Indemnification:  Lender shall be reimbursed for all direct and indirect costs, fees, and expenses, which shall be paid by Borrower.

            Indemnification provisions customary for transactions will be provided for in the definitive documentation

By signing this letter, both parties acknowledge that: (i) this letter is not a binding commitment on the part of any person to provide or arrange for financing on the terms and conditions set forth herein or otherwise; (ii) any such commitment on the part of the Lender would be in a separate written instrument signed by the Lender following satisfactory completion of the Lender's due diligence, internal review and approval process, including reapproval by the Lender's executive management (which approvals have not yet been sought or obtained); (iii) this letter supersedes any and all discussions and understandings, written or oral, between or among the Lender and any other person as to the subject matter hereof; and (iv) the Lender may, at any level of its approval process, decline any further consideration of the proposed financing and terminate its approval process. Under no circumstances would the Lender or any of its affiliates be liable for any punitive, exemplary, consequential or indirect damages which may be alleged to result from this letter, or the proposed financing or any other related financing.

To confirm your desire that the Lender continue its due diligence process which could lead us to seek approval for the above proposed transaction, time being of the essence, please execute and return this letter by 5:00 p.m. Dallas time on February 27th, 2009 along with the initial Expense Deposit (this Summary of Principal Terms and Conditions will expire on such date if not accepted by then).

Petrus Private Investments, L.P.

By Perot Investments, Inc., its General Partner

By: _____
Name:
Title:

Agreed and Accepted this 21 day of FEBRUARY, 2009.

Daufuskie Island Properties, LLC (on behalf of itself, its subsidiaries and affiliates)

By: *[signature]*
Name: William R. Dixon Jr.
Title: A Manager

Daufuskie Term Sheet                    Daufuskie.doc

**DAUFUSKIE ISLAND PROPERTIES, LLC**  **BUDGET**

| RESIDUAL/ANTICIPATED | FEB | MAR |
|---|---:|---:|
| **BEGINNING CASH BALANCE** | 55,000 | (324,075) |
| **RECEIPTS FROM SALES** | | |
|     Beach Club Restaurant | 0 | 77,645 |
|     Bloody Point Golf Course | 0 | 0 |
|     Bloody Point Restaurant | 0 | 0 |
|     Common Area Maintenance | 0 | 0 |
|     Cottage Cart Rentals | 0 | 0 |
|     Breathe Spa | 200 | 500 |
|     Residence Club/POA Fees | 2,700 | 4,015 |
|     Old Accounts Receivable | 2,000 | 6,500 |
|     Jacks Restaurant | 0 | 3,340 |
|     Melrose Golf Course | 17,000 | 44,000 |
|     Melrose Inn | 1,200 | 6,600 |
|     Melrose Restaurant | 4,400 | 14,400 |
|     DI Club & Resort Membership | 14,500 | 4,000 |
|     Lot Sales | 0 | 43,000 |
|     Rental Management Access Fees | 0 | 0 |
|       TOTAL SALES RECEIPTS | 42,000 | 204,000 |
| **RECEIPTS FROM LEASES** | | |
|     Daufuskie Ferry Co. - Clipper 1 | 0 | 0 |
|     Daufuskie Ferry Co. - DI3 | 0 | 0 |
|     Daufuskie Ferry Co. - Melrose | 1,500 | 1,500 |
|     Daufuskie Ferry Co. - Salty Fare | 2,500 | 2,500 |
|     Daufuskie Ferry Co. - Swift Cat | 0 | 0 |
|     Daufuskie Stables, LLC | 0 | 0 |
|     DIRR - Jack's Office | 0 | 300 |
|     DIRR - Melrose Inn Office | 0 | 200 |
|     DIRR - Savannah Office | 0 | 1,800 |
|     Rockby Inc Employee Housing | 850 | 850 |
|     Hilton Head Rentals & Golf | 400 | 380 |
|     Island Management, Inc. (1) | 300 | 300 |
|     Island Management, Inc. (2) | 1,650 | 1,670 |
|     JJK Realty Assoc., LLC - Maint. | 1,000 | 1,000 |
|     JJK Realty Assoc., LLC - Trans. | 0 | 15,000 |
|     Triune Corporation | 1,300 | 1,300 |
|       TOTAL LEASE RECEIPTS | 9,500 | 26,800 |
| **RECEIPTS FROM DIP LOAN** | 0 | 750,000 |
| **CASH AVAILABLE FOR EXPENSES** | 106,500 | 656,725 |

**DAUFUSKIE ISLAND PROPERTIES, LLC**                                                                    **BUDGET**

**DISBURSEMENTS**

| | | |
|---|---:|---:|
| Advertising | 0 | 0 |
| Auto & Truck | 500 | 500 |
| Capital Expense: Seawall | 42,500 | 0 |
| Capital Expense: Cottages | 2,500 | 2,500 |
| Continuing Education | 0 | 0 |
| Contract Services | 31,000 | 62,000 |
| Credit Card Fees | 2,000 | 4,000 |
| Data Processing (NCM, Opera) | 7,550 | 7,550 |
| Development Expenses | 21,890 | 21,890 |
| DIP Loan Commitment Fees | 0 | 150,000 |
| DIP Loan Due Diligent Fees | 0 | 75,000 |
| DIP Loan Collateral Admin Fees | 0 | 5,000 |
| Equipment Rentals | 0 | 4,500 |
| Ferry Tickets (Employees/Members) | 25,500 | 25,500 |
| Insurance - Business | 0 | 71,800 |
| Insurance - Employee | 27,000 | 26,970 |
| Interest (AFG) | 50,000 | 50,000 |
| Interest (Beachfirst) | 0 | 0 |
| Interest (DIP Loan) | 0 | 0 |
| Inventory Purchases | 4,000 | 4,000 |
| Lease Expense | 18,800 | 18,800 |
| Management Fees | 12,875 | 12,875 |
| Office Expense | 500 | 1,000 |
| Professional Fees | 15,000 | 30,000 |
| Repairs & Maintenance | 1,270 | 2,300 |
| Salaries - Employees | 0 | 58,650 |
| Subcontracts | 7,500 | 15,000 |
| Taxes - Hospitality | 2,900 | 2,905 |
| Taxes - License | 7,500 | 0 |
| Taxes - Payroll | 0 | 6,300 |
| Taxes - Property | 0 | 0 |
| Taxes - Sales | 10,160 | 10,160 |
| Telephone | 38,300 | 38,300 |
| Transportation (Guests, Employees) | 0 | 2,500 |
| Travel | 1,200 | 2,000 |
| Uniforms | 0 | 0 |
| US Trustee Fees | 0 | 4,300 |
| Utilities | 100,130 | 25,000 |
| **TOTAL DISBURSEMENTS** | 430,575 | 741,300 |

**ENDING CASH BALANCE**                                             (324,075)                     (84,575)

090226A