# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re:<br><br>Daufuskie Island Properties, LLC a/k/a<br>Daufuskie Island Resort & Breathe Spa,<br><br>          Debtor. | Case No.  09-00389-jw<br><br>Chapter 11 |

TO:    All Creditors and Parties in Interest

## NOTICE OF (1) SALE OF SUBSTANTIALLY ALL ASSETS OF THE ESTATE FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, (2) ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED EXECUTORY CONTRACTS AND LEASES, AND (3) HEARING ON THE SALE

YOU ARE HEREBY NOTIFIED that Robert C. Onorato, Trustee (the "Trustee") for the Chapter 11 bankruptcy estate (the "Estate") of Daufuskie Island Properties, LLC (the "Debtor") has filed a Motion and Memorandum for an Order (1) Authorizing the Sale of Substantially All Assets of the Estate Free and Clear of Liens, Claims, Encumbrances and Other Interests, and (2) Approving the Assumption and Assignment of Certain Unexpired Executory Contracts and Leases (the "Sale Motion") seeking authorization pursuant to 11 U.S.C. §§ 363(b)(1) and (f), Rule 6004 of the Federal Rules of Bankruptcy Procedure ("Rule 6004") and SCLBR 6004-1, to sell substantially all assets of the Estate as described below, free and clear of all liens, claims encumbrances and other interests, except for Assumed Liabilities and Permitted Encumbrances (as defined in the Asset Purchase Agreement), according to the terms and conditions stated below; and seeking authorization, as part of the sale, to assume and assign certain unexpired executory contracts and leases to the Buyer pursuant to 11 U.S.C. §§ 365(a), (b), and (f), and Rule 6006 of the Federal Rules of Bankruptcy Procedure ("Rule 6006").

TAKE FURTHER NOTICE that any response, return and/or objection to this Notice and Application, should be filed with the Clerk of Bankruptcy Court no later than twenty (20) days from service of this Notice  and a copy simultaneously served on all parties in interest.

TAKE FURTHER NOTICE that a hearing will be held on the sale proposed in the Sale Motion and in this Notice on **October 28, 2009 at 10:00 a.m., in the courtroom of the Beaufort Federal Building, located at 1501 Bay Street, Beaufort, South Carolina 29902.**

TYPE OF SALE:  Private Sale.

PROPERTY TO BE SOLD: The real property, improvements, furnishings, fixtures, equipment, and other personal property owned by the Estate generally comprising resort and development property on Melrose Plantation and the Bloody Point area of Daufuskie Island, South Carolina (collectively, the "Assets"), including the Melrose Inn, the Island Conference Center, the

Melrose Golf Course, the Melrose Beach Club, beach cottages, undeveloped land, employee housing, maintenance and repair buildings, the Bloody Point Golf Course, Melrose Landing, and related assets. In addition, the sale includes the Eigelberger tract, which is owned by Eprop, LLC, an entity wholly-owned by the Estate.

PRICE: $49.5 million; provided, however, that the sale to the Buyer identified in this Notice is subject to higher or otherwise better offers, on substantially similar terms.

The Trustee has filed a motion, and submitted a proposed order, to establish bidding procedures for competing offers for the Assets, and to establish bid protections for the proposed buyer, as the "Stalking Horse Bidder". A copy of the motion is simultaneously mailed with this Notice.

APPRAISAL VALUE: The Trustee does not have a current appraisal on the Assets but believes that the process by which the Assets are being sold will provide true fair market value for the Assets.

BUYER: Montauk Resorts, LLC or its assignee.

PLACE AND TIME OF SALE: If a Qualified Competing Bid is received in compliance with the bidding procedures established by the Court (the Trustee has filed a motion with a proposed order to establish the bidding procedures, which motion and proposed order are provided with this Notice), the Trustee will conduct an auction of the Assets among the Buyer identified in this Notice and Qualified Competing Bidders, on Monday, October 26, 2009, beginning at 11:00 a.m. at the offices of RBC Enterprises, Inc., 575 William Hilton Parkway, Hilton Head Island, South Carolina 29928.

The sale of the Assets is to be consummated as soon as possible after entry of an Order authorizing the sale.

Any party interested in making an offer for the Assets should (1) review the bidding procedures established for the sale, and (2) consult with the Trustee or the Trustee's attorney for information on the sale.

SALES AGENT/AUCTIONEER/BROKER: RBC Enterprises, Inc. has been employed as a non-exclusive broker for the sale of the property of the Estate.

COMPENSATION TO SALES AGENT/AUCTIONEER/BROKER/ETC.: Pursuant to the Order entered on May 19, 2009 authorizing the employment of RBC Enterprises, Inc. ("RBC") as a non-exclusive real estate broker for the sale of the Assets, "RBC's compensation is to be a real estate commission of three percent (3%) of the gross sale price of all sales RBC arranges, provided, however, that such compensation is subject to review by the Court in accordance with 11 U.S.C. § 330(a)." RBC arranged the sale herein, and its commission will be $1,485,000.

ESTIMATED TRUSTEE'S COMPENSATION: Based on the provisions of 11 U.S.C. § 326(a), the Trustee's compensation on the sale cannot exceed $1,485,000.

LIENS/MORTGAGES/SECURITY INTERESTS ENCUMBERING PROPERTY: (1) Unpaid ad valorem taxes are due on the property for 2008 in the approximate amount of $280,000 (the Trustee will confirm the amount and the amounts due for each of the properties); (2) Beach First National Bank ("Beach First") and Tidelands Bank jointly hold a first priority lien on all of the Assets to secure post-petition loans they made to the Trustee in the aggregate amount of $1.5 million; (3) Beach First also holds a second lien on certain real estate in Melrose Plantation and in the Bloody Point area, more particularly described in the Sale Motion, and including the Melrose Beach Club, various beach cottages, various lots and undeveloped property, securing a claim in the amount of $6,417,614.42, as of March 19, 2009; (4) AFG, LLC holds a second lien on real property and improvements in Melrose Plantation, including the Melrose Inn, the Melrose Golf Course, the Island Conference Center, the equestrian center, the tennis courts and the tennis villa area, the maintenance area, the employee/staff housing, a concrete plant, various undeveloped properties, and the Debtor's accounts receivable, inventory (e.g., pro shop inventory) and other personalty, to secure a claim in the principal amount of $4 million; (5) Carolina Shores, LLC holds a lien on a substantial portion of the Melrose Plantation property, including the Melrose Inn, the Island Conference Center, the Melrose Golf Course, the equestrian center, the tennis courts and tennis villa area, certain beach cottages, the Melrose maintenance area, and undeveloped land, securing a claim in the amount of $27,750,128.51; (6) William R. Dixon, Jr. asserts a mortgage on the property owned by the Estate in Melrose Plantation, to secure a claim in the filed amount of $34,692,660.58, which claim is disputed; (7) CS Eigelberger, LLC (successor to CSE Mortgage, LLC), holds a first mortgage on the Eigelberger tract owned in the name of Eprop, LLC, securing a claim of $9,119,560.26, plus interest and attorneys fees and costs; (8) The Greenery, Inc. filed a mechanic's lien notice on a portion of the Melrose property prior to the filing of the bankruptcy case, for a claim of $308,813.86; (9) Coastal Connections, Inc. filed a mechanic's lien notice on a portion of the Melrose property prior to the filing of the bankruptcy case, for a claim of $62,883.00; and (10) The Melrose Club, Inc. ("MCI") asserts rights and an interest in the Melrose property under a certain Transfer Agreement executed when it sold the property on or about December 26, 1996, and pursuant to a Memorandum of Agreement recorded in Beaufort County, South Carolina for the Transfer Agreement, for an undetermined amount and/or effect, which asserted rights and interest is disputed (though the Trustee is attempting to address and resolve the concerns of MCI with respect to the Assets).

