ENTERED
SEP 24 2009
K.R.W.

FILED
at ___ O'clock & ___ min ___ M
SEP 24 2009
United States Bankruptcy Court
Columbia, South Carolina (26)

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF SOUTH CAROLINA

In re:

Daufuskie Island Properties, LLC aka
Daufuskie Island Resort and Breathe Spa,

Debtor.

Case No. 09-00389-jw

Chapter 11

## ORDER AUTHORIZING SALE OF THE STOCK OF MELROSE UTILITY COMPANY, INC. AND THE STOCK OWNED BY THE ESTATE IN HAIG POINT/ MELROSE WASTEWATER TREATMENT COMPANY, INC. FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS PURSUANT TO 11 U.S.C. §§ 363(b)(1) and (f)

This matter came before the Court upon the motion (the "Motion") of Robert C. Onorato, Trustee (the "Trustee") for the Chapter 11 bankruptcy estate (the "Estate") of Daufuskie Island Properties, LLC (the "Debtor"), for authorization to sell the stock of Melrose Utility Company, Inc. ("MUC") and the stock owned by the Estate in Haig Point/Melrose Wastewater Treatment Company, Inc. ("HPMWTC") (together, MUC and HPMWTC are referred to herein as the "Melrose Utility Entities") to CK Materials, LLC ("CKM") for a sale price of not less than $500,000.00, paid and provided as set forth hereinbelow, free and clear of all liens, claims, encumbrances and interests pursuant to 11 U.S.C. §§ 363(b)(1) and (f). The terms of the proposed sale are stated in the Stock Purchase Agreement attached as **Exhibit A** to the Motion. The Trustee filed the Motion on August 5, 2009, and following notice to creditors and parties in interest in the case, the Court held a hearing on the Motion on September 22, 2009.

Objections or responses to the Motion were filed by Beach First National Bank ("Beach First"), The Melrose Club, Inc. ("MCI"), the Official Committee of Unsecured Creditors (the "Committee") and William R. Dixon, Jr. and Gayle Bulls-Dixon (the "Dixons"). Beach First and

2

MCI withdrew their objections to the Motion at the commencement of the hearing, upon stipulations made by the Trustee, as set forth below, and the Committee withdrew its objection to the Motion at the conclusion of the presentation of evidence at the hearing, citing the Trustee stipulations, CKM's stipulations regarding the deposit of funds to cover capital improvements and perform remedial measures as required by applicable government agencies to restore the MUC facilities to the required standards for the maintenance and operation of MUC's business, and the evidence presented at the hearing. Accordingly, the only remaining objection to the Motion is the Dixons' objection.

At the hearing, the parties presented the testimony of three witness: the Trustee, Jamie J. Karabinchak, an officer of CKM, and Christopher J. Hutton, an officer of Hutton Bros., which submitted a competing offer to purchase the stock of MUC and the stock owned by the Estate in HPMWTC. The Dixons also presented a number of documents into evidence. Based upon the testimony of the witnesses, the documents in evidence, the Motion and supporting documents filed by the Trustee, the filings made by the other parties in this matter, the arguments of counsel, and the stipulations made at the hearing, the Court makes the following findings of fact and conclusions of law.[1]

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Jurisdiction and Venue

1.  The Trustee's motion seeks authorization for a sale and other relief pursuant to 11 U.S.C. §§ 363(b)(1), (f) and (m), and pursuant to Rule 6004 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rule 6004") and SC LBR 6004-1 of this Court.

---

[1] To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any conclusions of law constitute findings of fact, they are so adopted.

2. The Court has jurisdiction over this matter pursuant ot 28 U.S.C. §§ 1334 and 157(a) and (b), and Local Civil Rule 83.IX.01 of the United States District Court for the District of South Carolina. The Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(N).

3. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### B. Background

4. On January 20, 2009 (the "Petition Date"), the Debtor filed its petition for relief under Chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101, et seq.). The Debtor operated as the debtor-in-possession until the Trustee's appointment in this case.

