**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| In re: | Case No.  09-00389-jw |
| Daufuskie Island Properties, LLC  a/k/a Daufuskie Island Resort & Breathe Spa, | Chapter 11 |
| Debtor. | |

**DISCLOSURE STATEMENT TO CHAPTER 11 PLAN**

Filed by Robert C. Onorato, Trustee

on November 20, 2009

**<u>Summary of Contents</u>**

I.     INTRODUCTION ................................................... 1

II.    GENERAL INFORMATION ................................... 2

III.    POST-PETITION MATTERS ................................ 6

IV.    PROPERTY OF THE ESTATE AND FINANCIAL DATA ...................................... 10

V.     SALE OF PROPERTY ........................................ 19

VI.    SUMMARY OF PROPOSED PLAN ....................... 21

VII.   FEASIBILITY OF PROPOSED PLAN.................... 30

VIII.   CONCLUSION................................................. 30

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ..................................................................................................1

II.   GENERAL INFORMATION ................................................................................2

    A.   Inception of the Case and General Background of the Debtor ........................2

    B.   The Debtor's Operation of the Property ..........................................................4

    C.   Ownership and Control of the Debtor ..............................................................5

    D.   Events Leading to the Chapter 11 Case ...........................................................5

III.  POST-PETITION MATTERS ...............................................................................6

IV.   PROPERTY OF THE ESTATE AND FINANCIAL DATA ...............................10

    A.   Assets ..............................................................................................................10

    B.   Liabilities ........................................................................................................12

        1.   Secured Claims .......................................................................................12

        2.   Administrative Priority Claims ..............................................................15

        3.   Priority Claims (Excluding Administrative Priority Claims)..............15

        4.   Non-Priority Unsecured Claims .............................................................16

        5.   Secured and Lease Creditors Whose Collateral or Leased
            Property Has Been Released to Them ..............................................16

    C.   The Melrose Club, Inc. Asserted Rights and Interest....................................16

    D.   Equity Interests...............................................................................................17

    E.   Summary of 2006 and 2007 Income, Expenses and Profit (Loss)................17

    F.   Tax Consequences of the Plan .......................................................................17

    G.   Liquidation Analysis ......................................................................................18

    H.   Income and Expenses During Chapter 11 ......................................................18

V.    SALE OF PROPERTY .........................................................................................19

    A.   Marketing and Sale Efforts ............................................................................19

    B.   Assets Being Sold...........................................................................................20

    C.   The Sale Motion and the Sale Order ..............................................................20

    D.   Projected Payment to Creditors......................................................................21

VI.   SUMMARY OF PROPOSED PLAN ...................................................................21

    A.   Preface ............................................................................................................21

VII.  FEASIBILITY OF PROPOSED PLAN................................................................30

VIII.    CONCLUSION......................................................................................................30

### LIST OF EXHIBITS

**EXHIBIT A** – Debtor's Schedules A and B

**EXHIBIT B** – 2006 Federal Tax Return Information

**EXHIBIT C** – 2007 Federal Tax Return Information

**EXHIBIT D** – Income Statement from September 2009 Monthly Operating Report

## DISCLOSURE STATEMENT

## I. INTRODUCTION

Robert C. Onorato, Trustee (the "Trustee") for the Chapter 11 bankruptcy estate (the "Estate") of Daufuskie Island Properties, LLC a/k/a Daufuskie Island Resort & Breathe Spa (the "Debtor"), provides this Disclosure Statement to all of the known creditors and equity interest holders of the Debtor pursuant to 11 U.S.C. § 1125. The purpose of this Disclosure Statement is to provide such information as may be deemed material, important, and necessary for the creditors and equity interest holders of the Debtor and the Estate to make a reasonably informed decision in exercising their right to vote on the acceptance of the Chapter 11 Plan filed by the Trustee (the "Plan") concurrently with this Disclosure Statement.

**EXCEPT WHERE SPECIFICALLY STATED OTHERWISE, THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE TRUSTEE AND HIS COUNSEL BASED ON INFORMATION AVAILABLE TO THE TRUSTEE AS OF THE DATE HEREOF. NO REPRESENTATIONS CONCERNING THE DEBTOR OR THE ESTATE (PARTICULARLY AS TO THE FUTURE BUSINESS OPERATIONS, OR THE VALUE OF ASSETS OF THE ESTATE, OR THE VALUE OF ANY SECURITIES) ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.**

**THE HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS.**

**THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. ALTHOUGH GREAT EFFORT HAS BEEN MADE TO PROVIDE ACCURATE INFORMATION, THE TRUSTEE IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY.**

The Bankruptcy Court (the "Court") will set a date at a later time for a hearing on the acceptance of the Plan. Notice of the hearing (the "Notice of Hearing") will be mailed to creditors and equity interest holders, and, upon receiving the Notice of Hearing, such creditors and equity interest holders may vote on the Plan by completing the Ballot mailed with the Notice of Hearing and returning their Ballots to the Court. As a creditor or equity interest holder, your vote is important. The Plan will be confirmed by the Court if it is accepted by the holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of creditor claims in each class voting on the Plan, and two-thirds (2/3) in amount of the allowed interests of each class of interests (for example, shareholders) voting on the Plan. In the event the requisite acceptances are not obtained, the Court nevertheless may confirm the Plan if at least one impaired class votes to accept the Plan (unless there are no impaired classes, in which case such affirmative vote is not required), and if the Court finds that the

1

Plan accords fair and equitable treatment to those particular classes rejecting it. Confirmation of the Plan is governed by 11 U.S.C. § 1129.

## II.  GENERAL INFORMATION

### A.  Inception of the Case and General Background of the Debtor

Daufuskie Island Properties, LLC (the "Debtor") filed its petition for relief under Chapter 11 of the United States Bankruptcy Code (11 U.S.C. § 101, et seq.) on January 20, 2009.  The Debtor operated as a Chapter 11 debtor-in-possession until March 23, 2009, when Robert C. Onorato was appointed the trustee (the "Trustee") for the Debtor's Chapter 11 bankruptcy estate (the "Estate").  Since his appointment, the Trustee has been working to arrange a sale of the assets to provide a source of payment of the Debtor's creditors.

The Debtor is a limited liability company organized and existing under the laws of the State of Delaware and authorized to do business in South Carolina, formed, upon information and belief, on or about May 14, 2002 for the purpose of purchasing, owning, developing, operating and selling certain real property and improvements located on Daufuskie Island in Beaufort County, South Carolina, and, in connection with the property on Daufuskie Island, owning and operating a ferry embarkation facility on Hilton Head Island, South Carolina. William R. Dixon, Jr. ("Bill Dixon") and his wife, Gayle Bulls Dixon ("Gayle Dixon"), are the only two members of the Debtor.[1]  Bill Dixon was the Manager of the Debtor prior to the Trustee's appointment.

The property on Daufuskie Island acquired by the Debtor consists of real property with improvements located in the Melrose Planned Unit Development, sometimes referred to as "Melrose Plantation" (the "Melrose Property"); real property with improvements located in the Bloody Point Planned Unit Development (the "Bloody Point Property"); the Eigelberger tract of property, now owned by Eprop, LLC, which is wholly owned by the Debtor; and the Melrose Landing property, which is the site of the dock and landing area for residents and guests of the Debtor's property.  The Daufuskie Island properties are accessible only by water; there is no bridge connecting Daufuskie Island to the mainland or to other island, and there is no established landing field for aircraft.  Accordingly, the Debtor also purchased the Salty Fare boat/ferry embarkation facility located on Hilton Head Island, which is now owned by The Collins Family Trust.  These properties and the improvements located on them are described more fully on pages 10 through 12 of this Disclosure Statement.

The Debtor purchased the properties from Daufuskie Club, Inc. (successor to Melrose Club Management, Inc.) ("DCI") on or about June 4, 2002.  DCI had acquired 300 acres of the Melrose Property, the Melrose Landing property, and the Salty Fare property

---

[1] The Trustee is informed and believes that the Original Members of the Debtor, as defined in the Debtor's Operating Agreement, were Bill Dixon, Gayle Dixon, John F. Dixon and Sean K. Maloney.  The Trustee is further informed and believes that Bill Dixon and Gayle Dixon are now the only members of the Debtor.

(collectively, such properties being the "MCI Property") from The Melrose Club, Inc. ("MCI") on or about December 26, 1996. When DCI acquired the MCI Property, it did so subject to the terms of a certain Transfer Agreement that it executed with MCI dated September 27, 1996, which was amended in or about December, 1996 (as amended, the "1996 Transfer Agreement"). MCI asserts that, under the 1996 Transfer Agreement, DCI was obligated to operate, maintain and preserve the MCI Property and facilities, and to provide certain club rights to property owners, and, if DCI were to default in these obligations, MCI would have certain rights, including a right to repurchase the MCI Property. In connection with the 1996 Transfer Agreement, a Memorandum of Agreement was executed by DCI and MCI and recorded in the RMC Office for Beaufort County, South Carolina. MCI asserts that the provisions of the 1996 Transfer Agreement are binding on the Debtor as the successor to DCI, and upon all successive owners of the MCI Property until the term of the 1996 Transfer Agreement expires in December 2016. MCI's rights and the Debtor's alleged obligations under the 1996 Transfer Agreement have been the subject of litigation in this case.

