## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

Case No.  09-00389-jw

## ORDER (1) AUTHORIZING SALE OF SUBSTANTIALLY ALL ASSETS OF THE ESTATE FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, AND (2) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED EXECUTORY CONTRACTS AND LEASES

The relief set forth on the following pages, for a total of 38 pages including this page, is hereby **ORDERED.**

**FILED BY THE COURT**
**01/07/2010**



Chief US Bankruptcy Court Judge
District of South Carolina

Entered: 01/07/2010

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re: | Case No.  09-00389-jw |
| Daufuskie Island Properties, LLC aka Daufuskie Island Resort and Breathe Spa, | Chapter  11 |
| Debtor. | |

## ORDER (1) AUTHORIZING SALE OF SUBSTANTIALLY ALL ASSETS OF THE ESTATE FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, AND (2) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED EXECUTORY CONTRACTS AND LEASES

This matter came before the Court upon the Motion and Memorandum for an Order (1) Authorizing the Sale of Substantially All Assets of the Estate Free and Clear of Liens, Claims, Encumbrances and Other Interests, and (2) Approving the Assumption and Assignment of Certain Unexpired Executory Contracts and Leases ( the "Sale Motion") filed on September 15, 2009 by Robert C. Onorato, as Trustee (the "Trustee") for the Chapter 11 bankruptcy estate (the "Estate") of Daufuskie Island Properties, LLC (the "Debtor"), seeking (1) authorization pursuant to 11 U.S.C. §§ 363(b)(1) and (f), Rule 6004 of the Federal Rules of Bankruptcy Procedure ("Rule 6004")[1] and SC LBR 6004-1, to sell substantially all of the assets of the Estate, as more fully described below (the "Sale"); and (2) approval of the Trustee's assumption and assignment of certain unexpired leases and executory contracts to the purchaser of the assets pursuant to 11

---

[1] Hereinafter, the Federal Rules of Bankruptcy Procedure are cited in this Order as "Rule _____."

U.S.C. §§ 365(a), (b) and (f) and Rule 6006, as part of the Sale.  The Sale is to be made to Montauk Resorts, LLC or its assigns ("Montauk"), which will also purchase the Eigelberger Tract of property titled in the name of Eprop, LLC, an entity wholly-owned by the Estate, for the total sale price of $49.5 million.

Although several parties in the case filed objections to the Sale Motion, all but one of the objections were resolved prior to or at the hearing on the Sale Motion on December 30, 2009.  The one objection remaining at the hearing, which is addressed in this Order, is the objection filed by The Melrose Club, Inc. ("MCI"), relating to the provision in the Sale Motion that the Sale shall be free and clear of MCI's rights and interest under that certain <u>Transfer Agreement</u> (the "Transfer Agreement") dated September 27, 1996, by and between MCI and Melrose Club Management, Inc. n/k/a Daufuskie Club, Inc. ("DCI"), and the <u>Memorandum of Agreement</u> filed in the RMC Office of Beaufort County, South Carolina on December 31, 1996 (the "Memorandum of Agreement").  For the reasons set forth hereinbelow, the Court overrules the MCI objection and grants authorization for the Sale.

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, which is made applicable to this matter by Rules 7052 and 9014, the Court makes the following Findings of Fact and Conclusions of Law.[2]

---

[2] The Court notes that, to the extent that any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

I.    **FINDINGS OF FACT**

A.    **The Bankruptcy Case**

1.    On January 20, 2009, the Debtor filed its petition for relief under Chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101, et seq., the "Bankruptcy Code").  The Debtor operated as a Chapter 11 debtor-in-possession until the Trustee's appointment in this case.

2.    On March 17, 2009, the Court entered its Order Granting Joint Motion for Appointment of Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104, granting the joint motion of the Official Committee of Unsecured Creditors (the "Creditors Committee"), Beach First National Bank ("Beach First") and AFG, LLC ("AFG") for the appointment of a trustee in this case.  Thereafter, on March 23, 2009, the Court entered its Order Approving Appointment of Trustee, approving the United States Trustee's appointment of Robert C. Onorato as Trustee for the Estate.

3.    Shortly before the Trustee's appointment, the Debtor closed its business operations after its proposed post-petition lender withdrew its offer to provide post-petition financing, whereupon the Debtor lacked funding to cover its operating expenses. Following his appointment, the Trustee was able to obtain post-petition loans for the payment of costs to maintain the property owned by the Estate, to resume some of the resort operations on the property, and to market the assets owned by the Estate for sale.

4.    The Trustee employed the services of RBC Enterprises, Inc. ("RBC") as the non-exclusive broker for the marketing and sale of the property in this case.  From the Trustee's testimony, it appears that the Trustee and RBC began marketing the property soon after the Trustee's appointment, that RBC contacted approximately 180 potential buyers of the property, that RBC sent those potential buyers a professionally prepared

book describing and showing the property, that there were over 30 site visits to the property by potential buyers, and that the Trustee and RBC have remained in contact with potential buyers pending the proposed sale to Montauk.

5.    After several months of marketing and soliciting for offers for the property, the Trustee accepted Montauk's offer, subject to authorization by the Court. The Trustee then filed the Sale Motion on September 15, 2009.

6.    In conjunction with the Sale Motion, the Trustee also filed a <u>Motion for Order Establishing Bidding and Other Procedures in Connection with the Sale of Property and Granting Protections to the Proposed Buyer, and Memorandum in Support of Motion</u> (the "Bidding Procedures Motion") pursuant to 11 U.S.C. §§ 105(a) and 363(b) and (f), and Rule 6004, for the entry of an order (1) establishing bidding and other procedures in connection with the sale of the Assets under the Sale Motion, and (2) granting certain protections to Montauk as the proposed purchaser of the assets in the Sale Motion.  On September 24, 2009, the Court entered the <u>Order (1) Establishing Bidding and Other Procedures in Connection with the Sale of Substantially All Assets of the Estate, (2) Granting Protections to the Proposed Buyer, and (3) Scheduling Hearing on the Sale (the "Bidding Procedures Order")</u>.  The Bidding Procedures Order established procedures for the submission of qualified competing bids for the assets being sold under the Sale Motion.

7.    In addition to the Sale Motion and the Bidding Procedures Motion, the Trustee filed a <u>Notice of (1) Sale of Substantially All Assets of the Estate Free and Clear of Liens, Claims, Encumbrances and Other Interests, (2) Assumption and Assignment of Certain Unexpired Executory Contracts and Leases, and (3) Hearing on the Sale</u> (the

"Notice of Sale") describing the Trustee's proposed sale and providing notice of the hearing on the Sale Motion.  As shown by certificates of service filed with the Court, the Notice of Sale, the Sale Motion, the Bidding Procedures Motion, and the Bidding Procedures Order were served on creditors and parties in interest in the case.

8.      The hearing on the Sale Motion (the "Sale Hearing") initially was scheduled for October 28, 2009; however, it was twice rescheduled at the Trustee's request to allow Montauk additional time in which to complete its due diligence review of the assets and related matters for the Sale.  The Court conducted the rescheduled Sale Hearing on December 30, 2009.

9.      On November 20, 2009, the Trustee filed his <u>Chapter 11 Plan</u> (the "Plan") and the <u>Disclosure Statement to Chapter 11 Plan</u> (the "Disclosure Statement").  The Plan incorporates the Sale under the Sale Motion.  The hearing on the Disclosure Statement is presently scheduled for January 13, 2010.

