## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

Case No.  09-00389-jw

## ORDER (1) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE ESTATE AT AUCTION FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, AND (2) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED EXECUTORY CONTRACTS AND LEASES

The relief set forth on the following pages, for a total of 42 pages including this page, is hereby **ORDERED.**

**FILED BY THE COURT**
**05/07/2010**



_John E Waites_

Chief US Bankruptcy Judge
District of South Carolina

Entered: 05/07/2010

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re: | Case No.  09-00389-jw |
| Daufuskie Island Properties, LLC aka Daufuskie Island Resort and Breathe Spa, | Chapter  11 |
| Debtor. | |

**ORDER (1) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE ESTATE AT AUCTION FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, AND (2) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED EXECUTORY CONTRACTS AND LEASES**

This matter came before the Court upon the <u>Motion and Memorandum for an Order (1) Authorizing the Sale of Substantially All Assets of the Estate at Auction Free and Clear of Liens, Claims, Encumbrances and Other Interests, and (2) Approving the Assumption and Assignment of Certain Unexpired Executory Contracts and Leases</u> ( the "Auction Motion") filed on March 10, 2010 by Robert C. Onorato, as Trustee (the "Trustee") for the Chapter 11 bankruptcy estate (the "Estate") of Daufuskie Island Properties, LLC (the "Debtor"), seeking (1) authorization pursuant to 11 U.S.C. §§ 363(b)(1) and (f), Rule 6004 of the Federal Rules of Bankruptcy Procedure ("Rule 6004")[1] and SC LBR 6004-1, to conduct a public auction of substantially all of the assets of the Estate, as more fully described below (the "Auction"); and (2) approval of the Trustee's assumption and assignment of certain unexpired leases and executory contracts to the purchaser of the assets pursuant to 11 U.S.C. §§ 365(a), (b) and (f) and Rule 6006, as part of the

---

[1] Hereinafter, the Federal Rules of Bankruptcy Procedure are cited in this Order as "Rule _____."

Sale. The sale of the assets at the Auction is to be free and clear of all liens, claims, encumbrances and other interests, except for any and all easements, covenants, conditions, restrictions and other matters of record (but not excepting the rights and interests of The Melrose Club, Inc. in the property) relating to the sale of the real property included in the sale.

The Trustee states in the Auction Motion that the scheduling of the Auction is part of a three-prong sale effort by the Trustee. Under this approach, the Trustee states that he has been simultaneously pursuing three separate sale approaches ("sale tracks"), to assure a sale of the Estate assets by a date certain, and to maximize the value of the assets. The first sale track has been to attempt to close the sale of assets to Montauk Resorts, LLC ("Montauk") already authorized under this Court's Order entered on January 7, 2010. The second track has been to seek to sell the assets to one or more potential buyers who previously indicated interest in the assets, under a contract of sale. The third track is the scheduling of an auction sale of the assets, to "backstop" the other sale efforts, by providing for a sale by a date certain. The Trustee states that the Auction Motion is in furtherance of the third track.

Although several parties in the case filed objections to the Auction Motion, all but one of the objections were resolved prior to or at the hearing on the Auction Motion on April 21, 2010. The one objection remaining at the hearing, which is addressed in this Order, is the objection filed by The Melrose Club, Inc. ("MCI"), relating to the provision in the Auction Motion that the sale of assets by the Auction shall be free and clear of MCI's rights and interest under that certain Transfer Agreement (the "Transfer Agreement") dated September 27, 1996, by and between MCI and Melrose Club Management, Inc. n/k/a Daufuskie Club, Inc. ("DCI"), and the Memorandum of Agreement filed in the RMC Office of Beaufort County, South Carolina on December 31, 1996 (the "Memorandum of Agreement"). For the reasons set forth hereinbelow,

the Court overrules the MCI objection and grants authorization for the Auction.

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, which is made applicable to this matter by Rules 7052 and 9014, the Court makes the following Findings of Fact and Conclusions of Law.[2]

## I.     <u>FINDINGS OF FACT</u>

### A.     <u>The Bankruptcy Case</u>

1.     On January 20, 2009, the Debtor filed its petition for relief under Chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101, <u>et</u> <u>seq.</u>, the "Bankruptcy Code").  The Debtor operated as a Chapter 11 debtor-in-possession until the Trustee's appointment in this case.

2.     On March 17, 2009, the Court entered its <u>Order Granting Joint Motion for Appointment of Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104</u>, granting the joint motion of the Official Committee of Unsecured Creditors (the "Creditors Committee"), Beach First National Bank, now known as BNC Bank, ("Beach First") and AFG, LLC ("AFG") for the appointment of a trustee in this case.  Thereafter, on March 23, 2009, the Court entered its <u>Order Approving Appointment of Trustee</u>, approving the United States Trustee's appointment of Robert C. Onorato as Trustee for the Estate.

3.     Shortly before the Trustee's appointment, the Debtor closed its business operations after its proposed post-petition lender withdrew its offer to provide post-petition financing, whereupon the Debtor lacked funding to cover its operating expenses.  Following his appointment, the Trustee was able to obtain post-petition loans for the payment of costs to

---

[2] The Court notes that, to the extent that any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

maintain the property owned by the Estate, to resume some of the resort operations on the property, and to market the assets owned by the Estate for sale.

4.      The Trustee has been attempting to sell the property of the Estate for approximately one year.  The Trustee employed the services of RBC Enterprises, Inc. ("RBC") as the non-exclusive broker for the marketing and sale of the property in this case.  It appears that the Trustee and RBC contacted numerous potential buyers of the property, sent those potential buyers a professionally prepared book describing and showing the property, hosted site visits to the property by potential buyers, and remained in contact with potential buyers pending the proposed sale to Montauk.

5.      On September 15, 2009, the Trustee filed a motion (the "Montauk Sale Motion") seeking authorization to sell the assets of the Estate, and the Eigelberger tract of property owned by Eprop, LLC, an entity wholly-owned by the Estate, to Montauk for the total sale price of $49.5 million.  Following a hearing on December 30, 2009, the Court granted the motion and authorized the sale to Montauk pursuant to the Order (1) Authorizing Sale of Substantially All Assets of the Estate Free and Clear of Liens, Claims, Encumbrances and Other Interests, and (2) Approving the Assumption and Assignment of Certain Unexpired Executory Contracts and Leases (the "January 7 Sale Order").  The January 7 Sale Order specifically provides that the sale to Montauk would be free and clear of MCI's asserted interest in the property.

6.      In authorizing the sale of the assets free and clear of MCI's asserted rights and interest, the January 7 Sale Order overruled MCI's objection to such sale.  MCI's objection to the Montauk Sale Motion was incorporated in the objection it filed to the Auction Motion, presenting the same issues, and the record of the hearing on December 30, 2009 on the Montauk Sale Motion included evidence and arguments which are also applicable to MCI's objection to

the Auction Motion.  MCI also presented additional objections to the Auction Motion, including

that an auction could negatively impact MCI members, homeowners, and other stakeholders by

breaking up the core amenities.

7.      The sale to Montauk has not closed.  The Trustee states that Montauk's funding

for its purchase of the assets has not arrived, hence his adoption of the three-prong sale approach.

8.      In conjunction with the Auction Motion, on March 10, 2010 the Trustee filed a

Notice of (1) Sale of Substantially All Assets of the Estate at Auction Free and Clear of Liens,

Claims, Encumbrances and Other Interests, (2) Assumption and Assignment of Certain

Unexpired Executory Contracts and Leases, and (3) Hearing on the Sale (the "Notice of Auction

Motion") describing the Trustee's proposed Auction and providing notice of the hearing on the

Auction Motion.  As shown by certificates of service filed with the Court, the Notice of Auction

Motion and the Auction Motion were served on creditors and parties in interest in the case.

9.      The Court conducted the hearing on the Auction Motion on April 21, 2010 (the

"Auction Motion Hearing").

10.     The Trustee filed a proposed plan of reorganization, but it has not yet been

confirmed.  The Trustee filed his Chapter 11 Plan (the "Plan") and the Disclosure Statement to

Chapter 11 Plan (the "Disclosure Statement") on November 20, 2009.  The Plan provides for the

sale of the assets of the Estate; however, the Plan and the Disclosure Statement are primarily

based on the sale of the assets to Montauk, and the Trustee has asked that the hearing on the

approval of the Disclosure Statement be held in abeyance pending a determination of the sale of

the assets, whereupon the Trustee proposes to amend the Plan and the Disclosure Statement as

appropriate to reflect the anticipated outcome of the sale.[3]  The Trustee states that he cannot provide adequate information on the likely recoveries for creditors under the Plan (or a modified Plan) until the provisions of the proposed sale of the assets are better known.