**Note:** The listing of secured claims and amounts claimed due should not be construed as an acknowledgement or stipulation by the Trustee as to the validity, priority or amounts due to the listed claimants.

DEBTOR'S EXEMPTION: Not Applicable

PROCEEDS ESTIMATED TO BE PAID TO ESTATE: The terms of this proposed sale provide that a total of $10 million will be set aside from the sale proceeds for unsecured creditors (both priority and non-priority unsecured creditors), from (a) unencumbered proceeds from property with equity, and (b) from sale proceeds of encumbered property (the "Carve-Out"), in an amount determined by the amount of unencumbered sale proceeds. The set aside and Carve-Out provisions are stated in the Sale Motion. It also should be noted that, if the Trustee and MCI reach a settlement which provides for payment to MCI, that payment will come from the $10 million.

STAY OF ORDER:  The Trustee requests that the Court order that the automatic 10-day stay under Rule 6004(h) an d the 10-day stay under Rule 6006(d) shall not apply to the Order authorizing the sale and approving the assumption and assignment of certain unexpired executory contracts and leases.

The Trustee is informed and believes that this proposed sale is in the best interest of the Estate.  Reference should be made to the Sale Motion, and the Asset Purchase Agreement filed as Exhibit A to the Sale Motion, for further information on the terms of the sale.

It should be noted that the APA is not attached to the Sale Motion due to its length, which totals over 100 pages with schedules and exhibits.  The APA is on file with the Court (as a filed attachment to the Sale Motion), and may be accessed through the Court's electronic filing system (ECF).  Any party that would like a copy of the APA and is unable to obtain it through ECF should contact the Trustee's attorneys for a copy of the document.

Reference also should be made to the bidding procedures established for this sale for the manner in which competing offers for the Assets may be made, and the Auction is to be conducted.

The Trustee may seek appropriate sanctions or other similar relief against any party filing a spurious objection to this Notice.

WHEREFORE, The Trustee requests the Court issue an order authorizing sale of said property, and granting such other and further relief as the Court may deem just and proper.

/s/ Julio E. Mendoza, Jr.
Julio E. Mendoza, Jr., Fed ID No. 3365
NEXSEN PRUET, LLC
1230 Main Street, Suite 700 (29201)
Post Office Drawer 2426
Columbia, South Carolina 29202
Phone: (803) 54-2026
Facsimile: (803) 727-1478
E-mail:  rmendoza@nexsenpruet.com

Attorneys for Robert C. Onorato, Trustee for the Chapter 11 Bankruptcy Estate of  Daufuskie Island Properties, LLC, a/k/a Daufuskie Island Resort & Breathe Spa

Columbia, South Carolina
September 15, 2009

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re: | Case No. 09−00389−jw |
| Daufuskie Island Properties, LLC, a/k/a Daufuskie Island Resort & Breathe Spa, Debtor. | Chapter 11 |

## MOTION AND MEMORANDUM FOR AN ORDER (1) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE ESTATE FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, AND (2) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED EXECUTORY CONTRACTS AND LEASES

Robert C. Onorato, as Trustee (the "Trustee") for the Chapter 11 bankruptcy estate (the "Estate") of Daufuskie Island Properties, LLC (the "Debtor"), hereby moves (the "Motion") (1) pursuant to 11 U.S.C. §§ 363(b)(1) and (f), Rule 6004 of the Federal Rules of Bankruptcy Procedure ("Rule 6004")[1] and SC LBR 6004-1 for authorization to sell substantially all assets of the Estate, as more fully described below, to Montauk Resorts, LLC or its assignee (hereinafter, the "Buyer" or "Montauk"), for the total price of $49.5 million, and (2) pursuant to 11 U.S.C. §§ 365(a) and (f)  and Rule 6006, as part of the sale, for approval of the assumption and assignment of certain unexpired executory contracts and leases.  A copy of the Asset Purchase Agreement ("APA") for this proposed sale has been filed with the Court as Exhibit A to this Motion.[2]  The sale shall

---

[1] Hereinafter, references to the Federal Rules of Bankruptcy Procedure shall be made as "Rule ___."

[2] The APA is not attached to this Motion due to its length, which totals over 100 pages with schedules and exhibits.  The APA is on file with the Court, and may be accessed through the Court's electronic filing system (ECF).  Any party that would like a copy of the APA and is unable to obtain it through ECF should contact the Trustee's attorneys for a copy of the document.

be free and clear of all liens, claims, encumbrances and other interests pursuant to 11 U.S.C. § 363(f), except for the Assumed Liabilities and Permitted Encumbrances (both as defined in the APA). As part of this Motion, the Trustee also requests that the Court find that the Buyer is a good faith purchaser entitled to the protections of 11 U.S.C. § 363(m), and that the Court order that the ten day stay provisions of Rule 6004(h) and Rule 6006(d) shall not apply to the order authorizing the sale and approving the assumption and assignment of executory contracts and leases.

This proposed sale is subject to higher or otherwise better offers, on substantially similar terms, such that if a higher or better offer is received for the assets, the Trustee will be authorized to sell the assets to that offeror. In conjunction with this Motion, the Trustee is filing a motion seeking to establish sale procedures for possible competing bids for the assets, and bid protections for Montauk as the initial contract party (the "Stalking Horse Bidder", and its proposed purchase, the "Stalking Horse Bid").

In support of the Motion, the Trustee would show to the Court that:

## I. **JURISDICTION AND VENUE**

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b), and Local Civil Rule 83.IX.01, D.S.C. This Motion is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(N) and (O).

2.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. **BACKGROUND**

### A. The Bankruptcy Case

3.      On January 20, 2009, the Debtor filed its petition for relief under Chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101, et seq., the "Bankruptcy

Code"). The Debtor operated as a Chapter 11 debtor-in-possession until the Trustee's appointment in this case.

4.     On March 17, 2009, the Court entered its Order Granting Joint Motion for Appointment of Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104, granting the joint motion of the Official Committee of Unsecured Creditors (the "Committee"), Beach First National Bank ("Beach First") and AFG, LLC ("AFG") for the appointment of a trustee in this case. Thereafter, on March 23, 2009, the Court entered its Order Approving Appointment of Trustee, approving the United States Trustee's appointment of Robert C. Onorato as Trustee for the Debtor's Chapter 11 estate.

5.     Since his appointment, the Trustee has been working to arrange a sale of assets to provide a source of payment for the Debtor's creditors. Although the Trustee seeks authorization for the proposed sale of assets through this Motion, the Trustee will also file a Chapter 11 plan which provides for the sale and an accompanying disclosure statement. The Trustee was not in a position to file a plan prior to his receipt of the Stalking Horse Bid, and due to limited funding available to the Trustee to maintain the property of the Estate, the Trustee cannot delay the sale for the period of time that would normally be required for confirmation of a Chapter 11 plan. However, the Trustee will file the plan and the disclosure statement prior to the hearing on the sale.