5. On March 17, 2009, the Court entered its <u>Order Granting Joint Motion for Appointment of Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104</u>, granting the joint motion of the Official Committee of Unsecured Creditors (the "Committee"), Beach First National Bank and AFG, LLC for the appointment of a trustee in this case. Thereafter, on March 20, 2009, the Court entered its <u>Order Approving Appointment of Trustee</u>, approving the United States Trustee's appointment of Robert C. Onorato as Trustee for the Debtor's Chapter 11 estate.

6. The assets of the Estate include, but are not limited to, real property located on Daufuskie Island, South Carolina, with structures and improvements which include an inn (the "Melrose Inn"), cottages, duplexes, a beach club, two golf courses (the "Melrose Golf Course" and the "Bloody Point Golf Course"), tennis courts, a pool and other structures, improvements and fixtures. The Debtor's real property is generally separated into real property contained in the Melrose Planned Unit Development (the "Melrose Property") and real property contained in the Bloody Point Planned Unit Development (the "Bloody Point Property"; and together with the Melrose Property, the "Melrose and Bloody Point Properties"). The Melrose Golf Course, the Melrose Inn, the Melrose beach club and cottages are located on the Melrose Property. The

4

Bloody Point Golf Course, miscellaneous maintenance buildings and structures and unsold residential lots are located on the Bloody Point Property.

7. The assets of the Estate also include the stock of MUC, and stock of HPMWTC. The Estate owns all stock of MUC, and it owns 40% of the stock of HPMWTC. These companies provide water, wastewater treatment and sewer services to the Melrose and the Bloody Point Properties. The provision of these services is an important factor in the value of the Melrose and the Bloody Point Properties.

8. As utility providers, MUC and HPMWTC are subject to regulation by the State of South Carolina, by and through its agencies the South Carolina Public Service Commission ("SCPSC") and the South Carolina Department of Health and Environmental Control ("DHEC"). These agencies establish requirements applicable to the Melrose Utility Entities' business, which must be maintained for MUC and HPMWTC to continue operating their businesses.

9. In providing its services, MUC is currently dependent upon services it obtains from Daufuskie Island Utilities, Inc., f/k/a Haig Point Utility Company, Inc. ("DIU"). MUC has no employees, and the Trustee states that, upon his appointment, he found MUC's records to be in disarray and incomplete. At present, MUC does not have the ability on its own to provide the utility services to the Melrose and the Bloody Point Properties.

10. Following his appointment, the Trustee found MUC to be at risk of loss of its right and/or ability to continue operating its business. The Trustee states that he found several serious problems to exist for MUC, including: (a) MUC's cash had been taken by the Debtor and deposited into its bank account shortly before the Trustee's appointment, leaving MUC without funds to pay its bills; (b) DHEC cited MUC for deficiencies in MUC's operations and facilities, which, if not corrected, would result in MUC's losing its ability to operate; (c) MUC owes DIU substantial payables which MUC is unable to pay, and DIU indicated that it would

5

terminate its services to MUC unless it were soon paid; and (d) MUC lacked funds or capital with which to address these problems.

11. DHEC sent a letter dated June 16, 2009 to MUC citing the deficiencies that MUC must correct. DHEC resent the letter to the Trustee on or about July 16, 2009. A copy of the DHEC letter is attached to the Motion as **Exhibit B**.

12. The Trustee has negotiated and agreed, subject to the Court's authorization, to sell the stock of MUC and the stock the Estate owns of HPMWTC to CKM, in order to enable the continued and uninterrupted utility service to the Melrose and Bloody Point Properties, which is necessary to protect and maintain the value of these properties. The Trustee further states that the continuous and uninterrupted utility service is important to avoid delay and loss in the Trustee's marketing and sale of the property of the Estate.