The Debtor operated the properties at substantial losses, causing the Debtor to obtain many loans. At the outset, both for it purchase of the property and to fund capital needs, the Debtor obtained a loan from Carolina Shores, LLC ("Carolina Shores"), on or about May 14, 2002 in the original principal amount of $12,700,000. Later, the Debtor executed a note on or about January 14, 2008 in the principal amount of $1,500,000.[2] It appears that no payment has been made to Carolina Shores on the notes it received, and Carolina Shores asserts a claim in this case in an aggregate amount in excess of $27 million, based on interest accruals, charges and attorneys fees.[3] In addition, the Debtor obtained loans from Beach First National Bank ("Beach First") and AFG, LLC ("AFG"), aggregating approximately $11.2 million; the Debtor formed Eprop, LLC and transferred the Eigelberger tract to it in order to obtain a loan on or about July 17, 2007 in the principal amount of $9,550,000 from CSE Mortgage, LLC, now CS Eigelberger, LLC ("CSE"); and the Debtor entered into a finance transaction by which it sold the Salty Fare property to Stewart Kittridge Collins and/or Susan Charles Collins, Trustees of the Collins Family Trust Dated May 26, 1989 (the "Collins Family Trust"), for the sale price of $5 million, and leased-back the property from the Collins Family Trust, with Bill Dixon having the right to repurchase the property. Bill Dixon also claims to have loaned to the Debtor $34,692,660.58, and Gayle Dixon asserts a claim of $890,000 for loans she says she made to the Debtor.

In mid to late 2008, the Debtor sought to sell some of its property, including the Melrose

---

[2] Carolina Shores alleges that this second "loan" was actually a means by which Dixon extracted money from Carolina Shores and/or the Debtor, to Carolina Shores' detriment.

[3] Bill Dixon was the Manager of Carolina Shores from its formation on or about May 14, 2002, until after the commencement of this Chapter 11 case, and Carolina Shores has filed actions against Bill Dixon for equitable subordination of Bill Dixon's claims against the Estate to Carolina Shores' claims, for breach of fiduciary duty and duty of loyalty, for breach of the duty of good faith and fair dealing, for fraud, for constructive fraud, for conversion, for gross negligence, for breach of fraud accompanied by a fraudulent act, and for intentional interference with contract . In his answer, Dixon has denied the allegations of wrongdoing and liability. The actions are in Adversary Proceeding No. 09-80134-jw in this Court.

Inn.  MCI filed an action in state court, alleging that the 1996 Transfer Agreement would be breached by the sale, and seeking relief.  The Debtor was unable to make its proposed sale.  Having exhausted (or nearly exhausted) its cash, the Debtor filed its Chapter 11 petition on January 20, 2009, commencing this case.

Upon the filing of this case, the Debtor filed motions seeking authorization to use cash collateral consisting of the income from its operations, and seeking authorization for post-petition financing.  The Debtor also filed a motion seeking to reject the 1996 Transfer Agreement as an executory contract under 11 U.S.C. § 365(a).  The Court denied the motion to reject the 1996 Transfer Agreement as an executory contract,[4] and the Debtor's proposed post-petition lender withdrew its offer to provide post-petition financing.  The Debtor closed its operations on or about March 16, 2009, having no funds to cover expenses.  On March 17, 2009, the Court entered its Order Granting Joint Motion for Appointment of Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104, granting the joint motion of the Official Committee of Unsecured Creditors (the "Committee"), Beach First and AFG.  Thereafter, on March 23, 2009, the Court entered its Order Approving Appointment of Trustee, approving the United States Trustee's appointment of Robert C. Onorato as Trustee for the Debtor's Estate.

### B. The Debtor's Operation of the Property

The Debtor had several facets of business operations on the property.  It operated the Melrose Inn, the Island Conference Center, the Melrose Golf Course, a spa in the Bloody Point clubhouse, and other resort facilities and amenities as "Daufuskie Island Resort & Breathe Spa"; it operated a membership club for use of the resort facilities by resident property owners and non-resident members; it operated as a property sales and development company with respect to undeveloped properties; and it acted as lessor for facilities such as the equestrian center.

In operating its business activities, the Debtor had management personnel in offices located in the Salty Fare embarkation facility on Hilton Head Island, South Carolina, and it also used the services of persons working in offices of a Bill Dixon company in San Francisco, California.  However, much of the day-to-day business was handled by management companies hired to operate the inn, the convention facilities, the spa and other resort facilities, and to operate the golf courses.

Following its acquisition of the property, the Debtor initially used Tiburon Hospitality Management, LLC as its management company for the properties, from June 3, 2002 through October 22, 2005.  The Trustee is informed and believes that Tiburon Hospitality Management, LLC is owned by, or controlled by, or an affiliate of Bill Dixon.  From December 5, 2005 through January 22, 2006, the Debtor employed The West Paces Hotel Group, LLC ("WPHG") as a consultant.  Pursuant to that certain Operating Agreement between the Debtor, as Owner, and WPHG, as Operator, dated January 23, 2006, WPHG managed the operations of the Debtor's property.  WPHG continued in the capacity of

---

[4] See the Order Denying Debtor's Motion to Reject Transfer Agreement of 1996, as Amended entered on May 6, 2009.

4

property manager through the post-petition closing of the Debtor's operations on or about March 16, 2009, when the Debtor had exhausted its working capital and lacked the funds to pay its costs of operation. WPHG is an unsecured creditor in this case, having filed a claim in the amended amount of $627,558.73. WHPG is a member of the Official Committee of Unsecured Creditors in this case.

In connection with the operation of the resort facilities, on or about July 1, 2005, "Daufuskie Island Club & Resort" entered into a Collective Bargaining Agreement with the International Union of Operating Engineers, Local, 465, AFL-CIO (the "Union") for "all regular full-time and regular part-time hourly associates employed at Daufuskie Island Club & Resort" and at Salty Fare, "but excluding all temporary, office clerical associates, confidential associates, guards and supervisors". The Union has filed a complaint with the National Labor Relations Board ("NLRB"), alleging that the Debtor and WPHG are responsible for certain paid time off ("PTO") benefits owed to the Union members employed on the Debtor's property at the time the Debtor closed its operations. Certain former employees have also filed action against the Debtor (which action is stayed by this bankruptcy case), WPHG and other named defendants for the benefits, and seeking class action status, which action is now pending in the United States District Court for the District of South Carolina as the case Anselmo, et al. v. The West Paces Hotel Group, LLC, et al., Civil Action No. 9:09-cv-2466-CWH-BM. In the Anselmo case in the District Court, the defendants have filed motions asserting that the matters should be dismissed and are properly addressed in the NLRB investigation of the Union complaints. The Union and the former employees have filed claims as creditors in this case.

At the time of the filing of this case, the Debtor employed Troon Golf, L.L.C. ("Troon Golf") to operate the Melrose Golf Course and the Bloody Point Golf Course, pursuant to that certain Golf Facility Management Agreement for Daufuskie Island Resort & Breathe Spa dated April 4, 2004. Troon Golf continued as the golf course operator until on or about March 29, 2009 when the Debtor had closed its operations. Troon Golf has an allowed administrative priority claim in the amount of $59,595.90.

Following the Debtor's Chapter 11 filing, the Debtor lacked available cash to meet its expenses, and it appears that the Debtor incurred substantial expenses post-petition prior to the Trustee's appointment which were not paid. The Trustee is still in the process of reviewing records and other information to determine the extent and validity of amounts that may have been incurred post-petition and were not paid.

## C. Ownership and Control of the Debtor

Bill Dixon and Gayle Dixon are the members of the Debtor, and prior to the appointment of the Trustee, they acted as the managers of the Debtor. It appears that Bill Dixon was most responsible for managing the Debtor's affairs.

## D. Events Leading to the Chapter 11 Case

Following its acquisition of the Melrose Property, the Bloody Point Property, Melrose Landing, Salty Fare and the Eigelberger tract in 2002, the Debtor suffered substantial

operating losses.  These losses are reflected in the loans the Debtor obtained from Beach First, AFG and CSE, from the asserted loans Bill Dixon and Gayle Dixon say they made to the Debtor, and from the sale/lease-back transaction of the Salty Fare property with The Collins Family Trust.  By 2008, the Debtor attempted to arrange a sale of certain of the Melrose Property assets, including the inn.

On September 25, 2008, MCI filed a lawsuit in Beaufort County, South Carolina, in the Court of Common Pleas, Civil Action No. 2008-CP-07-3647, naming as defendants the Debtor, Bill Dixon, Gayle Dixon, the Collins Family Trust, and Melrose Club Management, Inc., n/k/a Daufuskie Club, Inc., seeking a declaratory judgment that, pursuant to the 1996 Transfer Agreement, MCI is entitled to purchase assets owned by DIP and the Collins Family Trust.  The Debtor, Bill Dixon and Gayle Dixon filed an answer, counterclaims and third-party claims against certain individuals who were the officers and/or directors of MCI and the Melrose Property Owners Association, Inc.  When it filed the lawsuit, MCI also filed a lis pendens on the Melrose Property, Melrose Landing and Salty Fare.  The filing of the lawsuit and the lis pendens effectively put an end to the Debtor's sales of property.[5]

Running our of working capital and moving into the slowest part of the year, the Debtor determined that Chapter 11 was the appropriate course for it to attempt to workout of its situation.  It filed the Chapter 11 petition on January 20, 2009.

### III.  POST-PETITION MATTERS

Upon the filing of the Chapter 11 petition on January 20, 2009, the Debtor filed motions for authorization to use cash collateral, for authorization of new financing for its operations, and to reject the 1996 Transfer Agreement as an executory contract.  The first two of these motions were essential for the Debtor to continue operating; the third motion was an attempt to extricate the property from the alleged restrictions of the 1996 Transfer Agreement.  The Debtor was unsuccessful in two of the three motions, causing it to close its operations on or about March 16, 2009.  The Trustee was then appointed on March 23, 2009, and he arranged for the reopening of some operations and the preparation of the assets for marketing and sale.