### B.      General Description of the Assets of the Estate

10.      The assets of the Estate (collectively, the "Estate Assets") primarily consist of resort facilities, lodging, maintenance and support buildings and structures, and development property located on Daufuskie Island in Beaufort County, South Carolina. The Estate owns real property with improvements in the Melrose Planned Unit Development ("Melrose Plantation" or the "Melrose Property"), real property with improvements in the Bloody Point Planned Unit Development ("Bloody Point" or the "Bloody Point Property"), and real property and improvements comprising Melrose Landing, the dock and landing/departure location for the Debtor and for residents and visitors to Melrose Plantation and Bloody Point.  The Estate also owns the Eigelberger

tract of real property (the "Eigelberger Tract") on Daufuskie Island by and through the

Estate's ownership of Eprop, LLC, which holds title to the Eigelberger Tract.

11.     The Estate Assets include an inn (the "Melrose Inn"), a conference center

(the "Island House Conference Center"), cottages and duplexes (the "Beach Cottages"), a

beach club (the "Melrose Beach Club"), two golf courses (the "Melrose Golf Course" and

the "Bloody Point Golf Course"), an equestrian center, tennis courts, a pool and other

structures, improvements and fixtures. The Melrose Golf Course, the Melrose Inn, the

Melrose Beach Club, the tennis courts and the Beach Cottages are located on the Melrose

Property.   The Bloody Point Golf Course, miscellaneous maintenance buildings and

structures and two unsold residential lots are located on the Bloody Point Property.

### C.     Existing Liens on the Assets of the Estate

12.     Pursuant to Orders entered on April 24, 2009, May 8, 2009, July 17, 2009

and July 29, 2009, the Court granted the Trustee's motions for authorization to obtain

post-petition financing from Beach First in the principal amount of $1 million and from

Tidelands Bank in the principal amount of $500,000.00; these loans (the "Senior Post-

Petition Loans") comprise a participation loan by these two lenders, secured by a senior

mortgage on, security interest in and lien on all assets of the Estate (except for avoidance

actions and recoveries from avoidance actions), and having superpriority status under 11

U.S.C. § 364(c)(1) (except as to avoidance actions and recoveries from avoidance

actions).

13.     Pursuant to Orders entered on November 23, 2009, and on December 8,

2009, the Court granted the Trustee's motion for authorization of additional post-petition

financing, in the form of a new loan from Tidelands Bank (the "Second TB Post-Petition

Loan") in the principal amount of $250,000.00, secured by security interests in and liens

on all assets of the Estate (except for avoidance actions and recoveries from avoidance actions) junior in priority to the security interests and liens securing the Senior Post-Petition Loans, but senior in priority to all other liens and interests in the assets, including the asserted interests of MCI, pursuant to 11 U.S.C. §§ 364(c)(3) and 364(d); and having superpriority claim status pursuant to 11 U.S.C. § 364(c)(1) (except as to avoidance actions and recoveries from avoidance actions, as to which the claim would have administrative priority under 11 U.S.C. § 364(b)), provided, however, that the superpriority claim of the Second TB Post-Petition Loan is subordinate to the superpriority claims of the Senior Post-Petition Loans.   Pursuant to the Orders authorizing the Second TB Post-Petition Loan, Tidelands Bank holds a second lien on the assets of the Estate (except for avoidance actions and recoveries from avoidance actions).

14.    In addition to its claim for the Senior Post-Petition Loan it made in this case, Beach First filed a pre-petition claim [Claim No. 152 on the Claims Register] against the Estate in the amount of $6,417,614.42, as of March 19, 2009, which is secured by a portion of the Estate Assets, including two lots in Bloody Point, Beach Cottages, the Melrose Beach Club, and certain acreage in the Beach Cottages area of the Melrose Property.

15.    AFG filed a pre-petition claim [Claim No. 203 on the Claims Register] against the Estate in the principal amount of $4 million, which is secured by a portion of the Estate Assets, including the Melrose Golf Course, the Melrose Inn, the Island House Conference Center, and certain other real property and improvements in the Melrose Property.

16.     Carolina Shores, LLC ("Carolina Shores") filed a pre-petition claim [Claim No. 117 on the Claims Register] against the Estate in the amount of $27,750,128.51, secured by a mortgage on a portion of the Estate Assets.  Carolina Shores' lien on its collateral is junior in priority to the Senior Post-Petition Loans, the Second TB Post-Petition Loan and the liens securing the pre-petition claims of Beach First and AFG.

17.     William R. Dixon, Jr. ("Dixon") filed a claim [Claim No. 116 on the Claims Register] in the amount of $34,692,660.58 secured by a mortgage on a substantial portion of the Estate Assets; however, both the Trustee and Carolina Shores have filed adversary proceedings disputing Dixon's claim.[3]

18.     CS Eigelberger, LLC ("CSE"), successor to CSE Mortgage, LLC, holds a mortgage on the Eigelberger Tract.  CSE filed a claim [Claim No. 211 on the Claims Register] in the amount of $9,119,560.26, plus interest and attorney's fees and costs, upon the Debtor's guaranty of the loan CSE made to Eprop, LLC.  The Trustee states that he is informed and believes that the balance now due to CES from Eprop, LLC may be in excess of $10 million.

19.     Coastal Connections, Inc. and The Greenery may assert mechanic's lien claims on some of the Estate Assets.  The Trustee estimates these claims to total approximately $372,000.00.

20.     The Trustee states that *ad valorem* taxes are owed on the properties owned by the Estate for both 2008 and 2009.  Although the Trustee is still awaiting confirmation

---

[3] The Trustee filed Adversary Proceeding No. 09-80120-jw seeking to avoid the Dixon mortgage as a preference under 11 U.S.C. § 547(b), and Carolina Shores filed Adversary Proceeding No. 09-80134-jw alleging numerous causes of action, including the equitable subordination of Dixon's claim.

of the amounts due for the taxes, he has estimated the aggregate amount owed for 2008 and 2009 to be approximately $600,000.00.

### D.    MCI Asserted Interest in the Melrose Property

21.    MCI previously owned approximately 300 acres of the Melrose Property, including the 52-room Melrose Inn, the Island House Conference Center, the Melrose Beach Club, 37 Beach Cottages, the Melrose Golf Course, tennis facilities, a health and fitness center, the equestrian center, the Sportsman's Lodge, administration and maintenance facilities, certain acreage and other resort amenities, in addition to Melrose Landing and the Salty Fare embarkation center on Hilton Head Island with docks and parking (the former MCI property is hereinafter collectively referred to as the "1996 Property").[4]  MCI asserts certain rights (which include reconveyance rights) in the 1996 Property under the Transfer Agreement and the Memorandum of Agreement.

22.    Prior to the commencement of this case, MCI filed an action in state court asserting rights under the Transfer Agreement and the Memorandum Agreement, including a right to repurchase the 1996 Property upon the occurrence of certain conditions.

23.    On February 27, 2009, the Debtor filed a motion to reject ("Motion to Reject") the Transfer Agreement as an executory contract under 11 U.S.C. § 365(a).  The Debtor also filed a motion for an expedited hearing on the Motion to Reject, which was granted.

---

[4] The Debtor owned the Salty Fare facility from the time of its purchase of the 1996 Property in May 2002, until it transferred the Salty Fare facility in April 2007 to Stewart Kittredge Collins and/or Susan Charles Collins, Trustees of the Collins Family Trust Dated May 26, 1989 (the "Collins Family Trust").  As of the Sale Hearing, the Collins Family Trust still owned the Salty Fare facility.

24.     The Court conducted the hearing on the Motion to Reject on March 11, 2009.  At the conclusion of the hearing, the Court stated its ruling denying the Motion to Reject, which was to be set forth in a written order.  The Court entered the Order Denying Debtor's Motion to Reject Transfer Agreement of 1996, as Amended on May 6, 2009.