## B.    General Description of the Assets of the Estate

11.    The assets of the Estate (collectively, the "Estate Assets") primarily consist of resort facilities, lodging, maintenance and support buildings and structures, and development property located on Daufuskie Island in Beaufort County, South Carolina.  The Estate owns real property with improvements in the Melrose Planned Unit Development ("Melrose Plantation" or the "Melrose Property"), real property with improvements in the Bloody Point Planned Unit Development ("Bloody Point" or the "Bloody Point Property"), and real property and improvements comprising Melrose Landing, the dock and landing/departure location for the Debtor and for residents and visitors to Melrose Plantation and Bloody Point.

12.    The Estate Assets include an inn (the "Melrose Inn"), a conference center  (the "Island House Conference Center"), cottages and duplexes (the "Beach Cottages"), a beach club (the "Melrose Beach Club"), two golf courses (the "Melrose Golf Course" and the "Bloody Point Golf Course"), an equestrian center, tennis courts, a pool and other structures, improvements and fixtures. The Melrose Golf Course, the Melrose Inn, the Melrose Beach Club, the tennis courts and the Beach Cottages are located on the Melrose Property.  The Bloody Point Golf Course, miscellaneous maintenance buildings and structures and two unsold residential lots are located on the Bloody Point Property.

---

[3] A "Reuben Order" has been entered with regard to the Disclosure Statement, by which the hearing on the Disclosure Statement has been removed from the calendar of hearings, but can be restored upon motion of the Trustee or another party.

## C.      Existing Liens on the Assets of the Estate

13.     Pursuant to Orders entered on April 24, 2009, May 8, 2009, July 17, 2009 and July 29, 2009, the Court granted the Trustee's motions for authorization to obtain post-petition financing from Beach First in the principal amount of $1 million and from Tidelands Bank in the principal amount of $500,000.00; these loans (the "Senior Post-Petition Loans") comprise a participation loan by these two lenders, secured by a senior mortgage on, security interest in and lien on all assets of the Estate (except for avoidance actions and recoveries from avoidance actions), and having superpriority status under 11 U.S.C. § 364(c)(1) (except as to avoidance actions and recoveries from avoidance actions).

14.     Pursuant to Orders entered on November 23, 2009, and on December 8, 2009, the Court granted the Trustee's motion for authorization of additional post-petition financing, in the form of a new loan from Tidelands Bank (the "Second TB Post-Petition Loan") in the principal amount of $250,000.00, secured by security interests in and liens on all assets of the Estate (except for avoidance actions and recoveries from avoidance actions) junior in priority to the security interests and liens securing the Senior Post-Petition Loans, but senior in priority to all other liens and interests in the assets, including the asserted interests of MCI, pursuant to 11 U.S.C. §§ 364(c)(3) and 364(d); and having superpriority claim status pursuant to 11 U.S.C. § 364(c)(1) (except as to avoidance actions and recoveries from avoidance actions, as to which the claim would have administrative priority under 11 U.S.C. § 364(b)), provided, however, that the superpriority claim of the Second TB Post-Petition Loan is subordinate to the superpriority claims of the Senior Post-Petition Loans.  Pursuant to the Orders authorizing the Second TB Post-Petition Loan, Tidelands Bank holds a second lien on the assets of the Estate (except for avoidance actions and recoveries from avoidance actions).

15.     In addition to its claim for the Senior Post-Petition Loan it made in this case, Beach First filed a pre-petition claim [Claim No. 152 on the Claims Register] against the Estate in the amount of $6,417,614.42, as of March 19, 2009, which is secured by a portion of the Estate Assets, including two lots in Bloody Point, Beach Cottages, the Melrose Beach Club, and certain acreage in the Beach Cottages area of the Melrose Property.

16.     AFG filed a pre-petition claim [Claim No. 203 on the Claims Register] against the Estate in the principal amount of $4 million, which is secured by a portion of the Estate Assets, including the Melrose Golf Course, the Melrose Inn, the Island House Conference Center, and certain other real property and improvements in the Melrose Property.

17.     Carolina Shores, LLC ("Carolina Shores") filed a pre-petition claim [Claim No. 117 on the Claims Register] against the Estate in the amount of $27,750,128.51, secured by a mortgage on a portion of the Estate Assets.  Carolina Shores' lien on its collateral is junior in priority to the Senior Post-Petition Loans, the Second TB Post-Petition Loan and the liens securing the pre-petition claims of Beach First and AFG.

18.     William R. Dixon, Jr. ("Dixon") filed a claim [Claim No. 116 on the Claims Register] in the amount of $34,692,660.58 secured by a mortgage on a substantial portion of the Estate Assets; however, both the Trustee and Carolina Shores have filed adversary proceedings disputing Dixon's claim.[4]

19.     CS Eigelberger, LLC ("CSE"), successor to CSE Mortgage, LLC, holds a mortgage on the Eigelberger Tract.  CSE filed a claim [Claim No. 211 on the Claims Register] in the amount of $9,119,560.26, plus interest and attorney's fees and costs, upon the Debtor's

---

[4] The Trustee filed Adversary Proceeding No. 09-80120-jw seeking to avoid the Dixon mortgage as a preference under 11 U.S.C. § 547(b), and Carolina Shores filed Adversary Proceeding No. 09-80134-jw alleging numerous causes of action, including the equitable subordination of Dixon's claim.

guaranty of the loan CSE made to Eprop, LLC.

20.     Coastal Connections, Inc. and The Greenery may assert mechanic's lien claims on some of the Estate Assets.   The Trustee estimates these claims to total approximately $372,000.00.

21.     The Trustee states that *ad valorem* taxes are owed on the properties owned by the Estate for both 2008 and 2009.  Although the Trustee states that he needs to confirm the amounts due for the taxes, he has estimated the aggregate amount owed for 2008 and 2009 to be approximately $600,000.00.

### D.     MCI's Asserted Interest in the Melrose Property

22.     MCI previously owned approximately 300 acres of the Melrose Property, including the 52-room Melrose Inn, the location of the Island House Conference Center, the Melrose Beach Club, 37 Beach Cottages, the Melrose Golf Course, tennis facilities, a health and fitness center, the equestrian center, the Sportsman's Lodge, administration and maintenance facilities, certain acreage and other resort amenities, in addition to Melrose Landing and the Salty Fare embarkation center on Hilton Head Island with docks and parking (the former MCI property is hereinafter collectively referred to as the "1996 Property").[5]  MCI asserts certain rights (which include reconveyance rights) in the 1996 Property under the Transfer Agreement and the Memorandum of Agreement.

23.     Prior to the commencement of this case, MCI filed an action in state court asserting rights under the Transfer Agreement and the Memorandum Agreement, including a right to repurchase the 1996 Property upon the occurrence of certain conditions.

---

[5] The Debtor owned the Salty Fare facility from the time of its purchase of the 1996 Property in May 2002, until it transferred the Salty Fare facility in April 2007 to Stewart Kittredge Collins and/or Susan Charles Collins, Trustees of the Collins Family Trust Dated May 26, 1989 (the "Collins Family Trust").  As of the Auction Motion Hearing, the Collins Family Trust still owned the Salty Fare facility.

24.     On February 27, 2009, the Debtor filed a motion to reject (the "Motion to Reject")

the Transfer Agreement as an executory contract under 11 U.S.C. § 365(a).  The Debtor also

filed a motion for an expedited hearing on the Motion to Reject, which was granted.

25.     The Court conducted the hearing on the Motion to Reject on March 11, 2009.  At

the conclusion of the hearing, the Court stated its ruling denying the Motion to Reject, which was

to be set forth in a written order.  The Court entered the Order Denying Debtor's Motion to

Reject Transfer Agreement of 1996, as Amended on May 6, 2009.

26.     As a parallel matter to the Motion to Reject, the Debtor filed a Motion and

Memorandum to Incur Debt and for Approval of Post-Petition Debtor in Possession Financing

and Associated Relief (the "DIP Loan Motion") on March 2, 2009, with a motion for an

expedited hearing.  In the DIP Loan Motion, the Debtor sought authorization for post-petition

financing in the maximum amount of $3 million from Petrus Private Investment, L.P. or an

affiliate ("Petrus"), to be secured by a first priority lien on all of the Debtor's assets and to have

superpriority status.  The hearing on the DIP Loan Motion was scheduled for the same date as

the hearing on the Motion to Reject.  Upon the Court stating its ruling denying the Motion to

Reject at the hearing on March 11, 2009, Petrus withdrew its offer to provide post-petition

financing to the Debtor.