B. The Assets of the Estate

6.     The assets of the Estate generally consist of resort facilities, lodging and development property located on Daufuskie Island, South Carolina, primarily in the Melrose Planned Unit Development (the "Melrose Property") and in the Bloody Point Planned Unit Development (the "Bloody Point Property"). In addition, the Estate owns

the Eigelberger tract of real property by and through the Estate's ownership of Eprop, LLC, which holds title to the Eigelberger tract.

7.    More specifically, the assets of the Estate include the following:

(a)    <u>The Melrose Property</u>.  The Melrose Property includes 668 acres, a golf course, a beach club, an oceanfront inn, a conference facility, cottages, 237 approved development units, and 79 unassigned development units.

- The Melrose Golf Course is an 18-hole championship course designed by Jack Nicklaus with clubhouse facilities, which include a restaurant.

- The Melrose Inn is located oceanfront, and has 52 deluxe guest rooms and a fine dining restaurant.

- The Island House Conference Center is a 12,000 square foot facility designed for business conferences and meetings and social functions, and includes a recently updated commercial kitchen.

- The Beach Club site includes an oceanfront pool and restaurant, and approval for 56 development units.

- The Equestrian Center is on a 16-acre parcel of property, and it has full service stables, green pastures encircled by rail fences and the Sportsman's Lounge Pub.

- The facilities on the Melrose Property include administration (maintenance, gas, garbage) and employee housing buildings.  The engineering building is 6,240 square feet; the repair shop is 5,170 square feet; and the supply warehouse is 4,365 square feet.  There are eleven 1,590 square foot staff housing units.

- The Silver Dew Land parcel has approval for 25 development sites.

- Parcel C consists of 9.8 acres and has approval for 14 development sites.

- Easter Beach Village provides golf view sites with approval for 40 second-row oceanfront development units.

- The Melrose Tennis Center was designed by Stan Smith, and includes tennis courts and a full-service pro shop.

4

- The Tennis Villa parcel is adjacent to the Melrose Tennis Center and has approval for 30 development units.

- The Inn Expansion South parcel is four oceanfront acres with approval for 36 development units.

- The Inn Expansion North parcel is also four oceanfront acres with approval for 36 development units.

- The Estate owns four 4-bedroom oceanfront cottages, and one 2-bedroom oceanfront cottage.

- The Estate owns five 4-bedroom second row oceanfront cottages.

(b)    <u>Melrose Landing</u>.  The Melrose Landing is the site of the dock and landing area for Melrose and Bloody Point residents and guests arriving on and departing from Daufuskie Island.  It includes four acres on the Intracoastal Waterway (Cooper River), with approval for 30 development units and 10,000 square feet of commercial space.

(c)    <u>The Bloody Point Property</u>.  The Bloody Point Property owned by the Estate consists of an 18-hole golf course and clubhouse facility, a spa, and two lots.

- The Bloody Point Golf Course was designed by Tom Weiskopf and Jay Moorish.  The clubhouse includes a spa and a restaurant.

- The lots are part of an 8.8 acre parcel of oceanfront land between the beach and the clubhouse.  The lots would be second-row homesites.

(d)    <u>The Eigelberger Tract</u>.  The Eigelberger Tract consists of 199.28 acres of land on the southern end of Daufuskie Island, adjacent to the Bloody Point Property, on Mungen Creek.  It has deep water access lots.  It is not yet developed.  The Debtor previously owned this property but transferred it to Eprop, LLC, which is wholly-owned by the Estate, for the purpose of obtaining a loan secured by a mortgage on the property.

8.    In addition to the real property, the Estate owns furniture, fixtures, equipment, vehicles, boats, and other personalty used in operating the Debtor's resort and development business. These assets are listed in the schedules filed by the Debtor in this case.

9.    The assets of the Estate also include certain causes of action that are not included in, but are expressly excepted from, the sale. These causes of action include preference avoidance actions, and possible claims against persons for matters occurring

C. Summary of Debt

10.    The aggregate amount of the secured claims asserted against the Estate exceeds the sale price of the assets. In addition, substantial administrative priority claims have been incurred to date in this case, and will continue to be incurred until the resolution of this case. Other priority claims may exist, and the schedules filed by the Debtor at the beginning of the case indicate that non-priority unsecured claims in the case are likely to total more than $16 million. Nonetheless, this sale is in the best interest of the Estate, it will provide for payment of priority claims, and it will provide for a partial payment of non-priority unsecured claims.

11.    The secured claims against the Estate are as follows:[3]

(a)    Beach First and Tidelands Bank, by way of a participation loan, hold first priority security interests in and liens on all assets of the Estate for post-petition

---

[3] With the exception of the property securing the post-petition loans made by Beach First and Tidelands Bank, the identification of the property securing each of the secured claims is taken from the amended schedules filed by the Debtor on March 6, 2009. The Trustee will verify the correctness of the property on which each secured claim is asserted, but he is informed and believes that the identification of collateral in the amended schedules filed by the Debtor is reasonably accurate.

loans they made to the Trustee in the principal amount of $1.5 million, pursuant to the

Court's Orders entered on April 24, 2009, May 8, 2009, July 17, 2009 and July 29, 2009.

(b)     Beach First filed a claim [Claim No. 152 on the Claims Register]

in the amount of $6,417,614.42, as of March 19, 2009, secured by a second mortgage[4] on:

(i)     the two Bloody Point lots owned by the Estate, identified as Lots 50 and 51 of Phase 1 of Daufuskie Island Club;

(ii)     5.83 acres comprising the Melrose Beach Club parcel, including Beach Cottage 4160 located at 175 Avenue of Oaks, Beach Cottage 4170 located at 177 Avenue of Oaks, Beach Cottage 4180 at 179 Avenue of Oaks and Beach Cottage 4190, all of which cottages are located on part of the Melrose Beach Club parcel;

(iii)     5.01 acres comprising Parcel 81 on the subdivision of Beach Cottages nos. 81, 91 and 97 (Plat 123/164) (includes the beach cottages listed below located at 81, 83, 91, 93, 97 and 99 Avenue of Oaks);

(iv)     5.07 acres comprising Parcel 102 on subdivision of Beach Cottages nos. 102, 106 and 110 (includes the beach cottages located at 102, 104, 106, 108 and 110 Avenue of Oaks); and

(v)     Beach Cottage 3000-3001 located at 60 Avenue of Oaks (a/k/a Tract A, Lot 60), Beach Cottage 3050-3051 located at 62 Avenue of Oaks (a/k/a Tract B, Lot 62), Beach Cottage 3052-3053 located at 64 Avenue of Oaks (a/k/a Tract C, Lot 64), Beach Cottage 3100-3101 located at 66 Avenue of Oaks, Beach Cottage 3102-3103 located at 68 Avenue of Oaks, Beach Cottage 3500-3501 located at 102 Avenue of Oaks (a/k/a Lot K, Plat 124/31),  Beach Cottage 3502-3503 located at 104 Avenue of Oaks, Beach Cottage 3550-3551 located at 106 Avenue of Oaks (a/k/a Lot L, Plat 124/31), Beach Cottage 3552-3553 located at 108 Avenue of Oaks, Beach Cottage 4750-4751 located at 99 Avenue of Oaks,  Beach Cottage 4752-4753 located at 97 Avenue of Oaks, Beach Cottage 4900-4901 located at 93 Avenue of Oaks, Beach Cottage 4902-4903 located at 91 Avenue of Oaks, Beach Cottage 4950-4951 located at 83 Avenue of Oaks, and Beach Cottage 4952-4953 located at 81 Avenue of Oaks,  all of which cottages are located on the Melrose Property.