### C. Summary of the Terms of the CKM Transaction

13. The Stock Purchase Agreement attached as **Exhibit A** to the Motion provides the terms of the sale to CKM. The terms of the transaction are summarized as follows:

    a. By its acquisition of the Melrose Utility Entities, CKM will acquire all assets owned by MUC, including (but not limited to) real property owned by MUC, all machinery and equipment, accounts receivable, inventory and supplies owned at closing.

    b. The sale price is to be paid by, and consists of, the following: (1) CKM will assume and pay the outstanding payables owed by MUC to DIU, which the Trustee and Mr. Karabinchak state is presently in the approximate total amount of $241,000.00, including amounts that have accrued subsequent to the filing of the Motion; (2) CKM will install and construct capital improvements and perform such other remedial measures as required by applicable government agencies to restore the facilities to required standards for the maintenance and operation of MUC's business, which capital expenditures are estimated in the amount of at

least $150,000.00 (defined in the Stock Purchase Agreement as the "Restoration Costs"); (3) CKM will cover the costs for DIUC to provide management, repair and operating services to MUC for the period through December 31, 2009, which have been allocated a value of $100,000.00; and (4) payment of $20,000.00 in certified funds to the Estate, adjusted for pro-rations and Seller's costs under the Stock Purchase Agreement.

        c.     CMK's obligation to proceed with its purchase is contingent upon the necessary approvals of the SCPSC and DHEC and other pre-conditions to closing normal for bankruptcy sales, e.g., an order authorizing this sale under 11 U.S.C. §§ 363(b)(1) and (f) and providing for the protections of 11 U.S.C. § 363(m).

        d.     The closing of the sale shall take place on or before December 31, 2009, but not sooner than the issuance of the necessary SCPSC and DHEC approvals, which time can be extended by the agreement of the parties.

        14.     CKM intends to acquire the Melrose Utilities and transfer the ownership of them to JJK Utilities, which now owns 99% of the stock of DIUC. Mr. Karabinchak is also the President of DIUC, and he explained that the owners intend to unify the utility companies, by merger or common ownership, or by otherwise consolidating the businesses, and to recapitalize DIUC to position it to expand its facilities and the services it provides.

### D. The Trustee's Explanation of the CKM Transaction and Its Purposes

        15.     The sale of MUC and the Estate's stock in HPMWTC to CMK will likely provide only a small amount of net cash for the Estate. In explanation of the reasons for the sale to CKM, the Trustee states that:

        a.     The sale of MUC and the Estate's stock in HPMWTC is necessary to assure continued and uninterrupted utility service to real property owned by the Estate in the Melrose and Bloody Properties.

  b. MUC and HPMWTC provide water, water treatment and sewer services to the Melrose and Bloody Point Properties; these services are important to maintain the value of the Melrose and Bloody Point Properties, which include most of the property owned by the Estate; and the continued and uninterrupted provision of these utility services is important to the Trustee's timely sale of property of the Estate.

  c. He presently has an offer for the purchase of substantially all of the property owned by the Estate; other potential purchasers of the property have been in contact with the Trustee; and he is informed and believes that the disruption of the utility service to the Melrose and Bloody Point Properties would jeopardize the successful sale of the properties, and would, at the least, result in delay in the sale process. He believes that the disruption in the utility service to the property would likely lead to a loss of value of the property of the Estate.

  d. He is informed and believes that MUC is in danger of being closed by DHEC for certain deficiencies cited by DHEC, and pursuant to notice given by DHEC. MUC does not have the ability to remedy the deficiencies cited by DHEC absent an infusion of capital from an outside source.

  e. MUC now owes approximately $241,000.00 to DIU for services DIU provided to or on behalf of MUC, which MUC is unable to pay, and he is informed and believes that failure to make payment to DIU will result in the discontinuation of services needed to operate MUC's business.

  f. MUC lacks the capital needed to operate its business through the end of this calendar year. To continue operating, MUC requires either an infusion of new capital or services provided to it on a non-cash payment basis.

g. The sale of the Melrose Utility Entities to CMK enables the Melrose Utility Entities to continue operation, and to avoid the disruption of utility service to the Melrose and Bloody Point Properties.

### E. Stipulations Made at the Hearing

16. At the hearing, the Trustee resolved MCI's limited objection to the Motion by stipulating that authorization of the sale, and the consummation of the sale, will be without prejudice to any rights or interests MCI may have in the real property owned by MUC.