The Debtor filed its cash collateral motion on February 7 2009.  The cash collateral included the income from the Melrose Inn, the Island Conference Center, and the resort amenities, accounts receivable, and proceeds of collateral, all securing AFG.  The Debtor reached agreement with AFG for the use of cash collateral, pursuant to orders entered on February 7, 2009, March 17, 2009, and March 30, 2009; however, the cash collateral was not sufficient to fund the Debtor's operations and on March 2, 2009, the Debtor filed a motion seeking authorization for new financing.  The motion for authorization of the new financing sought authorization for a post-petition credit facility in the maximum amount of $3 million,

---

[5] Subsequent to the bankruptcy filing and the Trustee's appointment, the Trustee removed this lawsuit to the Bankruptcy Court, and it has now been consolidated with a declaratory judgment adversary proceeding MCI filed in this case, Adversary Proceeding No. 09-80094-jw.

secured by a first priority security interest and lien on the Debtor's assets, from Petrus Private Investment, L.P. or an affiliate ("Petrus"). The hearing on the motion to authorize the new loan was on March 11, 2009.

Also on March 11, 2009, the Court held the hearing on the Debtor's motion to reject the 1996 Transfer Agreement as an executory contract. The Debtor filed its motion on February 27, 2009, and the hearing on the motion to reject the 1996 Transfer Agreement was scheduled on an expedited basis, primarily because of its importance to the other motions. At the conclusion of the hearing on March 11, the Court orally stated its ruling that the Debtor's motion to reject the 1996 Transfer Agreement was denied. The written Order was entered on May 6, 2009.

Upon the Court's denial of the Debtor's motion to reject the 1996 Transfer Agreement as an executory contract, Petrus withdrew its offer to provide the post-petition loan, and the Debtor then lacked funding needed to continue its operations. Soon after, the Debtor closed its operations.

Following his appointment on March 23, 2009, the Trustee was able to arrange limited post-petition financing from Beach First and Tidelands Bank. Beach First made a $1 million post-petition loan, secured by a first lien on all assets of the Estate and having superpriority status, pursuant to the Orders entered on April 24, 2009 and on May 8, 2009, and Tidelands Bank made a $500,000.00 post-petition loan, secured by a first lien on all assets of the Estate and having superpriority status, pursuant to the Orders entered on July 17, 2009 and on July 29, 2009, such loans comprising a participation loan in the total amount of $1.5 million by Beach First and Tidelands Bank (the "Senior Post-Petition Loans"). The Senior Post-Petition Loans matured and became due on November 1, 2009. The Trustee has since arranged another post-petition loan from Tidelands Bank in the proposed amount of $250,000.00, of which $150,000.00 is now authorized under an interim order expected to be entered on November 20, 2009, and with a balance of $100,000.00 to be considered at the final hearing on the motion for authorization of the loan on December 1, 2009. The second Tidelands Bank loan is secured by a second lien on all assets of the Estate, junior in priority only to the first lien granted for the Senior Post-Petition Loans, and it has superpriority status, though subordinate to the superpriority claims of the Senior Post-Petition Loans). Beach First and Tidelands Bank have extended the maturity date of the Senior Post-Petition Loans until after January 1, 2010.

With the funding from the Senior Post-Petition Loans, the Trustee was able to arrange the reopening of the Melrose Golf Course and several of the key resort facilities on the Melrose Property. In addition, he was able to restore and protect the property for the marketing and sale of the Estate assets.

The Trustee made great efforts to sell the assets owned by the Estate prior to November 1, 2009, the maturity date of the Senior Post-Petition Loans, but a sale within that time was not possible. The Trustee has a proposed sale of the property, and on September 15, 2009, the Trustee filed his <u>Motion and Memorandum for an Order (1) Authorizing the Sale of Substantially All Assets of the Estate Free and Clear of Liens, Claims, Encumbrances and Other Interests, and (2) Approving the Assumption and Assignment of Certain Executory</u>

Contracts and Leases (the "Sale Motion"). In the Sale Motion, the Trustee proposes selling substantially all assets of the Estate to Montauk Resorts, LLC, for the sale price of $49.5 million, or to another buyer submitting a higher or otherwise better offer for the assets. The hearing on the Sale Motion is now scheduled for December 1, 2009. The contemplated closing on the sale would be in mid-December.

Numerous other matters have occurred in this case, and reference to the Court's docket of this case should be made. The post-petition matters include the following:

- The aforementioned post-petition financing needed to pay essential expenses to protect and maintain the assets of the Estate, and to market and sell the assets;

- Arrangements, including contracted services, for the reopening of the facilities on the property owned by the Estate;

- Budgetary matters, including the uses of funds obtained with the post-petition financing;

- Motions for stay relief filed by creditors in the case;

- Matters pertaining to the use of cash collateral, and the rights of creditors in cash collateral;

- Issues and provisions for continued utility service to the property owned by the Estate;

- Issues and problems regarding insurance coverage for the assets owned by the Estate;

- The adversary proceeding for declaratory judgment filed by MCI with regard to its asserted rights under the 1996 Transfer Agreement, which adversary proceeding is Adversary Proceeding No. 09-80094-jw;

- The adversary proceeding filed by the Trustee to avoid the mortgage asserted by Bill Dixon on certain property of the Estate, as an avoidable preference under 11 U.S.C. § 547(b), Adversary Proceeding No. 09-80120-jw;

- The adversary proceeding filed by Carolina Shores against Bill Dixon and the Trustee (as the Estate representative), alleging claims for damages, for equitable subordination, and other relief, based upon alleged wrongful conduct by Bill Dixon and the Debtor, Adversary Proceeding No. 09-80134-jw;

- Applications by Troon Golf, LLC and the Collins Family Trust for the allowance of administrative priority claims against the Estate;

- The rejection of equipment leases, and the disposition of the leased equipment;

- Issues regarding the rights, interests and obligations of the Debtor, the Estate and other parties in regard to the Salty Fare embarkation facility formerly owned by the Debtor;

- Repairs to the bulkhead protecting the Melrose property, including an appeal of the denial by the South Carolina Department of Health and Environmental Control ("DHEC") of the Debtor's application for a permit to make repairs to the bulkhead;

- Obtaining records and information necessary and/or important to address matters in the case;

- Coordination of The West Paces Hotel Group's retrieval of records it maintains belong to it;

- Issues regarding a post-petition contract entered by the Debtor with Daufuskie Island Cottage Carts and Bikes, LLC;

- Issues regarding a contract with Island Management, Inc. ("IMI"), IMI's performance of its obligations and its claim for payment;

- A claims proceeding before the National Labor Relations Board by former union employees on the Melrose Property;

- An action by former employees, for which class action status is sought, entitled, <u>Anselmo, et al. v. The West Paces Hotel Group, Inc., et al.</u>, now pending in the United States District Court for the District of South Carolina, and which should be stayed as to the claims against the Debtor;

- Matters regarding club membership rights and interests in the Melrose Property;

- The sale of Melrose Utility Company, Inc. and the stock owned by the Estate in Haig Point/Melrose Wastewater Treatment Company, Inc.;

- The possible sale of beach cottages in the Beach Cottages area of the Melrose Property (which would have conferred substantial benefit to the Estate in regard to beach cottages it owns in the area), and the possible grant of an easement to enable such sale;

- The sale and disposition of boats owned by the Estate, or by a limited liability company owned by the Estate; and

- The mortgage foreclosure action by CS Eigelberger, LLC (successor to CSE Mortgage, LLC) ("CSE") against Eprop, LLC, which is wholly owned by the Estate, to foreclose on the mortgage CSE holds on the Eigelberger tract of property formerly directly owned by the Debtor.

## IV.  PROPERTY OF THE ESTATE AND FINANCIAL DATA

Prior to the Trustee's appointment in this case, the Debtor filed schedules, its statement of affairs, and lists, and amended schedules, an amended statement of affairs and exhibits, stating its assets, liabilities, transfers, ownership and related information.  Based upon the Debtor's records and information provided by other persons, including creditors in this case, the information provided in the Debtor's filings appears to be reasonably accurate.  **However, it should be noted that the Trustee has not completed his review, analysis, and assessment of the assets and liabilities of the Estate, and the Trustee does not waive or limit the rights of the Estate, or any interest of the Estate in property, by the listing of assets and liabilities provided in this Disclosure Statement; and the Trustee specifically reserves all rights and all interests in assets of the Estate, including any claims or causes of action against other persons, for the benefit of the Estate.**

### A.  Assets

The Debtor listed the assets of the bankruptcy estate (the "Estate") in the schedules, statement of affairs and exhibits it filed on January 20, 2009, and in the amended schedules, statement of affairs and exhibits it filed on March 6, 2009.  Schedules A and B of those filings, with the attachments/exhibits they reference, are collectively attached as **Exhibit A** to this Disclosure Statement. Rather than repeat the listings in the filings made by the Debtor, the following is a summarized description of the assets of the Estate.

The assets of the Estate generally consist of resort facilities, lodging and development property located on Daufuskie Island, South Carolina, primarily in the Melrose Planned Unit Development (the "Melrose Property") and in the Bloody Point Planned Unit Development (the "Bloody Point Property").  In addition, the Estate owns the Eigelberger tract of real property by and through the Estate's ownership of Eprop, LLC, which holds title to the Eigelberger tract.

More specifically, the assets of the Estate include the following:

The Melrose Property.  The Melrose Property includes 668 acres, a golf course, a beach club, an oceanfront inn, a conference facility, cottages, 237 approved development units, and 79 unassigned development units.

(i)    The Melrose Golf Course is an 18-hole championship course designed by Jack Nicklaus with clubhouse facilities, which include a restaurant.

10

(ii)    The Melrose Inn is located oceanfront, and has 52 deluxe guest rooms and a fine dining restaurant.

(iii)    The Island House Conference Center is a 12,000 square foot facility designed for business conferences and meetings and social functions, and includes a recently updated commercial kitchen.

(iv)    The Beach Club site includes an oceanfront pool and restaurant, and approval for 56 development units.

(v)    The Equestrian Center is on a 16-acre parcel of property, and it has full service stables, green pastures encircled by rail fences and the Sportsman's Lounge Pub.