25.     As a parallel matter to the Motion to Reject, the Debtor filed a Motion and Memorandum to Incur Debt and for Approval of Post-Petition Debtor in Possession Financing and Associated Relief ("DIP Loan Motion") on March 2, 2009, with a motion for an expedited hearing.  In the DIP Loan Motion, the Debtor sought authorization for post-petition financing in the maximum amount of $3 million from Petrus Private Investment, L.P. or an affiliate ("Petrus"), to be secured by a first priority lien on all of the Debtor's assets and to have superpriority status.  The hearing on the DIP Loan Motion was scheduled for the same date as the hearing on the Motion to Reject.  Upon the Court stating its ruling denying the Motion to Reject at the hearing on March 11, 2009, Petrus withdrew its offer to provide post-petition financing to the Debtor.

26.     On several occasions, in connection with status hearings and hearings on other matters arising in the case after the Trustee's appointment, the Trustee, MCI, Beach First, AFG, Carolina Shores and the Creditors Committee advised the Court that they recognized the need to address the MCI rights and interest in the 1996 Property, and that a declaratory judgment action would be filed in the case for that purpose.

27.     On June 15, 2009, MCI filed an adversary proceeding seeking declaratory judgment of its rights and interest in the 1996 Property under the Transfer Agreement and the Memorandum of Agreement, which is Adversary Proceeding No. 09-80094-jw in this

Court (the "Declaratory Judgment Adversary Proceeding"). In its complaint, MCI named as defendants the Trustee, Beach First, AFG, Carolina Shores, the Collins Family Trust, and all parties having a recorded interest in the 1996 Property. In conjunction with the Declaratory Judgment Adversary Proceeding, MCI filed a lis pendens in Beaufort County, South Carolina as to the 1996 Property.

28.    MCI's asserted right to repurchase the 1996 Property arises under Article 5 of the Transfer Agreement, which provides:

> 5.1 Purchaser's Additional Obligations.    As additional consideration for the transfer and sale of the Assets, Purchaser agrees to execute, on the Closing Date, the Assignment and Assumption Agreement whereby Purchaser agrees to assume and fund the costs of the Additional Obligations pursuant to the terms and conditions recited therein. In the event Purchaser, at any time from the Closing Date to the expiration of twenty (20) years from the Closing Date, elects to not perform the Additional Obligations, or any material part thereof, then Purchaser shall provide written notice to Seller of its election (the "Written Notice"). Purchaser agrees to reconvey the Assets to Seller within thirty (30) days after the Written Notice has been received by Seller, if Seller, at its option in its sole discretion, notifies Purchaser, in writing within thirty (30) days after receipt of the Written Notice, that Seller agrees to accept such reconveyance. The closing of the reconveyance shall be in the same manner and the substantially same form of documentation as utilized for the Closing, and Seller shall assume all of the existing liabilities of Purchaser arising from its ownership and operation of the Assets, which liabilities shall not be greater than the Liabilities assumed by Purchaser at the Closing. Purchaser agrees, for a period of seven (7) years from the Closing Date, that any mortgage or security agreement against the Assets shall only secure funding for capital improvements, replacements, renovations, repairs, or the operation of the Club. The parties agree that a memorandum setting forth the reconveyance and debt restrictions set forth in this Section shall be recorded against the Real Property and shall be a covenant running with the land and be binding on any successor or assign of Purchaser who acquires the Real Property.

29.     The Memorandum of Agreement was recorded to provide record notice of the Article 5 reconveyance rights in the Transfer Agreement.  It does not reference other provisions of the Transfer Agreement.

30.     The parties to the Declaratory Judgment Adversary Proceeding filed extensive pleadings and motions in regard to the MCI issues, including motions for summary judgment or partial summary judgment.  Following a hearing on November 25, 2009 on the summary judgment motions, the Court entered its Order and Judgment on the motions on December 21, 2009 (the "December 21 Order"), (a) granting partial summary judgment to Carolina Shores, finding that the Debtor's alleged failure to perform under the Transfer Agreement by failing to fund operational deficits does not constitute an election so as to trigger MCI's right of reconveyance under Section 5.1 of the Transfer Agreement, (b) granting partial summary judgment to MCI, concluding that the reconveyance right of § 5.1 is a covenant running with title to the 1996 Property, and (c) reserving for later determination the priority and enforceability of the reconveyance right under § 5.1 and other claims made by the parties in the Declaratory Judgment Adversary Proceeding.

### E.      The Proposed Sale to Montauk

31.     The Sale Motion provides for the sale of the Estate Assets by the Trustee to Montauk, and the simultaneous sale of the Eigelberger Tract to Montauk by Eprop, LLC (the Estate Assets and the Eigelberger Tract, collectively, the "Assets").

32.     The Sale Motion identifies Montauk as the initial proposed purchaser[5] of the Assets for the price of $49.5 million and includes the Asset Purchase Agreement ("APA") for the Sale as Exhibit A to the Sale Motion.  The Sale Motion further provides that the proposed sale to Montauk was subject to higher or otherwise better offers, on substantially similar terms, such that if a higher or better offer was received for the Assets, the Trustee would be authorized to sell the Assets to that offeror.

33.     The offer made by Montauk is the highest and best offer received by the Trustee for the Assets.  In his testimony, the Trustee states that he is informed and believes that the sale price to Montauk, $49.5 million for the Assets, represents fair and reasonable value for the Assets under the prevailing economic and market conditions for properties of this kind.  At the Sale Hearing, the Trustee advised the Court that he received no higher or otherwise better offer for the Assets from any other potential buyer. Accordingly, the Trustee seeks authorization to proceed with the Sale of the Assets to Montauk.

34.     The Sale to Montauk is to be free and clear of all liens, claims, encumbrances and other interests pursuant to 11 U.S.C. § 363(f), except for the Assumed Liabilities (as defined in the APA) and any and all easements, covenants, conditions, restrictions and other matters of record (but not excepting the rights and interest of MCI under and pursuant to the Transfer Agreement and the Memorandum of Agreement) relating to the real property included in the sale.  The terms of the Sale specifically provide that the Assets are to be sold to Montauk free and clear of the rights and interest of MCI under the Transfer Agreement and the Memorandum of Agreement.

---

[5] The initial proposed purchaser in sales of this kind is frequently referred to as the "stalking horse" bidder.

35.    Montauk has acted in good faith to purchase the Assets for purposes of 11 U.S.C. § 363(m).

## F.  Compelling Circumstances for Sale

36.    In his testimony, the Trustee states that he has managed to stretch the funds he obtained from the post-petition loans in this case to cover essential expenses through the expected closing of the Sale on or about January 15, 2010, but that he expects to have exhausted those funds in mid-January 2010 and he would then be unable to pay the costs of the continued maintenance and care for the Assets if the Assets are not sold by that time.

37.    In his testimony, the Trustee states that, if he is unable to proceed with the Sale, he believes that he will have to shut down operations on the property owned by the Estate within a matter of days, whereupon MCI and surrounding property owners would not have access to the facilities; he would be unable to maintain the property and facilities, resulting in a serious, possibly irreversible deterioration of the properties and facilities; and both the Estate and surrounding property owners would suffer substantial loss of value for their properties.