27.     On several occasions, in connection with status hearings and hearings on other

matters arising in the case after the Trustee's appointment, the Trustee, MCI, Beach First, AFG,

Carolina Shores and the Creditors Committee advised the Court that they recognized the need to

address the MCI rights and interest in the 1996 Property, and that a declaratory judgment action

would be filed in the case for that purpose.

28.     On June 15, 2009, MCI filed an adversary proceeding seeking declaratory

judgment of its rights and interest in the 1996 Property under the Transfer Agreement and the

Memorandum of Agreement, which is Adversary Proceeding No. 09-80094-jw in this Court (the

"Declaratory Judgment Adversary Proceeding").  In its complaint, MCI named as defendants the

Trustee, Beach First, AFG, Carolina Shores, the Collins Family Trust, and all parties having a

recorded interest in the 1996 Property.  In conjunction with the Declaratory Judgment Adversary

Proceeding, MCI filed a lis pendens in Beaufort County, South Carolina as to the 1996 Property.

     29.    MCI's asserted right to repurchase the 1996 Property arises under Article 5 of the

Transfer Agreement, which provides:

> 5.1 <u>Purchaser's Additional Obligations</u>.  As additional consideration
> for the transfer and sale of the Assets, Purchaser agrees to execute, on the
> Closing Date, the Assignment and Assumption Agreement whereby
> Purchaser agrees to assume and fund the costs of the Additional
> Obligations pursuant to the terms and conditions recited therein.  In the
> event Purchaser, at any time from the Closing Date to the expiration of
> twenty (20) years from the Closing Date, elects to not perform the
> Additional Obligations, or any material part thereof, then Purchaser shall
> provide written notice to Seller of its election (the "Written Notice").
> Purchaser agrees to reconvey the Assets to Seller within thirty (30) days
> after the Written Notice has been received by Seller, if Seller, at its option
> in its sole discretion, notifies Purchaser, in writing within thirty (30) days
> after receipt of the Written Notice, that Seller agrees to accept such
> reconveyance.  The closing of the reconveyance shall be in the same
> manner and the substantially same form of documentation as utilized for
> the Closing, and Seller shall assume all of the existing liabilities of
> Purchaser arising from its ownership and operation of the Assets, which
> liabilities shall not be greater than the Liabilities assumed by Purchaser at
> the Closing.  Purchaser agrees, for a period of seven (7) years from the
> Closing Date, that any mortgage or security agreement against the Assets
> shall only secure funding for capital improvements, replacements,
> renovations, repairs, or the operation of the Club.  The parties agree that a
> memorandum setting forth the reconveyance and debt restrictions set forth
> in this Section shall be recorded against the Real Property and shall be a
> covenant running with the land and be binding on any successor or assign
> of Purchaser who acquires the Real Property.

     30.    The Memorandum of Agreement was recorded to provide record notice of the

Article 5 reconveyance rights in the Transfer Agreement.  It does not reference other provisions

of the Transfer Agreement.

31.     The parties to the Declaratory Judgment Adversary Proceeding filed extensive pleadings and motions in regard to the MCI issues, including motions for summary judgment or partial summary judgment.  Following a hearing on November 25, 2009 on the summary judgment motions, the Court entered its Order and Judgment on the motions on December 21, 2009 (the "December 21 Order"), (a) granting partial summary judgment to Carolina Shores, finding that the Debtor's alleged failure to perform under the Transfer Agreement by failing to fund operational deficits does not constitute an election so as to trigger MCI's right of reconveyance under Section 5.1 of the Transfer Agreement, (b) granting partial summary judgment to MCI, concluding that the reconveyance right of § 5.1 is a covenant running with title to the 1996 Property, and (c) reserving for later determination the priority and enforceability of the reconveyance right under § 5.1 and other claims made by the parties in the Declaratory Judgment Adversary Proceeding.

32.     The Trustee testified that all potential purchasers of the Assets have advised him that the Assets must be transferred to them free and clear of MCI's rights and interest as a condition to their purchase of the Assets.

### E.     The Proposed Auction

33.     The Auction Motion provides for the sale of substantially all assets of the Estate by the Trustee by public auction.  More specifically, the Trustee will sell by auction the Melrose Property, Melrose Landing, and the Bloody Point Property, together with all furnishings, fixtures, equipment, and other personalty owned by the Estate in connection with such real property, including permits, trademarks, and other related items of property (collectively, the "Assets"), to the successful bidder at the auction.  Expressly excluded from the sale are all claims and rights of action the Estate may have against other parties, any tax refunds due to the Estate,

cash and cash equivalents owned by the Estate, accounts receivable, any contract that is not expressly assumed by the purchaser, and any insurance policies or proceeds.

34.     The sale of the Assets at the Auction is to be free and clear of all liens, claims, encumbrances and other interests pursuant to 11 U.S.C. § 363(f), except for any and all easements, covenants, conditions, restrictions and other matters of record (but not excepting the rights and interest of MCI under and pursuant to the Transfer Agreement and the Memorandum of Agreement) relating to the real property included in the sale.  The terms of the Auction specifically provide that the Assets are to be sold to the successful buyer(s) at the Auction free and clear of the rights and interest of MCI under the Transfer Agreement and the Memorandum of Agreement pursuant to 11 U.S.C. §§ 363(f)(1) and (4).

35.     As outlined below, the Trustee has acknowledged that there are unresolved issues with respect to the proposed Auction, and has indicated that many of the unresolved issues may be settled by a supplemental order.  The Court may conduct a further hearing to determine any issues that remain unresolved.

36.     In the Auction Motion, the Trustee requests that the Court find that the successful buyer(s) at the Auction is a good faith purchaser of the Assets for purposes of 11 U.S.C. § 363(m).  At the Auction Motion Hearing, the Trustee acknowledged that the Court cannot make such a finding until after the Auction is concluded, and explained that he intended that any such finding be made upon a hearing held after the Auction to confirm the successful bidder(s) as the authorized purchaser(s).

37.     In the Auction Motion, the Trustee describes proposed terms upon which the Auction is to be conducted.  However, both the Auction Motion and the Notice of Auction Motion state that the proposed terms of the Auction may be modified upon consultation and

agreement by and among the Trustee, the auctioneer, Beach First, Tidelands Bank, AFG, Carolina Shores and the Creditors Committee, and in consultation (but not requiring the agreement of) MCI and Dixon.  At the Auction Motion Hearing, the Trustee advised the Court that these parties have not yet reached agreement upon the final bidding procedures for the Auction, and that he would file a motion to supplement this Order upon the agreement of the parties on the final bidding procedures.  The Trustee requested that the Court grant the Auction Motion subject to finalization of the bidding procedures among the parties, so that the Trustee can proceed with making the arrangements necessary for an auction of the Assets.

38.    The Assets will be offered for sale both collectively (as a single sale of all Assets), and as separate parcels or smaller groupings (e.g., the properties securing the Beach First or the AFG prepetition loans).  After the bidding has concluded on the assets collectively, and on the Assets separately, the highest bid for the Assets collectively will be compared with the total of the highest bids for the Assets separately, and whichever amount (either the bid for the Assets collectively, or the total of the bids for the Assets separately) is higher shall be the sale (the sale of the Assets collectively, or the sale of the Assets separately) the Trustee shall make pursuant to the Auction.

39.    The sale will be to the highest cash bidder; provided, however, that mortgage and lien creditors may bid for the purchase of the property and offset their secured claims against the purchase price of the property pursuant to 11 U.S.C. § 363(k).  Any and all liens against the property will attach to the proceeds of sale.

40.    The successful purchaser(s) at the Auction (the "Successful Bidder(s)") shall be the person(s) making the highest bid(s) for the Assets, pursuant to the final bidding procedures established in advance of the Auction.

41.    The Trustee will ask that the Court confirm and approve the highest bidder(s) at the Auction as the Successful Bidder to whom the Trustee is authorized to sell the Assets.  The Trustee will request that the hearing to confirm the Successful Bidder be scheduled for the earliest date possible after the Auction.  The Trustee may also request that the Court approve a second bidder from the Auction as a "back-up" buyer, in the event the Successful Bidder does not close its purchase of the Assets in a timely manner.

42.    The sale will be a final sale.

43.    Subject to payment of the auctioneer's fees and expenses, closing costs (including applicable prorations), and the Carve-Out (defined hereinbelow), secured creditors whose claims are not presently disputed or unresolved as to amount will be paid by the Trustee immediately upon his receipt of the payment of the purchase price from the purchaser, according to their respective interests in the property; provided, however, that if issues arise regarding the allocation of the sale proceeds among the Assets, such as would affect the secured status of a secured creditor, that secured creditor will not be paid until the issues are resolved, either consensually or by order of the Court.