(c)     AFG filed a claim [Claim No. 203 on the Claims Register] in the

principal amount of $4 million, secured by (i) a second mortgage[5] on (A) 300 acres

---

[4] This mortgage was a first mortgage on the property at the filing of this case, but it is now a second mortgage by virtue of the first priority lien granted to Beach First and Tidelands Bank to secure the post-petition loans they made to the Trustee.

comprising a substantial portion of Melrose Plantation, including the Melrose Inn, the Island House Conference Center, the Melrose Golf Course (with the clubhouse and related facilities), the equestrian center, the tennis courts and the tennis villa area; (B) 7.362 acres comprising the Melrose Maintenance Area (maintenance buildings, warehouse, gasoline facilities, repair area); (C) 7.26 acres which includes the site on which the staff/employee housing is located, a concrete plant, and a residual area of property, with an access and utility easement; and (D) vacant land in the second row development parcel where Beach Cottages 5501 through 5601 would be constructed (sometimes referred to as the "Village Area") on the Melrose Property;  and (ii) by a security interest in and lien on the Debtor's accounts receivable, inventory (e.g., pro shop inventory), and other personalty.

(d)    Carolina Shores, LLC ("Carolina Shores") filed a claim [Claim No. 117 on the Claims Register] in the amount of $27,750,128.51, secured by a mortgage on (i) 300 acres comprising a substantial portion of Melrose Plantation, including the Melrose Inn, the Island House Conference Center, the Melrose Golf Course (with clubhouse and related facilities), the equestrian center, the tennis courts and the tennis villa area; (ii) Beach Cottage 5501 located at 14 Avenue of Oaks and Beach Cottage 5601 located at 15 Avenue of Oaks; (iii) 7.362 acres comprising the Melrose Maintenance Area (maintenance buildings, warehouse, gasoline facilities, repair area); and (iv) vacant land in the second row development parcel where Beach Cottages 5501 through 5601 would be constructed (sometimes referred to as the "Village Area") on the Melrose

---

[5] This mortgage was a first mortgage on the property at the filing of this case, but is now a second mortgage by virtue of the first priority lien granted to Beach First and Tidelands Bank to secure the post-petition loans they made to the Trustee.

Property. The Trustee is informed and believes that the principal amount due in this claim is approximately $14.2 million.

(e)     William R. Dixon, Jr. ("Bill Dixon") filed a claim [Claim No. 116 on the Claims Register] in the amount of $34,692,660.58, secured by a mortgage on the portions of the Melrose Property still owned by the Estate.   This secured claim is disputed. The Trustee has filed an adversary proceeding [Adversary Proceeding No. 09-80120-jw] to avoid the mortgage, security interest, assignment and lien asserted by Bill Dixon on the assets as an avoidable preference pursuant to 11 U.S.C. § 547(b).   In addition, Carolina Shores has filed an adversary proceeding against Bill Dixon and the Estate [Adversary Proceeding No. 09-80134-jw] alleging that Bill Dixon's mortgage, security interest, assignment and lien should be subordinated to Carolina Shores' mortgage and lien. The Trustee is informed and believes that other grounds also exist upon which to contest Bill Dixon's claim.

(f)     CS Eigelberger, LLC (successor to CSE Mortgage, LLC) ("CSE") filed a claim [Claim No. 211 on the Claims Register] in the amount of $9,119,560.26, plus interest and attorneys fees and costs, upon the Debtor's guaranty of the loan CSE made to Eprop, LLC.   The CSE loan is secured by a first mortgage, security interest, assignment and lien on the Eigelberger tract of property.

(g)     The Greenery, Inc. filed a claim [Claim No. 132 on the Claims Register] in the amount of $308,813.86, secured by a mechanic's lien on certain parcels of the Melrose Property. The Trustee is informed and believes that this claim is actually unsecured, after deducting the senior liens on the property on which it is filed.

(h)    Coastal Connections, Inc. asserts a claim [see Schedule D filed by the Debtor on March 6, 2009] in the amount of $62,883.00, secured by a mechanic's lien on a certain parcel of the Melrose Property. The Trustee is informed and believes that this claim is actually unsecured, after deducting the senior liens on the property on which it is filed.

(i)    The 2008 ad valorem taxes for the property owned by the Estate have not been paid, and must be paid from the sale of the property. The Trustee is informed and believes that the aggregate amount of the property taxes is approximately $280,000.00. The Trustee is obtaining a breakout of the amounts due on each of the properties, and the tax due on each property shall be paid from the sale proceeds of that property.

12.    The administrative priority claims in this case will be substantial in amount. It appears that from the filing of the case through the date of the Trustee's appointment, large expenses were incurred by the Estate but not paid, including operating expenses, lease payments, professional fees, and other expenses associated with the Debtor's business and ownership of property. In addition, the Trustee's attorneys have invested substantial time and cost advances in this case, and they continue to spend considerable time in the matters necessary for this case; the Trustee also will be due compensation, pursuant to 11 U.S.C. § 326; the real estate broker employed by the Trustee for the sale of the property, RBC Enterprises, Inc., will be due a commission on the sale of the property; and the Trustee anticipates that he will need to employ the services of an accountant. The Trustee has not yet had sufficient time to review the validity of many of the potential administrative claims against the Estate, and he is thus

unable to quantify them at this time. However, the Trustee is informed and believes that the administrative expenses will total over $1.5 million and could exceed $3 million.

13.     Other priority claims include pre-petition taxes owed to the South Carolina Department of Revenue, in the amount of approximately $6,200.00 [Claim No. 121 on the Claims Register], and claims asserted by various individuals, including members of the club operated by the Debtor who claim the right to recover all or a portion of the fee/deposit they made. These claims are not yet established as to validity, and therefore are not quantified.

14.     As noted above, in the schedules filed by the Debtor early in this case, the Debtor identified unsecured non-priority claims in the aggregate amount of $16,310,899.21. See Summary of Schedules and Schedule F filed by the Debtor on March 6, 2009 [Docket No. 109.] The actual amount of the unsecured non-priority debt will depend upon the allowability of claims, and the amounts of the claims of creditors who are partially secured, lease claimants, and contract claimants.

15.     At the filing of this case, the Debtor has several secured and lease creditors who have since received their collateral or leased property. These creditors include Caterpillar Financial Services, CitiCapital Commercial Leasing, Textron Business Services, Colonial Pacific Leasing Corporation and Turf Equipment Leasing Company. In addition, the Debtor owned a boat, the Swift Cat, through a wholly-owned limited liability company, Swift Cat, LLC, which was subject to the lien of Key Equipment Finance, Inc.; Key Equipment Finance, Inc. has recovered the boat (with the Trustee's consent).