17. At the hearing, the Trustee and CKM both stipulated that CKM will deposit $150,000.00 at the closing of the sale into the trust account of CKM's attorney, for use in covering the Restoration Costs.

18. At the hearing, CKM also stipulated that, if the actual Restoration Costs are less than the estimated $150,000.00, the portion of the $150,000.00 deposited into the trust account which is not needed to cover the Restoration Costs will be paid to the Estate.

### F. The Hutton Bros. Offer

19. Hutton Bros. made an offer to the Trustee by a letter of intent, which it submitted at least twice to the Trustee. The Hutton Bros. offer states a total purchase price of $1 million for the stock of MUC and the stock owned by the Estate in HPMWTC, with payments to be made over a period of five years. Upon acceptance, Hutton Bros. would pay a $50,000.00 deposit to the Trustee, Hutton Bros. would have a thirty (30) day due diligence review period during which it could terminate the sale; if Hutton Bros. did not terminate the sale within the allowed due diligence period, the deposit would become non-refundable. Hutton Bros. would pay $200,000.00 to the Estate at closing,; it would then pay $200,000.00 per year for the next three years, on the anniversary of the closing, and make a final payment of $150,000.00 on the fourth anniversary of the closing. The offer provides, however, that after 24 months, Hutton

Bros. would have the right to adjust the payment schedule to the Estate to reflect the financial condition of the business.

20. Mr. Hutton testified that he questions whether the amount owed to DIUC is correct, and that the amount owed, if any, should be significantly lower. He testified that, if the amount owed to DIUC is greater than he believes should be correct, Hutton Bros.' purchase price would have to be reduced.

21. Neither Mr. Hutton nor Hutton Bros. has previously been through the process to obtain DHEC approval for a transfer in ownership of a utility. Neither Mr. Hutton nor Hutton Bros. has previously owned a utility company.

22. Hutton Bros. would hope to expand the utility service. Capital improvements for such expansion, or to address needs of the business, would be funded by requiring that the customer, such as the new owner of the Melrose and Bloody Point Properties, provide the funds for the expansion of facilities or other needed capital improvements. Hutton Bros. has no other planned source of funding to cover the capital expenditures.

23. Hutton Bros. needs an opportunity to review records and assess whether or not it would be willing and able to proceed with its offer. Mr. Hutton has reviewed the 2007 and 2008 operating records for the Melrose Utility Companies, and he is familiar with the physical assets owned by MUC, but Hutton Bros. is not willing to proceed with its purchase without further review and analysis of the operations of the business.

### G. The Dixons' Objection

24. Although four objections or responses were filed to the Motion, all but one of the objections were withdrawn. The remaining objection is the objection of the Dixons.

25. The Dixons object to the proposed sale to CKM on the grounds that the offer by Hutton Bros. is better than the CKM offer and should be accepted in place of the CKM offer. The Dixons also argue that, even if the sale to Hutton Bros. is not authorized at this time, the Motion should be held in abeyance for at least thirty days to allow Hutton Bros. to review the MUC and HPMWTC records and then present an offer with more certainty as to amount and terms.

26. In support of their objection, the Dixons presented notices of tax liens filed against Mr. Karabinchak and against Karabinchak Bros., Inc. in New Jersey, relating to unpaid wage withholding taxes and pension benefits. The Dixons argue that the tax liens show that CKM's purchase of the Melrose Utility Entities would expose the Melrose Utility Entities to risk of inability to perform their services or to expand the services. However, Mr. Karabinchak testified that he owns only a portion of CKM and the entity to which the Melrose Utility Entities would be transferred, that Karabinchak Bros., Inc. is not involved in this transaction, and that he has been, and is, contesting the taxes assessed against him and Karabinchak Bros., Inc.