(vi)    The facilities on the Melrose Property include administration (maintenance, gas, garbage) and employee housing buildings.  The engineering building is 6,240 square feet; the repair shop is 5,170 square feet; and the supply warehouse is 4,365 square feet.  There are eleven 1,590 square foot staff housing units.

(vii)    The Silver Dew Land parcel has approval for 25 development sites.

(viii)    Parcel C consists of 9.8 acres and has approval for 14 development sites.

(ix)    Easter Beach Village provides golf view sites with approval for 40 second-row oceanfront development units.

(x)    The Melrose Tennis Center was designed by Stan Smith, and includes tennis courts and a full-service pro shop.

(xi)    The Tennis Villa parcel is adjacent to the Melrose Tennis Center and has approval for 30 development units.

(xii)    The Inn Expansion South parcel is four oceanfront acres with approval for 36 development units.

(xiii)    The Inn Expansion North parcel is also four oceanfront acres with approval for 36 development units.

(xiv)    The Estate owns four 4-bedroom oceanfront cottages, and one 2-bedroom oceanfront cottage.

(xv)    The Estate owns five 4-bedroom second row oceanfront cottages.

<u>Melrose Landing</u>.  The Melrose Landing is the site of the dock and landing area for Melrose

and Bloody Point residents and guests arriving on and departing from Daufuskie Island. It includes four acres on the Intracoastal Waterway (Cooper River), with approval for 30 development units and 10,000 square feet of commercial space.

The Bloody Point Property. The Bloody Point Property owned by the Estate consists of an 18-hole golf course and clubhouse facility, a spa, and two lots.

> (xvi)    The Bloody Point Golf Course was designed by Tom Weiskopf and Jay Moorish. The clubhouse includes a spa and a restaurant.

> (xvii)   The lots are part of an 8.8 acre parcel of oceanfront land between the beach and the clubhouse. The lots would be second-row homesites.

The Eigelberger Tract. The Eigelberger Tract consists of 199.28 acres of land on the southern end of Daufuskie Island, adjacent to the Bloody Point Property, on Mungen Creek. It has deep water access lots. It is not yet developed. The Debtor previously owned this property but transferred it to Eprop, LLC, which is wholly-owned by the Estate, for the purpose of obtaining a loan secured by a mortgage on the property.

In addition to the real property, the Estate owns furniture, fixtures, equipment, vehicles, boats, and other personalty used in operating the Debtor's resort and development business. These assets are listed in the schedules filed by the Debtor in this case.

The assets of the Estate also include certain causes of action that are not included in, but are expressly excepted from, the sale. These causes of action include preference avoidance actions, and possible claims against persons for matters occurring

## B. Liabilities

The Debtor's Statements and Schedules provide a listing of creditors in this case. The Debtor's secured debt is as follows:

The aggregate amount of the secured claims asserted against the Estate exceeds the sale price of the assets. In addition, substantial administrative priority claims have been incurred to date in this case, and will continue to be incurred until the resolution of this case. Other priority claims may exist, and the schedules filed by the Debtor at the beginning of the case indicate that non-priority unsecured claims in the case are likely to total more than $16 million. Nonetheless, this sale is in the best interest of the Estate, it will provide for payment of priority claims, and it will provide for a partial payment of non-priority unsecured claims.

### 1.    **Secured Claims**

The secured claims against the Estate are as follows:[6]

_____

[6] With the exception of the property securing the post-petition loans made by Beach First and

Beach First and Tidelands Bank, by way of a participation loan, hold first priority security interests in and liens on all assets of the Estate for post-petition loans they made to the Trustee in the principal amount of $1.5 million, pursuant to the Court's Orders entered on April 24, 2009, May 8, 2009, July 17, 2009 and July 29, 2009.

Beach First filed a claim [Claim No. 152 on the Claims Register] in the amount of $6,417,614.42, as of March 19, 2009, secured by a second mortgage[7] on:

>   (i)    the two Bloody Point lots owned by the Estate, identified as Lots 50 and 51 of Phase 1 of Daufuskie Island Club;

>   (ii)    5.83 acres comprising the Melrose Beach Club parcel, including Beach Cottage 4160 located at 175 Avenue of Oaks, Beach Cottage 4170 located at 177 Avenue of Oaks, Beach Cottage 4180 at 179 Avenue of Oaks and Beach Cottage 4190, all of which cottages are located on part of the Melrose Beach Club parcel;

>   (iii)    5.01 acres comprising Parcel 81 on the subdivision of Beach Cottages nos. 81, 91 and 97 (Plat 123/164) (includes the beach cottages listed below located at 81, 83, 91, 93, 97 and 99 Avenue of Oaks);

>   (iv)    5.07 acres comprising Parcel 102 on subdivision of Beach Cottages nos. 102, 106 and 110 (includes the beach cottages located at 102, 104, 106, 108 and 110 Avenue of Oaks); and

>   (v)    Beach Cottage 3000-3001 located at 60 Avenue of Oaks (a/k/a Tract A, Lot 60), Beach Cottage 3050-3051 located at 62 Avenue of Oaks (a/k/a Tract B, Lot 62), Beach Cottage 3052-3053 located at 64 Avenue of Oaks (a/k/a Tract C, Lot 64), Beach Cottage 3100-3101 located at 66 Avenue of Oaks, Beach Cottage 3102-3103 located at 68 Avenue of Oaks, Beach Cottage 3500-3501 located at 102 Avenue of Oaks (a/k/a Lot K, Plat 124/31),  Beach Cottage 3502-3503 located at 104 Avenue of Oaks, Beach Cottage 3550-3551 located at 106 Avenue of Oaks (a/k/a Lot L, Plat 124/31), Beach Cottage 3552-3553 located at 108 Avenue of Oaks, Beach Cottage 4750-4751 located at 99 Avenue of Oaks,  Beach Cottage 4752-4753 located at 97 Avenue of Oaks, Beach Cottage 4900-4901 located at 93 Avenue of Oaks, Beach

---

Tidelands Bank, the identification of the property securing each of the secured claims is taken from the amended schedules filed by the Debtor on March 6, 2009.  The Trustee will verify the correctness of the property on which each secured claim is asserted, but he is informed and believes that the identification of collateral in the amended schedules filed by the Debtor is reasonably accurate.

[7] This mortgage was a first mortgage on the property at the filing of this case, but it is now a second mortgage by virtue of the first priority lien granted to Beach First and Tidelands Bank to secure the post-petition loans they made to the Trustee.

Cottage 4902-4903 located at 91 Avenue of Oaks, Beach Cottage 4950-4951 located at 83 Avenue of Oaks, and Beach Cottage 4952-4953 located at 81 Avenue of Oaks, all of which cottages are located on the Melrose Property.

AFG filed a claim [Claim No. 203 on the Claims Register] in the principal amount of $4 million, secured by (i) a second mortgage[8] on (A) 300 acres comprising a substantial portion of Melrose Plantation, including the Melrose Inn, the Island House Conference Center, the Melrose Golf Course (with the clubhouse and related facilities), the equestrian center, the tennis courts and the tennis villa area; (B) 7.362 acres comprising the Melrose Maintenance Area (maintenance buildings, warehouse, gasoline facilities, repair area); (C) 7.26 acres which includes the site on which the staff/employee housing is located, a concrete plant, and a residual area of property, with an access and utility easement; and (D) vacant land in the second row development parcel where Beach Cottages 5501 through 5601 would be constructed (sometimes referred to as the "Village Area") on the Melrose Property; and (ii) by a security interest in and lien on the Debtor's accounts receivable, inventory (e.g., pro shop inventory), and other personalty.

Carolina Shores, LLC ("Carolina Shores") filed a claim [Claim No. 117 on the Claims Register] in the amount of $27,750,128.51, secured by a mortgage on (i) 300 acres comprising a substantial portion of Melrose Plantation, including the Melrose Inn, the Island House Conference Center, the Melrose Golf Course (with clubhouse and related facilities), the equestrian center, the tennis courts and the tennis villa area; (ii) Beach Cottage 5501 located at 14 Avenue of Oaks and Beach Cottage 5601 located at 15 Avenue of Oaks; (iii) 7.362 acres comprising the Melrose Maintenance Area (maintenance buildings, warehouse, gasoline facilities, repair area); and (iv) vacant land in the second row development parcel where Beach Cottages 5501 through 5601 would be constructed (sometimes referred to as the "Village Area") on the Melrose Property. The Trustee is informed and believes that the principal amount due in this claim is approximately $14.2 million.

William R. Dixon, Jr. ("Bill Dixon") filed a claim [Claim No. 116 on the Claims Register] in the amount of $34,692,660.58, secured by a mortgage on the portions of the Melrose Property still owned by the Estate. This secured claim is disputed. The Trustee has filed an adversary proceeding [Adversary Proceeding No. 09- 80120-jw] to avoid the mortgage, security interest, assignment and lien asserted by Bill Dixon on the assets as an avoidable preference pursuant to 11 U.S.C. § 547(b). In addition, Carolina Shores has filed an adversary proceeding against Bill Dixon and the Estate [Adversary Proceeding No. 09- 80134-jw] alleging that Bill Dixon's mortgage, security interest, assignment and lien should be subordinated to Carolina Shores' mortgage and lien. The Trustee is informed and believes that other grounds also exist upon which to contest Bill Dixon's claim.

---

[8] This mortgage was a first mortgage on the property at the filing of this case, but is now a second mortgage by virtue of the first priority lien granted to Beach First and Tidelands Bank to secure the post-petition loans they made to the Trustee.

CS Eigelberger, LLC (successor to CSE Mortgage, LLC) ("CSE") filed a claim [Claim No. 211 on the Claims Register] in the amount of $9,119,560.26, plus interest and attorneys fees and costs, upon the Debtor's guaranty of the loan CSE made to Eprop, LLC. The CSE loan is secured by a first mortgage, security interest, assignment and lien on the Eigelberger tract of property.