38.    In his testimony, the Trustee states that, if the Transfer Agreement and the Memorandum of Agreement were prepared, as he understands, to protect MCI and surrounding property owners from the deterioration of the condition of the Melrose Property, to preserve their access to the facilities on the Melrose Property, and to maintain a high level of quality of the Melrose Property and the facilities, the Sale to Montauk is consistent with those objectives.  In his testimony, the Trustee states that Montauk's stated intentions are to operate the facilities on the property, to invest in

capital improvements and renovations to the Assets, and to operate a club membership for which it would like to have surrounding property owners as members. In his testimony, the Trustee contrasts the benefits of the Sale to Montauk with the dire consequences that would occur if the Sale fails and he no longer had the ability to pay costs to maintain and care for the Assets.

**G.  Additional Relief Requested in the Sale Motion, and Objections to the Sale Motion**

39.    As part of the Sale Motion, the Trustee requests that the Court order that the stay provisions of Rule 6004(h) and Rule 6006(d) are not applicable to this Order authorizing the sale of the Assets and the assumption and assignment of certain executory contracts and leases.[6]  MCI objected to this requested relief.  As set forth below, the MCI objection is overruled.

40.    Beach First, CSE, Carolina Shores, the Creditors Committee, MCI and The Melrose Property Owners Association, Inc. ("MPOA") filed objections and responses to the Sale Motion.  The objections filed by Beach First, CSE, Carolina Shores, the Creditors Committee and MPOA were resolved or withdrawn prior to or during the Sale Hearing.[7]

---

[6] At the filing of the Sale Motion, Rule 6004(h) provided for a ten day stay of the effectiveness of an order authorizing the sale of assets, and Rule 6006(d) provided for a ten day stay on the effectiveness of an order authorizing the assignment of an unexpired executory contract or lease, unless otherwise ordered by the Court.  Effective December 1, 2009, the stay period became fourteen days, unless otherwise ordered by the Court.

[7] In addressing the limited objection to the Sale Motion filed by Carolina Shores, the Trustee advised the Court at the Sale Hearing that he agreed that the allocation of the sale proceeds among the Assets proposed in the Sale Motion would not be deemed determinative, and that the allocation of the sale proceeds among the Assets would be discussed and resolved separately from the Sale: provided, however, that it is agreed that, from the sale proceeds, the Trustee may now pay (1) the amounts due to Beach First and Tidelands Bank for the post-petition loans they made to the Estate, (2) the amount due to Beach First for its pre-petition secured loan, (3) the amount due to AFG for its pre-petition secured loan, (4) the amount

## CONCLUSIONS OF LAW

The Trustee seeks authorization for the Sale pursuant to 11 U.S.C. § 363(b)(1), as a sale not made in the ordinary course of the Debtor's business, and pursuant to 11 U.S.C. § 363(f), to convey the Assets free and clear of all liens, claims, encumbrances and other interests.[8]   Because the sale is one of substantially all assets of the Estate prior to confirmation of a Chapter 11 plan in this case, authorization for the sale under § 363(b)(1) requires that the Trustee satisfy the "sound business purpose" test for pre-confirmation sales.   As discussed below, the Trustee satisfied this test.   In regard to making the Sale free and clear of liens, claims, encumbrances and interests, the Trustee must show that one of the provisions of § 363(f)(1) – (5) is applicable to each lien or interest from which the Sale is to be free and clear.   The Trustee also satisfied this requirement.   As part of the Sale, the Trustee is to assume and assign certain executory contracts and leases pursuant to 11 U.S.C. §§ 365(a) and (f), and the Trustee has satisfied the requirements for approval of the assumption and assignment of those executory contracts and leases.   Therefore, authorization for the Sale is proper and should be granted.

### A.    Jurisdiction

The Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. §§ 157(a) and 1334(a), and Local Civil Rule 83.IX.01, DSC, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N). Venue of this case and the Sale Motion in

---

due to CSE for its mortgage loan on the Eigelberger Tract, and (5) allowed administrative priority claims and administrative expenses incurred in the case.

[8] The Trustee excepts from the free and clear provisions of the Sale the Assumed Liabilities (as defined in the APA) and any and all easements, covenants, conditions, restrictions and other matters of record, but not the rights and interest of MCI under and pursuant to the Transfer Agreement and the Memorandum of Agreement.

this District is proper under 28 U.S.C. §§ 1408 and 1409.

**B.     Authorization Under 11 U.S.C. § 363(b)(1)**

The Trustee seeks authorization to sell the Assets pursuant to 11 U.S.C. §363(b)(1), outside of the ordinary course of business, prior to confirmation of a Chapter 11 plan. Although sales of substantially all assets of an estate normally should be proposed and conducted pursuant to a confirmed Chapter 11 plan, this Court has recognized that when a sound business justification exists, the Court may authorize such a sale under §363(b)(1) without a confirmed plan of reorganization. In re Taylor, 198 B.R. 142, 156-157 (Bankr. D.S.C. 1996). See also Stephen Indus., Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986)("bankruptcy court can authorize a sale of a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); In re WBQ Partnership, 189 B.R. 97 (Bankr. E.D. Va. 1995)(explaining and adopting the sound business purpose test); and In re The Lady H. Coal Company, Inc., 193 B.R. 233, 234 (Bankr. S.D.W.Va. 1996)(also adopting the sound business purpose test).

Under the sound business purpose test, the Trustee has the burden of proving the following: (1) a sound business reason or emergency justifies the pre-confirmation sale; (2) the sale has been proposed in good faith; (3) adequate and reasonable notice of the sale has been provided to interested parties; and (4) the purchase price is fair and reasonable. In re Taylor, 198 B.R. at 157. The Trustee's proposed Sale of the Assets in this case satisfies the test.

**1.  Sound Business Reason or Emergency**

This case presents compelling reasons for a sale of the Assets without delay. At the time of the Trustee's appointment, the Debtor's business was closed due to the lack of funds to pay any expenses, and the Estate was in danger of loss of substantial value in the

Assets.  The Trustee had to obtain post-petition loans from Beach First and Tidelands Bank to fund payment of essential expenses to maintain and protect the Assets, and and it appears likely that these funds will be exhausted on or about mid-January 2010.   The Trustee filed his Plan on November 20, 2009, but the Disclosure Statement has not yet been approved[9] and it is uncertain as to when a confirmation hearing might be scheduled on the Plan.  If the Sale were to be delayed until confirmation of a Chapter 11 plan, it is unlikely that the Trustee would be able to maintain the operation of the Assets – which at present is only on a partial basis – and the amenities and facilities on the property would again shut down.  If the amenities and facilities on the property are again shut down, it is uncertain when, if ever, they would reopen, and the Trustee urges that the Assets would suffer a significant, and potentially catastrophic, loss of value.

The Trustee has shown that the Sale of the Assets needs to occur as soon as reasonably possible, to maximize their value and avoid significant loss.

## 2.  Good Faith

The terms of the proposed sale to Montauk are the product of arms-length negotiations.  It appears that the Trustee and RBC provided information to numerous potential buyers, met with many potential buyers, and continued a dialogue with several potential investors, all resulting in Montauk's offer to purchase the Assets.

In his testimony, the Trustee stated that he is informed and believes that Montauk and its principals are  unrelated to the Debtor or any other party in this case.

The record in this matter supports the finding that Montauk is a good faith

---

[9] The hearing on the Disclosure Statement is presently scheduled for January 13, 2010.  The Trustee requested that the hearing on the Disclosure Statement not be scheduled sooner, as the outcome of the Sale Hearing necessarily would affect the content of the Plan and the Disclosure Statement.

purchaser and that the protections of 11 U.S.C. § 363(m) should apply to Montauk and the Sale.