44.    Secured creditors may exercise their rights to offset a bid under 11 U.S.C. § 363(k); provided that, if a secured creditor making a § 363(k) credit bid is deemed to be the Successful Bidder, the secured creditor must advance funds to the Trustee to cover the portion of the Carve-Out attributable to the property purchased by that secured creditor.

45.    As part of the Auction, a portion of the sale proceeds will be set aside (the "Carve-Out) for payment of unsecured claims, including administrative claims and administrative expenses, but excluding the fees and expenses of the auctioneer and normal closing costs.  The Carve-Out will be comprised of equity (if any) from assets and a portion of

the proceeds from otherwise fully encumbered property.  The amount of the Carve-Out is to be established in the final provisions for the Auction, and incorporated into a supplemental order of this Court.  After deducting the amount of the equity realized from the Assets, the remainder of the Carve-Out (e.g., a $2 million Carve-Out, less $1 million of proceeds from equity in property, results in a $1 million additional amount needed to fund the remainder of the Carve-Out) will be paid from the sale proceeds based upon the proration of the additional amount among the Assets according to the portion of the sale proceeds allocated to each.

46.    The Carve-Out shall not be used to pay the auctioneer's fee and costs, which shall be paid from the gross sale proceeds at closing.

47.    The allocation of the sale proceeds will be determined either by agreement among (a) Beach First, Tidelands Bank, AFG, Carolina Shores, the Trustee and the Creditors Committee in advance of the Auction, or (b) if not agreed prior to the Auction, based upon the sale price of the parcels, if they are sold separately, or (c) if not agreed by the parties prior to the Auction and if the parcels are not sold separately, by order of this Court upon motion by the Trustee or by a creditor of the Estate.

48.    At the closing of the sale, the Trustee will pay from the sale proceeds the ordinary and customary closing costs and payment items, including but not limited to the deed preparation fee, any recording fees chargeable to the Estate,[6] the 2008 and 2009 ad valorem taxes due on the Assets, pro rated 2010 ad valorem taxes on the Assets, operating expense items typically pro rated and paid at closing (e.g., utilities), and costs necessary to close the sale which are chargeable to the Estate.  In addition, at the closing, the auctioneer's fees and/or any real estate

---

[6] The Trustee is informed and believes that document stamps and recording fees will not apply to this sale, pursuant to 11 U.S.C. § 1146(a).  The Trustee has filed a Chapter 11 plan which provides for the sale of the Assets under this Motion.  Although the plan will not have been confirmed by the date of the closing of the sale, the Trustee intends to assert that § 1146(a) is applicable to the recording of the deed and other transfer documents.

commission due on the sale will be paid.

49.     The ad valorem taxes shall be charged to, and deducted from, the sale proceeds of the particular properties upon which the tax is due, e.g., if $1,000 (an amount used solely for illustration) of ad valorem tax is due on Melrose Landing, the payment of that $1,000 of tax shall be deducted from the sale proceeds allocated to Melrose Landing.   All other closing costs and the auctioneer's fees and/or any real estate commission due on the sale shall be pro rated among the Assets based upon the amount of the sale proceeds allocated to each Asset.

50.     It is contemplated that after payment of the closing costs, the expense items described above, and the auctioneer's fees and/or any real estate commission due on the sale, the remainder of the sale proceeds should be sufficient to pay the superpriority secured indebtedness to Beach First and Tidelands Bank for the post-petition loans they made to the Trustee.[7]  After payment of the Senior Post-Petition Loans and the Second TB Post-Petition Loan, the sale proceeds will be paid to creditors holding liens on the Assets according to the allocation of sale proceeds made to and on account of their respective collateral.  These secured claims will be paid at the closing of the sale to the successful buyer.

51.     At closing, the Carve-Out will be set aside from the sale proceeds for payment of unsecured creditors, including both priority and non-priority unsecured creditors.  The Trustee may use these funds to pay administrative expenses and administrative claims, but payment of non-priority unsecured creditors will not occur until confirmation of a Chapter 11 plan.

### F.     Compelling Circumstances for Sale

52.     In his testimony in the hearing on authorization of the sale to Montauk, the

---

[7] The Trustee states that he may seek authorization for another post-petition loan to fund the costs of the Auction.  If such a loan is authorized and obtained, it shall receive payment and treatment consistent with the provisions of the Order(s) authorizing it, and consistent with the provisions for payment of the post-petition loans already made by Beach First and Tidelands Bank.

Trustee stated that he had managed to stretch the funds he obtained from the post-petition loans in this case to cover essential expenses through the expected closing of the sale to Montauk on or about January 15, 2010, but that he expected to have exhausted those funds in mid-January 2010 whereupon he would be unable to pay the costs of the continued maintenance and care for the Assets.  At the Auction Motion Hearing, the Trustee advised the Court that he has managed to continue maintaining the Assets, notwithstanding the failure of the Montauk sale to close, by persons being willing to provide services on credit with the expectation of payment upon the closing of the sale of the Assets, and by "luck", but that it is a very tenuous situation and he does not believe that he can continue the maintenance and care of the Assets indefinitely without a sale.

53.    In his testimony, the Trustee states that he has managed to "hold on" longer than expected, but that, if he is unable to proceed with the sale of the Assets soon, he believes that he will have to completely shut-down operations on the property owned by the Estate, whereupon MCI and surrounding property owners would not have access to the facilities; that he would be unable to maintain the property and facilities, resulting in a serious, possibly irreversible deterioration of the properties and facilities; that both the Estate and surrounding property owners would suffer substantial loss of the value of their properties; and that the situation would result in a disaster for all persons having an interest in the Melrose and Bloody Point communities.

54.    In his testimony at the hearing on the sale to Montauk, the Trustee stated that, if the Transfer Agreement and the Memorandum of Agreement were prepared, as he understands, to protect MCI and surrounding property owners from the deterioration of the condition of the Melrose Property, to preserve their access to the facilities on the Melrose Property, and to

maintain a high level of quality of the Melrose Property and the facilities, the sale of the Assets

is consistent with those objectives.  Although the Successful Bidder(s) cannot be determined

until the Auction has been concluded, and thus the intentions of the Successful Bidder(s) as the

new owner(s) of the Assets are not known, the Trustee stated in his testimony at the Auction

Motion Hearing that the Estate cannot continue maintaining the property indefinitely and

transferring the property to a new owner is important if there is to be any hope of maintaining the

property and facilities beyond the short term.

### G.    Additional Relief Requested in the Sale Motion, and Objections to the Sale Motion

55.    As part of the Auction Motion, the Trustee requests that the Court order that the

stay provisions of Rule 6004(h) and Rule 6006(d) are not applicable to this Order authorizing the

sale of the Assets and the assumption and assignment of certain executory contracts and leases.

MCI objected to this requested relief.  As set forth below, the MCI objection is overruled.

56.    Beach First, AFG, CSE, Carolina Shores, the Creditors Committee, Tidelands

Bank, Dixon and MCI filed objections and responses to the Auction Motion.  The objections

filed by Beach First, AFG, CSE, Carolina Shores, the Creditors Committee, Tidelands Bank and

Dixon were resolved or withdrawn prior to or during the Auction Motion Hearing.

## CONCLUSIONS OF LAW

The Trustee seeks authorization for the Auction pursuant to 11 U.S.C. § 363(b)(1), as a

sale not made in the ordinary course of the Debtor's business, and pursuant to 11 U.S.C. §

363(f), to convey the Assets free and clear of all liens, claims, encumbrances and other interests.[8]

Because the Auction is a sale of substantially all assets of the Estate prior to confirmation of a

---

[8] The Trustee excepts from the free and clear provisions of the Auction any and all easements, covenants, conditions, restrictions and other matters of record, but not the rights and interest of MCI under and pursuant to the Transfer Agreement and the Memorandum of Agreement.