D. The Melrose Club, Inc. Asserted Rights and Interest

16.    The Melrose Club, Inc. ("MCI") previously owned the 300 acres comprising a substantial portion of Melrose Plantation.   MCI sold the property to Daufuskie Club, Inc., f/k/a Melrose Management Club, Inc. ("DCI") on or about December 26, 1996.  In conjunction with the sale of the property to DCI, MCI and DCI executed that certain Transfer Agreement (the "1996 Transfer Agreement").  Based upon the provisions of the 1996 Transfer Agreement, MCI asserts that it has the right to have the Melrose Property returned to it if DCI or its successors "failed to fund Operational Deficits."  See ¶ 27 of the Amended Complaint for Declaratory Judgment filed by MCI on August 21, 2009 in Adversary Proceeding No. 09-80094-jw in this Court (the "MCI Litigation").

17.    The existence of the 1996 Transfer Agreement was stated in that certain Memorandum of Agreement filed in the RMC Office of Beaufort County, South Carolina, on December 31, 1996.  Pursuant to this recorded document, MCI maintains that its rights and interests under the 1996 Transfer Agreement are binding on and effective against subsequent owners of the transferred property (with the exception of sales made in the ordinary course of business) and the subsequent lenders taking mortgages on the property.

18.    As stated in filings in the MCI Litigation made by the Trustee, Beach First, AFG, Carolina Shores, and other named defendants, the Trustee and other named defendants deny that the rights and interest asserted by MCI under the 1996 Transfer Agreement are valid and/or effective against them or as to the Melrose Property.

Although no settlement has yet been reached, the Trustee has been working with MCI in an attempt to address and resolve MCI's concerns regarding the Melrose Property.

19.    Hearings are scheduled in the MCI Litigation on motions to dismiss and/or for summary judgment, however, it is not certain when a final determination of the rights and interest asserted by MCI will be made.

## III. PROPOSED SALE

### A. Terms of the Sale

20.    The sale to Montauk is to be made free and clear of all lien, claims, encumbrances and other interests, including the asserted rights and interest of The Melrose Club, Inc. ("MCI") under the 1996 Transfer Agreement, pursuant to 11 U.S.C. § 363(f).

21.    Pursuant to the APA, the Trustee will sell to Montauk the Melrose Property, Melrose Landing, the Bloody Point Property and the Eigelberger tract, all as generally described above on pages 4 and 5 of this Motion, together with all furnishings, fixtures, equipment, and other personalty owned by the Estate in connection with such real property, including permits, trademarks, and other items of property more fully described in the APA (collectively, the "Assets"), for the sale price of $49.5 million. Expressly excluded from the sale are all claims and rights of action the Estate may have against other parties, any tax refunds due to the Estate, cash and cash equivalents owned by the Estate, accounts receivable, any contract that is not an Assigned Contract, and any insurance policies or proceeds.

22.     Specific reference should be made to the APA, which is on file with the Court (see footnote 2, supra.), however, the terms of the APA are generally summarized as follows:

(a)     Purchase Price:  Payment of $49.5 million, and assumption of the Assumed Liabilities. [footnote:  The APA provides that the Assumed Liabilities are the obligations under the Assigned Contracts which are assumed by the Buyer.  The Assigned Contracts include equipment leases and tenant leases, but exclude any management agreements or management contracts.  Pursuant to the APA, the Buyer may elect to receive an assignment and assume contracts or leases, but is not obligated to assume them.]

(b)     Purchaser:  Montauk Resorts, LLC

(c)     Deposit:  $250,000.00, due two business days after entry of the Sale Procedures Order.[6]

(d)     (d)    Assets Being Sold:  The Assets defined in paragraph 21 above.  However, reference should be made to the APA and its schedules and exhibits for specific identification of the Assets.

(e)     Due Diligence Review Period:  The due diligence review period expires on October 24, 2009.

(f)     Closing Date:  Within ten days after satisfaction of the Conditions Precedent (as defined in the APA), and in any event no later than November 23, 2009 unless agreed by the Purchaser.

---

[6] The Sale Procedures Order is defined in the APA, inter alia, as an order establishing the bidding procedures for competitive bidding in response to the Stalking Horse Bid, with certain bid protections for the Stalking Horse Bidder.  The Trustee is filing a separate motion seeking to establish the bidding procedures and the bid protections for this sale.

(g)   Conditions Precedent:  The Conditions Precedent are set forth in Article 9 of the APA (beginning on page 31 of the APA), and are standard for a sale of this kind.  The most significant condition precedents to be satisfied by the Trustee, as Seller, are (1) the entry of an order (the "Sale Order") authorizing and providing for the sale of the Assets to the Buyer free and clear of all liens, claims, encumbrances and other interests pursuant to 11 U.S.C. §§ 363(b)(1) and (f), except for the Assumed Liabilities and the Permitted Encumbrances (as defined in the APA), and (2) the Sale Order must not be subject to invalidation by appeal at the time of the closing of the sale, which requirement the Trustee will address by asking that the Court find that the Buyer is a good faith purchaser entitled to the protections of 11 U.S.C. § 363(m).

(h)   Stalking Horse Bidder Protection – Due Diligence Reimbursement Fee:  As a provision of the APA, in consideration of Montauk making the Stalking Horse Bid, the Trustee will seek a provision in the order establishing bidding procedures and bid protections for payment of a due diligence reimbursement fee (the "Due Diligence Reimbursement Fee") to Montauk in the event that it is not ultimately deemed to be the successful bidder for the Assets and another buyer closes the purchase of the Assets.  This Due Diligence Reimbursement Fee shall not be payable if Montauk has withdrawn its Stalking Horse Bid or if it fails to close the purchase of the Assets under the APA after being determined to be the successful bidder for the Assets.  The amount of the Due Diligence Reimbursement Fee is $500,000.00 (i.e., slightly over one percent (1%) of the Stalking Horse Bid).  It shall be payable upon the closing of the sale Assets to the successful purchaser (other than Montauk).

(i)     <u>Real Estate Broker Fee</u>:   RBC Enterprises, Inc. ("RBC") is employed by the Trustee as the non-exclusive real estate broker for the sale of the Assets, pursuant to the <u>Order</u> entered on May 19, 2009.   The Order provides that, "RBC's compensation is to be a real estate commission of three percent (3%) of the gross sale price of all sales RBC arranges, provided, however, that such compensation is subject to review by the Court in accordance with 11 U.S.C. § 330(a)."

### B. The Allocation of the Sale Proceeds

23.     The Trustee is informed and believes that the sale proceeds of the Assets are properly allocated, and he proposes to allocate the sale proceeds, as follows:

**Melrose Plantation**

| | |
|---|---|
| Administration and Employee Housing | |
| (Maintenance, Gasoline Facilities, Garbage) | $400,000.00 |
| Equestrian Center and Sportsman's Lodge | $500,000.00 |
| Silver Dew Land parcel | |
| Development of 25 sites | $1,200,000.00 |
| | |
| Parcel C | |
| Development of 14 sites | $750,000.00 |
| | |
| Tennis Villa Site | |
| 30 Development Units | $1,290,000.00 |
| | |
| Melrose Inn – 52 rooms on | |
| Approximately 4 acres Oceanfront | $2,000,000.00 |
| | |
| Inn South Parcel - 4 Acres Oceanfront | |
| 36 Development Units | $2,505,000.00 |
| | |
| Inn North Parcel – 4 Acres Oceanfront | |
| 36 Development Units | $2,505,000.00 |
| | |
| Easter Beach Village – Golf View, 2nd | |
| Row Ocean, 40 Development Units | $3,000,000.00 |
| | |
| Beach Club Site – Ocean and Sound Front | |
| 56 Development Units | $7,000,000.00 |

| | |
|---|---|
| Oceanfront Cottages – four 4-bedroom Unrenovated, $625,000 each | $2,500,000.00 |
| Oceanfront Cottage – 2-bedroom | $350,000.00 |
| Second Row Cottages – five 4-bedroom | |
| Unrenovated, $500,000 each | $2,000,000.00 |
| Melrose Golf Course and Facilities | $3,000,000.00 |
| Island House Conference Center | $1,500,000.00 |
| Total | $30,500,000.00 |