### H. Applicable Authority

27. Pursuant to 11 U.S.C. § 363(b)(1), the Trustee may sell property other than in the ordinary course of business, upon notice and hearing. The proposed sale should be for good value and in the best interest of the Estate. See WBQ Partnership v. Commonwealth of Virginia Department of Medical Assistance Services (In re WBQ Partnership), 189 B.R. 97 (Bankr. E.D.Va. 1995). For a sale of property free and clear of liens, the Trustee may sell the property

free and clear if one or more of the requirements under 11 U.S.C. § 363(f) is met. In this case, these requirements are met.

### 1. Section 363(b)(1) Authorization

28. In reviewing a proposed sale of property of the bankruptcy estate, the courts "apply standards that, although stated variously [sic.] ways, represent essentially a business judgment test." 3 Collier on Bankruptcy ¶ 363.02[1][f], at pages 363-14 and 363-15 (15th ed.rev. 6/2009). The proposed sale price must be fair and reasonable, WBQ Partnership, 189 B.R. at 104; however, "[a]lthough a trustee would normally be expected to sell to the highest bidder at an auction, there may be sound business reasons to accept a lower bid, particularly in a negotiated sale." 3 Collier on Bankruptcy ¶ 363[1][f], at page 363-15. "For example, the payment terms may be more favorable, or the trustee may have substantial reason to doubt the ability of the higher bidder to raise the cash necessary to complete the purchase." Id.; see also In re Long Point Road Limited Partnership, Case No. 93-72769-W, slip op. at 2-3 (Bankr. D.S.C. 6/5/1996).

29. In this case, the Trustee has presented good reasons for the sale. The sale is necessary to assure the continued, uninterrupted utility service to the property owned by the Estate, which is important to protect the value of the Estate's property, and which is important to avoid delay and possible adverse effects on the Trustee's efforts to sell the property. The Trustee is particularly concerned about the need to close the sale of the Melrose Utility Entities as a means of assuring the proposed purchaser of substantially all other assets of the Estate, and any other potential purchasers who might make competing offers for those assets, that the Melrose and Bloody Point Properties will have continued and appropriate water, wastewater and sewer services.

12

30.     The Trustee also presented sound reasons for his proposed sale of the Melrose Utility Entities to CKM. These reasons include the following:

a.     CKM has stated its intention to transfer the Melrose Utility Entities to another entity for unification with DIUC, and to then recapitalize the company to position it to expand its facilities and services, all of which the Trustee believes are important to prospective purchasers of the Melrose and Bloody Point Properties.

b.     CKM, by and through its officers and affiliates, has experience in owning and operating a utility company providing the same type services provided by the Melrose Utility Companies, and in going through the DHEC process for approval of a transfer of ownership of such a utility company. Hutton Bros. does not have experience in these areas.

c.     The sale to CKM will provide the funds to cover the Restoration Costs necessary to cure deficiencies cited by DHEC and to comply with applicable requirements for the maintenance and operation of MUC's business. CKM has agreed to deposit $150,000.00, which is its estimation of the Restoration Costs, into its attorney's trust account at the closing of its purchase of the Melrose Utility Entities, to assure funding of the Restoration Costs.[2]

d.     The sale to CKM will avoid the termination of services by DIUC to MUC and the disruption of MUC service to the Melrose and Bloody Point Properties. The sale to CKM will satisfy MUC's outstanding indebtedness to DIUC, and provide for continued services by DIUC to MUC pending SCPSC and DHEC approval of the transfer of ownership of MUC.

e.     The sale to CMK is without contingencies, other than SCPSC and DHEC approval of the sale (which is required for the sale to occur) and entry of this Order.

f.     The Trustee is informed and believes that the authorization for the sale to CKM will provide comfort to the prospective purchaser and other potential purchasers of the

---

[2] At the hearing, CKM agreed that if the Restoration Costs are less than the estimated $150,000.00, the amount of the $150,000.00 deposit in excess of the Restoration Costs will be paid to the Estate.