The Greenery, Inc. filed a claim [Claim No. 132 on the Claims Register] in the amount of $308,813.86, secured by a mechanic's lien on certain parcels of the Melrose Property. The Trustee is informed and believes that this claim is actually unsecured, after deducting the senior liens on the property on which it is filed.

Coastal Connections, Inc. asserts a claim [see Schedule D filed by the Debtor on March 6, 2009] in the amount of $62,883.00, secured by a mechanic's lien on a certain parcel of the Melrose Property. The Trustee is informed and believes that this claim is actually unsecured, after deducting the senior liens on the property on which it is filed.

> The 2008 ad valorem taxes for the property owned by the Estate have not been paid, and must be paid from the sale of the property. The Trustee is informed and believes that the aggregate amount of the property taxes is approximately $280,000.00. The Trustee is obtaining a breakout of the amounts due on each of the properties, and the tax due on each property shall be paid from the sale proceeds of that property.

2.    **Administrative Priority Claims**

The administrative priority claims in this case will be substantial in amount. It appears that from the filing of the case through the date of the Trustee's appointment, large expenses were incurred by the Estate but not paid, including operating expenses, lease payments, professional fees, and other expenses associated with the Debtor's business and ownership of property. For example, Troon Golf holds an allowed administrative claim in the amount of $59,595.90 from its post-petition operation of the golf courses, and the Collins Family Trust has a pending application for allowance of an administrative claim in the amount of $199,466.39 for post-petition rent and taxes under the Salty Fare lease. In addition, the Trustee's attorneys have invested substantial time and cost advances in this case, and they continue to spend considerable time in the matters necessary for this case; the Trustee also will be due compensation, pursuant to 11 U.S.C. § 326; the real estate broker employed by the Trustee for the sale of the property, RBC Enterprises, Inc., will be due a commission on the sale of the property; and the Trustee anticipates that he will need to employ the services of an accountant. The Trustee has not yet had sufficient time to review the validity of many of the potential administrative claims against the Estate, and he is thus unable to quantify them at this time. However, the Trustee is informed and believes that the administrative expenses will total over $1.5 million and could exceed $3 million.

3.    **Priority Claims (Excluding Administrative Priority Claims)**

Other priority claims include pre-petition taxes owed to the South Carolina Department of Revenue, in the amount of approximately $6,200.00 [Claim No. 121 on the

Claims Register], and claims asserted by various individuals, including members of the club operated by the Debtor who claim the right to recover all or a portion of the fee/deposit they made. These claims are not yet established as to validity, and therefore are not quantified.

### 4.    <u>Non-Priority Unsecured Claims</u>

As noted above, in the schedules filed by the Debtor early in this case, the Debtor identified unsecured non-priority claims in the aggregate amount of $16,310,899.21. <u>See</u> Summary of Schedules and Schedule F filed by the Debtor on March 6, 2009 [Docket No. 109.] The actual amount of the unsecured non-priority debt will depend upon the allowability of claims, and the amounts of the claims of creditors who are partially secured, lease claimants, and contract claimants. In addition, the claim asserted by the National Labor Relations Board upon the complaint filed by Union employees, the claims of former employees based upon the allegations in the <u>Anselmo, et al. v. The West Paces Hotel Group, LLC, et al.</u> litigation, the claims of Club members asserting the right to recovery of amounts they paid when they purchased club membership rights and deficiency claims of partially secured creditors may significantly increase the total amount owed to non-priority unsecured creditors of the Estate.

### 5.    <u>Secured and Lease Creditors Whose Collateral or Leased Property Has Been Released to Them</u>

At the filing of this case, the Debtor has several secured and lease creditors who have since received their collateral or leased property. These creditors include Caterpillar Financial Services, CitiCapital Commercial Leasing, Textron Business Services, Colonial Pacific Leasing Corporation, Turf Equipment Leasing Company and Ford Motor Credit Company. In addition, the Debtor owned a boat, the Swift Cat, through a wholly-owned limited liability company, Swift Cat, LLC, which was subject to the lien of Key Equipment Finance, Inc.; Key Equipment Finance, Inc. has recovered the boat (with the Trustee's consent).

### C.  The Melrose Club, Inc. Asserted Rights and Interest

The Melrose Club, Inc. ("MCI") previously owned the 300 acres comprising a substantial portion of Melrose Plantation. MCI sold the property to Daufuskie Club, Inc., f/k/a Melrose Management Club, Inc. ("DCI") on or about December 26, 1996. In conjunction with the sale of the property to DCI, MCI and DCI executed that certain <u>Transfer Agreement</u> (the "1996 Transfer Agreement"). Based upon the provisions of the 1996 Transfer Agreement, MCI asserts that it has the right to have the Melrose Property returned to it if DCI or its successors "failed to fund Operational Deficits." <u>See</u> ¶ 27 of the <u>Amended Complaint for Declaratory Judgment</u> filed by MCI on August 21, 2009 in Adversary Proceeding No. 09-80094-jw in this Court (the "MCI Litigation").

The existence of the 1996 Transfer Agreement was stated in that certain <u>Memorandum of Agreement</u> filed in the RMC Office of Beaufort County, South Carolina, on December 31, 1996. Pursuant to this recorded document, MCI maintains that its rights and interests under the 1996 Transfer Agreement are binding on and effective against subsequent

owners of the transferred property (with the exception of sales made in the ordinary course of business) and the subsequent lenders taking mortgages on the property.

As stated in filings in the MCI Litigation made by the Trustee, Beach First, AFG, Carolina Shores, and other named defendants, the Trustee and other named defendants deny that the rights and interest asserted by MCI under the 1996 Transfer Agreement are valid and/or effective against them or as to the Melrose Property.   Although no settlement has yet been reached, the Trustee has been working with MCI in an attempt to address and resolve MCI's concerns regarding the Melrose Property.

Hearings are scheduled in the MCI Litigation on motions to dismiss and/or for summary judgment, however, it is not certain when a final determination of the rights and interest asserted by MCI will be made.

**D.  Equity Interests**

William R. Dixon, Jr. and Gayle Bulls Dixon own all membership interests of the Debtor.

**E.  Summary of 2006 and 2007 Income, Expenses and Profit (Loss)**

The Trustee has the tax returns for the Debtor for 2006 and 2007, which appear as Schedule C (Form 1040) to the federal tax returns filed by Bill Dixon for those years; the Trustee does not have copies of the tax return information for the Debtor for prior years.  The Trustee is informed and believes that the 2008 tax return information may have been recently completed for the filing of returns by October 15, 2009, but the Trustee does nor presently have that information.

In 2006, the Debtor had gross income of $17,332,162, and a net loss of $10,283,216. In 2007, the Debtor had gross income of $23,244,087, and a net loss of $8,398,600.

Copies of the Debtor's Schedule C (Form 1040), which were part of Bill Dixon's federal tax returns, are attached as **Exhibits B and C** to this Disclosure Statement.

**F.  Tax Consequences of the Plan**

Although the Trustee intends to verify the effect of the Plan, if any, in regard to tax consequences, prior to the confirmation hearing on the Plan, the Trustee is informed and believes that the Plan does not result in adverse tax consequences for the Estate.

The Debtor's substantial losses in recent years should eliminate concern over income taxes.  In addition, the Trustee is informed and believes that, the Debtor being a limited liability company, any income tax incurred by the Debtor would pass through to the Debtor's members, Bill Dixon and Gayle Bulls Dixon. With respect to capital gains tax, the Trustee is informed and believes that the sale price of the Property is not sufficiently high to generate capital gains tax.  Finally, the Trustee is not aware of any other basis upon which the Estate would be assessed a tax as a result of the Plan.

### G.  Liquidation Analysis

Pursuant to 11 U.S.C. § 1129(a)(7) (commonly called the "Best Interests Test"), creditors must receive payment under a Chapter 11 plan at least equal to the payment they would receive if the case were liquidated under Chapter 7 of the Bankruptcy Code.  In this case, the Trustee is informed and believes that this requirement is met by the Plan.

The Assets being sold include substantially all – if not all, in fact – assets of the Estate.  Other than the Assets and any recoveries from possible claims against other persons, there is no other significant source of payment of claims against the Estate.  The Plan provides that the Assets will be sold for the highest or otherwise best value obtainable, and that the Trustee will, as appropriate, pursue collection on claims the Estate has against other person.

Accordingly, in this case, the matter is one of maximizing the value of the Assets for creditors by selling the Assets through a process that is reasonably likely to result in the best obtainable value within the time constraints applicable to the Assets and this case, and by pursuing recovery on claims against other persons where the assertion and prosecution of the claims appears to be cost-justified and beneficial for the creditors of the Estate.  The Trustee is informed and believes that the Plan provisions provide maximum value for the Estate.

The Trustee is informed and believes that each class of creditor claims is receiving as much payment and value under this Plan as it would receive in a Chapter 7 bankruptcy.  Accordingly, the requirement of 11 U.S.C. § 1129(a)(7) is satisfied.

### H.  Income and Expenses During Chapter 11

The income received and expenses paid during this Chapter 11 case are reported in the Trustee's monthly reports filed with the Court.  The Income Statement from the September 2009 Monthly Report filed by the Trustee is attached as **Exhibit D** to this Disclosure Statement.  The Income Statement shows the year-to-date income and expenses for the period of March 23, 2009, the date of the Trustee's appointment, through September 30, 2009.