### 3. Notice

As evidenced by certificates of service filed with the Court, the Sale Motion and the Notice of Sale were served upon all creditors and parties in interest in this case. Notice of the hearing is included in the Notice of Sale. Although the Sale Hearing was rescheduled to later dates at the Trustee's request, it appears that all creditors and parties in interest had ample opportunity to respond to the Sale Motion and the Notice of Sale, and all creditors and parties who did respond to the Sale Motion and/or the Sale Notice did, in fact, attend the Sale Hearing. Accordingly, all creditors and parties in interest had reasonable and proper notice of the Sale of the Assets proposed in the Sale Motion.

### 4. Purchase Price

The evidence in the record in this matter establishes that the purchase price to be paid by Montauk for the Assets is fair and reasonable in this case. The Trustee and RBC engaged in extensive marketing efforts and negotiations with potential purchasers over a period of many months. The Montauk offer is the highest and best offer received by the Trustee.

### C. Authorization Under 11 U.S.C. § 363(f)

The sale of the Assets to the Buyer is to be free and clear of all liens, claims, encumbrances and interests pursuant to 11 U.S.C. § 363(f), except for Assumed Liabilities and Permitted Encumbrances (both as defined in the APA). Section 363(f) provides:

> (f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if -

(1) applicable non-bankruptcy law permits such sale of such property free and clear of such interests;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

The Sale free and clear of liens and interests under § 363(f) is proper as set forth below. Because MCI's objection is the only remaining objection to the Sale Motion, authorization for the Sale free and clear of its rights and interest is addressed separately from other holders of liens or interests in the Assets.

**1. Application of § 363(f) to Liens and Interests Other Than the MCI Interest**

The interests of the holders of liens on and interests in the Assets are properly addressed under § 363(f) as follows:

a.   In regard to the liens and interests of Beach First and Tidelands Bank for the post-petition loans they made to the Estate, the Beach First pre-petition loan secured by a portion of the Assets, and the AFG pre-petition loan secured by a portion of the Assets, these secured creditors are to be fully paid upon the closing of the Sale, they consent to the Sale, and the Sale free and clear of these liens and interests is proper under §§ 363(f)(2) and (3).

b.   In regard to the liens and interest of Carolina Shores, it consents to the Sale (upon the Trustee's stipulation noted in footnote 7 of this Order), and the Sale free and clear of the Carolina Shores liens and interest is proper under § 363(f)(2).

c.   In regard to the asserted liens and interest of Dixon on the Assets, because Dixon did not object to the Sale Motion, he is deemed to have consented to it; in addition,

the Trustee asserts that Dixon's interest is subject to bona fide dispute. Accordingly, the Sale free and clear of Dixon's asserted interest is proper under both §§ 363(f)(2) and (4).

d. In regard to the possible liens of Coastal Connections, Inc. and The Greenery, Inc., because these creditors did not object to the Sale Motion, they are deemed to consent to the Sale; in addition, the Trustee asserts that their possible liens have no value, pursuant to 11 U.S.C. §§ 506(a) and (d), and it would be the burden of these two creditors under 11 U.S.C. § 363(p)(2) to establish the validity, priority and extent of their asserted interest in the property. Accordingly, the Sale free and clear of their possible liens and interest is proper under §§ 363(f)(2) and (4).

e. In regard to the liens of Beaufort County, South Carolina for *ad valorem* taxes on the Assets, these taxes are to be paid at the closing of the Sale, and the Sale free and clear of the 2008 and 2009 tax amounts is proper under § 363(f)(3).

f. In regard to the rights and interests of MPOA and Bloody Point Property Owners Association ("BPPOA"), MPOA and BPPOA hold rights and interests pursuant to matters of record for Melrose Plantation and Bloody Point which were part of the development of the affected properties. The Sale Motion provides that the Sale is not to be free and clear of, but shall be subject to, any and all easements, covenants, conditions, restrictions and other matters of record (except for the rights and interest of MCI under and pursuant to the Transfer Agreement and the Memorandum of Agreement, as to which the Assets will be sold free and clear), and upon this stipulated provision, MPOA and BPPOA have consented to the Sale. Therefore, § 363(f) is not applicable to the MPOA or BPPOA rights and interests.

g. In regard to the mortgage rights and interest of CSE in the Eigelberger Tract,

the property is not directly an Estate Asset and § 363(f) is thus inapplicable to the property and to CSE's rights and interest in the property; however, it is also noted that CSE is to be fully paid at the closing of the Sale from sale proceeds attributable to the Eigelberger Tract.

## 2. **The MCI Interest in the 1996 Property**

As an initial matter in addressing MCI's asserted interest as it relates to the Sale, the Court notes that the ultimate goal of any bankruptcy proceeding is to create and maximize value and benefits for creditors of the estate and other parties involved in the case to share, all the while balancing the parties' respective interests.  In this case, because the parties find themselves in the context of a bankruptcy proceeding, as opposed to some other venue, the matters presently before the Court pertaining to MCI's asserted interest in the 1996 Property are not purely property rights issues.  The dilemmas involved in this litigation over the Sale have not necessarily been caused by the parties; rather it is a fact of life that there is currently a slow market for sales that has affected revenue generated by the Debtor and, later, by the Trustee.  This limitation of revenue and markets affects everyone and is beyond the parties' control.  Further, in many bankruptcy cases, assets are ultimately returned to lenders who must effectuate a sale in a piecemeal fashion that detracts from a greater value that could have been obtained had the assets been sold as a whole.  Such a result often creates little benefit for those creditors or for the community.  This case presents the opportunity for a different result, as there exists the potential for some equity above liens or that would pass to some creditors through agreements.  The Court's decision to grant the Trustee's Sale Motion is based on its determination that the Trustee has successfully carried his burden of

establishing that the requirements of 11 U.S.C. § 363(f)(1) and § 363(f)(4)[10] have been

met with regard to MCI's asserted interest in the Property.  However, the maximization

of the benefit to creditors and to the community as a whole were serious considerations in

the Court's decision to grant the Trustee's Sale Motion.

### a.  The Transfer Agreement and Relevant Provisions

This bankruptcy case, since its inception, has been focused on the issue of the

rights of MCI regarding the 1996 Property owned by the Debtor.  The Court's attention

has always been directed in this case to Article 5 of the Transfer Agreement and, in

somewhat specific circumstances, the Court has had to address certain narrow questions

raised by the parties pertaining to that Agreement.[11]  During the course of this case, the

Court has allowed the development of a declaratory judgment adversary proceeding, the

Court has provided the parties with time to complete discovery, and, perhaps most

importantly, the Court has provided the Debtor and the Trustee with the opportunity to

market the Estate's assets.

The Transfer Agreement at issue in this litigation is a complicated document that

has served a purpose between the parties over a number of years; however, the document

---

[10] At the hearing, the Court denied MCI's request for continuance and overruled MCI's objection regarding the Court's consideration of the Trustee's arguments in favor of sale pursuant to 11 U.S.C. § § 363(f)(1) and (f)(5) on the basis that MCI did in fact have notice of those grounds prior to the hearing, as the litigation was pending for quite some time and all parties were aware of the various arguments pertaining to the Transfer Agreement that were presented at the hearing.  Indeed, the issues surrounding the asserted interest in the Property by MCI have been repeatedly cited as the crux of the case.  Furthermore, MCI conducted a very thorough job in responding to these grounds offered by the parties as a basis for sale at the hearing and in its briefings submitted to the Court.