Chapter 11 plan in this case, authorization for the sale under § 363(b)(1) requires that the Trustee satisfy the "sound business purpose" test for pre-confirmation sales. As discussed below, the Trustee satisfied this test. In regard to making the sale of the Assets free and clear of liens, claims, encumbrances and interests, the Trustee must show that one of the provisions of §§ 363(f)(1) – (5) is applicable to each lien or interest from which the sale is to be free and clear. The Trustee also satisfied this requirement. As part of the Auction, the Trustee is to assume and assign certain executory contracts and leases pursuant to 11 U.S.C. §§ 365(a) and (f), and the Trustee has satisfied the requirements for approval of the assumption and assignment of those executory contracts and leases. Therefore, authorization for the Auction is proper and should be granted.[9]

## A.    Jurisdiction

The Court has jurisdiction over the Auction Motion pursuant to 28 U.S.C. §§ 157(a) and 1334(a), and Local Civil Rule 83.IX.01, DSC, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N). Venue of this case and the Auction Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

## B.    Authorization Under 11 U.S.C. § 363(b)(1)

The Trustee seeks authorization to sell the Assets pursuant to 11 U.S.C. §363(b)(1), outside of the ordinary course of business, prior to confirmation of a Chapter 11 plan. Although sales of substantially all assets of an estate normally should be proposed and conducted pursuant to a confirmed Chapter 11 plan, this Court has recognized that when a sound business justification exists, the Court may authorize such a sale under §363(b)(1) without a confirmed

---

[9] The Court notes that while it reserved its rights, MCI's proposed order on the Trustee's Auction Motion recognized and provided for the Court's authorization of the Auction and a sale of the property free and clear of MCI's asserted interest pursuant to § 363(b)(1) and § 363(f)(4).

plan of reorganization.  In re Taylor, 198 B.R. 142, 156-157 (Bankr. D.S.C. 1996).  See also

Stephen Indus., Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986)("bankruptcy court can authorize a

sale of a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates

such action");  In re WBQ Partnership, 189 B.R. 97 (Bankr. E.D. Va. 1995)(explaining and

adopting the sound business purpose test); and In re The Lady H. Coal Company, Inc., 193 B.R.

233, 234 (Bankr. S.D.W.Va. 1996)(also adopting the sound business purpose test).

Under the sound business purpose test, the Trustee has the burden of proving the

following: (1) a sound business reason or emergency justifies the pre-confirmation sale; (2) the

sale has been proposed in good faith; (3) adequate and reasonable notice of the sale has been

provided to interested parties; and (4) the purchase price is fair and reasonable.  In re Taylor, 198

B.R. at 157.  The Trustee's proposed sale of the Assets by the Auction satisfies the test.

## C.    Sound Business Reason or Emergency

This case presents compelling reasons for a sale of the Assets without delay.  At the time

of the Trustee's appointment, the Debtor's business was closed due to the lack of funds to pay

any expenses, and the Estate was in danger of loss of substantial value in the Assets.  The

Trustee had to obtain post-petition loans from Beach First and Tidelands Bank to fund payment

of essential expenses to maintain and protect the Assets, and these funds have been exhausted.  It

appears that the Trustee has managed to continue maintaining the Assets only by persons

providing services on credit with the expectation of payment upon the sale of the Assets, and that

the Trustee, in his estimation, cannot continue maintaining the Assets much longer without an

imminent sale.  The Trustee filed his Plan on November 20, 2009, but the Disclosure Statement

has not yet been approved[10] and it is uncertain as to when a confirmation hearing might be scheduled on the Plan.  If the Auction were to be delayed until confirmation of a Chapter 11 plan, it is unlikely that the Trustee would be able to maintain the operation of the Assets – which at present is only on a partial basis – and the amenities and facilities on the property would again shut-down.  If the amenities and facilities on the property are again shut-down, it is uncertain when, if ever, they would reopen, and the Trustee urges that the Assets would suffer a significant, and potentially catastrophic, loss of value.

The Trustee has shown that the sale of the Assets needs to occur as soon as reasonably possible, to maximize their value and avoid significant loss.

### D.      Good Faith

The terms of the proposed Auction provide for a public auction.  The bidding procedures applicable to the Auction are to be established by the Trustee upon consultation with the auctioneer, the secured creditors, the Creditors Committee and MCI.   It appears that the Trustee and RBC previously provided information to numerous potential buyers, met with many potential buyers, and have continued a dialogue with several potential investors.  The Trustee states that he cannot continue maintaining the Assets indefinitely without a sale, and that he seeks authorization for the Auction to assure that a sale of the Assets will occur by a date certain. The record in this case supports the finding that the Auction is proposed in good faith.

### E.      Notice

As evidenced by certificates of service filed with the Court, the Auction Motion and the Notice of Auction Motion were served upon all creditors and parties in interest in this case.

---

[10] The hearing on the Disclosure Statement has been removed from the Court's calendar of scheduled hearings until the nature of the sale of the Assets can be better determined.  The Trustee requested that the hearing on the Disclosure Statement be held in abeyance because the nature and expected outcome of a sale of the Assets will necessarily affect the content of the Plan and the Disclosure Statement.

Notice of the Auction Motion Hearing is included in the Notice of Auction Motion.  It appears

that all creditors and parties in interest had ample opportunity to respond to the Auction Motion

and the Notice of Auction Motion, and all creditors and parties who did respond to the Auction

Motion and/or the Notice of Auction Motion did, in fact, attend the Auction Motion Hearing.

Accordingly, all creditors and parties in interest had reasonable and proper notice of the Auction

proposed in the Auction Motion.

### F.     Purchase Price

The purchase price will be determined at the Auction.  In the Auction Motion, and in

explanation by the Trustee's counsel at the Auction Motion Hearing, the Trustee has stated that

the Auction represents the third track of his three-pronged sale approach, that he has attempted to

arrange a contract sale of the Assets to potential buyers, and that the Auction is to be scheduled

because he does not have a contract sale at an acceptable price ready to close.  The Auction is a

public sale.  In light of the involvment of the Trustee, the secured creditors, the Creditors

Committee and other parties in the development of the provisions for the Auction, all of whom

have or should have strong incentive to make the Auction a success, it appears that the Auction

should produce a purchase price for the Assets which is fair and reasonable under the

circumstances of this case.

### G.     Authorization Under 11 U.S.C. § 363(f)

The sale of the Assets to the Buyer is to be free and clear of all liens, claims,

encumbrances and interests pursuant to 11 U.S.C. § 363(f), except for any and all easements,

covenants, conditions, restrictions and other matters of record (but not excepting the rights and

interest of MCI under and pursuant to the Transfer Agreement and the Memorandum of

Agreement) relating to the real property included in the Auction.  Section 363(f) provides:

> (f) The trustee may sell property under subsection (b) or (c) of this

section free and clear of any interest in such property of an entity other than the estate, only if -

(1) applicable non-bankruptcy law permits such sale of such property free and clear of such interests;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

The sale of the Assets by the Auction free and clear of liens and interests under § 363(f) is proper as set forth below. Because MCI's objection is the only remaining objection to the Auction Motion, authorization for the sale of the Assets free and clear of its rights and interest is addressed separately from other holders of liens or interests in the Assets.

## H.    Application of § 363(f) to Liens and Interests Other Than the MCI Interest

The interests of the holders of liens on and interests in the Assets are properly addressed under § 363(f) as follows:

a.    In regard to the liens and interests of Beach First and Tidelands Bank for the post-petition loans they made to the Estate, the Beach First pre-petition loan secured by a portion of the Assets, and the AFG pre-petition loan secured by a portion of the Assets, these secured creditors consent to the Auction, and the sale of the Assets by the Auction free and clear of these liens and interests is proper under §§ 363(f)(2) and (3).

b.    In regard to the liens and interest of Carolina Shores, it consents to the Auction, and the sale of the Assets by the Auction free and clear of the Carolina Shores liens and interest is proper under § 363(f)(2).

c.    In regard to the asserted liens and interest of Dixon on the Assets, Dixon has consented to the Auction; in addition, the Trustee asserts that Dixon's interest is subject to bona fide dispute. Accordingly, the sale of the Assets by the Auction free and clear of Dixon's

asserted interest is proper under both §§ 363(f)(2) and (4).

d.    In regard to the possible liens of Coastal Connections, Inc. and The Greenery, Inc., because these creditors did not object to the Auction Motion, they are deemed to consent to the Auction; in addition, the Trustee asserts that their possible liens have no value, pursuant to 11 U.S.C. §§ 506(a) and (d), and it would be the burden of these two creditors under 11 U.S.C. § 363(p)(2) to establish the validity, priority and extent of their asserted interest in the property. Accordingly, the sale of the Assets by the Auction free and clear of their possible liens and interest is proper under §§ 363(f)(2) and (4).

e.    In regard to the liens of Beaufort County, South Carolina for *ad valorem* taxes on the Assets, these taxes are to be paid at the closing of the sale following the Auction, and the sale of the Assets by the Auction free and clear of the 2008 and 2009 tax amounts is proper under § 363(f)(3).