**Melrose Landing**

Docks and Development Rights

| | |
|---|---|
| 30 Units – 10,000 square feet Commercial | $2,500,000.00 |

**Bloody Point**

Two 2nd Row Homesites

Bloody Point Golf Course and Facilities

Oceanfront Village, 20 Development Units

| | |
|---|---|
| Total | $2,000,000.00 |

**Eigelberger Tract**

| | |
|---|---|
| 192 Development Units | $15,000,000.00 |
| **Grand Total** | **$49,500,000.00** |

### C. Net Proceeds for Unsecured Creditors and The Carve-Out

24.    As a condition for this sale, the Trustee seeks approval requiring a net amount of $10 million for payment of unsecured creditors, including both priority and non-priority unsecured claims. This amount is to be derived from the equity in assets and

from the setting aside of a portion of the sale proceeds (the "Carve-Out") of otherwise fully encumbered assets for the benefit of the unsecured creditors (both priority and non-priority). The $10 million net amount shall not be used to pay normal closing costs of the sale, the real estate commission due on the sale, or the Due Diligence Reimbursement Fee (if any); normal closing costs, real estate commissions on the sale, and any Due Diligence Reimbursement Fee shall be paid from the gross sale proceeds and ratably charged to each property included in the sale.

25.     The amount of the Carve-Out will be determined by the unencumbered proceeds realized from properties having equity, and the Carve-Out will be charged pro rata to each otherwise fully encumbered property in the sale based on the allocated proceeds of the properties. As an example, if the sale were to net $5 million of unencumbered proceeds from the sale of properties having equity, the Carve-Out from the proceeds of fully encumbered properties would be $5 million, which would be pro rated among those fully encumbered properties based on the allocated value of each of them.

D.  Potential Payment for Rights and  Interest Asserted by MCI

26.     The Trustee is informed and believes that MCI asserts the right to payment of funds based upon its rights and interest under the 1996 Transfer Agreement. The Trustee is informed and believes that MCI's asserted right to payment includes the reimbursement of legal fees and expenses it has incurred in litigation and efforts to protect its asserted rights and interest under the 1996 Transfer Agreement, and other amounts which have not yet been specifically identified to the Trustee.

27.    Although the Trustee has not agreed to make a payment to MCI from the sale proceeds, the Trustee may negotiate terms with MCI to obtain MCI's consent to the sale to the Buyer under this Motion, and such terms may include a payment from the sale proceeds. If the Trustee reaches such an agreement with MCI, the Trustee shall promptly advise the Committee and any impacted secured creditor of the proposed settlement payment, and file an amendment to this Motion, in advance of presenting the sale with the proposed settlement payment to the Court for approval, so as to allow the Committee and any impacted secured creditor to assert an objection (if any) to the proposed payment to MCI. However, the Trustee is informed and believes that no additional notice to the creditors and parties in interest on the mailing matrix in this case shall be required for approval of the sale to the Buyer with the provision for the settlement payment to MCI.

E. Anticipated Distribution of Sale Proceeds

28.    At the closing of the sale, the Trustee will pay from the sale proceeds the ordinary and customary closing costs and payment items, including but not limited to the deed preparation fee, any recording fees chargeable to the Estate,[7] the 2008 ad valorem taxes due on the Assets, pro rated 2009 ad valorem taxes on the Assets, operating expense items typically pro rated and paid at closing (e.g., utilities), and costs necessary to close the sale which are chargeable to the Estate. In addition, if an order has been entered approving RBC's commission pursuant to the Order of May 19, 2009, RBC will receive payment of its commission at closing; if not at closing, funds in the amount of

---

[7] The Trustee is informed and believes that document stamps and recording fees will not apply to this sale, pursuant to 11 U.S.C. § 1146(a). The Trustee intends to file a Chapter 11 plan prior to the hearing on this Motion which will incorporate the sale of the Assets under this Motion. Although the plan will not have been confirmed by the date of the closing of the sale, the Trustee intends to assert that § 1146(a) is applicable to the recording of the deed and other transfer documents.

three percent (3%) will be escrowed from the sale proceeds,[8] and RBC will receive payment upon entry of an order approving its commission.

29.     The sale proceeds shall be allocated among the Assets based upon the allocation of values set forth in paragraph 23 hereinabove.  The ad valorem taxes shall be charged to, and deducted from, the sale proceeds of the particular properties upon which the tax is due, e.g., if $1,000 (an amount used solely for illustration) of ad valorem tax is due on Melrose Landing, the payment of that $1,000 of tax shall be deducted from the sale proceeds allocated to Melrose Landing.   All other closing costs and the RBC real estate commission shall be pro rated among the Assets based upon the amount of the sale proceeds allocated to each Asset in paragraph 23 hereinabove.

30.     After payment of the closing costs, the expense items described in paragraph 28 above, and the RBC real estate commission, the remainder of the sale proceeds should be sufficient to pay the superpriority secured indebtedness to Beach First and Tidelands Bank for the post-petition loans they made to the Trustee; the Beach First prepetition secured claim; the AFG secured claim; and the CSE mortgage on the Eigelberger tract.  These secured claims will be paid at the closing of the sale to the Buyer.

31.     The amount of the Carolina Shores secured claim will be determined based upon the sale proceeds of the property securing it, after (a) payment of the senior liens on such property and the allocated portion of closing costs and real estate commission for such property, and (b) the amount of the Carve-Out chargeable to such

---

[8] The escrowed funds shall be held in the trust account of the Trustee's attorney.

property.[9]  In addition, it is possible that subordination issues under 11 U.S.C. § 510(a)

(i.e., contractual subordination) may need to be decided in connection with the

determination of Carolina Shores' secured claim.[10]  Upon the determination of Carolina

Shores' secured claim (either by consent or by order of the Court), the Trustee will pay

the Carolina Shores secured claim from the sale proceeds.

32.     The Trustee maintains that Bill Dixon is an unsecured creditor.

33.     At closing, $10 million will be set aside from the sale proceeds for

payment of unsecured creditors, including both priority and non-priority unsecured

creditors.  This $10 million will consist of unencumbered funds from equity existing in

some of the Assets and from the Carve-Out.  The Trustee may use these funds to pay

administrative expenses and administrative claims, but payment of non-priority

unsecured creditors will not occur until confirmation of a Chapter 11 plan.

34.     At present, the Trustee has not agreed to a payment to be made to MCI;

however, as discussed in paragraph 27 above, if necessary or appropriate, the Trustee

may agree to a payment to MCI, or to fund a matter (e.g., a beach renourishment fund), in

settlement of sale issues.  If the Trustee reaches such an agreement, he shall promptly

advise the Committee and any affected secured creditor of the proposed payment,

allowing them an opportunity to object to it.

---

[9] The Carve-Out is defined and discussed in paragraphs 24 and 25 hereinabove.