Melrose and Bloody Point Properties that the utility services to those properties will continue without disruption and that proper provision has been made for expanded service capacity, as needed for the new owner of the Melrose and Bloody Point Properties to develop the approved development units on the properties.

    g.  The Trustee finds the Hutton Bros. offer to have too many uncertainties to accept. The offer is conditioned on a satisfactory due diligence review by Hutton Bros., which the Trustee asserts is a problem given the status of the DHEC matters and the pending motion for authorization of the sale of substantially all other assets; Hutton Bros. estimates a much lower total for the Restoration Costs, and it is not certain how Hutton Bros. would fund the Restoration Costs if they are at the level estimated by CMK; Hutton Bros. does not have a definite provision for the outstanding indebtedness of MUC to DIUC; Hutton Bros. has never owned a utility company, and it has never been through the process for approval by SCPSC and DHEC of the transfer of ownership of a utility company; the Hutton Bros. purchase price is to be paid over an extended period of time, which period of payment is to be adjusted if expenses are too high; and there is risk of disruption of MUC's services to the Melrose and Bloody Point Properties while waiting on resolution of these uncertainties.

  31.  MUC and the Estate do not have the ability to remedy the deficiencies cited by DHEC which jeopardize MUC's ability to operate. Likewise, MUC and the Estate do not have the ability to pay the indebtedness to DIU, to assure that DIU will continue to provide its services which are necessary for MUC's business operation, or to provide the working capital needed for operation of the business through the end of this year. The sale to CMK will enable MUC and HPMWTC to continue operating, and avoid the disruption of services to the Estate's property. Accordingly, the Trustee has shown that this sale is beneficial to and in the best interest of the Estate.

### 2. Section 363(f) Authorization

32. The sale of the stock to CKM is to be free and clear of all liens, claims, encumbrances and interests pursuant to 11 U.S.C. § 363(f). Section 363(f) provides:

> (f) The trustee may sell property under subsection (b) or (c) of section free and clear of any interest in such property of an entity other than the estate, only if -
> (1) applicable non-bankruptcy law permits such sale of such property free and clear of such interests;
> (2) such entity consents;
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> (4) such interest is in bona fide dispute; or
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

33. In this case, the stock of MUC and HPMWTC owned by the Estate are subject only to the post-petition liens granted to Beach First National Bank and Tidelands Bank for the post-petition loans they made to the Estate under orders entered by this Court. The Trustee asserts that no other liens exist on the stock, and that no other enforceable interests are asserted on or in the stock owned by the Estate in MUC and HPMWTC. No creditor or party in interest has disputed this assertion, and there is no evidence before the Court indicating otherwise.

34. The Trustee seeks authorization for the sale to CMK under § 363(f)(2), upon the consent of the lienholders, Beach First National Bank and Tidelands Bank. Both of these lienholders consent to the sale. Accordingly, authorization is proper for the sale free and clear pursuant to § 363(f)(2).

### I. Conclusion

35. The Trustee's proposed sale of the stock of MUC and HPMWTC owned by the Estate is proper and should be authorized under 11 U.S.C. §§ 363(b)(1) and (f). The Trustee should be authorized to sell the stock to CMK upon the terms stated in the Motion, as modified by the stipulations made by the Trustee and CMK at the hearing, free and clear of all liens,

claims, encumbrances and interests. In addition, upon the record in this matter, the Court finds that CMK is a good faith purchaser entitled to the protections of 11 U.S.C. § 363(m).

**THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED** that:

A.   The Trustee is hereby authorized to sell the stock of MUC and the stock owned by the Estate in HPMWTC to CMK pursuant to the terms and provisions of the Stock Purchase Agreement attached as **Exhibit A** to the Motion, as modified by the stipulations made by the Trustee and CMK at the hearing, pursuant to 11 U.S.C. § 363(b)(1);

B.   The transfer and conveyance of the ownership of the stock of MUC and the stock the Estate owns in HPMWTC shall be free and clear of all lien, claims and encumbrances pursuant to 11 U.S.C. § 363(f); and

C.   In regard to its purchase of the stock of MUC and the stock owned by the Estate in HPMWTC, CMK is a good faith purchaser entitled to the protections of 11 U.S.C. § 363(m).

**AND IT IS SO ORDERED.**

_____        9/24/09
John E. Waites                         Date
U.S. Bankruptcy Court Judge
District of South Carolina

16