The Trustee has filed the following monthly reports in this case:

| **Period Covered** | **Monthly Report** | **Date Filed** |
| --- | --- | --- |
| March 20 – 31, 2009[9] | March 20 – 31, 2009 | June 24, 2009 |
| April 1- 30, 2009 | April 2009 | June 24, 2009 |
| May 1 – 31, 2009 | May 2009 | June 24, 2009 |
| June 1 – 30, 2009 | June 2009 | August 5, 2009 |
| July 1 – 31, 2009 | July 2009 | August 17, 2009 |
| August 1 – 30, 2009 | August 2009 | September 18, 2009 |
| September 1 – 30, 2009 | September 2009 | October 20, 2009 |

## V.  SALE OF PROPERTY

### A.  Marketing and Sale Efforts

The Trustee employed RBC Enterprises, Inc. ("RBC") as the non-exclusive broker for the sale of the primary assets of the Estate, on a three percent (3%) commission.  RBC and its principal, Russell E. Brown Jr., are very familiar with Daufuskie Island and the properties owned by the Estate.  The Order authorizing RBC's employment was entered on May 19, 2009.  RBC immediately began working with an Orlando based advertising and public relations firm, Ryan and Deslauriers, to develop a marketing piece to promote the assets owned by the Estate for sale.  At the same time, RBC began studying its database of cooperating brokers to determine which ones were qualified for this type of offering as well as its own database of prospective qualified clients.

By July 6, 2009 the offering book was designed, produced and delivered to RBC's offices on Hilton Head.  By July 9, 2009, RBC had identified through its contacts and those of its network of 24 cooperating brokers a total of 87 qualified prospects and had mailed each one an Estate Offering Book along with a hand written card from Mr. Brown that explained why they received the book, invited them to call if they had further questions, and notified them that Mr. Brown would follow up with a call.

From July 9, 2009 to the present, RBC has telephone discussions and dealt with over 160 prospects for the sale of properties owned by the Estate.  The majority of the additional 73+ potential buyers (i.e., the potential buyers in addition to the original 87 potential buyers

---

[9]    The Trustee's first monthly report covered the period of March 20, 2009, the date of his appointment, through March 31, 2009.

initially identified) came from the 87 initially identified potential buyers, when asked by Mr. Brown if they knew of anyone else that might have an interest in the property. RBC has over 55 confidentiality agreements executed by parties who wanted more information. RBC has toured over 30 parties through the assets of the Estate that were in some stage of assessment of the potential purchase of the Estate's property. RBC helped over 20 entities with the construction of a business plan, timeline, and pro forma to aid in the due diligence analysis process. It toured over 30 different hospitality, golf, and/or marina management companies exploring the possibilities with prospective purchasers for the opportunity to participate with them in the venture. The activity has been continual, productive, and promoting.

By and through these efforts, the Trustee received an offer from Montauk Resorts, LLC to purchase substantially all assets of the Estate and the Eigelberger tract owned by Eprop, LLC for the price of $49.5 million.

### B.  Assets Being Sold

The sale of the property includes substantially all assets of the Estate. More particularly, the assets being sold include the Melrose Property, the Bloody Point Property, Melrose Landing, along with all improvements, personalty owned by the Estate in connection with these properties, and all rights and interests of the Estate in connection with these properties. In addition, Eprop, LLC, which is wholly owned by the Estate, will simultaneously sell the Eigelberger tract to Montauk Resorts, LLC.

### C.  The Sale Motion and the Sale Order

On September 15, 2009, the Trustee filed his <u>Motion and Memorandum for an Order (1) Authorizing the Sale of Substantially All Assets of the Estate Free and Clear of Liens, Claims, Encumbrances and Other Interests, and (2) Approving the Assumption and Assignment of Certain Unexpired Executory Contracts and Leases</u> (the "Sale Motion"), seeking authorization pursuant to 11 U.S.C. §§ 363(b)1) and (f), Rule 6004 of the Federal Rules of Bankruptcy Procedure and SCLBR 6004-1, to sell substantially all assets of the Estate to Montauk Resorts, LLC ("Montauk") free and clear of all liens, claims, encumbrances and other interests, except for Assumed Liabilities and Permitted Encumbrances (as defined in the Asset Purchase Agreement attached to the Sale Motion), and seeking authorization, as part of the sale, to assume and assign certain unexpired executory contracts and leases to Montauk pursuant to 11 U.S.C. §§ 365(a), (b) and (f) and Rule 6006 of the Federal Rules of Bankruptcy Procedure. In conjunction the sale of the Estate assets, Eprop, LLC, which is wholly owned by the Estate, will sell the Eigelberger tract to Montauk as part of the overall sale transaction. The total sale price is $49.5 million.

The Sale Motion, and the accompanying Notice of Sale, specifically provide that the proposed sale to Montauk is subject to higher or otherwise better offers, on substantially similar terms, such that if a higher or better offer were received for the assets, the Trustee would be authorized to sell the assets to that offeror.

In conjunction with the Sale Motion, on September 15, 2009, the Trustee also filed a motion (the "Bidding Procedures Motion") seeking entry of an Order establishing bidding

and other procedures, and certain bidder protections, in connection with the sale of the Assets. On September 24, 2009, the Court entered its <u>Order (1) Establishing Bidding and Other Procedures in Connection with the Sale of Substantially All Assets of the Estate, (2) Granting Protections to the Proposed Buyer, and (3) Scheduling Hearing on the Sale</u> (the "Bidding Procedures Order").

The hearing on the Sale Motion is currently scheduled for December 1, 2009.

### D. Projected Payment to Creditors

The Trustee projects that the sale to Montauk will generate sufficient proceeds to fully pay the post-petition loans made by Beach First and Tidelands Bank, the prepetition secured loan of Beach First, the prepetition secure loan of AFG, a substantial portion of the principal amount of the prepetition secured claim of Carolina Shores, all priority claims, and an estimated $6 million or more to non-priority unsecured creditors to share <u>pro rata</u>. These payment amounts are projected, and will depend upon the allocation of value among the assets sold, the priority claims allowed for payment, the rights of Carolina Shores and Bill Dixon as may be determined by the Court, and other factors of this kind. However, the Trustee believes this projection is realistic if the sale to Montauk closes.

## VI. SUMMARY OF PROPOSED PLAN

### A. Preface

In reviewing the Plan, the reader should understand what is meant by "impairment". An "impaired" class of creditors shall mean a class of claims given under the Plan less than the full amount of the filed and approved individual claims in the class, or a class of claims as to which contract rights are modified or compromised by the Plan. An "unimpaired" class shall mean a class of claims whose rights are not affected under the Plan, or which is entitled to and will receive under the Plan full satisfaction of its filed and approved claims as required by the Bankruptcy Code. A class of claims shall not be deemed to be impaired, however, solely by virtue of any Court-approved rejection of an executory contract or lease; for any creditor whose executory contract or lease has been rejected under 11 U.S.C. § 365, the Plan's treatment of the claim (if any) resulting from the rejection will determine whether or not the class is impaired.

<u>Overview of Plan Provisions</u>.

The Plan provides for the sale of substantially all assets of the Estate, and for the payment of the sale proceeds to creditors. The Trustee will sell the assets to the buyer(s) offering the highest and best value for the assets, subject to authorization by the Court. It is presently contemplated that the sale of the assets will be made to a single buyer; however, if necessary or appropriate to realize the best obtainable value for the Estate, the assets may be sold to more than one buyer, and in more than one transaction. The Trustee will obtain authorization for each sale transaction by an order of the Court, with the exception of sale transactions involving assets being sold for a price of $7,500.00 or less. As a condition of the

sale of the assets, a portion of the sale proceeds will be reserved for payment of administrative and other priority claims, and for payment to the non-priority unsecured creditors of the Estate. A portion of the proceeds, however, will be reserved to cover the continuing costs to complete the administration of the Estate, including any litigation costs.

The Sale of Substantially All Assets of the Estate.

The Trustee filed a motion (the "Sale Motion") on September 15, 2009 seeking authorization for a sale of substantially all assets of the Estate to Montauk Resorts, LLC ("Montauk") for the sale price of $49.5 million, free and clear of all liens, claims, encumbrances and other interests, including the interests asserted by The Melrose Club, Inc. ("MCI") in the Melrose Property, pursuant to 11 U.S.C. §§ 363(b)(1) and (f), except for Assumed Liabilities and Permitted Encumbrances, as defined in the Asset Purchase Agreement (the "Montauk APA") attached to the Sale Motion. The Trustee also filed a second motion on September 15, 2009 to establish bidding procedures and certain bid protections (the "Bidding Procedures Motion") in connection with the proposed sale to Montauk as the proposed buyer (the "Stalking Horse Bidder", and its offer the "Stalking Horse Bid"). Following a hearing on the Bidding Procedures Motion, the Court entered the Order (1) Establishing Bidding and Other Procedures in Connection with the Sale of Substantially All Assets of the Estate, (2) Granting Protections to the Proposed Buyer, and (3) Scheduling the Hearing on the Sale (the "Bidding Procedures Order") on September 24, 2009. As set forth in the Bidding Procedures Order, the proposed sale to Montauk is subject to higher or otherwise better offers, provided that such other offers comply with certain requirements. The hearing on the Sale Motion is scheduled for October 28, 2009.

The Trustee contemplates the sale of substantially all assets of the Estate to Montauk, or, if a higher or otherwise better offer is received and approved by the Court, to the successful bidder under the Bidding Procedures Order. However, in the event that the proposed sale to Montauk or to another bidder under the Bidding Procedures Order is not made (such as if Montauk were to terminate its purchase during the remainder of its due diligence period under the Montauk APA), the Trustee will seek authorization for another sale, or sales, of all or a portion of the assets of the Estate. The Plan specifically provides that the Trustee shall seek to sell the assets, or to arrange another disposition of the assets, in a manner to provide the best recovery of value for the Estate and payment for creditors.