[11] As examples, the Court has previously addressed such issues in the context of what a certain provision of the Transfer Agreement meant in regard to a motion to reject the Transfer Agreement as an executory contract, in conjunction with a proposed post-petition loan; and in the context of a motion to dismiss, judged under a specific standard of law, in the Declaratory Judgment Adversary Proceeding. Certain of these issues were also recently considered in various motions for summary judgment in the Declaratory Judgment Adversary Proceeding, with the Court making certain rulings and reserving others for future determination in the December 21 Order.

is not wholly consistent.  Article 5 placed additional obligations on the purchaser of the 1996 Property, with the principal additional obligation being that the purchaser would undertake substantial improvements to the 1996 Property.  Many, if not all, of these substantial improvements were made.[12]  The remaining obligation under Article 5 was the obligation of the purchaser to fund any operational deficits, which is certainly of interest to MCI and its members in order to avoid exposure to any additional assessments associated with facilities located on the 1996 Property.  The Court is convinced and has ruled that the parties intended Article 5 as a covenant running with the land.  However, what has not been discussed or examined at length are the obligations the purchaser had under Article 14 and, to some degree, Article 3 of the Transfer Agreement.  Article 14 and Article 3 are the provisions that provide MCI's members with the right to use the club and the facilities on the 1996 Property.  These provisions differ significantly from Article 5 in the way that they are written; the very language is different.  There is no indication in the Transfer Agreement that these provisions were intended to be covenants running with the land.  The club memberships appear to be personal and transferable and not tied to real property under the terms of the recorded document.  Further, the parties did not record the Transfer Agreement, but, instead, chose to prepare and record the Memorandum of Agreement, which specifically references Article 5 but not Articles 3 or 14.  It appears to the Court that a transfer of assets may be made free and clear of the contract rights associated with the use of the club as these are not the type of property interests that run with the land, such as the interest contained in Article 5.[13]

---

[12] It has been cited to the Court that these improvements had a value of up to $45 million dollars.

[13] The Court notes, but does not decide, that the transfer may trigger a breach of contract or some other claim for damages under the Transfer Agreement.  It should also be noted that, although there was

**b.  Authorization of Sale Pursuant to 11 U.S.C. §§ 363(f)(1) and (4)**

As noted above, the Court's decision to grant the Trustee's Sale Motion is based on both 11 U.S.C. §§ 363(f)(1) and (4).  In making the determination that both provisions apply for authorization of the Sale, the Court finds that MCI's repurchase right under the Transfer Agreement is an interest within the purview of § 363(f), that applicable South Carolina law permits the sale of the Assets free and clear of MCI's asserted interest in the portion of the 1996 Property owned by the Estate, and that MCI's asserted interest is subject to bona fide dispute.

**(1) Interest in Property**

MCI argues that its repurchase right, which the Court found to be a covenant running with the land, is not the type of "interest" subject to discharge pursuant to 11 U.S.C. § 363(f)(1) or (4).  It appears that this argument is based on the premise that a covenant running with the land is not an "interest" from which the land may be sold free and clear.

As this Court has previously stated, the term "interest", although not defined in the Bankruptcy Code, should be interpreted broadly.  In re BHB Enterprises, LLC, 1997 WL 33344250 at * 4 (Bankr. D.S.C. 1997) (citing In re Taylor, 198 B.R. 161).  See also In re Downtown Athletic Club of New York City, Inc., Case No. M-47 (JSM), 2000 WL 744126, * 4 (Bankr. S.D.N.Y. 2000) (the interpretation of what constitutes an "interest" under § 363(f)(4) is expansive.  It is well settled that what constitutes an interest under § 363(f) is defined by state property law.  Restaurant Associates, LLC v. The Meadowbrook Mall Co., Case No. 1:06CV53, 2007 WL 951849, *8, fn. 9 (Bkrtcy.

---

some discussion at the hearing regarding Section 14.1.6 of the Transfer Agreement, that provision was not considered in making this ruling.

N.D.W.Va. March 28 2007) (citing In re FCX, Inc., 853 F.2d 1149, 1153 (4th Cir. 1988)). See also Butner v. United States, 440 U.S. 48, 54 (1979) (generally, state law determines property rights in assets of the debtor's estate).   Accordingly, South Carolina real property law determines the nature of MCI's repurchase right under the Transfer Agreement.

In the Court's Order entered on December 21, 2009 in the Declaratory Judgment Adversary Proceeding, the Court found that the MCI repurchase right under § 5.1 of the Transfer Agreement is a restrictive covenant running with the 1996 Property under South Carolina law.[14]  In Marathon Finance Company v. HHC Liquidation Corp., 325 S.C. 589, 607, 483 S.E.2d 757, 766 (Ct. App. 1998) (Cureton, J., concurring in part and dissenting in part), the South Carolina Court of Appeals determined that restrictive covenants constitute an interest in property under South Carolina law that are subject to the provisions of 11 U.S.C. § 363(f).  Additionally, the Court notes that MCI has maintained the position throughout the course of this bankruptcy case, including in connection with the Motion to Reject, in connection with motions for post-petition financing and in the Declaratory Judgment Adversary Proceeding, that it does hold an interest in the portion of the 1996 Property owned by the Estate, and it filed the Declaratory Judgment Adversary Proceeding to sustain that interest.

Based on the authority and the findings cited above, the Court holds that under South Carolina law MCI's interest in the Estate Assets is one that can be dispelled pursuant to the provisions of 11 U.S.C. § 363(f).

---

[14] However, the Court did not rule on all issues relating to the validity, the enforceability or the priority of the repurchase rights, or of other rights, under the Transfer Agreement and reserved those issues for later determination.

**(2) 11 U.S.C. § 363(f)(1)**

The Court will now address the Trustee's Sale Motion pursuant to § 363(f)(1). This section of the Bankruptcy Code permits the Trustee to sell property free and clear of an interest of another entity if applicable non-bankruptcy law permits the sale of such property free and clear of such interest. 11 U.S.C. § 363(f)(1). Therefore, if the Estate Assets could be sold free and clear of MCI's restrictive covenant under South Carolina law, the Court may authorize the Sale pursuant to § 363(f)(1). The Estate Assets can be sold free and clear of the restrictive covenant under applicable South Carolina law, and the Sale Motion should be granted.

In reviewing the matter, it is significant that, with regard to Article 14 and its relationship to Article 5 of the Transfer Agreement, the Article 14 rights to use the club memberships do not carry forward in the future, and the remaining obligation under Article 5 to fund operational deficits is not material or particularly relevant to MCI's members, as their membership benefits will cease to exist. Therefore, the continuing obligation under Article 5 that, in the future, the purchaser will fund operational deficits, does not have value.

Furthermore, in the December 21 Order the Court found that the remedy provided in Article 5, i.e., the repurchase right, has not been triggered and it is dependent upon the unlikely event that a future owner would trigger it voluntarily. It is clear that it would be unwise for any purchaser of this property to voluntarily act to elect to trigger this provision and expose itself to the repurchase right under § 5.1, were it to continue to exist in this case. Since the repurchase right in Article 5 has not been triggered and is unlikely to be triggered in the future, and because it is contingent upon the one remaining criteria

which relates to the extinguished club memberships, the repurchase right offers no real protection to MCI or its members.  This is not a decision the Court has made on its own; rather it is dependent upon the drafting of the Transfer Agreement.   Moreover, the evidence and the record in this case indicates that the Transfer Agreement, particularly its Articles 5 and 14, inhibits the sale of property to the present buyer before the Court at the price that is offered.  It has been indicated to the Court that, if this provision remains effective against the Estate Assets, the buyer will not purchase the Assets.  The Court is also well aware that this provision inhibited the lending of money to the Debtor earlier in this case.   A condition of proposed loan from Petrus to the Debtor[15] was that the provision be rejected, with which the Court did not agree at that stage of the case.  The Court denied the Motion to Reject, allowing MCI to develop its case and for the parties to proceed with discovery.  It is the Court's opinion that, were this provision allowed to continue in the case as to the Estate Assets, it would threaten all future sales and the development of the Estate Assets.  Therefore, the restrictive covenant under Article 5 is oppressive and unreasonable.