## I.    The MCI Interest in the 1996 Property

As an initial matter in addressing MCI's asserted interest as it relates to the Auction, the Court again notes as it did in the January 7 Sale Order that the ultimate goal of any bankruptcy proceeding is to create and maximize value and benefits for creditors of the estate and other parties involved in the case to share, all the while balancing the parties' respective interests.  In this case, because the parties find themselves in the context of a bankruptcy proceeding, as opposed to some other venue, the matters presently before the Court pertaining to MCI's asserted interest in the 1996 Property are not purely property rights issues.  The dilemmas involved in this litigation over the sale of the Assets have not necessarily been caused by the parties; rather it is a fact of life that there is currently a slow market for sales that has affected revenue generated by the Debtor and, later, by the Trustee.  This limitation of revenue and markets affects everyone and is beyond the parties' control.  The Court's decision to grant the Trustee's Auction Motion is

based on its determination that the Trustee has successfully carried his burden of establishing

that the requirements of 11 U.S.C. § 363(f)(1) and § 363(f)(4) have been met with regard to

MCI's asserted interest in the property.  However, the maximization of the benefit to creditors

and to the community as a whole are serious considerations in the Court's decision to grant the

Trustee's Auction Motion.

### J.     The Transfer Agreement and Relevant Provisions

This bankruptcy case, since its inception, has been focused on the issue of the rights of

MCI regarding the 1996 Property owned by the Debtor.  The Court's attention has always been

directed in this case to Article 5 of the Transfer Agreement and, in somewhat specific

circumstances, the Court has had to address certain narrow questions raised by the parties

pertaining to that Agreement.[11]   During the course of this case, the Court has allowed the

development of a declaratory judgment adversary proceeding, the Court has provided the parties

with time to complete discovery, and, perhaps most importantly, the Court has provided the

Debtor and the Trustee with the opportunity to market the Estate's assets.  The Court has also

ruled on the validity of the MCI rights in regard to the sale to Montauk, holding that the Trustee

could sell the Assets free and clear of MCI's rights and interest under the Transfer Agreement

and the Memorandum of Agreement.  See the January 7 Sale Order.

The Transfer Agreement at issue in this litigation is a complicated document that has

served a purpose between the parties over a number of years; however, the document is not

wholly consistent.  Article 5 placed additional obligations on the purchaser of the 1996 Property,

---

[11] As examples, the Court has previously addressed such issues in the context of what a certain provision of
the Transfer Agreement meant in regard to a motion to reject the Transfer Agreement as an executory contract, in
conjunction with a proposed post-petition loan; and in the context of a motion to dismiss, judged under a specific
standard of law, in the Declaratory Judgment Adversary Proceeding. Certain of these issues were also considered in
various motions for summary judgment in the Declaratory Judgment Adversary Proceeding, with the Court making
certain rulings and reserving others for future determination in the December 21 Order.

with the principal additional obligation being that the purchaser would undertake substantial improvements to the 1996 Property.  Many, if not all, of these substantial improvements were made.[12]  The remaining obligation under Article 5 was the obligation of the purchaser to fund any operational deficits, which is certainly of interest to MCI and its members in order to avoid exposure to any additional assessments associated with facilities located on the 1996 Property.  The Court is convinced and has ruled that the parties intended Article 5 as a covenant running with the land.  However, what has not been discussed or examined at length are the obligations the purchaser had under Article 14 and, to some degree, Article 3 of the Transfer Agreement.  Article 14 and Article 3 are the provisions that provide MCI's members with the right to use the club and the facilities on the 1996 Property.  These provisions differ significantly from Article 5 in the way that they are written in that there is no indication in the Transfer Agreement that these provisions were intended to be covenants running with the land.  The club memberships appear to be personal and transferable and not tied to real property under the terms of the recorded document.  Further, the parties did not record the Transfer Agreement, but, instead, chose to prepare and record the Memorandum of Agreement, which specifically references Article 5 but not Articles 3 or 14.  It appears to the Court that a transfer of assets may be made free and clear of the contract rights associated with the use of the club as these are not the type of property interests that run with the land, such as the interest contained in Article 5.[13]

### K.    Authorization of Sale Pursuant to 11 U.S.C. §§ 363(f)(1) and (4)

As noted above, and consistent  with the Court's decision in the January 7 Sale Order, the

---

[12] It has been cited to the Court that these improvements had a value of up to $45 million dollars.

[13] The Court notes, but does not decide, that the transfer may trigger a breach of contract or some other claim for damages under the Transfer Agreement.  It should also be noted that, although there was some discussion at the hearing regarding Section 14.1.6 of the Transfer Agreement, that provision was not considered in making this ruling.

Court's decision to grant the Trustee's Auction Motion is based on both 11 U.S.C. §§ 363(f)(1) and (4).  In making the determination that both provisions apply for authorization of the sale of the Assets by the Auction, the Court finds that MCI's repurchase right under the Transfer Agreement is an interest within the purview of § 363(f), that applicable South Carolina law permits the sale of the Assets free and clear of MCI's asserted interest in the portion of the 1996 Property owned by the Estate, and that MCI's asserted interest is subject to bona fide dispute.

## L.    Interest in Property

MCI argues that its repurchase right, which the Court found to be a covenant running with the land, is not the type of "interest" subject to discharge pursuant to 11 U.S.C. § 363(f)(1) or (4).  It appears that this argument is based on the premise that a covenant running with the land is not an "interest" from which the land may be sold free and clear.

As this Court has previously stated, the term "interest", although not defined in the Bankruptcy Code, should be interpreted broadly.  In re BHB Enterprises, LLC, 1997 WL 33344250 at * 4 (Bankr. D.S.C. 1997) (citing In re Taylor, 198 B.R. 161).  See also In re Downtown Athletic Club of New York City, Inc., Case No. M-47 (JSM), 2000 WL 744126, * 4 (Bankr. S.D.N.Y. 2000) (the interpretation of what constitutes an "interest" under § 363(f)(4) is expansive).  It is well settled that what constitutes an interest under § 363(f) is defined by state property law.  Restaurant Associates, LLC v. The Meadowbrook Mall Co., Case No. 1:06CV53, 2007 WL 951849, *8, fn. 9 (Bankr. N.D.W.Va. March 28 2007) (citing In re FCX, Inc., 853 F.2d 1149, 1153 (4th Cir. 1988)).  See also Butner v. United States, 440 U.S. 48, 54 (1979) (generally, state law determines property rights in assets of the debtor's estate).  Accordingly, South Carolina real property law determines the nature of MCI's repurchase right under the Transfer Agreement.

In the Court's Order entered on December 21, 2009 in the Declaratory Judgment

Adversary Proceeding, the Court found that the MCI repurchase right under § 5.1 of the Transfer Agreement is a restrictive covenant running with the 1996 Property under South Carolina law.[14] In <u>Marathon Finance Company v. HHC Liquidation Corp.</u>, 325 S.C. 589, 607, 483 S.E.2d 757, 766 (Ct. App. 1998) (Cureton, J., concurring in part and dissenting in part), the South Carolina Court of Appeals determined that restrictive covenants constitute an interest in property under South Carolina law that are subject to the provisions of 11 U.S.C. § 363(f). Additionally, the Court notes that MCI has maintained the position throughout the course of this bankruptcy case, including in connection with the Motion to Reject, in connection with motions for post-petition financing and in the Declaratory Judgment Adversary Proceeding, that it does hold an interest in the portion of the 1996 Property owned by the Estate, and it filed the Declaratory Judgment Adversary Proceeding to sustain that interest.

Based on the authority and the findings cited above, the Court holds that under South Carolina law MCI's interest in the Assets is one that can be dispelled pursuant to the provisions of 11 U.S.C. § 363(f).

### M.    11 U.S.C. § 363(f)(1)

The Court will now address the Trustee's Auction Motion pursuant to § 363(f)(1). This section of the Bankruptcy Code permits the Trustee to sell property free and clear of an interest of another entity if applicable non-bankruptcy law permits the sale of such property free and clear of such interest. 11 U.S.C. § 363(f)(1). Therefore, if the Assets could be sold free and clear of MCI's restrictive covenant under South Carolina law, the Court may authorize the sale of them free and clear of MCI's restrictive covenant pursuant to § 363(f)(1). The Court finds and

---

[14] However, the Court did not rule on all issues relating to the validity, the enforceability or the priority of the repurchase rights, or of other rights, under the Transfer Agreement and reserved those issues for later determination.

concludes that the Assets can be sold free and clear of the restrictive covenant under applicable South Carolina law, and the Auction Motion should be granted.

In reviewing the matter, it is significant that, with regard to Article 14 and its relationship to Article 5 of the Transfer Agreement, the Article 14 rights to use the club memberships do not carry forward in the future if the assets deteriorated, wasted or were sold, and the remaining obligation under Article 5 to fund operational deficits does not meet its purpose for MCI's members, as their membership benefits would cease to exist.[15] Therefore, the continuing obligation under Article 5 that, in the future, the purchaser will fund operational deficits, does not have value.