[10] Language in certain documents of Bill Dixon and Carolina Shores appears to provide for subordination.  Carolina Shores has filed action against Bill Dixon alleging, among other claims, that such provisions should be held unenforceable and that Bill Dixon's claim against the Estate should be subordinated to the Carolina Shores claim.  See Adversary Proceeding No. 09-80134-jw.

## IV. **ARGUMENT**

35.    The Trustee is informed and believes that, by the sale to the Buyer, the Estate will receive a fair and reasonable value for the Assets, and he believes that the sale to the Buyer is in the best interest of the bankruptcy estate.  The Trustee is further informed and believes that authorization for the sale is proper and should be granted under 11 U.S.C. §§ 363(b)(1), 363(f), 365(a) and 365(f).

### A.  Authorization Under 11 U.S.C. § 363(b)(1)

36.    The Trustee seeks authorization to sell the Assets pursuant to 11 U.S.C. §363(b)(1), outside of the ordinary course of business, prior to a hearing on confirmation of a Chapter 11 plan.  Although sales of substantially all assets of an estate are usually proposed and conducted pursuant to a Chapter 11 plan, this Court has recognized that when a sound business justification exists, the Court may authorize such a sale under 11 U.S.C. §363(b)(1) without a confirmed plan of reorganization.  In re Taylor, 198 B.R. 142, 156-157 (Bankr. D.S.C. 1996).  See also Stephen Indus., Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986); and In re WBQ Partnership, 189 B.R. 97 (Bankr. E.D. Va. 1995).  In reviewing motions for authorization to sell substantially all assets of the estate prior to confirmation of a Chapter 11 plan, the Court has applied the "sound business purpose" test.

37.    Under the sound business purpose test, the Trustee has the burden of proving the following: (1) a sound business reason or emergency justifies the pre-confirmation sale; (2) the sale has been proposed in good faith; (3) adequate and reasonable notice of the sale has been provided to interested parties; and (4) the purchase

price is fair and reasonable.  In re Taylor, 198 B.R. at 157.  The sale proposed in this

Motion satisfies the test.

### 1.  Sound Business Reason or Emergency

38.    This case presents compelling reasons for a sale of  the Assets without

delay.  At the time of the Trustee's appointment, the Debtor's business was closed due to

lack of funds to pay any expenses, and the Estate was in danger of loss of substantial

value in the Assets.  The Trustee had to obtain post-petition loans from Beach First and

Tidelands Bank just to fund payment of essential expenses to maintain and protect the

Assets, and and these funds will be exhausted on or about early November, 2009.   The

prospects of additional post-petition loans for the Estate are not good, and any additional

loans almost certainly would be limited in amount.  If the sale were to be delayed until

confirmation of a Chapter 11 plan, it is unlikely that the Trustee would be able to

maintain the operation of the Assets – which at present is only on a partial basis – and the

amenities and facilities on the property would again shut down.  If the amenities and

facilities on the property are again shut down, it is uncertain when, if ever, they would

reopen, and the Trustee is informed and believes that the Assets would suffer a

significant, and potentially catastrophic, loss of value.

39.    The Trustee has not been able to file a Chapter 11 plan and disclosure

statement prior to this time because, quite simply, he could not provide sufficient

information in a plan and disclosure statement on the nature and type of a proposed sale

(a private sale, or an auction), the expected value to be realized from the sale,   the

expected distribution to creditors, and other factors important for creditors and parties in

interest to assess and vote on a Chapter 11 plan.  Prior to this time, a plan providing for

the sale of the property would only have been skeletal in information, and would have provided the sale process to be used but no specifics on the sale.

40.    As stated earlier in this Motion, the Trustee intends to file a Chapter 11 plan and a disclosure statement prior to the hearing on this Motion; however, the time required for the plan confirmation process would exceed the time by which the sale of the Assets needs to occur.

41.    The sale of the Assets needs to occur as soon as possible, to maximize their value and avoid significant loss.

## 2. Good Faith

42.    The terms of the proposed sale to Montauk are the product of extensive discussion and arms-length negotiations. The Trustee, by and through RBC and his own efforts, has provided information to scores of potential buyers, met with over a dozen potential buyers, and continued a dialogue with several potential investors, all resulting in the Stalking Horse Bid of Montauk.

43.    The Trustee is informed and believes that Montauk and its principals are unrelated to the Debtor or any other party in this case.

44.    The Trustee is informed and believes that Montauk has expended substantial funds in making a due diligence review of the Assets and in preparing its offer to purchase the Assets.

45.    The Trustee is informed and believes that the Court should find that the protections of 11 U.S.C. § 363(m) are applicable to the Buyer and this sale.

### 3. Notice

46.     The Motion and the accompanying Notice of Sale will be served upon all creditors and parties in interest in this case.  Notice of the hearing is included in the Notice of Sale.  Accordingly, all creditors and parties in interest will have notice of the sale of the Assets proposed in this Motion.

47.     The Trustee, by and through RBC and of his own, continue to talk with other potential purchasers of the Assets, and all other potential purchasers are being advised of the Stalking Horse Bid and encouraged to submit competing bids for the Assets.

### 4. Purchase Price

48.     The Trustee believes and represents to the Court that the purchase price for the Assets in the APA is fair and reasonable.  The purchase price in the Stalking Horse Bid is the product of extensive marketing efforts and negotiation with potential purchasers.  It is the highest and best offer received by the Trustee to date.

49.     The sale of the Assets is subject to higher or otherwise better competing offers under bidding procedures to be established by the Court.  Contemporaneous with this Motion, the Trustee is filing a motion seeking to establish bidding procedures by which Qualified Competing Bids (as defined in the motion) may be submitted for the Assets, and which should provide a process by which maximum value is obtained for the Assets.

### B. Authorization Under 11 U.S.C. § 363(f)

50.     The sale of the Assets to the Buyer is to be free and clear of all liens, claims, encumbrances and interests pursuant to 11 U.S.C. § 363(f), except for Assumed

Liabilities and Permitted Encumbrances (both as defined in the APA).  Section 363(f)

provides:

> (f) The trustee may sell property under subsection (b) or (c) of
> section free and clear of any interest in such property of an entity
> other than the estate, only if -
>> (1) applicable non-bankruptcy law permits such sale of such
>> property free and clear of such interests;
>> (2) such entity consents;
>> (3) such interest is a lien and the price at which such property is to
>> be sold is greater than the aggregate value of all liens on such
>> property;
>> (4) such interest is in bona fide dispute; or
>> (5) such entity could be compelled, in a legal or equitable
>> proceeding, to accept a money satisfaction of such interest.

51.    The sale to the Buyer will provide for full payment of the liens of Beach

First, Tidelands Bank, AFG, and CSE.  Accordingly, the sale of the Assets free and clear

of the liens and interests of these creditors is proper under § 363(f)(3).  The Trustee is

also informed and believes that these creditors consent to the sale, and thus the sale free

and clear of their liens and interests is proper under § 363(f)(2).

52.    Although Carolina Shores may not receive payment in full for its secured

claim, the Trustee is informed and believes that Carolina Shores consents to the sale, and

thus the sale free and clear of its liens and interest is proper under § 363(f)(2).  As a

possible second basis for the sale free and clear of Carolina Shores' liens and interest,

the position and priority of Carolina Shores' liens and interest may be subject to bona

fide dispute in light of the subordination issue raised in the Bill Dixon and Carolina

Shores documents,[11] and, in such event authorization would be proper under § 363(f)(4).