Pursuant to the Montauk APA, the Trustee will sell to Montauk the Melrose Property, Melrose Landing, the Bloody Point Property and the Eigelberger tract, all as generally described above on pages 10 through 12 of this Disclosure Statement and pages 4 and 5 of the Sale Motion, together with all furnishings, fixtures, equipment, and other personalty owned by the Estate in connection with such real property, including permits, trademarks, and other items of property more fully described in the Montauk APA (collectively, the "Assets"), for the sale price of $49.5 million. Expressly excluded from the sale are all claims and rights of action the Estate may have against other parties, any tax refunds due to the Estate, cash and cash equivalents owned by the Estate, accounts receivable, any contract that is not an Assigned Contract, and any insurance policies or proceeds.

The Trustee is informed and believes that the proper allocation of the sale proceeds among the Assets is as follows:

**Melrose Plantation**

Administration and Employee Housing

    (Maintenance, Gasoline Facilities, Garbage)    $400,000.00

Equestrian Center and Sportsman's Lodge    $500,000.00

Silver Dew Land parcel

    Development of 25 sites    $1,200,000.00

Parcel C

    Development of 14 sites    $750,000.00

Tennis Villa Site

    30 Development Units    $1,290,000.00

Melrose Inn – 52 rooms on

    Approximately 4 acres Oceanfront    $2,000,000.00

Inn South Parcel - 4 Acres Oceanfront

    36 Development Units    $2,505,000.00

Inn North Parcel – 4 Acres Oceanfront

    36 Development Units    $2,505,000.00

Easter Beach Village – Golf View, 2nd

    Row Ocean, 40 Development Units    $3,000,000.00

Beach Club Site – Ocean and Sound Front

    56 Development Units    $7,000,000.00

Oceanfront Cottages – four 4-bedroom

    Unrenovated, $625,000 each    $2,500,000.00

Oceanfront Cottage – 2-bedroom    $350,000.00

Second Row Cottages – five 4-bedroom

23

| | |
|---|---|
| Unrenovated, $500,000 each | $2,000,000.00 |
| Melrose Golf Course and Facilities | $3,000,000.00 |
| Island House Conference Center | $1,500,000.00 |
| Total | $30,500,000.00 |

**Melrose Landing**

Docks and Development Rights

| | |
|---|---|
| 30 Units – 10,000 square feet Commercial | $2,500,000.00 |

**Bloody Point**

Two 2nd Row Homesites

Bloody Point Golf Course and Facilities

Oceanfront Village, 20 Development Units

| | |
|---|---|
| Total | $2,000,000.00 |

**Eigelberger Tract**

| | |
|---|---|
| 192 Development Units | $15,000,000.00 |
| **Grand Total** | **$49,500,000.00** |

The proceeds from the sale of the Assets to Montauk should be sufficient to fully pay the senior liens on the Assets, but it will not be sufficient to pay all asserted secured claims. See § below and Article III of this Plan.

As a term and condition of the Trustee's sale of the Assets, the net amount of $10 million (the "Unsecured Claims Fund", or the "UCF") of the sale proceeds shall be set aside for payment of unsecured priority and unsecured non-priority creditor claims. The UCF is to be funded by a combination of (1) the equity in assets, and (2) from the setting aside a portion of the sale proceeds (the "Carve-Out") of otherwise fully encumbered assets for the benefit of the unsecured creditors. The UCF shall not be used to pay normal closing costs of the sale of the Assets, the real estate commission due on the sale, or the Due Diligence Reimbursement Fee (as defined in the Bidding Procedures Order), if any; normal closing costs, real estate commissions on the sale of the Assets, and any Due Diligence Reimbursement Fee shall be paid from the gross sale proceeds and ratably charged to each property included in the sale.

The amount of the Carve-Out used to fund the UCF will be determined by the unencumbered sale proceeds realized from properties having equity, and the Carve-Out will be charged pro rata to each otherwise fully encumbered property in the sale based on the

24

allocated value and proceeds of the properties.  As an example, if the sale were to net $5 million of unencumbered proceeds from the sale of properties having equity, the Carve-Out from the proceeds of fully encumbered properties would be $5 million, which would be pro rated among those fully encumbered properties based upon the allocated value of each of them.

The UCF will be used to make payments as follows:  administrative priority claims will be paid in full; other priority claims next will be paid in full; and funds remaining after payment of the priority claims will be distributed to non-priority unsecured creditors on a pro rata basis.

The specific payment and treatment provisions, and the classes of creditors, under the Plan are stated in pages 25 through 30 below and in Article III of the Plan.

Sales of Assets Having a Sale Price of $7,500.00 or Less.

Upon confirmation of the Plan, for sales of assets having a sale price of $7,500.00 or less, which sale price represents the aggregate price for all items included in the sale, the Trustee shall not be required to serve notice of the sale or notice of a motion to authorize the sale on any parties other than the Creditors Committee, any secured creditor affected by such sale, the United States Trustee and any party claiming an interest in the asset being sold. There are over 500 creditors and parties in interest on the mailing list in this Case, and the cost of serving notice of a sale of $7,500.00 or less consumes a disproportionate amount of the sale proceeds.  Accordingly, the sale notice is hereby streamlined for sales having a sale price of $7,500.00 or less.

Reservation of Funds for Completion of Administration of the Case.

In the event that the administration of this Case has not been completed by the date of the distribution to non-priority unsecured creditors in Class 13, as provided in § 2.7 of the Plan and in Article III of the Plan, the Trustee shall reserve funds from the UCF in an estimated amount to cover the projected costs to complete the administration of the Case, including any litigation costs.  The projection of costs shall take into account the likelihood of additional recoveries for the Estate.  At the conclusion of the administration of the Estate, the Trustee shall distribute any remaining funds to creditors according to their respective rights under the Bankruptcy Code.

(vi)    Payment Provisions Regarding Secured Claims.  The secured creditors of the Estate comprise classes 1, 2, 3, 4, 5 and 6 under the Plan.  The sale of the Assets to Montauk at the price of $49.5 million, or the sale of the Assets to another purchaser at a higher sale price, will provide for full payment of the senior lien creditors secured by the Assets; however, some of the creditors asserting secured claims will not be paid at closing, or will not be paid in full, or will not be treated as a secured creditor.    In this regard:

(vii)    Class 1:  Beach First National Bank ("Beach First") and Tidelands Bank jointly hold a first priority lien on all of the Assets

pursuant to the Orders entered by the Court authorizing post-petition loans they made to the Trustee, in the total principal amount of $1.5 million. The post-petition loans made by Beach First and Tidelands Bank comprise Class 1 under the Plan. The Class 1 secured claims will be paid in full at the closing of the sale of the Assets.    Class 1 is impaired

(viii)   Class 2:   Beach First also holds a second mortgage[10] on certain of the Beach Cottages, on the Beach Club property and facilities, on certain lots and acreage in the Beach Cottages area of the Melrose Property, and two lots in the Bloody Point Property, to secure a claim in the amount of $6,417,614.42, as of March 19, 2009.  This secured claim is Class 2 under the Plan, and it is presently impaired.[11]  It will receive payment in full at the closing of the sale of the Assets.

(ix)    Class 3:   AFG, LLC ("AFG") holds a second mortgage and second priority security interest[12] (1) on certain real property in the Melrose Property, including the Melrose Inn, the Island House Conference Center, the Melrose Golf Course (with clubhouse and related facilities), the equestrian center, the tennis courts and tennis villa area, the Melrose Maintenance Area (maintenance buildings, warehouse, gasoline facilities, repair area), the staff/employee housing, and lots and other acreage in the Melrose Property, and (2) accounts receivable, inventory (e.g., pro shop inventory), and other personalty, securing a claim in the principal amount of $4 million.  This secured claim is Class 3 under the Plan, and it is presently impaired.[13]  Class 3 will receive payment in full at the closing of the sale of the Assets.

(x)    Class 4:   The Eigelberger tract of property is being sold in conjunction with the sale of the Assets owned by the Estate, though

---

[10] This mortgage was a first mortgage on the property at the filing of this Case, but is now a second mortgage by virtue of the first priority lien granted to Beach First and Tidelands Bank to secure the post-petition loans they made to the Trustee.

[11] Class 2 is presently impaired because the date of the closing of the sale, and thus the date of the payment of Class 2, is not yet certain.  However, if the closing and payment occur prior to the confirmation hearing on the Plan, as expected, Class 2 will be unimpaired.

[12] This mortgage and this security interest were a first priority mortgage on and a first priority security interest in the property at the filing of this Case, but they are now in a second priority position by virtue of the first priority lien granted to Beach First and Tidelands Bank to secure the post-petition loan they made to the Trustee.  An exception exists regarding accounts receivable, which were to be paid to AFG pursuant to Order of the Court in connection with the Debtor's use of cash collateral prior to the Trustee's appointment.

[13] Class 3 is presently impaired because the date of the closing, and thus the date of the payment of Class 3, is uncertain.  However, if the closing and payment occur prior to the confirmation hearing on the Plan, Class 3 will be unimpaired.

the Eigelberger tract is titled in the name of Eprop, LLC, which is wholly-owned by the Estate.  CS Eigelberger, LLC (successor to CSE Mortgage, LLC) ("CSE") holds a mortgage on the Eigelberger tract securing a claim in the amount of $9,119,560.26, plus interest and attorneys' fees and costs.  CSE filed a claim against the Estate for the indebtedness secured by the mortgage on the Eigelberger tract.  CSE's claim against the Estate and its mortgage lien on the Eigelberger tract comprise <u>Class 4</u> under the Plan; Class 4 is presently <u>impaired</u>.[14] Class 4 will receive payment if full at the closing of the sale of the Eigelberger tract.

(xi)    <u>Class 5</u>:  All <u>ad valorem</u> taxes on the Assets will be paid at the closing of the sale of the Assets.  These secured taxes comprise <u>Class 5</u> under the Plan, which is <u>impaired</u> due to the uncertain date(s) of the closing of the sale(s) of the Assets.