In ruling that the Trustee's Sale may proceed under § 363(f)(1), the Court relies on the doctrine of changed conditions or changed circumstances, recognized under South Carolina law, which provides that when such a significant change occurs with regard to the servient property so as to render a covenant valueless to the covenantee and oppressive and unreasonable as to the covenantor, it can be annulled, viewed as unenforceable, and determined ineffective and invalid.  Dunlap v. Beaty, 239 S.C. 196, 122 S.E.2d 9, 15 (1961); see also Menne v. Keowee Key Property Owners Association,

---

[15] See paragraph 25 of the Findings of Fact hereinabove.

<u>Inc.</u>, 368 S.C. 557, 564, 629 S.E.2d 690, 694 (Ct. App. 2007).   <u>Dunlap</u> and <u>Menne</u>

further indicate that the use of this doctrine can be affirmative.  <u>Dunlap</u>, 122 S.E.2d at 15-

16; <u>Menne</u>, 629 S.E.2d at 694.

The Court finds support in the decision in <u>In re Tousa</u>, 393 B.R. 920 (Bankr. S.D.

Fla. 2008), a case admittedly decided under Florida law, but similar to the instant matter,

in that it is a sales motion case brought under § 363(f) involving restrictive covenants on

real estate.   The restrictive covenant in that case prohibited property from being sold

below a certain value, which is often to benefit the surrounding properties.  <u>In re Tousa</u>,

393 B.R. at 922.   The court found, in the instance of that case, that there had been a

downturn in the real estate market that lowered the value of all property in that area.  <u>Id.</u>

at 923.   Therefore, to allow that real covenant to continue would be to not only

effectively set a minimum of value that could not be met, but would also give the holder

of the covenant the right to veto sales, although it would be of no benefit to the holder to

do so.  <u>Id.</u>  The court in <u>Tousa</u> effectively discounted, annulled, and terminated the

covenant, as Florida law rendered the restriction unenforceable due to its

unreasonableness.  <u>Id.</u> at 923-925.

Although this Court acknowledges that South Carolina case law indicates a very

strict application of the changed circumstances doctrine, the Court nevertheless finds that

its ruling complies with State law as the instant matter presents a very unusual case.  As

discussed hereinabove, the Court previously found that the repurchase right provisions of

Article 5 have not been triggered, that it is highly unlikely that those provisions will be

triggered in the future, that the MCI club memberships are dependent upon different

Articles contained in the Transfer Agreement, and that only Article 5 of the Transfer

Agreement is a covenant running with the land, i.e., the other Articles of the Transfer

Agreement are not covenants running with the land.[16]   The remaining obligations in

Article 5 are of no value if the benefits contained in other Articles of the Transfer

Agreement are not continually offered to MCI's members.   Simply no purpose would be

served by permitting the restrictive covenant to continue.   This would create no value for

the homeowners, would cause issues with the title to all property left to be sold and

developed, and would interfere with lending as indicated by the course of this case.

Furthermore, the Trustee's testimony in this case shows that allowing the repurchase

right to remain in place as a restrictive covenant would not only block the proposed Sale,

but it would likely lead to the closing of all operations on the property, which would

defeat the objectives of the Transfer Agreement and expose the Estate, the creditors,

MCI, and surrounding property owners to potentially disastrous consequences.[17]   The

Court therefore finds that a changed condition exists in this case that permits the Court to

find the restrictive covenant contained in Article 5 unenforceable and a nullity.   Dunlap,

122 S.E.2d at 15-16; Menne, 629 S.E.2d at 694.   See also In re Tousa, 393 B.R. at 922-

925.   Further, public policy makes enforcement of the restrictive covenant unfair under

the same exact terms and argument, except in this instance maintaining the covenant

would not only affect the property adjacent to the Melrose Property, but the entire

community, threatening the development of the island and commerce thereon.

---

[16] In the Order of May 6, 2009, denying the Motion to Reject, the Court found that Article 5 is a separate contract within the Transfer Agreement.

[17] The Trustee's testimony indicates that he expects to exhaust the funding he obtained in mid-January 2010, and that he then would be unable to pay for even normal and basic maintenance and care of the property, resulting in a serious, possibly irreversible, deterioration of the property and the facilities on it, and that both the Estate and surrounding property owners would likely suffer substantial loss of value of their properties.   MCI would thus be denied access to and use of the property and the facilities on it, and the MCI goals of preserving the condition, quality and value of the property would be defeated.

### (3) 11 U.S.C. § 363(f)(4)

In the event the Court's grant of the Trustee's Sale Motion is for some reason determined improper under § 363(f)(1), or the basis for the Court's reasoning is found not controlling under § 363(f)(1), the Court also holds that these issues raise a bona fide dispute, creating substantial issues on an objective basis for both factual and legal dispute as to the validity of the asserted MCI interest.  Pursuant to 11 U.S.C. § 363(f)(4), the Court may authorize the Trustee to sell property under § 363(b) free and clear of any interest in such property of an entity other than the estate only if such interest is in bona fide dispute.  In re Taylor, 198 B.R. at 158 (citing 11 U.S.C. §§ 363(f)(4)).  The goal of § 363(f)(4) is to "'allow the sale of property subject to dispute so that liquidation of the estate's assets need not be delayed while such disputes are being litigated.'"  In re Bella Vista Associates, LLC, Bankruptcy No. 07-18134/JHW, 2007 WL 4555891, * 4 (Bankr. D.N.J. December 18, 2007) (citing In re Durango Georgia Paper Co., 336 B.R. 594, 597 (Bankr. S.D.Ga. 2005), quoting In re Gulf States Steel, Inc. of Atlanta, 285 B.R. 497, 507 (Bankr. N.D.Ala. 2002)).

For authorization of the sale of the Estate Assets free and clear of MCI's interest pursuant to this section, the Trustee must demonstrate that (1) MCI holds an "interest" in the Estate Assets, and (2) that the interest is in bona fide dispute.  In re BHB Enterprises, LLC, Case No. 97-01975-JW, 1997 WL 33344250, * 4 (Bankr. D.S.C. September 30, 1997).  See also In re Taylor, 198 B.R. at 161.  The Court has already determined that MCI's interest is the type that can be dispelled pursuant to § 363(f).  However, in order for a sale to proceed under 11 U.S.C. § 363(f)(4), the Trustee must also demonstrate the existence of a bona fide dispute.  In re Taylor, 198 B.R. at 161.

The term "bona fide dispute" is not defined in the Bankruptcy Code.  Id. at 162.

However, bankruptcy courts have held that the standard for determining if such a dispute

exists is, whether "there is an objective basis for either a factual or a legal dispute as to

the validity of the asserted interest."  Id.  Importantly, this standard does not require that

the Court resolve the underlying dispute or that it determine the probable outcome of the

dispute; rather, it only requires a determination that such a dispute does, in fact, exist.  Id.

(citing In re Collins, 180 B.R. 447, 452 (Bkrtcy. E.D.Va. 1995)).  Evidence must be

provided to show factual grounds that there is an objective basis for the dispute.  Id.