Furthermore, in the December 21 Order the Court found that the remedy provided in Article 5, i.e., the repurchase right, has not been triggered and it is dependent upon the unlikely event that a future owner would trigger it voluntarily. It is clear that it would be unwise for any purchaser of this property to voluntarily act to elect to trigger this provision and expose itself to the repurchase right under § 5.1, were it to continue to exist in this case. Since the repurchase right in Article 5 has not been triggered and is unlikely to be triggered in the future, and because it is contingent upon the one remaining criteria which relates to the extinguished club memberships, the repurchase right offers no real protection to MCI or its members. This is not a decision the Court has made on its own; rather it is dependent upon the drafting of the Transfer Agreement. Moreover, the evidence and the record in this case indicate that the Transfer

---

[15] In argument upon its motion to vacate or to alter or amend the January 7 Sale Order, MCI argued, inter alia, that the provision for funding operational deficits also has the purpose of assuring the continuation of the facilities on the property. However, the Trustee testified that all potential purchasers of the Assets have advised him that they require the transfer of the Assets to them free and clear of the MCI repurchase right, as a condition to their purchase. The Trustee also testified that, absent a sale of the Assets, the facilities necessarily will be closed and they will likely deteriorate to the point that they no longer exist. Accordingly, the repurchase right under Article 5 threatens to cause the occurrence of the very thing that MCI argues it was intended to prevent, the deterioration and possible loss of the facilities.

Agreement, particularly Article 5, inhibits the sale of property.  It has been indicated to the Court

that, if this provision remains effective against the Assets, prospective buyers will not purchase

the Assets.  The Court is also well aware that this provision inhibited the lending of money to the

Debtor earlier in this case.  A condition of proposed loan from Petrus to the Debtor[16] was that the

provision be rejected, with which the Court did not agree at that stage of the case.  The Court

denied the Motion to Reject, allowing MCI to develop its case and for the parties to proceed with

discovery.  It is the Court's opinion that, were this provision allowed to continue in the case as to

the Assets, it would threaten all future sales and the development of the Assets.  Therefore, the

restrictive covenant under Article 5 is oppressive and unreasonable.

In ruling that the Trustee's Auction may proceed under § 363(f)(1), the Court relies on

the doctrine of changed conditions or changed circumstances, recognized under South Carolina

law, which provides that when such a significant change occurs with regard to the servient

property so as to render a covenant valueless to the covenantee and oppressive and unreasonable

as to the covenantor, it can be annulled, viewed as unenforceable, and determined ineffective and

invalid.  Dunlap v. Beaty, 239 S.C. 196, 122 S.E.2d 9, 15 (1961); see also Menne v. Keowee Key

Property Owners Association, Inc., 368 S.C. 557, 564, 629 S.E.2d 690, 694 (Ct. App. 2007).

Dunlap and Menne further indicate that the use of this doctrine can be affirmative.  Dunlap, 122

S.E.2d at 15-16; Menne, 629 S.E.2d at 694.

The Court finds support in the decision in In re Tousa, 393 B.R. 920 (Bankr. S.D. Fla.

2008), a case admittedly decided under Florida law, but similar to the instant matter, in that it is a

sales motion case brought under § 363(f) involving restrictive covenants on real estate.  The

restrictive covenant in that case prohibited property from being sold below a certain value, which

---

[16] See paragraph 26 of the Findings of Fact hereinabove.

is often to benefit the surrounding properties.  In re Tousa, 393 B.R. at 922.  The court found, in the instance of that case, that there had been a downturn in the real estate market that lowered the value of all property in that area.  Id. at 923.  Therefore, to allow that real covenant to continue would be to not only effectively set a minimum of value that could not be met, but would also give the holder of the covenant the right to veto sales, although it would be of no benefit to the holder to do so.  Id.  The court in Tousa effectively discounted, annulled, and terminated the covenant, as Florida law rendered the restriction unenforceable due to its unreasonableness.  Id. at 923-925.

Although this Court acknowledges that South Carolina case law indicates a very strict application of the changed circumstances doctrine, the Court nevertheless finds that the circumstances of the instant matter meet these requirements.  As discussed hereinabove, the Court previously found that the repurchase right provisions of Article 5 have not been triggered, that it is highly unlikely that those provisions will be triggered in the future, that the MCI club memberships are dependent upon different Articles contained in the Transfer Agreement, and that only Article 5 of the Transfer Agreement is a covenant running with the land, i.e., the other Articles of the Transfer Agreement are not covenants running with the land.  The purpose of the remaining obligation in Article 5 is defeated if the benefits contained in other Articles of the Transfer Agreement are not continually offered to MCI's members.  Allowing the covenant to continue to block any proposed sales or refinancing and lead to the closing of all operations and maintenance of the property has and will likely continue to result in the deterioration of the property and facilities and substantial loss in value to homeowners, creditors, and the

community.[17]

As stated by the Trustee, if the MCI restrictive covenant were to remain in effect, the Melrose Property, which has been a high-end resort with amenities for club members, would cease to be a resort, and the amenities would disappear as the condition of the property deteriorated. The Court therefore finds that a changed condition exists in this case that permits the Court to find the restrictive covenant contained in Article 5 unenforceable and a nullity. Dunlap, 122 S.E.2d at 15-16; Menne, 629 S.E.2d at 694. See also In re Tousa, 393 B.R. at 922-925. Further, public policy makes enforcement of the restrictive covenant unfair under the same exact terms and argument, except in this instance maintaining the covenant would not only affect the property adjacent to the Melrose Property, but the entire community, threatening the development of the island and commerce thereon.

## N.    11 U.S.C. § 363(f)(4)

In the event the Court's grant of the Trustee's Auction Motion is for some reason determined improper under § 363(f)(1), or the basis for the Court's reasoning is found not controlling under § 363(f)(1), the Court also holds that these issues raise a bona fide dispute, creating substantial issues on an objective basis for both factual and legal dispute as to the validity of the asserted MCI interest. Pursuant to 11 U.S.C. § 363(f)(4), the Court may authorize the Trustee to sell property under § 363(b) free and clear of any interest in such property of an entity other than the estate only if such interest is in bona fide dispute. In re Taylor, 198 B.R. at

---

[17] The Trustee's testimony indicates that he has exhausted the post-petition funding he obtained, and that he has managed to continue basic maintenance and care of the property only because a few people have been willing to provide services on credit, with the expectation of payment when the property is sold. However, he adds that he cannot continue in this manner indefinitely, and he is concerned that the situation may reach the point where he is unable to continue the maintenance and care of the Assets, resulting in a serious, possibly irreversible, deterioration of the property and the facilities on it, and that both the Estate and surrounding property owners would likely suffer substantial loss of value of their properties. MCI would thus be denied access to and use of the property and the facilities on it, and the MCI goals of preserving the condition, quality and value of the property would be defeated.

158 (citing 11 U.S.C. §§ 363(f)(4)).  The goal of § 363(f)(4) is to "'allow the sale of property subject to dispute so that liquidation of the estate's assets need not be delayed while such disputes are being litigated.'"    In re Bella Vista Associates, LLC, Bankruptcy No. 07-18134/JHW, 2007 WL 4555891, * 4 (Bankr. D.N.J. December 18, 2007) (citing In re Durango Georgia Paper Co., 336 B.R. 594, 597 (Bankr. S.D.Ga. 2005), quoting In re Gulf States Steel, Inc. of Atlanta, 285 B.R. 497, 507 (Bankr. N.D.Ala. 2002)).

For authorization of the sale of the Assets free and clear of MCI's interest pursuant to this section, the Trustee must demonstrate that (1) MCI holds an "interest" in the Assets, and (2) that the interest is in bona fide dispute.  In re BHB Enterprises, LLC, Case No. 97-01975-JW, 1997 WL 33344250, * 4 (Bankr. D.S.C. September 30, 1997).  See also In re Taylor, 198 B.R. at 161. The Court has already determined that MCI's interest is the type that can be dispelled pursuant to § 363(f).  However, in order for a sale to proceed under 11 U.S.C. § 363(f)(4), the Trustee must also demonstrate the existence of a bona fide dispute.  In re Taylor, 198 B.R. at 161.

The term "bona fide dispute" is not defined in the Bankruptcy Code.  Id. at 162. However, bankruptcy courts have held that the standard for determining if such a dispute exists is, whether "there is an objective basis for either a factual or a legal dispute as to the validity of the asserted interest."  Id.  Importantly, this standard does not require that the Court resolve the underlying dispute or that it determine the probable outcome of the dispute; rather, it only requires a determination that such a dispute does, in fact, exist.  Id. (citing In re Collins, 180 B.R. 447, 452 (Bkrtcy. E.D.Va. 1995)).  Evidence must be provided to show factual grounds that there is an objective basis for the dispute.  Id.