---

[11] The Trustee is not herein taking a position on the validity or effect of the possible subordination provisions; he is merely noting their existence as a possible second basis for sale authorization under § 363(f).

53.     The asserted lien of Bill Dixon is subject to bona fide dispute, and the sale of the Assets free and clear of his asserted lien is proper under § 363(f)(4). Bill Dixon's asserted lien is presently the subject of two adversary proceedings Adversary Proceeding No. 09-80120-jw, filed by the Trustee to avoid Bill Dixon's mortgage as an avoidable Preference; and Adversary Proceeding No. 09-80134-jw, filed by Carolina Shores, alleging numerous causes of action, including subordination of the Bill Dixon mortgage.

54.     The asserted rights and interest of MCI under the 1996 Transfer Agreement, which MCI asserts constitute a binding interest in the Melrose Property, are subject to bona fide dispute, and the sale of the Assets free and clear of MCI's asserted interest in the property is proper under § 363(f)(4). The MCI asserted interest in the property is presently the subject of the MCI Litigation [Adversary Proceeding No. 09-80094-jw]. The Trustee has been working with MCI in an attempt to address MCI's concerns relating to the Assets, and the Trustee hopes to resolve those concerns and obtain MCI's consent to the sale, in which event sale authorization also would be proper under § 363(f)(2).

55.     The Trustee is informed and believes that mechanic's lien claims of The Greenery, Inc. and Coastal Connections, Inc. are unsecured claims, because there is not sufficient value in the property on which the mechanic's liens were asserted to reach to these asserted liens, and they are unsecured pursuant to 11 U.S.C. §§ 506(a) and (d). In regard to this sale, if these two lien claimants do not consent to the sale (the Trustee is informed and believes that they may consent), it is their burden to establish the validity, priority and extent of their asserted interest in the property. See 11 U.S.C. § 363(p)(2). Where the value of the property is clearly insufficient to provide any value for a junior

lien claimant, that junior lien claimant does not have an interest in the property sufficient

to block authorization of a sale free and clear of liens and interests under § 363(f). See In

re Simpson Creek Development, Inc., Case No. 90-03836-B, slip op. (Bankr. D.S.C.

11/26/1991) (Order granting motion for authorization to sell assets free and clear of liens,

overruling objection of junior lien creditor, on page 9 of the Order) (citing 11 U.S.C. §

363(o) [now § 363(p)], and In re Century Brass Products, Inc., 95B.R. 277 (D.Conn.

1989), in which the court disallowed adequate protection to an unsecured lien creditor)).[12]

C. Assumption and Assignment of Unexpired Leases and Executory Contracts
Pursuant to 11 U.S.C. §§ 365(a) and (f)

56.    The APA allows the Buyer to review any unexpired leases (e.g., tenant

leases) and executory contracts associated with the Assets, and to elect to assume them.

If the   Buyer elects to assume any unexpired leases or executory contracts, the Trustee

will Assume the lease or contract and assign it to the Buyer pursuant to 11 U.S.C. §§

365(a) and (f).

57.    Section 365(a) provides that the Trustee may assume unexpired leases and

executory contracts.   Section 365(f) provides that, upon assumption of the lease or

contract, the Trustee may assign it.   Requirements for assumption and assignment include

curing monetary defaults by the Debtor under such lease or contract, and providing

adequate assurance of future performance of the Debtor's obligations under such lease or

contract. See 11 U.S.C. §§ 365(b) and (f)(2).

58.    In this case, the Trustee is informed and believes that there are no

significant unexpired leases or executory contracts that will be assumed by the Buyer. If

---

[12] This Order is not attached due to its length (it is 25 pages), in light of the number of pages of
this Motion and related documents.  However, if a party would like to obtain a copy of the Simpson Creek
Order, they should notify the Trustee's attorney, who will provide a copy of it.

there are any unexpired leases or executory contracts to be assumed and assigned to the Buyer, and if there are cure amounts that must be paid for the assumption to be approved, the payment of the cure amount will be taken from the sale proceeds set aside for unsecured creditors. However, the Trustee is informed and believes that no significant cure amounts (if any) will need to be paid for this sale.

### D. Conclusion

59.     Compelling grounds exist in this case for authorization of the sale of the Assets prior to confirmation of a Chapter 11 plan. The sale is for fair and reasonable value, it is supported by sound business purposes, and it is in the best interest of the Estate. The sale under this Motion is proper and should be authorized pursuant to § 363(b)(1). The sale is to be free and clear of all liens, claims, encumbrances and interests, except for the Assumed Liabilities and the Permitted Encumbrances (both as defined in the APA), and such sale free and clear is proper under § 363(f). As part of the sale, the assumption and assignment of any unexpired leases and/or executory contracts is proper under §§ 365(a) and (f). Accordingly, this Motion should be granted.

## V. ADDITIONAL RELIEF REQUESTED

60.     The Trustee requests that the Court order that the ten day stay otherwise applicable under Rule 6004(h) shall not apply to the order authorizing the sale under this Motion, and that the court also order that the ten day stay otherwise applicable under Rule 6006(d) shall not be applicable to the order authorizing the assumption and Assignment of any unexpired leases and executory contracts as part of this sale.

61.    The Trustee further requests that the Trustee and the Buyer be afforded the special tax provisions of 11 U.S.C. § 1146(a) since the sale will be made in conjunction with a Chapter 11 plan.

62.    Finally, the Trustee requests that the Court approve a back-up bid for the Assets.  If the successful bidder is unable to consummate the sale, the Trustee seeks to sell the Assets to the back-up bidder without further notice, hearing or order.

**WHEREFORE**, the Trustee prays that the Court:  (A) authorize the sale of the Assets to the Buyer pursuant to 11 U.S.C. § 363(b)(1), upon the terms and conditions stated in the APA; (B) as part of the authorization of the sale, order that the sale of the Assets to the Buyer, or any successful bidder if other than Montauk, shall be free and clear of all liens, claims, encumbrances and interests pursuant to 11 U.S.C. § 363(f), except for the Assumed Liabilities and the Permitted Encumbrances (both as defined in the APA); (C) approve the assumption and assignment of unexpired leases and executory contracts pursuant to 11 U.S.C. §§ 365(a) and (f), upon the provision that the assumption and assignment shall be in compliance with 11 U.S.C. §§ 365(b) and (f)(2); (D) order that the ten day stay provisions of Rules 6004(h) and 6006(d) shall not apply to the sale order and the order approving the assumption and assignment of any unexpired leases and executory contracts which are part of this sale; (E) order that the provisions of 11 U.S.C. § 1146(a) shall apply to this transaction; (F) approve a back-up bidder for the sale of the Assets; and (G) grant such other and further relief as the Court may deem just and proper in this matter.

/s/ Julio E. Mendoza, Jr.
Julio E. Mendoza, Jr. (Fed ID No. 3365)
NEXSEN PRUET, LLC
1230 Main Street, Suite 700 (29201)
Post Office Drawer 2426
Columbia, South Carolina  29202
Telephone: (803) 540-2026
Facsimile: (803) 727-1478

September 15, 2009
Columbia, South Carolina

Attorneys for Robert C. Onorato, Trustee for the
Chapter 11 Bankruptcy Estate of Daufuskie Island
Properties, LLC, a/k/a Daufuskie Island Resort &
Breathe Spa