(xii)    <u>Class 6</u>:  Carolina Shores, LLC ("Carolina Shores") filed a claim in the amount of $27,750,128.51, secured by a mortgage and lien on a substantial portion of the properties in the Melrose Property, including the Melrose Inn, the Island Conference Center, the Melrose Golf Course (with clubhouse and related facilities), the equestrian center, the tennis courts and the tennis villa area, two of the Beach Cottages, the Melrose Maintenance Area (maintenance buildings, warehouse, gasoline facilities, repair area) and certain vacant land.  Carolina Shores' secured claim comprises <u>Class 6</u> under the Plan, and it is <u>impaired</u>.  The Trustee is informed and believes that Carolina Shores is only partially secured.  The Class 6 secured claim will be determined based upon the sale proceeds of the property securing it, after (1) payment of the senior liens on such property and the allocated portion of the closing costs and real estate commission for such property, and (2) the amount of the Carve-Out chargeable to such property.  In addition, it is possible that subordination issues under 11 U.S.C. § 510(a) (<u>i.e.</u>, contractual subordination) may need to be decided in connection with the determination of the Class 6 secured claim.[15]  From the sale proceeds, an amount equal to the estimated Class 6 secured claim will be placed into escrow and held for payment.  Upon the final determination (either by consent or by order of the

---

[14] Class 4 is presently impaired because the date of the closing, and thus the date of the payment of Class 4, is uncertain.  However, if the closing and the payment occur prior to the confirmation hearing on the Plan, Class 4 will be unimpaired.

[15] Language in certain documents of William R. Dixon, Jr. ("Bill Dixon") and Carolina Shores appears to provide for such subordination.  Carolina Shores has filed action against Bill Dixon alleging, among other claims, that such provisions should be held unenforceable and that Bill Dixon's claim against the Estate should be subordinated to the Carolina Shores claim.  <u>See</u> Adversary Proceeding No. 09-80134-jw.

Court) of the Class 6 secured claim and any subordination issues relating to it, the Trustee will pay the Class 6 secured claim. The amount of the Carolina Shores claim in excess of the Class 6 secured claim will be a non-priority unsecured claim against the Estate.

(xiii)   Class 7:  William R. Dixon, Jr. ("Bill Dixon") filed a claim in the amount of $34,692,660.58, secured by a mortgage on the portions of the Melrose Property still owned by the Estate. This secured claim is disputed. The Bill Dixon claim comprises Class 7 under the Plan; it is impaired. Bill Dixon's claim is subject to a preference avoidance action by the Trustee, wherein the Trustee seeks to avoid the mortgage asserted by Bill Dixon pursuant to 11 U.S.C. § 547(b); the claim is also subject to the adversary proceeding filed by Carolina Shores, seeking, among other things, the subordination of the Bill Dixon claim.[16] The Bill Dixon claim shall be treated as an unsecured claim, in such amount as determined by the Court. In addition, if the Court determines that the Bill Dixon claim should be subordinated, the Bill Dixon claim will be subordinate to other claims, including the non-priority unsecured claims.

(xiv)   Class 8:  The Greenery, Inc. and Coastal Connections, Inc. asserted mechanic's lien claims against the Debtor prior to the commencement of the Case. These two mechanic's lien claims comprise Class 8 under the Plan, which is impaired. The Trustee is informed and believes that these two claims are unsecured pursuant to 11 U.S.C. §§ 506(a) and (d), after deducting the senior liens on the property on which the liens were asserted. These two creditors will receive payment as non-priority unsecured creditors.

The Melrose Club, Inc. Asserted Rights and Interest in the Melrose Property.

The Melrose Club, Inc. ("MCI"), a previous owner of the Melrose Property, asserts rights and interests in the Melrose Property owned by the Estate, Melrose Landing and the Salty Fare Property under a certain Transfer Agreement (the "1996 Transfer Agreement") that it executed with the buyer when it sold the Melrose Property on or about December 26, 1996, and a Memorandum of Agreement filed in the RMC Office of Beaufort County, South Carolina on December 31, 1996 for the 1996 Transfer Agreement. These asserted rights include the asserted right to repurchase the Melrose Property, Melrose Landing and the Salty Fare Property upon certain conditions. The rights and interest asserted by MCI are disputed and presently the subject of litigation in Adversary Proceeding No. 09-80094-jw. MCI's asserted rights and interests comprise Class 9 under the Plan. Class 9 is impaired. The Plan provides that the Assets will be sold free and clear of MCI's asserted rights and interest under the 1996 Transfer Agreement. Any MCI claim resulting from the sale of the Assets free and

---

[16] The preference avoidance action filed by the Trustee is in Adversary No. 09-80120-jw, and the actions filed by Carolina Shores are in Adversary Proceeding No. 09-80134-jw.

clear of MCI's asserted rights and interest shall be a non-priority unsecured claim, unless the Court determines MCI to be entitled to a different status or priority for its claim.

<u>Payment Provisions Regarding Executory Contracts and Leases</u>.  <u>Class 10</u>:  All executory contracts and leases not previously assumed or rejected shall be deemed rejected by and upon confirmation of the Plan.  The claims of the contracting parties for obligations owed to them under their respective executory contracts with the Debtor will comprise <u>Class 10</u> of the Plan.  This class is <u>impaired</u> and each contracting party will be entitled to an unsecured claim for their damages caused by such rejection.

<u>Payment Provisions for Priority and Administrative Creditors</u>.  The Plan provides for three classes of unsecured priority claims.

> <u>Class 11</u>:  <u>Administrative Priority Claims</u> - Class 11 which is <u>impaired</u>, consists of claims of creditors holding allowed claims entitled to administrative priority pursuant to 11 U.S.C. §§ 503(b) and 507(a)(2).  Pursuant to 11 U.S.C. § 1129(a)(9)(A), administrative priority claims must be paid upon the effective date of the Plan, or upon authorization by the Court, unless the administrative priority claimants agree to accept a different treatment of their claims.  With regard to the fees and expenses of the Trustee and professionals he has employed (<u>e.g.</u>, his bankruptcy counsel, Nexsen Pruet, LLC), fees and expenses incurred through the date of Confirmation of the Plan must be approved by the Court before payment.

> <u>Class 12</u>:  <u>Unsecured Priority Tax Claims</u> – Class 12 is comprised of any unsecured claims for pre-petition (non-<u>ad valorem</u>) taxes owed by the Debtor, which claims are entitled to priority pursuant to 11 U.S.C. § 507(a)(8).  Class 12 is <u>impaired.</u>  The Plan provides for the taxing entities holding Class 12 claims to be paid on a priority basis out of the Carve-Out from the sale proceeds of the Property.

<u>Payment Provisions for Non-Priority Unsecured Creditors</u>.  Class 13 consists of the general non-priority unsecured claims against the Estate.  This class is <u>impaired</u>.  The creditors in Class 13 will receive payment after the priority claims have been paid, and Class 13 claims will be paid on a <u>pro rata</u> basis from the remaining funds in the Unsecured Claims Fund.  The Trustee will make the distribution to Class 13 following a reasonable period of time, not to exceed 120 days after Confirmation of the Plan, to allow the Trustee to assess and verify the validity of the Class 13 claims; provided, however, that any claims which are subject to filed claim objections which have not been finally decided by the Court (or, if applicable, by the court on appeal), will not be paid until a final determination by the Court (or, if applicable, appellate court) or a consensual resolution.  If any claims are subject to a filed objection not finally decided by the Court on the 120th day after Confirmation of the Plan, the Trustee shall make the distribution to the allowed Class 13 claimants based on a <u>pro rata</u> calculation which includes the contested claim(s) in the asserted amount(s), reserving the share of the distribution of the contested claim(s) for distribution after a final decision or consensual resolution of the claim issues in the claim dispute.

Equity Interests.  The interests of the existing members of the Debtor and the interests of any person or entity claiming rights in equity interests of or in the Debtor, comprise Class 14 under the Plan.  The Trustee is informed and believes that the member interests of the Debtor are owned by Bill Dixon and Gayle Bulls Dixon.  This class is impaired. The Class 14 member rights are suspended, and shall not be exercisable by the members of the Debtor, until after the Trustee has consummated the Plan and a Final Decree closing the Case has been entered.


## VII.  FEASIBILITY OF PROPOSED PLAN

Section 1129(a)(11) of the Bankruptcy Code (11 U.S.C. §101 et seq.) requires that in order for a plan to be confirmed, it must be demonstrated that the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor of the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.  The Plan satisfies this requirement.

The Plan provides for the sale of the Assets, which include substantially all assets of the Estate.  Although there are still some matters to resolve for the closing of the sale of the Assets, the Trustee is informed and believes that the matters will be soon resolved.  It is expected that the closing of the sale of the Assets will occur prior to the confirmation hearing on the Plan.  If the sale to Montauk Resorts, LLC does not close, the Plan provides that the Trustee will proceed with the sale(s) of the Assets to another buyer(s).

A sale of the Assets is pending.  It is the source for the payments to creditors under the Plan.  The Plan ratifies the sale efforts to date, and its provisions involve no material risk to creditors.  There is a reasonable probability that the Plan will be fully consummated by its terms.  Therefore, the Plan satisfies the requirement of 11 U.S.C. § 1129(a)(11).


## VIII.  CONCLUSION

Readers of this Disclosure Statement are directed to the Plan for specific treatment of their particular rights or claims against the Estate.  The Trustee is informed and believes that the provisions of the Plan address the claims against the Estate in a manner providing each the maximum value available for payment of the claims.

/s/ Julio E. Mendoza, Jr.
Julio E. Mendoza, Jr., Fed. ID No. 3365
NEXSEN PRUET, LLC
1230 Main Street, Suite 700 (29201)
Post Office Drawer 2426
Columbia, South Carolina  29202
Phone: (803) 540-2026
Facsimile:  (803) 727-1478
E-mail:  RMendoza@nexsenpruet.com

Attorneys for Robert C. Onorato, Trustee

November 20, 2009
Columbia, South Carolina