Certainly if there are grounds by which the restrictive covenant cannot be

enforced by MCI, the covenant is subject to a bona fide dispute.  It is the Court's opinion

that this case presents a blueprint of litigation issues associated with real property

disputes.  There is a history of very significant litigation indicating that there have been

and still are significant issues in dispute between the parties pertaining to the validity of

MCI's asserted interest.  Not everything was decided in the Court's recent summary

judgment ruling.  In fact, the Court carefully crafted the December 21 Order in such a

way as to not indicate that it was making a determination that the restrictive covenant at

issue was valid.  The Court also notes that, at the time of the Sale Hearing, the December

21 Order was still appealable by any of the involved parties, and is now subject to a

motion to alter or amend filed by MCI.  These circumstances indicate that significant

issues regarding MCI's asserted interest in the Estate Assets remain in dispute.  The

effect of Article 14 of the Transfer Agreement, whether it is in breach or not, as well as

the priority of rights among the parties, all constitute issues of bona fide dispute.  Finally,

the Court notes that the issue of the validity and the effectiveness of the repurchase right

was made a matter of public record by MCI in the filing of its lis pendens in connection with the Declaratory Judgment Adversary Proceeding.

The Court finds that there exists an objective basis for numerous factual and legal disputes as to the validity of MCI's asserted interest in the Estate Assets. Therefore, the Trustee has carried his evidentiary burden of establishing that MCI's interest in the Estate Assets is subject to bona fide dispute pursuant to § 363(f)(4), and that the Estate Assets may be sold free and clear of the MCI interest pursuant to that subsection.

### D.  Additional Conclusions Stated for Sale

In addition to the conclusions stated above, the following conclusions apply for the Sale:[18]

a.   Proper, timely, adequate and sufficient notice of the Sale Motion, the Sale Hearing, and the Sale, has been provided in accordance with 11 U.S.C. §§ 105(a), 363 and 365 and Rules 2002, 6004, 6006 and 9014; such notice was good and sufficient, and appropriate under the particular circumstances; and no other or further notice of the Sale Motion, or the Sale Hearing or the Sale, shall be required.

b.   Authorization of the Sale to Montauk and consummation of the Sale at this time are in the best interests of the Estate, creditors, and other parties-in-interest.

c.   The Trustee has demonstrated both (i) good, sufficient, and sound business purpose and justification and (ii) compelling circumstances for the Sale pursuant to 11 U.S.C. § 363(b) prior to, and outside of, a confirmed Chapter 11 plan.

d.   A reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested persons and entities.

---

[18] Some of these conclusions are also addressed above, but they are restated for clarity in the provisions for the Sale.

e.    A reasonable opportunity was provided for interested bidders to participate in the sale process pursuant to the bidding procedures approved by the Court.

f.    The terms of the Sale, as stated in the APA, were negotiated, proposed and entered into by the Trustee and Montauk without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Trustee nor Montauk have engaged in any conduct that would cause or permit the APA to be avoided under 11 U.S.C. § 363(n).

g.    Montauk is a good faith purchaser under 11 U.S.C. § 363(m) and, as such, is entitled to all of the protections afforded thereby.  Montauk will be acting in good faith within the meaning of 11 U.S.C. § 363(m) in closing the transactions contemplated by the APA at all times after the entry of this Order.

h.    The consideration provided by Montauk for the Assets pursuant to the APA (i) is fair and reasonable, (ii) is the highest and best offer for the Assets, (iii) will provide a greater recovery for the creditors of the Estate than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the United States Bankruptcy Code (11 U.S.C. §§ 101, et seq.) and other applicable law.

i.  With the exception of any and all easements, covenants, conditions, restrictions and other matters of record (but not excepting the rights and interest of MCI under and pursuant to the Transfer Agreement, and the Memorandum of Agreement) relating to the real property included in the Sale, the Trustee may sell the Assets to Montauk free and clear of all interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in 11 U.S.C. §§ 363(f)(l) - (5) have been satisfied.  The Sale to Montauk is made free and clear of the rights and interests of MCI and its successors in

interest under the Transfer Agreement and the Memorandum of Agreement. Those non-debtor parties with interests in the Assets who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented pursuant to 11 U.S.C. §§ 363(f)(2) and 365.

      j. Montauk has provided adequate assurance of future performance with respect to all executory contracts and unexpired leases that will be assumed and assigned to Montauk pursuant to the APA.

      k. The Trustee has provided adequate assurance that he can promptly pay any amounts necessary to cure defaults under any executory contracts or leases to be assumed and assigned to Montauk, as finally determined by agreement between the parties or by order of this Court (such amounts being the "Cure Costs").

      l. Montauk is not a successor in interest to the Debtor and shall not have any successor or transferee liability for liabilities of the Debtor (whether under federal or state law or otherwise) as a result of the purchase and sale of the Assets, except to the extent provided in the APA. Montauk shall not be deemed joint employers, co-employers or successor employers with or of the Debtor or the Trustee and shall have no obligation to pay wages, severance pay, WARN Act claims, benefits or any other payment to employees of the Debtor.

      NOW THEREFORE, IT IS HEREBY:

      ORDERED that the Sale Motion is granted, as further described herein; and it is further

      ORDERED that the APA between the Trustee and Montauk, including all of the terms and conditions thereof, is hereby approved in all respects, including such

immaterial contract modifications and amendments as may be agreed to from time to time by the Trustee and Montauk; and it is further

ORDERED that pursuant to 11 U.S.C. § 363(b), the Trustee is authorized and directed to consummate the Sale, pursuant to and in accordance with the terms and conditions of the APA; and it is further

ORDERED that pursuant to 11 U.S.C. §§ 105(a) and 363(f), the Assets shall be transferred to Montauk, and upon consummation of the APA (the "Closing") shall be, with the exception of any and all easements, covenants, conditions, restrictions and other matters of record (but not excepting the rights and interests of MCI under and pursuant to the Transfer Agreement and the Memorandum of Agreement) relating to the real property included in the Sale, free and clear of all liens, claims and encumbrances and any and all other interests of any kind or nature, including without limitation, any claim (as defined under the United States Bankruptcy Code), security interest, setoff, pledge, mortgage, lien, judgment lien, tax lien, tax, pension claim, employee claim, employee benefit claim, retiree health care benefit claim, right of first refusal, option to purchase or any similar interest with all such interests of any kind or nature whatsoever to attach to the net proceeds of the Sale in the order of their priority, with the same validity, force and effect which they now have as against the Assets, subject to any claims and defenses the Debtor or the Estate may possess with respect thereto; and that, specifically, by this provision of this Order, the Assets shall be transferred to Montauk, and upon the Closing shall be, free and clear of the rights and interests of MCI and its successors in interest under and pursuant to the Transfer Agreement and the Memorandum of Agreement; and it is further

ORDERED that the transfer of the Assets to Montauk pursuant to the APA

constitutes a legal, valid, and effective transfer of the Assets, and shall vest Montauk with all right, title, and interest of the Debtor and the Estate in and to the Assets free and clear of all interests of any kind or nature whatsoever; and it is further

ORDERED that the Trustee is authorized to assume and assign to Montauk all Contracts and Leases, as set forth in the APA, and the Trustee is obligated to pay the Cure Costs as soon as practicable after such Cure Costs are finally determined by agreement of the parties to the contract or lease, or by order of this Court; and it is further

ORDERED that the transactions contemplated by the APA are undertaken by Montauk in good faith, as that term is used in 11 U.S.C. § 363(m), and Montauk shall be considered a good faith purchaser.  Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale to Montauk, unless such authorization is duly stayed pending such appeal. Montauk is a purchaser in good faith of the Assets, and is entitled to all of the protections afforded by 11 U.S.C. § 363(m); and it is further

ORDERED that notwithstanding Rules 6004(h), 6006(d) and 7062, this Order shall be effective and enforceable immediately upon entry.  The Court expressly finds that the circumstances now existing in this case militate that the Trustee immediately proceed with the Sale and the implementation of this Order; and it is further

ORDERED that the Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.

# # # # #