Certainly if there are grounds by which the restrictive covenant cannot be enforced by MCI, the covenant is subject to a bona fide dispute.  It is the Court's opinion that this case

presents a blueprint of litigation issues associated with real property disputes. There is a history of very significant litigation indicating that there have been and still are significant issues in dispute between the parties pertaining to the validity of MCI's asserted interest. Not everything was decided in the Court's summary judgment ruling in the December 21 Order. In fact, the Court carefully crafted the December 21 Order in such a way as to not indicate that it was making a determination that the restrictive covenant at issue was valid. These circumstances indicate that significant issues regarding MCI's asserted interest in the Assets remain in dispute. The effect of Article 14 of the Transfer Agreement, whether it is in breach or not, as well as the priority of rights among the parties, all constitute issues of bona fide dispute. Finally, the Court notes that the issue of the validity and the effectiveness of the repurchase right was made a matter of public record by MCI in the filing of its lis pendens in connection with the Declaratory Judgment Adversary Proceeding.

The Court finds that there exists an objective basis for numerous factual and legal disputes as to the validity of MCI's asserted interest in the Assets. Therefore, the Trustee has carried his evidentiary burden of establishing that MCI's interest in the Assets is subject to bona fide dispute pursuant to § 363(f)(4), and that the Assets may be sold free and clear of the MCI interest pursuant to that subsection.

## O.    Additional Conclusions Stated for the Auction

In addition to the conclusions stated above, the following conclusions apply for the Auction:[18]

a.   Proper, timely, adequate and sufficient notice of the Auction Motion and the Auction Motion Hearing was provided in accordance with 11 U.S.C. §§ 105(a), 363 and 365 and Rules

---

[18] Some of these conclusions are also addressed above, but they are restated for clarity in the provisions for the Auction.

2002, 6004, 6006 and 9014; such notice was good and sufficient, and appropriate under the particular circumstances; and no other or further notice of the Auction Motion, or the Auction Motion Hearing, shall be required.

b.    Authorization of the Auction at this time is in the best interests of the Estate, creditors, and other parties-in-interest.

c.    The Trustee has demonstrated both (i) good, sufficient, and sound business purpose and justification and (ii) compelling circumstances for the Auction pursuant to 11 U.S.C. § 363(b) prior to, and outside of, a confirmed Chapter 11 plan.

d.    A reasonable opportunity to object or be heard with respect to the Auction Motion and the relief requested therein has been afforded to all interested persons and entities.

e.    The Trustee's inclusion of Beach First, Tidelands Bank, AFG, Carolina Shores and the Creditors Committee in the development of the final bidding procedures for the Auction should assure that the Auction will provide a reasonable opportunity for interested bidders to participate in the Auction, given that it is in the interest of these parties that the Auction be successful.

f.    By the nature of the Auction as a public sale, it is expected that the consideration provided by the Successful Bidder at the Auction for the Assets will (i) be fair and reasonable, (ii) be the highest and best offer for the Assets, (iii) provide a greater recovery for the creditors of the Estate than would be provided by any other practical available alternative, and (iv) constitute reasonably equivalent value and fair consideration under the United States Bankruptcy Code (11 U.S.C. §§ 101, et seq.) and other applicable law.  The Court will conduct a hearing soon after the Auction for approval of the sale to the Successful Bidder, at which time it will review matters to confirm these findings.

i.  With the exception of any and all easements, covenants, conditions, restrictions and other matters of record (but not excepting the rights and interest of MCI under and pursuant to the Transfer Agreement, and the Memorandum of Agreement) relating to the real property included in the Auction, the Trustee may sell the Assets by Auction free and clear of all interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in 11 U.S.C. §§ 363(f)(l) - (5) have been satisfied.  The sale of the Assets by Auction is made free and clear of the rights and interests of MCI and its successors in interest under the Transfer Agreement and the Memorandum of Agreement.  Those non-debtor parties with interests in the Assets who did not object, or who withdrew their objections, to the Auction or the Auction Motion are deemed to have consented pursuant to 11 U.S.C. §§ 363(f)(2) and 365.

j.  By providing for the Auction and the assignment of executory contracts and leases to the Successful Bidder conditioned upon the cure of any existing monetary defaults and the Successful Bidder's agreement to assume the obligations thereunder, the Trustee has provided adequate assurance of future performance with respect to all executory contracts and unexpired leases that will be assumed and assigned to the Successful Bidder.

k.  By conditioning the assignment of executory contracts and leases upon the cure of any existing monetary defaults thereunder, the Trustee has provided adequate assurance that he can promptly pay any amounts necessary to cure defaults under any executory contracts or leases to be assumed and assigned to the Successful Bidder at the Auction, as finally determined by agreement between the parties or by order of this Court (such amounts being the "Cure Costs").

l.  The Successful Bidder at the Auction will not be a successor in interest to the Debtor and shall not have any successor or transferee liability for liabilities of the Debtor (whether under federal or state law or otherwise) as a result of the purchase and sale of the Assets, except to the

extent of any existing executory contracts and leases assigned to it.  The Successful Bidder shall

not be deemed joint employers, co-employers or successor employers with or of the Debtor or

the Trustee and shall have no obligation to pay wages, severance pay, WARN Act claims,

benefits or any other payment to employees of the Debtor.

NOW THEREFORE, IT IS HEREBY:

ORDERED that the Auction Motion is granted, as further described herein; and it is

further

ORDERED that pursuant to 11 U.S.C. § 363(b), the Trustee is authorized and directed to

conduct the Auction, pursuant to and in accordance with the terms and conditions of the final

bidding procedures approved as set forth hereinabove; and it is further

ORDERED that pursuant to 11 U.S.C. §§ 105(a) and 363(f), the Assets shall be

transferred to Successful Bidder, and upon consummation of the sale to the Successful Bidder

(the "Closing") shall be, with the exception of any and all easements, covenants, conditions,

restrictions and other matters of record (but not excepting the rights and interests of MCI under

and pursuant to the Transfer Agreement and the Memorandum of Agreement) relating to the real

property included in the Auction, free and clear of all liens, claims and encumbrances and any

and all other interests of any kind or nature, including without limitation, any claim (as defined

under the United States Bankruptcy Code), security interest, setoff, pledge, mortgage, lien,

judgment lien, tax lien, tax, pension claim, employee claim, employee benefit claim, retiree

health care benefit claim, right of first refusal, option to purchase or any similar interest with all

such interests of any kind or nature whatsoever to attach to the net proceeds of the sale in the

order of their priority, with the same validity, force and effect which they now have as against

the Assets, subject to any claims and defenses the Debtor or the Estate may possess with respect

thereto; and that, specifically, by this provision of this Order, the Assets shall be transferred to Successful Bidder, and upon the Closing shall be, free and clear of the rights and interests of MCI and its successors in interest under and pursuant to the Transfer Agreement and the Memorandum of Agreement; and it is further

ORDERED that the transfer of the Assets to the Successful Bidder shall constitute a legal, valid, and effective transfer of the Assets, and shall vest the Successful Bidder with all right, title, and interest of the Debtor and the Estate in and to the Assets free and clear of all interests of any kind or nature whatsoever; and it is further

ORDERED that the Trustee is authorized to assume and assign to the Successful Bidder all executory contracts and leases of the Estate, and the Trustee is obligated to pay the Cure Costs as soon as practicable after such Cure Costs are finally determined by agreement of the parties to the contract or lease, or by order of this Court; and it is further

ORDERED that, subject to confirmation by the Court at the hearing following the Auction to approve the Successful Bidder, the transactions to consummate the sale of the Assets to the Successful Bidder are made in good faith, as that term is used in 11 U.S.C. § 363(m), and the Successful Bidder shall be considered a good faith purchaser. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale to the Successful Bidder shall not affect the validity of the sale to Successful Bidder, unless such authorization is duly stayed pending such appeal. Subject to confirmation by the Court at the hearing following the Auction to approve the Successful Bidder, the Successful Bidder shall be a purchaser in good faith of the Assets, and is entitled to all of the protections afforded by 11 U.S.C. § 363(m); and it is further

ORDERED that notwithstanding Rules 6004(h), 6006(d) and 7062, this Order shall be

effective and enforceable immediately upon entry. The Court expressly finds that the circumstances now existing in this case and the urgency of the sale process militate that the Trustee immediately proceed with the Auction and the implementation of this Order; and it is further

ORDERED that the Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order. To the extent that any unresolved issues related to the Auction are not settled by a supplemental order, a further hearing will be held by the Court following the Auction.

**AND IT IS SO ORDERED.**