## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

In re:

Daufuskie Island Properties, LLC,

Debtor.

Case No.  09-00389-jw

Chapter  11

**MOTION AND MEMORANDUM FOR ORDER (1) ESTABLISHING BIDDING AND OTHER PROVISIONS AND PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL ASSETS OF THE ESTATE BY AUCTION, AND (2) SCHEDULING HEARING TO CONFIRM THE SUCCESSFUL PURCHASER(S)**

Robert C. Onorato, Trustee (the "Trustee") for the Chapter 11 estate (the "Estate") of Daufuskie Island Properties, LLC (the "Debtor"), hereby moves the Court pursuant to 11 U.S.C. §§105(a) and 363(b) and (f), and Fed. R. Bankr. P. 6004 (the "Motion"), for the entry of an order establishing bidding and other provisions and procedures in connection with the sale of substantially all assets of the bankruptcy estate by public auction, and scheduling a hearing following the auction to confirm the successful purchaser(s) at the auction.  This Motion is filed in furtherance of the auction provisions in the Order (1) Authorizing the Sale of Substantially All Assets of the Estate at Auction Free and Clear of Liens, Claims, Encumbrances and Other Interests, and (2) Approving the Assumption and Assignment of Certain Unexpired Executory Contracts and Leases (the "Auction Order") entered by the Court on May 7, 2010.  The Auction Order contemplates, and expressly provides, that it might be supplemented with another order establishing the provisions and procedures governing the auction.  This Motion seeks to supplement the Auction Order with those provisions and procedures.

## I. PREFACE

As the Trustee has previously advised the Court, the scheduling of the Auction is part

of a three-prong sale effort by the Trustee. Under this approach, the Trustee has been simultaneously pursuing three separate sale approaches ("sale tracks"), to assure a sale of the Estate assets by a date certain, and to maximize the value of the assets. The first track has been to attempt to close the sale of assets to Montauk Resorts, LLC ("Montauk") already authorized under the Court's Order entered on January 7, 2010. The second track has been to seek to sell the assets to one or more potential buyers who have indicated interest in the assets, under a contract of sale. The third track is the scheduling of an auction sale of the assets, to "backstop" the other sale efforts, by providing for a sale by a date certain. The Auction Order authorized the sale of the assets by auction free and clear; it also provided a description of the framework of the Auction, with the caveat that the provisions and procedures (1) might be subsequently revised, based upon the Trustee's consultations with creditors and an auctioneer, and (2) if revised, the revised auction provisions would be stated in an order which would supplement the Auction Order. The Motion is to establish the details of the third track, the Auction.

## II. BACKGROUND

In support of this Motion, the Trustee would show to the Court that:

1.    On January 20, 2009, the Debtor filed its petition for relief under Chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101, et seq., the "Bankruptcy Code"). The Debtor operated as a Chapter 11 debtor-in-possession until the Trustee's appointment in this case.

2.    On March 17, 2009, the Court entered its Order Granting Joint Motion for Appointment of Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104, granting the joint motion of the Official Committee of Unsecured Creditors (the "Committee"), Beach First National Bank ("Beach First") and AFG, LLC ("AFG") for the appointment of a trustee in this case. Thereafter,

on March 23, 2009, the Court entered its <u>Order Approving Appointment of Trustee</u>, approving the United States Trustee's appointment of Robert C. Onorato as Trustee for the Debtor's Chapter 11 estate.

3.     Since his appointment, the Trustee has been working to arrange a sale of assets to provide a source of payment for the Debtor's creditors. As set forth above in the Preface of this Motion, the third track of the Trustee's sale efforts is the sale of substantially all assets of the Estate by public auction. The Auction Order authorizes such sale by auction; this Motion is to establish provisions and procedures governing the auction.

4.     The assets of the Estate which are to be sold at the Auction (the "Assets") are described in the Auction Order, and in paragraph 6 hereinbelow.

### III. THE AUCTION PROVISIONS AND PROCEDURES

The Trustee will sell substantially all assets of the Estate by public auction upon the following provisions:

5.     The sale is to be made by auction free and clear of all liens, claims, encumbrances and other interests, including the asserted rights and interest of The Melrose Club, Inc. ("MCI") under the Transfer Agreement and the Memorandum of Agreement,[1] pursuant to 11 U.S.C. §§ 363(f)(1) and (4). Authorization for this sale is provided pursuant to the <u>Order (1) Authorizing the Sale of Substantially All Assets of the Estate at Auction Free and Clear of Liens, Claims, Encumbrances and Other Interests, and (2) Approving the Assumption and Assignment of Certain Unexpired Executory Contracts and Leases</u> (the "Auction Order") entered on May 7, 2010.

---

[1] The "Transfer Agreement" is that certain <u>Transfer Agreement</u> dated September 27, 1996, by and between MCI and Melrose Club Management, Inc., n/k/a Daufuskie Club, Inc., and the "Memorandum of Agreement" is that certain <u>Memorandum of Agreement</u> filed in Beaufort County, South Carolina on December 31, 1996 relating to the Transfer Agreement.

6. The Trustee will sell by auction the real property owned by the Estate, including all improvements thereon, and other personalty owned by the Estate in connection with such real property, including permits, trademarks, and other related items of property (collectively, the "Assets"), to the successful bidder(s) at the auction. Expressly excluded from the sale are all claims and rights of action the Estate may have against other parties, any tax refunds due to the Estate, cash and cash equivalents owned by the Estate, accounts receivable, any contract that is not expressly assumed by the purchaser, and any insurance policies or proceeds.

## A. **The Auction**

7. The Assets will be sold by auction (the "Auction") conducted on the following terms:

(a) The Assets will be offered for sale collectively (as a single sale of all Assets); if the highest bid received does not equal or exceed the Reserve (as defined below), the Assets will be offered for sale as separate groupings corresponding to the collateral securing the prepetition loans of AFG and Beach First and the property which was not subject to a mortgage at the filing of the case. Subject to the below provisions regarding Credit Bids and the Reserve, after the bidding has concluded on the Assets collectively, and on the Assets individually, the highest bid for the Assets collectively will be compared with the total of the highest bids for the Assets individually, and whichever amount (either the bid for the Assets collectively, or the total of the bids for the Assets individually) is higher shall be the sale (the sale of the Assets collectively, or the sale of the Assets individually) the Trustee shall make pursuant to the Auction.

(b) The sale will be to the highest cash bidder; provided, however, that mortgage and lien creditors may bid for the purchase of the property and offset their secured

claims against the purchase price of the property pursuant to 11 U.S.C. § 363(k) (which credit bid provisions are more fully set forth hereinbelow); and _further provided_ that the purchase price must exceed the Reserve (which is defined hereinbelow) established by the Trustee in consultation with secured creditors and the Creditors Committee. Any and all liens against the property will attach to the proceeds of sale.

(c)    In order to bid for the purchase of the Assets at the Auction, persons must:

(i)    register with the Trustee's auctioneer prior to the Auction; and

(ii)   deliver a cash (or cash equivalent, such as a cashier's check from a national bank which is not under an agreement with or on a watch list of bank regulatory authorities) deposit in the amount of $1,000,000.00 to the Trustee's auctioneer prior to the Auction, which $1,000,000.00 deposit will be non-refundable if the person is the highest bidder at the Auction.

(d)    At the conclusion of the Auction, the person(s) having made the highest bid for the Assets (the "Successful Bidder") shall pay to the Trustee's auctioneer twenty percent (20%) of the person's bid amount, less the $1 million deposit made under subparagraph (c)(ii) above. This payment (the "20% Downpayment") shall be applied to the person's bid amount. The 20% Downpayment will be non-refundable, unless the Trustee was unable to transfer the Assets to the Successful Bidder.

(e)    The Successful Bidder shall close its purchase of the Assets, and pay its bid amount in cash or certified funds pursuant to the Auction (less the $1 million deposit and the 20% Downpayment), within twenty (20) days after the Auction.

(f)    The $1 million deposits required in subparagraph (c)(ii) above will be refunded to the persons who are not the Successful Bidder; and, with regard to the Successful Bidder, the deposit would be refunded if the Trustee were unable to transfer the Assets to the Successful Bidder.

(g)    The provisions of subparagraphs (c), (d), (e) and (f) shall not apply to secured creditors entitled to credit bid under 11 U.S.C. §363(k).

(h)    The Trustee will ask that the Court confirm and approve the highest bidder at the Auction as the Successful Bidder to whom the Trustee is authorized to sell the Assets. The Trustee will request that the hearing to confirm the Successful Bidder be scheduled for the earliest date possible after the Auction. The Trustee also will request that the Court approve a second bidder from the Auction as a "back-up" buyer, in the event the Successful Bidder does not close its purchase of the Assets in a timely manner.

(i)    The Trustee will execute any and all documents and instruments necessary to convey title to the successful purchaser of the property.

(j)    The sale will be a final sale.

(k)    Subject to payment of the auctioneer's fees and expenses, closing costs (including applicable pro rations), and the Carve-Out (defined hereinbelow), secured creditors whose claims are not presently disputed or unresolved as to amount will be paid by the Trustee immediately upon his receipt of the payment of the purchase price from the purchaser, according to their respective interests in the property; provided, however, that if issues arise regarding the allocation of the sale proceeds among the Assets, such as would affect the secured status of a secured creditor, that secured creditor will be paid the undisputed portion of its secured claim but it will not be paid the disputed portion of its secured claim until the issues are resolved, either consensually or by order of the Court.

8.    The Trustee contemplates employing J.P. King Auction Company, Inc. ("King") as the auctioneer to conduct the Auction. In conjunction with this Motion, the Trustee has filed a motion (the "Auctioneer Motion") seeking authorization to employ pay King as auctioneer

pursuant to the provisions of an Auction Listing Agreement which is an exhibit to and incorporated into the Auctioneer Motion. In addition to the the Auction Listing Agreement, the proposed employment of King includes documents entitled and providing "Terms of Auction", "Real Property Sale Contract" and "Buyer's Broker Incentive Program Broker Registration Form", which documents together with the Auction Listing Agreement are attached to this Motion and incorporated herein collectively by reference as **Exhibit A**.[2] These documents shall apply to the Auction if the Auctioneer Motion is granted.

9.     As a provision of the employment of King, or any other auctioneer, the Trustee shall be authorized to make routine and necessary decisions related to the marketing and auction of the Assets, and to enter with King into like revisions of the Auction Listing Agreement and other related auction documents.

## B. Credit Bid Provisions

10.     Secured creditors may exercise their rights to offset a bid under 11 U.S.C. §363(k) ("Credit Bid"). In the event that the Assets are sold to secured creditors by Credit Bid, the following provisions shall apply to the sale and to the parties:

(a)     The secured creditors purchasing their collateral by Credit Bid shall be responsible for payment of the court-approved post-petition loans obtained by the Trustee in this case. The amount of the post-petition loans paid by each secured creditor purchasing its collateral by Credit Bid shall be determined by allocation of value among the properties purchased by the secured creditor Credit Bids. By way of illustration, if only AFG and Beach

---

[2] Some of the attachments to the Auction Listing Agreement are still being finalized and therefore are not included with the attached document. The attachments will be provided prior to the hearing on this motion. In addition, the Terms of Auction, the Real Property Sale Contract and the Buyer's Broker Incentive Program Broker Registration form may be modified prior to the hearing on this motion. The Trustee is informed and believes that none of these additions and/or modifications will materially affect the provisions of this motion or the Auction Listing Agreement.

First were the purchasers of their prepetition collateral, and the only purchasers by Credit Bid, and if their purchased collateral were deemed to be equal in value (such value allocation is provided only for illustration, and does not represent an agreed or established valuation), then AFG and Beach First would each be responsible for payment of one-half of the total amount due to the holders of the court-approved post-petition loans. However, if only AFG or Beach First were the purchaser of its prepetition collateral by Credit Bid, it would be responsible for payment of the amount of the court-approved post-petition loans equal to the allocated value of its prepetition collateral in accordance with **Exhibit B**; and the balance of the court-approved post-petition loans would be paid pursuant to the provisions of paragraph 12 hereinbelow.[3]

(b)    The Estate shall retain the Melrose Landing property, the Bloody Point golf course property, and all other parcels which were not subject to a mortgage of record at the filing of the Debtor's bankruptcy petition on January 20, 2009 (such property being the "Retained Property"). Following the Auction, which shall provide for the full payment of the court-approved post-petition loans, the Retained Property shall not be subject to any mortgage or lien, other than a lien for ad valorem taxes due on the Retained Property.[4] The Retained Property shall be available for and used for the payment of priority claims (excluding the court-approved post-petition loans) and unsecured non-priority claims against the Estate, to the extent possible.

(c)    The secured creditors who purchase their collateral by Credit Bid shall provide cash to the Estate sufficient to fund the payments due to the United States Trustee

---

[3] In making reference to the "amount" and the "balance" of the court-approved loans, the "amount" and the "balance" refer to the aggregate amount due on all court-approved post-petition loans; however, notwithstanding the reference to the aggregate amount due, these provisions shall be construed to assure that each of the court-approved post-petition loans is fully paid.

[4] As provided below in paragraph 12, in a sale to a buyer(s) who is not a Credit Bid purchaser, the court-approved post-petition loans shall be paid from the sale proceeds prior to allocation of the sale proceeds among properties and prior to payment of other secured creditors and unsecured creditors. Therefore, upon such payment, the Retained Property would no longer be subject to the liens securing the post-petition loans. In the event of a Credit Bid sale, the Credit Bid purchasers shall pay the court-approved post-petition loans.

("UST") for quarterly fees, including both amounts outstanding at the time of the Auction and any amounts which will result from the Auction, but not for UST fees due for periods after the quarter in which the property is sold. The cash payment shall be made to the Estate at the time of the closing of the transfer of the property purchased by the secured creditor by Credit Bid. The amount due from each Credit Bid purchaser shall be determined in the same manner as the determination of each Credit Bid purchaser's share of the payment of the post-petition loans, as set forth in subparagraph 10(a) hereinabove.

(d)   The Trustee shall grant the Credit Bid purchasers easements for the normal and customary use of roadways, common areas and existing access areas on the real property located on Melrose Plantation, and an easement for access over and use of the Melrose Landing property for normal and customary embarkation and debarkation purposes. These easements shall be granted prior to or contemporaneous with the conveyance of the property purchased by Credit Bid.

(e)   Following the conveyances of property purchased by secured creditor Credit Bids, the Trustee and the Credit Bid purchasers shall reasonably cooperate with each other in attempting the sell the Assets to a single buyer; however, neither the Trustee nor any Credit Bid purchaser shall be bound to wait to sell their respective properties or to refuse a sale which is in his/its best interest (as determined in their respective sole discretion) in order for a sale of all Assets to a single buyer to occur.

## C. The Carve-Out and Set-Aside Funds

11.   A primary source of the payment of unsecured claims, including administrative claims and administrative expenses (but excluding the fees and expenses of the auctioneer and normal closing costs), will be the equity generated from the sales of assets (the "Equity

Proceeds"). In addition, and as part of the Auction, a portion of the sale proceeds from otherwise fully encumbered property (the "Carve-Out") will be set aside for payment of unsecured claims. The total of the combined Equity Proceeds and the Carve-Out shall be referred to as the "Set-Aside Funds".

12.    The amount of the Equity Proceeds and the Carve-Out portions of the Set-Aside will be determined in accordance with the allocation of sale proceeds provided in paragraph 19 below and in **Exhibit B** attached hereto and incorporated herein by reference.[5]    The gross sale price of the Assets, <u>less</u> the costs of closing the sale (including fees due to the auctioneer), and <u>less</u> the amounts due on the court-approved post-petition loans, shall be allocated among the properties included in the sale of the Assets in accordance with **Exhibit B**. The Equity Proceeds in a given sale shall be in the amount of the value of the property that is unencumbered following payment of the post-petition loans, <u>i.e.</u>, the portion of the sale proceeds allocated to such property, less the amount of <u>ad valorem</u> taxes due on that property. The Carve-Out shall be in the amount necessary to supplement the Equity Proceeds to reach the total of the Set-Aside Funds established for the sale at the sale price achieved.[6]    The Set-Aside amounts specified in paragraph 11 below shall be provided by the combination of the Equity Proceeds and the Carve-Out.

---

[5] These provisions for a Carve-Out shall not apply in the event the Assets are sold under the Credit Bid sale provisions set forth in paragraph 10 above.

[6] As provided herein, the court-approved post-petition loans are to be paid (i) from the sale proceeds prior to the allocation of sale proceeds among the properties, and prior to payment of other secured creditors and unsecured creditors, or (ii) by Credit Bid purchasers as provided in paragraph 8 above. Accordingly, the Carve-Out provisions do not apply to the court-approved post-petition loans.

13.    If the total sale price is $15 million or less,[7] the Set-Aside Funds shall be in the minimum amount of $1.5 million; if the total sale price is in excess of $15 million but less than $18 million, the Set-Aside Funds shall be in the minimum amount of $2 million; if the total sale price is in excess of $18 million, the Set-Aside Funds will be not less than $2 million, but it may be greater in amount depending on the amount of Equity Proceeds; and if the sale price is more than $20 million,  the Set-Aside Funds will be not less than ten percent (10%) of the total sale price, and it may be greater in amount depending on the equity in properties after payment of senior liens on such properties.

14.    In calculating the amount of the Carve-Out that is to be taken from sale proceeds otherwise subject to a lien (the "Charged Amount"), the Charged Amount shall be (a) the amount necessary to fund the minimum Set-Aside Funds amounts stated in paragraph 13 hereinabove, and (b) not less than $1 million (as the Carve-Out to supplement Equity Proceeds) for sales at a total sale price of $30 million or less, but (c) no amount due for sales which generate $4 million or more of Equity Proceeds.

15.    In regard to the funding of the Set-Aside Funds, after deducting the amount of Equity Proceeds from the Assets, the remainder of the Set-Aside Funds (e.g., a $2 million amount for Set-Aside Funds, less $1 million of Equity Proceeds, would result in a $1 million Carve-Out to fund the remainder of the Set-Aside Funds amount) will be paid from the sale proceeds based upon the proration of the additional amount among the Assets according to the portion of the sale proceeds allocated to each.

---

[7] As provided hereinbelow in paragraph 16, a Reserve price will be established.  The Assets will not be sold to a third party purchaser(s) for a total price less than the Reserve, unless the secured creditors entitled to Credit Bid consent.  The reference to a total sale price of "$15 million or less" is to address that possibility that the Trustee and the secured creditors entitled to Credit Bid could consent to total sale price less than the Reserve.  At present, no consent has been given to a sale for less than the Reserve.

### D. Reserve Established for Sale Price

16.    The Assets will not be sold to a third party purchaser at the Auction unless the highest bid for the Assets exceeds the minimum acceptable price (the "Reserve") established by the Trustee in consultation with secured creditors and the Creditors Committee.    It is contemplated that the Reserve will not be published prior to the sale, but it will be stated in writing shared with the secured creditors and the Creditors Committee in this case, and with the auctioneer. The amount of the Reserve may be reduced at the Auction by the Trustee if secured creditors who would otherwise Credit Bid to purchase their collateral advise the Trustee that they agree to reduce the amount they deem acceptable for their collateral so that a sale to a third party may occur.

17.    In the event the highest bid at the Auction does not exceed the Reserve, the Assets will be sold in accordance with the Credit Bid provisions set forth hereinabove.

### E. The Allocation of the Sale Proceeds

18.    The allocation of the sale proceeds will be determined based upon the sale price of the parcels, if they are sold separately.

19.    The Trustee is informed and believes that the Assets are likely to be sold collectively, or in combined groupings of parcels, in which case the allocation of the sale price for collectively sold parcels will be based upon the allocation percentages stated in **Exhibit B** which is attached hereto and incorporated herein by reference.

### IV. ARGUMENT

The Trustee seeks entry of an order establishing the above-described bidding procedure. Establishment of the bidding procedures will insure an orderly and fair mechanism for evaluating competing offers and will allow competing bidders an opportunity to increase their bids, thereby

maximizing the value of the estate. See In Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558 (8th Cir. 1997); In re Gould, 977 F.2d 1038 (7th Cir. 1992)(holding that adoption of detailed bidding procedures was within the court's discretion). The Trustee is informed and believes that the auction provisions and procedures stated above are fair, reasonable, and properly balance the rights and interests of the parties in this case. The Trustee is further informed and believes that that the provisions and procedures will enhance the prospects of a successful Auction in this case, and that establishing the provisions and procedures stated above for the Auction is in the best interest of the Estate and its creditors.

WHEREFORE, the Trustee requests that the Court enter an order (1) approving and implementing the Auction provisions and procedures stated hereinabove, (2) scheduling a hearing on a date soon after the Auction to confirm the successful purchaser(s) at the Auction, and (3) providing for such other and further relief as the Court may deem necessary and proper in this case.

RESPECTFULLY SUBMITTED on this the 30th day of June, 2010, at Columbia, South Carolina.

/s/ Julio E. Mendoza, Jr.
Julio E. Mendoza, Jr. (Fed ID No. 3365)
NEXSEN PRUET, LLC
1230 Main Street, Suite 700 (29201)
Post Office Drawer 2426
Columbia, South Carolina  29202
Telephone: (803) 540-2026
Facsimile: (803) 727-1478

Attorneys for Robert C. Onorato, Trustee for the
Chapter 11 Bankruptcy Estate of Daufuskie Island
Properties, LLC, a/k/a Daufuskie Island Resort &
Breathe Spa

EXHIBIT

A

## J. P. KING AUCTION COMPANY, INC.

### AUCTION LISTING AGREEMENT

THIS DEVELOPER AUCTION LISTING AGREEMENT ("Agreement") made _____ 2010 ("Effective Date"), by J. P. King Auction Company, Inc. ("King"), an Alabama corporation located at 108 Fountain Avenue in Gadsden, Alabama 35901 (tel. 800-662-5464), and the below-signed broker associated with King ("King's Broker"), and Robert C. Onorato, Chapter 11 Trustee (herein "Seller"), duly appointed by the U. S. Bankruptcy Court, District of South Carolina ("Bankruptcy Court") on behalf of the debtor in bankruptcy, Daufuskie Island Properties, LLC dba "Daufuskie Island Resort & Breathe Spa" ("Debtor"), with Seller's address being 3 Carma Court, Hilton Head, S.C. 29926-1965 (tel. 843-681-9080).

For good and valuable consideration acknowledged and received, the Parties agree:

***1. Property.*** Seller engages King to market for public auction or other sale the real property described in the "Property Inventory" included in "Attachment A" ("Property"). "Property" means the whole or any fraction thereof (i.e., "unit" / "parcel"). "Sale" means any sale of the Property by whatever means. Seller solely owns all right, title, and interest in the Property, or has the right to sell it and receive the proceeds. Seller authorizes King to do what King reasonably deems appropriate for the marketing and sale of the Property under this Agreement. There is no claim, deed of trust, dispute of title, lien, loan, mortgage, or security recorded against or affecting the Property (individually or in any combination "Encumbrance"), unless disclosed by Seller in "Attachment B." Seller will not refinance or amend any existing Encumbrance, other than reducing or satisfying the balance owed, nor allow any new Encumbrance. Where permitted, the Property will be sold in *"as is"* condition with no guarantee or warranty, except as given by Seller or required by law. Seller does not engage King to market personal property. King may use Seller's name in marketing, press releases, the sale result, and invite the news media to attend the auction.

***2. Term.*** This Agreement begins on the Effective Date and continues through the latest date provided. Seller grants King an exclusive listing and right to market the Property ending forty-five (45) days following the date the auction was conducted or last due to be conducted ("Listing Period"). During the Listing Period, if Seller enters into any contract or other arrangement that results in a sale, exchange, lease, trade, or other transfer of the Property or of any interest in the ownership of Seller where Seller is an artificial person or business entity, whether by merger, purchase, or otherwise, Seller will owe and immediately pay King its full selling commission ("Selling Commission") provided for in section 9 below, regardless of the reason for, or parties to, the transaction. Likewise, for ninety (90) days following the expiration of the Listing Period, if Seller enters into such a contract or other arrangement with any person or entity that became aware of the Property by King's efforts, Seller will immediately pay King its full Selling Commission upon the closing of the sale or the effective date of any other arrangement referenced above.

Notwithstanding anything to the contrary above, the Parties agree that RBC Enterprises, Inc. ("RBC"), a licensed South Carolina real-estate broker, also has a right to list and market the Property, as provided by a prior Order of the Bankruptcy Court, but only with regard to certain, named prospects ("RBC Prospects"). The entire list of RBC Prospects appears as "Attachment E" to this Agreement.

In the event RBC properly registers with King and qualifies RBC Prospects to be bidders in the auction, RBC will be treated as a "Buyer-Broker," under the *"Buyer-Broker Incentive Plan"* detailed in section 9 below, on any sale made at the auction to one or more RBC Prospects.

In the event RBC makes a sale of the Property either before the auction or following it, where the Property has not already been sold, to one or more of RBC Prospects ("RBC Sale"), the following terms will apply to the RBC Sale:

    A.  a Three and One-half Percent (3.5%) buyer's premium will be added to the highest offer price for the Property to determine the "Total Contract Price" to be paid by the buyer at Closing;

    B.  King will be paid by Seller at Closing its full "Selling Commission," as provided for in section 9 below;

    C.  RBC will be paid by King at Closing a commission of One and One-half Percent (1.5%) of the amount of the buyer's highest offer price for the Property (note: the highest offer price does not include the addition of the buyer's premium); and

    D.  any additional commission, fee, costs, or expenses claimed by RBC to be owed and due to RBC or any other agent or broker will be the exclusive responsibility of Seller to pay, as subsequently approved by the Bankruptcy Court, and such amounts will not be any responsibility for King to pay.

***3. Preparation.*** Within fifteen (15) days after the Effective Date, Seller will furnish King with a title insurance commitment issued by a title insurance company that is mutually acceptable to Seller and King ("Escrow Agent") which provides: (a) Seller is the sole owner of the entire fee simple interest in the Property and possessed of good and marketable title ("Good Title"), subject only to any Encumbrance disclosed in "Attachment B" and (b) agreement to insure fee simple title to the Property through Escrow Agent with ALTA Standard Exceptions and at normal rates. Seller will obtain all third-party approvals needed for King to market the Property. Seller will give King the information it has that King needs or requests to market the Property and make necessary disclosures, including any lead-based paint hazard. Seller warrants it is aware of no circumstance, condition, danger, defect, hazard, material condition or fact, latent or patent, of record or not, that could adversely affect the Property or its sale, unless disclosed by Seller on "Attachment C." Seller will promptly refer to King all inquires received about the Property. Seller will solely pay: (a) all attorneys' fees and other costs related to its obligations herein and (b) Escrow Agent's fees and costs not paid by buyer. King will have no responsibility for any matter within this section including, but not limited to, certificate of occupancy, deed, subdivision, use, and zoning.

***4. Mutual Warranties.*** The Parties mutually warrant: (a) full authority, competence, and power to make and perform this Agreement, subject to the approval of the Bankruptcy Court in Case No. 09-00389-jw (see section 7.A.), (b) full compliance with all applicable federal, state, local, and other law, regulations, and rules, (c) to jointly engage Escrow Agent to perform the Escrow Agreement ("Attachment D"), and (d) to immediately notify the other of any concern, complaint, or problem with the other's performance..

***5. Engagement Fee.***

    (a) On the Effective Date, Seller will pay King Twenty Thousand Dollars and No Cents ($20,000.00) as an initial, non-refundable fee to begin work on this auction

    (b) Immediately upon the entry of the necessary approval order ("Order") by the Bankruptcy Court (referenced in section 7.A. below), Seller will pay King an additional, nonrefundable fee of One Hundred Eighty-four

Thousand Seven Hundred Sixty-five Dollars and Eighty Cents ($184,765.80). These two installments together will total Two Hundred Four Thousand Seven Hundred Sixty-five Dollars and Eighty Cents ($204,765.80) and will represent the "Engagement Fee" for Seller to engage King to: (1) advertise the Property and auction on King's and other websites, (2) prepare and mail a descriptive brochure with photographs, (3) place print-media advertising, (4) place signage, (5) plan and prepare for the auction, (6) furnish a site director for the period King specifies, (7) communicate with prospects, and (8) furnish staff, equipment, and supplies. Immediately upon the payment of any portion of the Engagement Fee, it will be fully earned by King and will not be an unearned or prepaid fee or cost. The Engagement Fee is not part of King's Selling Commission and not part of any liquidated damages to be paid to King, as detailed in this Agreement.

(c) Seller must fully and timely perform all of its duties, obligations, and responsibilities under this Agreement so that King realizes the benefits for which it is contracting. Should Seller not give full and timely performance under this Agreement, in addition to all other rights that it has, King has the right to stop all performance under the Agreement and unilaterally terminate it, without cost or liability of any kind or amount owed by King to Seller or anyone else, and thereafter King will not conduct the auction.

**6. Auction Date, Postponement, Cancellation, Damages.** King will conduct the auction as mutually scheduled with Seller and this date will be approximately sixty (60) days following the latest date of when the Order (referenced in section 7.A. below) is entered by the Bankruptcy Court and the Seller pays the entire balance then due for the Engagement Fee. Seller will not postpone or cancel the auction once scheduled, unless ordered by the Bankruptcy Court.

**7. Auction Method.** The available methods for conducting the auction are: (a) "auction without reserve" where the Property will sell to the highest bidder regardless of price ("Absolute Auction"), or (b) "auction with reserve" ("Auction With Reserve"), or (c) combination of (a) and (b) for multiple parcels. King has explained the potential benefits, detriments, and risks of these methods and Seller has made a voluntary and informed decision that King will conduct the auction as an Auction With Reserve.

The liberty will be reserved for certain creditors of Debtor (i.e., "Creditors" which are identified in "Attachment A" of this Agreement) to "credit bid," in the auction for certain designated portions of the Property ("Grouping," as more fully addressed below), pursuant to U. S. Bankruptcy Code section 363(k) and an Order of approval to be entered by the Bankruptcy Court; however, inasmuch as such "credit bidding" could have an adverse effect on King earning and being paid a Selling Commission for the subject Grouping, these Creditors must explicitly agree that any "credit bid" will be made only on the limited basis, as defined in this Agreement, and not otherwise, and a Creditor authorized to "credit bid" for a certain Grouping may not make a "credit bid" that equals or exceeds the amount of the reserve for that Grouping (see "Attachment A" for details). To avoid any confusion, potential for misrepresentation, or conflict with law, King will disclose by publication in the *Terms of Auction* to all prospective bidders, as well as by announcement prior to the start of the Auction, that the liberty for Creditors to "credit bid" has been reserved. All bidders, including these Creditors, must each agree not to use any illegal means to bid or otherwise attempt to influence the bidding or outcome of the auction. Any Creditor that "credit bids" in the Auction will do so on the same terms as all other bidders, except no Creditor will be required to post any registration fee or other amount in order to bid. If a Creditor buys the Property or any Grouping, it will do so on the same terms as any other buyer, except such Creditor will not be required to make an earnest money deposit on the Property or Grouping, and the sale will be closed, as provided in this Agreement, with the Property or Grouping conveyed by deed from Seller to the Creditor.

The Property will initially be offered in the Auction With Reserve as an entirety (i.e., one auction lot), with a reserve of Sixteen Million Dollars and No Cents ($16,000,000.00) in effect, before the addition of any buyer's premium as provided in section 9 below. No Creditor may "credit bid" for the entirety of the Property. King is authorized to sell the Property to the highest bidder that bids the amount of the reserve or greater. If the offering of the entirety of the Property results in a high bid being made that equals or exceeds the amount of the reserve, no further offering will be made and King will announce the Property to be sold to the highest bidder.

In the event that the entirety offering of the Property does not result in its sale, King will next offer the Property in two "Groupings," as more fully defined in "Attachment A." The Creditors identified in "Attachment A" may "credit bid" for the Groupings, but only as specifically provided for in this Agreement and "Attachment A." King is authorized to sell each Grouping to the highest bidder that bids the amount of the reserve listed in "Attachment A" for that Grouping or greater.

The Parties agree that Seller will draft a written procedure for offering the Property at auction and "credit bidding" consistent with the terms of this Agreement. Seller will submit this procedure to the Bankruptcy Court for its approval and incorporation into an Order which must be entered before King can conduct the auction.

**7.A. Bankruptcy Court Approval.** This Agreement is subject to the approval of the Bankruptcy Court which has jurisdiction over Seller, Debtor, and the Property. Within five (5) days after the Effective Date, Seller will file a motion with the Bankruptcy Court seeking an expedited hearing and use best efforts to obtain an Order from the Bankruptcy Court, acceptable to King and including the specific language provided below which authorizes the marketing, auction, and sale of the Property and approves this Agreement in its entirety. Seller understands and agrees that King will do only limited work before the hearing, not to exceed what will be compensated by the Twenty Thousand Dollars and No Cents ($20,000.00) initial payment on the Engagement Fee (see section 5 above), until the Bankruptcy Court enters an Order that is acceptable to King. In the event the Bankruptcy Court enters an Order from the Bankruptcy Court, including language acceptable to King, the Parties agree that this Agreement will become null and void and neither of them will have any further responsibility or liability to the other under it, nor claim against the other as a result of it. The specific language to be included in the Order is as follows:

> ORDERED that Robert C. Onorato, Chapter 11 Trustee duly appointed by this Court ("Trustee"), is, authorized to sell the Property at public auction, as provided in the Auction Listing Agreement ("ALA") entered into by and between Trustee and J. P. King Auction Company, Inc. ("King"), which agreement has been filed with the Court and is affirmed, ratified, and incorporated into this Order in its entirety; and it is further
>
> ORDERED that Trustee is authorized to make routine and necessary decisions related to the marketing and auction of the Property to include approving advertising and marketing materials, auction-related documents and materials, and to enter with King into routine revisions to the ALA; and it is further

ORDERED that any offer to sell or buy the Property, and every agreement or contract for its sale or purchase, which offer, agreement, or contract was made or entered into prior to the Effective Date of the ALA is held to have lapsed and is now null, void, and of no effect whatsoever such that no broker or agent involved with such offer, agreement, or contract is owed or otherwise entitled to receive, either now or in the future, any related commission, fee, or other compensation; and it is further

ORDERED that the "Terms of Auction," "Real Property Sale Contract," and "Buyer's Broker Incentive Program Broker Registration Form" that the Trustee also filed with the Court relative to the upcoming auction of the Property are each approved by the Court for King to use in relation to the auction and sale of the Property; and it is further

ORDERED that two of Debtors creditors, AFG, LLC and Beach First National Bank, may "credit bid" in the auction for the respective portions of the Property that each has secured debt against which is owed by Debtor, but each of these creditors may "credit bid" only in accordance with the terms of the ALA and its "Attachment A" and not on any other terms, or on any other portion of the Property, or in any greater amount than specified, and no other creditor may "credit bid" for the Property, or any portion thereof, on any terms and in any amount; and it is further,

ORDERED that, immediately following the auction, the Trustee will execute the Real Property Sale Contract with the buyer of the Property to memorialize the terms of the sale agreement and then proceed with a timely closing of the sale; and it is further

ORDERED that the "Selling Commission" or "Auction Fee", whichever one is ultimately owed by Trustee to King, is hereby found to be reasonable and appropriate compensation for King and is approved by the Court and authorized to be timely paid by Trustee to King, as provided for in the ALA, without need for further Order by the Court.

**8. Auction Conduct.**

King will conduct the auction in the manner it deems appropriate to seek the highest bid for the Property then reasonably achievable.

**9. Selling Commission and Auction Fee.** In addition to the Engagement Fee provided for in section 5 above, Seller will compensate King for its work on one of two bases, as here detailed:

 A. Basis One: A Three and One-half Percent (3.5%) buyer's premium will be added to the highest bid or offer price for the Property to determine the "Total Contract Price" to be paid by the buyer at Closing. The amount of the buyer's premium will represent King's Selling Commission owed by Seller on a sale of the Property. An amount equal to Three-sevenths (3/7) of the buyer's premium will be allotted from King's Selling Commission to fund the Buyer-Broker Incentive Program for Seller. A "Buyer-Broker" qualified under the program will be paid at Closing a commission of One and One-half Percent (1.5%) of the amount of buyer's written opening bid, plus Three-quarters of One Percent (00.75%) of the difference between buyer's written opening bid and the highest bid or offer price for the Property. For any sale on which a buyer's premium is not collected for any reason not the fault of King, Seller will pay King its full Three and One-half Percent (3.5%) Selling Commission and King will use a portion, as necessary, to fund the incentive program, as provided above. King will not earn or be paid a Selling Commission on a sale of the Property, or any designated portion thereof known as a "Grouping" (see "Grouping" in section 7 and also "Attachment A") where the highest bid for the Grouping was a Creditor's "credit bid" where that Creditor was authorized, as stated within this Agreement, to "credit bid" that amount on the subject Grouping. Otherwise, King will earn and be timely paid by Seller its full Selling Commission on any sale of the Property made to any buyer, including a Creditor, where the highest bid or other offer made equals or exceeds the amount of the reserve for the Property or the subject Grouping, or where the Seller specifically agrees to a sale of the Property or subject Grouping for an amount less than the designated reserve for the Property or Grouping.

 B. Basis Two: If no sale of the Property is made at the auction, or a sale is made at anytime during the term of this Agreement that for any reason does not result in King earning and being paid by Seller a Selling Commission that equals or exceeds Two Hundred Fifty Thousand Dollars and No Cents ($250,000.00), in lieu of a Selling Commission Seller will owe King a flat fee ("Auction Fee") of Two Hundred Fifty Thousand Dollars and No Cents ($250,000.00), which amount Seller will pay to King not later than thirty (30) days immediately following the date scheduled for the auction.

**10. Closing.** Buyer must immediately pay Ten Percent (10%) of the Total Contract Price down, with the balance due within thirty (30) days at Closing, except a Creditor that becomes a buyer of the Property at the auction as a result of a "credit bid" will not be required to make any earnest money on the Property. Seller will do all things reasonably necessary to perform the contract for sale and ensure timely Closing. The Parties unconditionally and irrevocably agree Escrow Agent will immediately disburse the Total Contract Price paid by buyer in the following order: (a) King's Selling Commission will first be paid in full with no funds disbursed before, (b) all incentive program payments, (c) all Encumbrances against the Property and prorations for which Seller is responsible and, in the event there is insufficient money available from Closing, Seller will immediately pay from Seller's other assets the amount necessary to satisfy these items to permit conveyance of Good Title, and (d) any remaining balance to Seller. If buyer fails to close for any reason other than Seller's default, buyer will forfeit the earnest money deposit which Escrow Agent will split and pay equally to Seller and King. King will have no responsibility to pay any Closing cost or brokerage commission.

**11. No Guarantee.** Neither King nor any agent or representative of it guarantees or warrants any bid amount, offer, or selling price for the Property. The Parties agree that no appraisal of value made for the Property

3

has any relevance to the bid amount, offer amount, or selling price that may be realized for the Property during the term of this Agreement.

**12. Agency Disclosure.** No agent or other broker is a sub-agent or co-broker of King and King will have no liability for same. King is acting solely as a single agent and exclusively representing Seller and not acting as a sub-agent, buyer's agent, or limited consensual dual agent.

**13. Limitation on Advice.** King is acting solely as a marketer of real property for Seller and not as a financial or legal adviser, or in any other capacity. King will provide Seller with its *Terms of Auction* for use. King will also provide Seller with its *Real Property Sale Contract*, unless another form is required by law in which case Seller will pay for and provide the sale contract which must be in a form approved by King. King cannot give Seller legal advice on the appropriateness of these documents for this auction or sale and Seller should obtain legal advice from an attorney on all matters.

**14. Assignment and Third Parties.** Neither Party may assign, delegate, or transfer any interest, obligation, or right in this Agreement without the prior, written consent of the other. This Agreement does not create any rights in, nor was it executed for the benefit of, any third party.

**15. Hold Harmless and Indemnification.** A Party at fault will hold a Party not at fault harmless from, and indemnify that Party against, any action, arbitration, award, claim, complaint, cost, damage, deficiency, demand, expense, indemnity, injury, judgment, liability, loss, obligation, penalty, and suit of every kind, matured or not, known or not, accrued or not, absolute or contingent, including reasonable attorneys' fees and costs of defense, asserted by any person, real or artificial, or government entity, that the Party not at fault incurs as a result of any act, error, omission, or wrongdoing attributable to the Party at fault or that Party's agent, assign, attorney, broker, contractor, director, employee, invitee, licensee, member, officer, representative, or successor in interest, and which arises out of this Agreement or the Parties' related dealings (collectively "Party Matters"); likewise, Seller will hold King harmless from and indemnify King against any such matter arising out of an agreement, contract, or other relationship that Seller has or had with another agent or broker in relation to the Property and its sale.

**16. Notice.** Any notice between the Parties permitted, required, or associated with Party Matters or otherwise related to this Agreement, will be given in writing including, but not limited to, any approval, complaint, consent, objection, option, or exercise of right. Notice will be deemed given and effective on the date when personally delivered to a Party, or addressed to a Party and deposited with the U. S. Postal Service and sent by certified mail with a receipt retained, or sent by a nationally-recognized delivery service with a receipt retained. Each Party's address is on page one. A Party will give notice of a change in address within five (5) business days after a new address becomes effective. Notice to King should be sent to Steve Proffitt and King's Broker.

**17. Legal Action. THE PARTIES KNOWINGLY, VOLUNTARILY, INTENTIONALLY, AND IRREVOCABLY WAIVE ANY RIGHT TO TRIAL BY JURY** and will submit any claim or controversy arising out of Party Matters, the transactions contemplated herein, and the related dealings of the parties, whether controlled by federal or state law, and whether an issue of law or equity, to the Bankruptcy Court for its adjudication. The prevailing Party will be entitled to collect from the other its full costs associated with the legal action, including reasonable attorneys' fees. To the fullest extent allowed by law, no Party will be liable for any consequential, exemplary, incidental, indirect, punitive, or special loss or damage that might arise out of Party Matters, and any award sought by Seller against King and/or King's Broker will be limited to the sum paid by Seller to King for the Engagement Fee and Selling Commission. This section is a material inducement for King to enter into this Agreement with Seller and King would not have done so without this section being included.

**18. Choice of Law, Jurisdiction, Venue.** All Party Matters will be exclusively construed and governed in accordance with the laws of South Carolina, without regard to its conflict of laws principles. The exclusive jurisdiction and venue for any claim or controversy between the Parties is the U. S. Bankruptcy Court in Charleston, South Carolina. In the event of any conflict on choice of law, jurisdiction, or venue, as to these Parties and this Agreement, as opposed to any term in the *Terms of Auction*, *Real Property Sale Contract*, or any other sale contract, this Agreement will control.

**19. Construction.** Section headings are for reference only and are not intended to expand or restrict the scope or substance of the provisions of this Agreement. Any reference to a section, unless otherwise noted, includes all subsections and paragraphs. The terms of this Agreement are severable and, if any term is held illegal, invalid, or unenforceable, the remainder of the Agreement will not be affected and in lieu of the illegal, invalid, or unenforceable term will be added a term as similar in effect as is possible, legal, valid, and enforceable. Referenced "Attachments" are fully incorporated into this Agreement. Words used in the present tense also include the future tense. Wherever used, the singular includes the plural, the plural includes the singular, and pronouns are read as masculine, feminine or neuter, as the context requires. The Parties have jointly participated in the negotiation and drafting of this Agreement and no legal inference, presumption, principle, or rule of draftsmanship or construction will apply in favor of, or against, either of them.

**20. Miscellaneous.** This Agreement contains the complete, exclusive, and final agreement of the Parties and there is no oral or other written agreement, inducement, promise, representation, or warranty, and any such matter has been merged into this Agreement and does not survive its execution. A deletion, modification, revision, supplement, or waiver of any term will be effective only if made in writing and executed by the Parties with the same formality as this Agreement, unless otherwise provided herein. No waiver by either Party of any breach of this Agreement will be a waiver of any other breach, and no waiver of any right will be construed to be a waiver of any other right. Each Party had the opportunity to consult legal counsel and has done so or voluntarily forgone such advice knowing the risk. Each Party acknowledges receiving a copy of this Agreement, reading it, and agreeing to all terms. *Time is of the essence of this Agreement.* This Agreement is binding upon the Parties, their agents, assigns, attorneys, beneficiaries, brokers, directors, distributees, employees, executors, heirs, legatees, members, officers, representatives, and successors in interest. This Agreement may be signed in multiple counterparts with each being an original and all constituting a single instrument. A facsimile signature is as valid as an original.

**21. Force Majeure.** A Party will not be liable to the other for failure to perform its obligations herein if such failure is a result of an Act of God (including fire, flood, earthquake, hurricane, or other natural disaster), war, invasion, act of foreign enemy, civil war, rebellion, insurrection, or terrorism, but not including a Party's financial matters. No Party will be entitled to terminate this Agreement for such circumstances, unless specifically ordered by the Bankruptcy Court. A Party asserting *force majeure* as reason for its failure to perform must prove that it took reasonable steps to minimize delay or damages caused by the event, that it timely performed all non-excused obligations, and that it notified the other of the *force majeure* event at the earliest reasonable date. In such case,

there will be an equitable adjustment to the time for performance and the Parties will resolve related issues, including additional expenses.

    **22. *Survival.*** These sections will survive any termination of this Agreement and remain in full force and effect: *2. Term* (Listing Period and post-Listing Period protections for King will survive early termination), *9. Commissions*, *11. No Guarantee*, *13. Limitation on Advice*, *14. Assignment and Third Parties*, *15. Hold Harmless and Indemnification*, *17. Legal Action*, *18. Choice of Law, Jurisdiction, Venue*, *19. Construction*, *20. Miscellaneous*, *22. Survival*, and "*Attachment D – Escrow Agreement.*"

    IN WITNESS WHEREOF, the Parties agree to be fully bound by the terms of this Agreement.

SELLER

J. P. KING AUCTION COMPANY, INC.

By: _____

By: _____
       Vincent E. Jarbo

Title: _____

Title: Chief Operating Officer

Date: _____

Date: _____

KING'S BROKER

By: _____

Address: _____

Date: _____

Telephone: _____

## ATTACHMENT A – PROPERTY INVENTORY

ENTIRETY:

The entirety of the Property is defined as:  + + + (description)

GROUPINGS:

Pursuant to section 7 of the Agreement, in the event that the offering of the Property in the auction as an entirety does not result in its sale, King will next offer the Property in the auction in two separate Groupings which are each generally defined here, along with the designation of the reserve amount for each Grouping and the Creditor that may "credit bid" for the subject Grouping:

Grouping 1:  + + + (description)
        Creditor, Assurance Financial Group, LLC, ("AFG") *only* is entitled to "credit bid" for this
        portion of the Property and no other Creditor may do so.
        The reserve is Six Million Six Hundred Thousand Dollars and No Cents ($6,600,000.00) and
        AFG may only "credit bid" an amount that is less than this reserve..

Grouping 2:  + + + (description)
        Creditor, Beach First National Bank ("BFNB"), *only* is entitled to "credit bid" for this portion of
        the Property and no other Creditor may do so.
        The reserve is Eight Million Five Hundred Thousand Dollars and No Cents ($8,500,000.00)
        and BFNB may only "credit bid" an amount that is less than this reserve...

## ATTACHMENT B – ENCUMBRANCES

Creditor                                                    Current Balance

## ATTACHMENT C – DISCLOSURES

## ATTACHMENT D – ESCROW AGREEMENT

THIS ESCROW AGREEMENT made _____ 2010 ("Effective Date"), by and between J. P. King Auction Company, Inc. ("King"), through the below-signed broker associated with King ("King's Broker"), and Robert C. Onorato, Chapter 11 Trustee (herein "Seller"), duly appointed by the U. S. Bankruptcy Court, District of South Carolina ("Bankruptcy Court") on behalf of the debtor in bankruptcy, Daufuskie Island Properties, LLC dba "Daufuskie Island Resort & Breathe Spa" ("Debtor"), with Seller's address being 3 Carma Court, Hilton Head, S.C. 29926-1965 (tel. 843-681-9080) (herein "Seller"), and Chicago Title Insurance Company ("Escrow Agent").

For good and valuable consideration received, the Parties jointly, unconditionally, and irrevocably agree:

**1.  Agreement.**  Seller, King, and King's Broker ("Parties") jointly engage Escrow Agent to represent each of them on any sale of the Property made pursuant to the Auction Listing Agreement ("ALA") that they entered into, and Escrow Agent agrees to this joint representation and the duties and obligations herein. The Parties agree to be fully and jointly bound by all of the terms included in the ALA, a copy of which is attached and incorporated by reference into this Escrow Agreement and which exclusively controls the Parties and the closing of any sale of the Property ("Closing"). In the event of a conflict between the terms of the ALA and this Escrow Agreement, or if the Escrow Agreement is silent on a point addressed by the ALA, the ALA controls in all instances.

**2.  Services.**  Escrow Agent will receive and hold buyer's earnest money deposit, paid in connection with a sale of the Property, in a designated escrow account at a bank in which deposits are insured by Federal Deposit Insurance Corporation. Escrow Agent will close the sale on the date specified in the contract for sale and disburse the proceeds as herein provided.

**3.  Term.**  This Escrow Agreement will be in effect until performance has been completed.

**4.  Fee.**  Escrow Agent's fees will be solely owed and paid by Seller.

**5.  Closing Statement.**  Escrow Agent will deliver a complete, written statement to Seller and King not less than three (3) days before any Closing to show the sale's full financial details. King must approve this statement in writing before Escrow Agent may close the sale and disburse any funds.

**6.  Disbursements.**  At Closing, Escrow Agent will immediately disburse the Total Contract Price paid by buyer for the Property, including earnest money deposit, strictly in the following order: (a) King's Selling Commission, as provided for in the ALA and reported to Escrow Agent by King, will be paid first and no funds will be disbursed, under any circumstance, without King's Selling Commission being fully paid (commission checks to be made payable to "J. P. King Auction Company, Inc." and sent to its accounts receivable department at 108 Fountain Avenue, Gadsden, Alabama 35901, tel. 800-662-5464); (b) King will report to Escrow Agent any other amounts it is due to be paid, or any incentive program payments due to be made (as specifically detailed in section 9 of the ALA), as provided for in the ALA and these payments will next be paid; (c) any amounts ordered by the Bankruptcy Court to be paid to named creditors; and (d) any remaining balance will be paid to Seller.

**7.  Buyer's Default.**  If buyer fails to close the sale for any reason other than Seller's default, buyer will immediately forfeit the earnest money deposit which Escrow Agent will split and pay equally to Seller and King. No other broker will be entitled to any portion of the forfeited earnest money deposit.

**8.  Seller's Default.**  If Seller fails to close the sale for any reason other than buyer's default, Escrow Agent will refund buyer's earnest money deposit.

**9.  Miscellaneous.**  This Escrow Agreement: (a) is not subject to amendment, cancellation, modification, revision, revocation, supplement, suspension, termination, or waiver, either in whole or in part, unless mutually agreed in advance and in writing by the Parties and executed with the same formality as this Escrow Agreement; (b) may be signed in multiple counterparts with each being an original and all constituting a single instrument; (c) allows a facsimile signature to be as valid as an original; and (d) will survive Closing and/or any termination of the ALA. Each Party acknowledges receiving a copy of the ALA and this Escrow Agreement, reading both, and unconditionally and irrevocably agreeing to all terms.

IN WITNESS WHEREOF, the Parties agree to jointly, unconditionally, and irrevocably be fully bound by the terms of this Escrow Agreement.

SELLER                                                J. P. KING AUCTION COMPANY, INC.


By: _____          By: _____
                                                               Vincent E. Jarbo
Title: _____       Title: Chief Operating Officer

Date: _____        Date: _____


ESCROW AGENT                                    KING'S BROKER


By: _____          By: _____

Title: _____       Title: King's Broker

Date: _____        Date: _____

7

**ATTACHMENT E – RBC ENTERPRISES, INC. PROSPECTS**

<u>Full Name</u>                          <u>Address</u>

# J. P. KING AUCTION COMPANY, INC.

## TERMS OF AUCTION

### DAUFUSKIE ISLAND PROPERTY
#### Daufuskie Island, South Carolina
( + + + Time / Date + + + )

J. P. King Auction Company, Inc. ("King"), an Alabama corporation headquartered at 108 Fountain Avenue in Gadsden, Alabama 35901 (telephone 800-662-5464 or 256-546-5217 and facsimile 256-543-8036) and its South Carolina broker of record, Rick Gilliam ("Broker") whose address is Gilliam and Associates, 3946 Tybre Down Circle, Little River, South Carolina 29566 (King and its Broker being referred to herein collectively as "Auctioneer") have contracted with Robert C. Onorato, Chapter 11 Trustee (herein "Seller") duly appointed by the U. S. Bankruptcy Court, District of South Carolina ("Bankruptcy Court"), to offer to sell at public auction ("Auction") certain real property ("Property"). The Property is an asset owned by the debtor in bankruptcy, Daufuskie Island Properties, LLC dba "Daufuskie Island Resort & Breathe Spa" ("Debtor"), and this offering and any sale will be made under the exclusive jurisdiction and oversight of the Bankruptcy Court. These terms, plus any additions, deletions, and/or revisions announced by Auctioneer before the commencement of the Auction, represent the exclusive terms for the Auction ("Terms of Auction").

    *1. AGENCY:* Auctioneer is acting exclusively as an agent for Seller and not as an agent for any Bidder or Buyer. No third-party broker is acting as a sub-agent of Auctioneer.

    *2. COLLUSION:* Bid-rigging is a federal felony punishable by imprisonment and fine. Auctioneer will report all illegal conduct to the F.B.I. and cooperate with any prosecution.

    *3. COPYRIGHT:* The Auction is the exclusive intellectual property of Auctioneer, covered by copyright protection, and may not be recorded, reproduced, or used in any form by anyone other than Auctioneer.

    *4. PROPERTY:* The Property is described in the "Real Property Sale Contract" ("Sale Contract"), a copy of which is available from Auctioneer, online at www.jpking.com, and posted at the Auction.

    *5. DUE DILIGENCE:* Seller and Auctioneer do not attempt to provide Bidder with all of the information Bidder may need to make an informed decision about the Auction and Property. Bidder should obtain professional advice and conduct due diligence on the Property, title commitment (available from Auctioneer and posted at the Auction), surrounding area, all information provided by Seller or Auctioneer, "Property Information Package" (available from Auctioneer, online at www.jpking.com, and posted at the Auction), public records, these Terms of Auction, the Auction, Sale Contract, transaction contemplated, and all burdens, circumstances, defects, facts, faults, dangers, hazards, issues, items, problems, vandalism, and all other relevant matters(individually or in any combination "Property Issues"). All information provided by Auctioneer came from Seller and is believed to be accurate, but neither Seller nor Auctioneer guarantees, represents, or warrants its accuracy or completeness and Bidder should not rely upon it without independent inspection and verification from sources Bidder knows to be reliable. Seller and Auctioneer are not required to update any information provided or published and will have no liability on any basis for failing to do so.

    *6. DISCLAIMER:* Participation in the Auction is at Bidder's sole risk and Seller and Auctioneer, plus their agents, contractors, and employees, will have no liability on any basis. The Property will be offered *"AS IS, WHERE IS, WITH ALL FAULTS."* To the fullest extent allowed by law, Seller and Auctioneer unconditionally disclaim any guarantee, representation, or warranty of every kind, whether expressed, implied, or statutory, whether oral or written, whether past, present, or future, with respect to all Property Issues, except as expressly provided in the Terms of Auction and the Sale Contract.

    *7. DISCLOSURES:* Unless otherwise disclosed, the Property will be offered for sale and conveyed by deed free and clear of all liens, mortgages, deeds of trust, delinquent taxes, assessments and warrants, but subject to all non-monetary encumbrances such as conditions, covenants, deeds, easements, reservations, restrictions, right-of-ways, title exceptions, zoning regulations and matters of record. Maps, depictions, and sketches in any materials related to the Property are for illustration purposes only and Seller and Auctioneer do not guarantee, represent, or warrant their accuracy or completeness. Residential dwellings built prior to 1978 may include lead-

TOA F-117033010

*but free and clear of MCI interest*

based paint. Buyer of such property must immediately execute a "Lead-Based Paint Waiver" in favor of Seller to be made part of the Sale Contract, thereby waiving Buyer's right to conduct any risk assessment or inspection for lead-based paint hazards. Every Bidder should read and understand the lead hazard information pamphlet provided and the "Lead Warning Statement" in the Sale Contract. Asbestos was commonly used in building construction prior to 1981 and can pose a significant health risk if disturbed and or dislodged in a way that causes asbestos fibers to be released. This can result from pounding, sanding, sawing, scraping, tearing, removing, or other remodeling procedures involving asbestos-containing material. Molds, fungi, mildew, and similar organisms may exist in the Property (individually or collectively "Mold"). There are many types of Mold and moisture is one of the most significant factors contributing to its growth. Information about controlling and eliminating Mold growth may be available from agencies of local, state and federal government. Certain strains of Mold may cause damage to property and adversely affect the health of susceptible persons, including allergic reactions that may include skin, eye, nose, and throat irritation and infections in persons with suppressed immune systems. Experts do not agree about the nature and extent of the health problems caused by Mold or about the level of exposure that may cause such problems. Seller and Auctioneer do not represent or warrant the absence of Mold at the Property and it is Bidder's obligation to determine whether a Mold problem is present. Radon is a radioactive gas that comes from the natural breakdown of uranium in soil, rock, and water. It is drawn into buildings through foundation and other openings to the soil. The U.S. Environmental Protection Agency and Surgeon General recommend all homebuyers have an indoor radon test conducted. Radon is a Class-A carcinogen and the second leading cause of lung cancer in the U.S. A building built, improved, or renovated during the approximate timeframe beginning in 2004 to present could contain defective drywall primarily manufactured in China. The presence of Chinese or other defective drywall has been linked to corrosion and significant damage to structural systems and other elements within and on affected properties. Chinese or other defective drywall is reported to emit a strong sulfur-like odor or fume which may also cause persons to experience health problems. The only cure known for Chinese or other defective drywall is to remove and replace it. Seller and Auctioneer notify Bidders of the potential issues and problems involved with Chinese or other defective drywall and make no representation of its existence or absence from the Property and specifically disclaim any and all responsibility or liability whatsoever to Bidder, Buyer, or anyone else if it is present.

    *Property Specific Disclosures:* Property specific disclosures will be attached to these Terms of Auction.

    **8. REGISTRATION:** Any competent adult with a satisfactory photo identification who properly registers and complies with the Terms of Auction may bid. Auctioneer may refuse to register or expel any person who is disruptive, noncompliant, or previously caused a problem for Seller or Auctioneer. Bidder must deposit a cashier's check in the amount of One Million Dollars and No Cents ($1,000,000.00) with Auctioneer at registration. This deposit must be in the form of a cashier's check made payable to Bidder. Any person intending to bid on behalf of another must present Auctioneer with an executed, enforceable, recorded, and unexpired power of attorney which is subject to Auctioneer's approval. The requirements for Bidder registration may be waived by Auctioneer with respect to any Bidder, without waiving same for any other Bidder. By registering, Bidder acknowledges receipt of the Terms of Auction and access to the Sale Contract and unconditionally and irrevocably agrees to be bound by both.

    **9. BUYER'S PREMIUM:** A Three and One-Half Percent (3.50%) buyer's premium will be in effect for the Auction and added to the amount of the highest bid to arrive at the selling price for the Property ("total contract price").

    **10. AUCTION:** The Property is scheduled for sale to the highest bidder for it with the liberty to bid being reserved for all creditors of Debtor and others that may be related in some manner to Debtor or the Property. Auctioneer's discretion includes, but is not limited to, the auction method, bid-calling, bid increments, and determining the buyer. The decision of Auctioneer is final regarding all matters that arise before, during, or after the Auction. Seller will not bid. Bidder will not retract any bid. Bidder's purchase will be considered a single transaction whether of the whole or a fraction of the Property. The sale of any fraction of the Property will not be contingent upon the sale of any other portion thereof, whether purchased by the same Buyer or not.

    **11. SALE CONTRACT:** This is a cash sale and not contingent upon any matter, including Buyer obtaining financing. Buyer will immediately execute the Sale Contract and all related documents presented by Auctioneer to bind Bidder and Seller to the sale of the Property. Any Buyer purchasing on behalf of a business or arm of government ("Artificial Person") will immediately execute the Sale Contract in both the Artificial Person's and buyer's names, until such time as the Artificial Person presents Auctioneer with acceptable, written evidence of the Artificial Person's good standing in its state of formation, plus written authority, in a form acceptable to Auctioneer, agreeing to be bound by the Sale Contract. The Terms of Auction are incorporated into the Sale

Contract which defines the entire agreement between Seller and Buyer. The Terms of Auction complement the Sale Contract and, in the event of any conflict between them, the Sale Contract will control in all instances. Buyer will execute the Sale Contract and no addition, deletion, or revision will be permitted.

   *12. DEPOSIT:* Buyer will immediately pay to the escrow/closing agent, in U. S. Dollars, an earnest money deposit ("Earnest Money Deposit") of no less than Ten Percent (10.00%) of the total contract price of the Property. If for any reason Buyer fails to timely execute the Sale Contract or pay the Earnest Money Deposit, Seller has sole discretion, to: (a) pursue all legal and equitable remedies available against Buyer, or (b) declare Buyer's bid to be immediately forfeited, null, and void, without any requirement of notice, and immediately re-sell the Property to another buyer.

   *13. RELEASE:* Bidders, Buyers, and other persons present at the Auction (collectively "Attendees") are advised that Auctioneer and its agents, contractors, employees, and/or representatives may record the Auction, related matters, and Attendees through audiotape, photography, motion pictures, and/or videotape for advertising, marketing, promotion, publicity, record, and/or trade purposes, and in consideration of being allowed to attend the Auction, Attendees unconditionally and irrevocably agree that their images and voices may be so recorded and used by Auctioneer in all types of media without territorial, time, or use limitation, and without compensation being owed or paid to Attendees by Auctioneer or Seller.

   *14. LEGAL ACTION AND ARBITRATION:* Any action, claim, controversy, counterclaim, dispute, or proceeding arising out of the Property Issues and involving Seller, Bidder, Buyer, or Auctioneer, in any combination, whether controlled by federal or state law, and whether an issue of law or equity, must be submitted to the Bankruptcy Court for its exclusive adjudication and determination. Any matter that the Bankruptcy Court refuses to adjudicate for any reason must submitted for determination and resolution exclusively by final and binding arbitration, with no appeal permitted, except as provided by applicable law for the judicial review or enforcement of arbitration decisions. The arbitration will be administered by Judicial Arbitration and Mediation Services, Inc., or its successor, and decided by a panel of three (3) independent arbitrators. Judgment on the arbitration award may be entered in any court having jurisdiction. The parties waive the right to any legal action and trial by jury. The costs of arbitration, including the fees and expenses of the arbitrators, but not including the parties' attorneys' fees, will initially be paid equally by them. The prevailing party will be entitled to collect from the other its full costs associated with the arbitration, including reasonable attorneys' fees. All aspects of any arbitration will be permanently kept confidential and not disclosed in any form or manner to any entity, media, or person, and the parties will jointly move the court entering judgment on the arbitration award to so order. Any action or arbitration must be commenced within two (2) years from the date when the cause of action or arbitration accrues or it will be forever barred. The right of action or arbitration will accrue, and the two (2) year limitation period will begin to run, on the date the breach, damage, or injury is sustained and not when the resulting damage or harm is discovered.

   *15. CHOICE OF LAW, JURISDICTION, AND VENUE:* Any Auction matter will be exclusively construed and governed in accordance with the laws of the State of South Carolina, without regard to its conflict of laws principles. The exclusive jurisdiction and venue for any controversy or claim between the parties will be the City of Charleston in the State of South Carolina.

   *16. MISCELLANEOUS:* The Terms of Auction will bind Bidders and their agents, assigns, attorneys, beneficiaries, brokers, directors, distributees, employees, executors, heirs, legatees, officers, representatives, shareholders, and successors in interest. No deletion, modification, supplement, or waiver of any provision of the Terms of Auction will be made, except by Auctioneer's written revision or announcement at the Auction.

# J. P. KING AUCTION COMPANY, INC.

## REAL PROPERTY SALE CONTRACT

### Daufuskie Island Property
### Daufuskie Island, South Carolina
### ( + + + Time / Date + + + )

BIDDER NO. _____

THIS REAL PROPERTY SALE CONTRACT ("Sale Contract"), made _____, 2010 by and between Robert C. Onorato, Chapter 11 Trustee (herein "Seller"), duly appointed by the U. S. Bankruptcy Court, District of South Carolina ("Bankruptcy Court") on behalf of the debtor in bankruptcy, Daufuskie Island Properties, LLC dba "Daufuskie Island Resort & Breathe Spa" ("Debtor"), with Seller's address being 3 Carma Court, Hilton Head, S.C. 29926-1965 (tel. 843-681-9080) and

_____ ("Buyer"),

whose address is _____.

Seller is represented in this sale by J. P. King Auction Company, Inc. ("King"), an Alabama corporation headquartered at 108 Fountain Avenue in Gadsden, Alabama 35901 (telephone 800-662-5464 or 256-546-5217 and facsimile 256-543-8036) and its broker of record, Rick Gilliam ("Broker") whose address is Gilliam and Associates, 3946 Tybre Down Circle, Little River, South Carolina 29566 (unless otherwise noted, King and Broker collectively referred to as "Auctioneer").

NOW, THEREFORE, in consideration of the agreements and covenants herein, and other good and valuable consideration, the adequacy and receipt of which are acknowledged, the parties being duly authorized and empowered to execute this Sale Contract and intending to be legally bound agree as follows:

## AGREEMENTS

### ARTICLE I – AGREEMENT TO PURCHASE

**1.1.** Seller agrees to sell and Buyer agrees to buy, pursuant to the terms herein, the real property described below ("Property").

**1.2.** The terms for the Auction ("Terms of Auction") are incorporated into this Sale Contract which defines the entire agreement between Seller and Buyer for the purchase and sale of the Property, whether by auction ("Auction") or otherwise.

**1.3.** The Terms of Auction complement this Sale Contract and may differ in some respects from it. In the event of any conflict between the Terms of Auction and this Sale Contract, the Sale Contract will control in all instances.

**1.4.** In the event of a sale of the Property other than by Auction, Buyer is advised that the Terms of Auction are still incorporated into this Sale Contract to define the entire agreement between Seller and Buyer for the purchase and sale of the Property, and Buyer is advised to obtain, read, and fully understand the Terms of Auction before entering into this Sale Contract.

### ARTICLE II – THE PROPERTY

**2.1.** The Property is located at_____.
The Property is described in the legal description contained in the title commitment prepared by
_____, which is hereby made part of this Sale Contract and incorporated herein by reference.

**2.2.** Should any survey, now existing or later made, indicate greater or lesser acreage or square footage in the Property than represented by Seller or Auctioneer, no adjustment will be made to the purchase price ("total contract price") to be paid by Buyer to Seller for the Property.

Daufuskie Island Property

Attorney (White) Seller (Yellow) JPK (Pink) Buyer (Goldenrod)

### ARTICLE III – TOTAL CONTRACT PRICE

**3.1.** The Property's selling price and scheduled payments are as follows:

HIGH BID PRICE...........................................................................$_____

ADD – 3.50 % BUYER'S PREMIUM.......................................$_____

TOTAL CONTRACT PRICE...............................................$_____


LESS – EARNEST MONEY DEPOSIT ("EMD") (10.00%) ........$(_____)

BIDDER DEPOSIT   $___1,000,000.00_____

BALANCE EMD TO PAY   $_____


BALANCE OF TOTAL CONTRACT PRICE OWED................$_____

**3.2.** All payments must be made in U. S. Dollars.

**3.3.** Buyer's earnest money deposit ("Buyer's deposit") will be paid to _____, the designated Escrow Agent ("Escrow Agent"), and Escrow Agent will administer the deposit and conduct the closing of the sale of the Property ("closing").

**3.4.** This is a cash sale which is not contingent upon any matter including, but not limited to, Buyer's ability to obtain financing for this purchase.

**3.5.** The balance of the total contract price owed by Buyer for the Property does not include Buyer's closing costs, any costs associated with financing, any prepaid or prorated closing charges, or taxes applicable to Buyer.

### ARTICLE IV – DISCLAIMER

**4.1.** As a material part of the consideration for this Agreement, Seller and Buyer agree that the Property is being sold in **"AS IS, WHERE IS, WITH ALL FAULTS"** and condition with all burdens, circumstances, defects, faults, dangers, hazards, issues, material facts, problems, and other relevant matters, whether latent or patent, whether past, present, or future, and whether or not referenced herein, or in the Terms of Auction, and Buyer knowingly, voluntarily, unconditionally, and irrevocably waives, releases, and discharges Seller and Auctioneer from any claim that Buyer may otherwise have had with respect to the Property, the Auction, this Sale Contract, and the transaction contemplated.

**4.2.** To the fullest extent allowed by law, Seller and Auctioneer unconditionally disclaim any guarantee, representation, and warranty of every kind, whether expressed, implied, or statutory, whether oral or written, with respect to the Property, the surrounding area, the Auction, the Terms of Auction and all matters referenced therein (including, but not limited to, all matters referred to within this Article, plus the section on "Bidder's Due Diligence" included in the Terms of Auction), plus all other relevant matters, whether past, present, or future, and whether or not referenced herein, in the Terms of Auction, or elsewhere, except for limited warranties that may be given by Seller to Buyer in the deed of conveyance, or as expressly stated herein.

**4.3.** Maps, depictions, and sketches included in the marketing material for the Auction are for illustration purposes only and neither Seller nor Auctioneer warrants or guarantees these materials or related information to be accurate or complete.

**4.4.** Buyer acknowledges and agrees that it is Buyer's exclusive responsibility to make and independently verify such factual, legal, and other inquiries, inspections, investigations, and studies as Buyer deems appropriate, desirable, and necessary with respect to the Property, the Auction, this Sale Contract, and this sale, all of which will be at Buyer's exclusive cost, and Seller and Auctioneer will have no liability whatsoever on any basis or in any amount.

**4.5.** Buyer acknowledges and agrees that, in executing this Sale Contract and purchasing the Property, Buyer is not relying upon any guarantee, representation, or warranty of any kind that Seller and Auctioneer have disclaimed, nor is Buyer relying upon any assertion, brochure, claim, document, information, literature, map, projection, sketch, or statement of any kind with respect to the Property and any improvements thereon, including the surrounding area and all relevant circumstances, facts, issues, and matters, whether past, present, or future, whether expressed or implied, whether oral or written, whether material or immaterial, and whether given or made by, or on behalf of, Seller or Auctioneer. Instead, Buyer is relying solely upon Buyer's independent due diligence, inspection, investigation, and findings with respect to the

Attorney (White) Seller (Yellow) JPK (Pink) Buyer (Goldenrod)

Property, the surrounding area, the Auction, the Terms of Auction and all relevant matters whether past, present, or future, and whether or not referenced herein, in the Terms of Auction, or elsewhere.

4.6. Seller and Auctioneer will not be liable to Buyer for any relief, including, but not limited to, adjustment, allowance, damages, reformation, or rescission, based upon the failure of the Property to conform to any specific condition, expectation, standard, or any third-party documents or information.

4.7. Buyer will look only to Seller, and not Auctioneer, with respect to all matters regarding the sale of the Property and this Sale Contract.

## ARTICLE V – FIXTURES AND PERSONAL PROPERTY

5.1 This sale includes all built-in appliances, cabinets, fixtures, installed systems (cooling, electrical, heating, lighting, mechanical, and plumbing), in-ground plantings (including flowers, shrubbery, and trees), window treatments (blinds, drapes, and hardware), and all other items and things as now situated and permanently attached to the Property.

5.2 No personal property is to be conveyed.

## ARTICLE VI – DISCLOSURES

6.1. Any disclosures made and information given by Seller and/or Auctioneer to Buyer regarding the Property and any improvements thereon, the surrounding area, and all circumstances, facts, issues, and other matters relevant to this sale are provided subject to the disclaimers stated herein. All disclosures, information, representations, and statements made or given are attributable solely to Seller and not Auctioneer, and these represent Seller's belief at the time this Sale Contract was drafted, but nothing is guaranteed or warranted to be accurate, complete, or correct.

6.2. A list of property specific disclosures has been made a part of this Sale Contract as referenced herein.

## ARTICLE VII – BUYER'S DEPOSIT

7.1. Immediately upon the execution of this Sale Contract, Buyer will pay ten percent (10.00%) of the total contract price for the Property as Buyer's deposit to Escrow Agent to be held on deposit by Escrow Agent in a designated bank escrow account, insured by Federal Deposit Insurance Corporation, and Escrow Agent will administer the funds in accordance with this Sale Contract. This escrow account will be non-interest bearing, unless otherwise required by law.

7.2. The parties agree Escrow Agent will be relieved of all liability and held harmless by them so long as Escrow Agent holds Buyer's Deposit and makes any disbursement from it in accordance with this Sale Contract and the Escrow Agreement previously executed by Escrow Agent with Seller and Auctioneer.

7.3. In the event of any controversy regarding Buyer's Deposit, Escrow Agent will not be required to take any action, but may await the result of any proceeding, or at Escrow Agent's discretion, interplead Buyer's deposit into a court of competent jurisdiction for determination, and Escrow Agent will thereafter have no liability whatsoever on any basis and for any amount with regards to Buyer's deposit and this Sale Contract.

## ARTICLE VIII – BROKER INVOLVEMENT

8.1. Buyer warrants that Buyer (check one) … [ _____ is ] … [ _____ is not ] … represented by a qualified, licensed, real-estate broker in this transaction. If Buyer is represented by a broker, the broker's full name, firm, and address are:

_____

_____

8.2. Buyer warrants not to have contacted or communicated with any real-estate agent or broker about the Property, other than Auctioneer and any broker identified in the previous paragraph, and no other real-estate agent or broker was in any way instrumental in effecting this sale of the Property and there are no brokerage commissions, expenses, fees, or other sums due to any other real-estate agent or broker.

8.3. Buyer agrees to hold Seller and Auctioneer harmless against any claim by any real-estate agent or broker not properly registered with and qualified by Auctioneer in the Buyer-Broker Incentive Program (see below), and Buyer will indemnify Seller and Auctioneer against any action, arbitration, award, claim, cost, damage, deficiency, demand, expense, injury, judgment, liability, loss, or suit of every kind, including attorneys' fees and costs of defense, asserted by a real-estate agent or broker as a result of, or in relation to, the Auction, this Sale Contract, the transaction contemplated, or any related dealings involving Buyer, Seller, and/or Auctioneer.

8.4. Buyer understands that upon closing, Seller will pay Auctioneer a commission pursuant to the terms of a separate, written agreement.

## ARTICLE IX – BUYER-BROKER INCENTIVE PROGRAM

9.1. If the Buyer-Broker Incentive Program is in effect for the Auction, a properly licensed broker ("Buyer-Broker") who timely registers and qualifies with Auctioneer in accordance with the terms of this program will be paid a commission by Seller at closing, in accordance with the terms of this program, provided that both Buyer-Broker and the

Daufuskie Island Property

Attorney (White) Seller (Yellow) JPK (Pink) Buyer (Goldenrod)

Buyer that Buyer-Broker represents fulfill all requirements under the Terms of Auction, this Sale Contract, and this incentive program.

**9.2.** If for any reason closing does not occur, including, but not limited to, the default of any party hereto, no commission will be due or paid to any Buyer-Broker and Seller and Auctioneer will have no liability on any basis and for any amount.

### ARTICLE X – BUYER INCENTIVE PROGRAM (Not Applicable)
### ARTICLE XI – CASUALTY

**11.1.** All risk of loss or damage to the Property will be borne exclusively by Seller until closing. Immediately upon closing, all risk of loss will be borne exclusively by Buyer.

**11.2.** In the event the Property is, in the opinion of Seller, significantly damaged or destroyed by fire or other casualty after the execution of this Sale Contract and before closing, Seller will have the option to restore the Property to its pre-casualty condition or cancel this Sale Contract, after giving written notice to Buyer of the option Seller selects. In the event Seller chooses to cancel this Sale Contract, Buyer's deposit will be promptly and fully refunded and this will be a complete and final settlement with Buyer of all of Seller's obligations to Buyer herein, or otherwise relating to the Property and this sale. Should Seller desire to restore the Property to its pre-casualty condition, Seller will have one hundred twenty (120) days, immediately following the date on which written notice is given to Buyer, to complete restoration. In the event Seller timely completes restoration, Seller will give written notice of this fact to Buyer and closing will immediately occur. In the event Seller does not timely complete restoration, Buyer will have the option to give written notice to Seller of Buyer's intention to terminate this Sale Contract and Buyer's obligations herein will then be immediately ended and Buyer's deposit will be promptly and fully refunded, together with any interest accrued thereon, if applicable, or Buyer may continue to seek performance from Seller under this Sale Contract.

### ARTICLE XII – SELLER'S BREACH

**12.1.** If Seller defaults in the performance of any term or obligation herein and closing does not timely occur as a result, Buyer will have the option to give Seller written notice of Buyer's intention to terminate this Sale Contract and Buyer's obligations herein will be immediately ended and Buyer's deposit will be promptly and fully refunded, together with any interest accrued thereon, if applicable, or Buyer may have all rights allowed by law and in equity and pursuant to this Sale Contract, including the right to pursue a claim against Seller for specific performance of this Sale Contract, including Seller's payment of Buyer's reasonable attorneys' fees and costs.

**12.2.** In no event will Auctioneer have any liability whatsoever on any basis and for any amount as a result of Seller's breach of this Sale Contract or other wrongful act or omission.

### ARTICLE XIII – BUYER'S BREACH

**13.1.** If Buyer defaults in the performance of any term or obligation herein and closing does not timely occur as a result, Seller will give written notice to Buyer that Buyer's deposit will be immediately forfeited to Seller and King (but not King's Broker) as reasonable liquidated damages and not as a penalty against Buyer. Seller and King (but not King's Broker) will equally split Buyer's deposit between them and keep their respective shares. Buyer forever waives and releases any right to sue Seller, Auctioneer, or Escrow Agent to recover the Buyer's deposit, or any part thereof, on the grounds that it is unreasonable in amount, or that its retention by Seller and Auctioneer is wrongful or a penalty not agreed upon by the parties as reasonable liquidated damages.

**13.2.** If Buyer defaults in the performance of any term or other obligation herein and closing does not timely occur as a result, Seller will have all rights allowed by law and in equity and pursuant to this Sale Contract, including the right to pursue a claim against Buyer for additional damages, specific performance of this Sale Contract, or cancellation of the sale, and including Buyer's payment of Seller's reasonable attorneys' fees and costs.

**13.3.** In no event will Auctioneer have any liability whatsoever on any basis and for any amount as a result of Buyer's breach of this Sale Contract or other wrongful act or omission.

### ARTICLE XIV – CONVEYANCE AND TITLE

**14.1** Seller will convey fee simple title to the Property to Buyer by general warranty deed, free and clear of all liens and encumbrances, non-monetary encumbrances except as specified in the "exceptions" of the title commitment, the Terms of Auction, this Sale Contract, and subject to all existing covenants, easements, restrictions, and matters of record.

**14.2.** Buyer agrees to accept title to the Property subject to: (a) all standard exclusions and printed exceptions set forth in the owner's policy of title insurance, including all matters that would be disclosed by a current and accurate survey of the Property, (b) taxes and liens for taxes not yet due and payable, (c) easements for public utilities affecting the Property, (d) all other easements or claims to easements, covenants, restrictions, and rights-of-way affecting the Property; (e) rights and claims of any persons in possession, (f) all title exceptions referenced in the title commitment, (g) land-use

Attorney (White) Seller (Yellow) JPK (Pink) Buyer (Goldenrod)

laws, (g) applicable statutes, rules, and regulations,  (h) zoning ordinances, and (i) all matters herein waived by Buyer (individually and collectively (a) through (i) are referred to as "permitted title exceptions").

14.3.  If the title commitment reveals a defect in title which is not one of the permitted title exceptions, or if prior to closing a new defect in title is disclosed by an updated endorsement to the title commitment, which defect is not one of the permitted title exceptions, prior to closing Buyer may either waive such defect or give written notice of such to Seller and Escrow Agent not later than five (5) days from the date of discovery of such defect in title, whereupon Seller may, at its option, attempt to cure such defect prior to closing, or decline to cure the defect.  If Buyer has given written notice to Seller of a defect in title which Buyer does not waive, and Seller is unable or unwilling to cure the defect on or before closing, this Sale Contract will be terminated without liability to either party and Buyer's deposit will be promptly and fully refunded, together with any interest accrued thereon, if applicable, except that, upon written notice to Buyer, Seller will have the right, at Seller's sole election, to extend the date of closing by up to sixty (60) days, but not longer, to allow time for Seller to attempt to cure any defect in title.

14.4.  Seller will not voluntarily create or cause any lien or other encumbrance to attach to the Property between the date this Sale Contract is made and closing.

## ARTICLE XV – CLOSING

15.1  Seller has chosen _____ to serve as Escrow/Closing Agent for this sale.  The closing will be held at the law firm's office located at _____; telephone _____. Closing must occur on or before 5:00 p.m. _____ ("Closing Date").  The contact for _____ is _____..

15.2.  South Carolina is an "attorney state" which means that real estate transactions must be closed under the supervision of a South Carolina licensed attorney.  A Buyer may choose who will act as his/her closing agent to examine the title and provide title insurance to the Buyer.  For this Auction sale, the title commitment is being provided by Seller through the Escrow/Closing Agent named in Section 15.1.  The Buyer may contact the Escrow/Closing Agent for the closing of the Property and/or issuance of final owner's and/or loan policies.  Should the Buyer choose to use his own attorney, Buyer's attorney will be required to coordinate all closing documents and procedures with the Escrow/Closing Agent, along with Buyer being responsible for any and all costs associated with the Escrow Agent.

15.3.  At closing, Seller will deliver to Buyer the deed provided for herein to convey good and clear title to the Property to Buyer, and Buyer will pay to Seller the balance of the purchase price owed in cash or by confirmed bank wire transfer of funds.

15.4.  Seller will solely pay the costs for preparing the deed and all other legal documents needed to convey title to the Property to Buyer, including the deed transfer tax, and the costs to record the release of every encumbrance against the Property, plus Seller's attorney's fees.

15.5.  Buyer will solely pay the costs for the owner's policy (and loan policy, if applicable) of title insurance, the costs for recording the Deed, title search and exam fees, all closing fees, and any and all additional financing and sale costs, plus Buyer's attorney's fees.

15.6.  The current year's assessments and any special assessments, association dues and fees, current year's *ad valorem* taxes, insurance, interest, rents, and all similar items applicable will be prorated between Seller and Buyer to the closing date, with Buyer being responsible for the day of closing.  Should any additional assessments, other costs, or taxes be levied or charged as a result of any change of use of the Property attributable to Buyer, such amounts will be the exclusive responsibility of Buyer to pay.

15.7.  Closing may be conducted by mail.

15.8.  Seller will grant Buyer possession of the Property immediately upon closing.

## ARTICLE XVI – ASSIGNMENT AND THIRD PARTIES

16.1.  Neither party may assign or transfer any interest in this Sale Contract without the prior, written consent of the other.

16.2.  Nothing contained in this Sale Contract, or in any document or instrument executed by a party in connection with the sale contemplated, will create any rights in, or be deemed to have been executed for, the benefit of any person or entity not a party hereto, except as expressly provided herein.

## ARTICLE XVII – AGENCY

17.1.  The parties understand and agree that Auctioneer is acting solely as a single agent and exclusively representing Seller on this Sale Contract, the transaction contemplated, and all related matters, and Auctioneer is not acting as a sub-agent, Buyer's agent, or limited consensual dual agent.

Daufuskie Island Property

Attorney (White) Seller (Yellow) JPK (Pink) Buyer (Goldenrod)

## *ARTICLE XVIII – HOLD HARMLESS AND INDEMNIFICATION*

**18.1.** A party at fault will hold a party not at fault, as well as Auctioneer, harmless from, and indemnify the party not at fault against, any action, arbitration, award, claim, cost, damage, deficiency, demand, expense, indemnity, injury, judgment, liability, loss, obligation, or suit of every kind, including reasonable attorneys' fees and costs of defense, asserted by any person, real or artificial, or by any entity of government, that the party not at fault incurs as a result of any act, error, omission, or wrongdoing attributable to the party at fault or that party's agents, assigns, attorneys, brokers, contractors, directors, employees, invitees, licensees, members, officers, representatives, shareholders, or successors in interest, and which arises out of this Sale Contract, the transaction contemplated, or the related dealings of the parties, except as expressly provided herein.

## *ARTICLE IX – NOTICE*

**19.1.** Any notice between the parties permitted, required, or otherwise relating to this Sale Contract, the transaction contemplated, or the related dealings of the parties, will be given in writing including, but not limited to, notice which addresses approval, breach, cancellation, claim, closing, complaint, consent, default, demand, objection, option, termination, waiver, or exercise of right.

**19.2.** Notice will be deemed given by a party and effective on the date when personally delivered to the other party or, in lieu of personal delivery, when addressed to the other party at the address set forth herein and deposited in the mail handled by the United States Postal Service and sent certified mail with postage prepaid and a receipt retained, or sent by a nationally-recognized overnight courier or delivery service with a receipt retained.

**19.3.** A copy of any notice will simultaneously be given to Auctioneer at the addresses listed on page one of this Sale Contract.

## *ARTICLE XX – LEGAL ACTION AND ARBITRATION*

**20.1.** Any action, claim, controversy, counterclaim, dispute, or proceeding arising out of the Property Issues and involving Seller, Bidder, Buyer, or Auctioneer, in any combination, whether controlled by federal or state law, and whether an issue of law or equity, must be submitted to the Bankruptcy Court for its exclusive adjudication and determination. Any matter that the Bankruptcy Court refuses to adjudicate for any reason must submitted for determination and resolution exclusively by final and binding arbitration, with no appeal permitted, except as provided by applicable law for the judicial review or enforcement of arbitration decisions.

**20.2.** The arbitration will be administered by Judicial Arbitration and Mediation Services, Inc., or its successor, pursuant to its "Comprehensive Arbitration Rules and Procedures" then in effect, and heard and decided by a panel of three (3) independent arbitrators. Judgment on the arbitration award may be entered in any court having jurisdiction.

**20.3.** Each party unconditionally and irrevocably waives all right to a trial by jury in any action, proceeding, or counterclaim arising out of or related to this Sale Contract, the transactions contemplated, and the related dealings of the parties.

**20.4.** The costs of arbitration, including the fees and expenses of the arbitrators, but not including the parties' attorneys' fees, will initially be paid equally by the parties.

**20.5.** The prevailing party will be entitled to collect from the other its full costs associated with the arbitration, including reasonable attorneys' fees.

**20.6.** The parties agree that the filing, proceedings, rulings, decisions, result, and award from any arbitration will be permanently kept confidential and not disclosed in any form or manner to any entity, media, or person whatsoever, and the parties will jointly move the court entering judgment on the arbitration award to so order.

**20.7.** Any action, arbitration, or other adversarial proceeding must be commenced within two (2) years from the date of the Auction or when the cause of action or arbitration accrued, whichever first occurs, or it will be forever barred. The right of action or arbitration will accrue, and the two-year (2) limitation period will begin to run, from the date the breach, damage, or injury is sustained and not when discovered.

## *ARTICLE XXI – BINDING EFFECT*

**21.1.** This Sale Contract will be binding upon the parties and their agents, assigns, attorneys, beneficiaries, brokers, directors, distributees, employees, executors, heirs, legatees, members, officers, representatives, shareholders, and successors in interest.

## *ARTICLE XXII – CHOICE OF LAW, JURISDICTION, AND VENUE*

**22.1.** This Sale Contract, the transaction contemplated, and all related dealings of the parties will be exclusively construed and governed in accordance with the laws of the State of South Carolina, without regard to its conflict of laws principles.

**22.2.** The exclusive jurisdiction and venue for any controversy or claim between the parties will be the City of Charleston in the State of South Carolina.

Daufuskie Island Property

Attorney (White) Seller (Yellow) JPK (Pink) Buyer (Goldenrod)

## ARTICLE XXIII – SEVERABILITY, HEADINGS, PRONOUNS, AND CONSTRUCTION

**23.1.** If any clause or provision of this Sale Contract is held illegal, invalid, or unenforceable, it is the parties' intention that the remainder of this Sale Contract will not be affected and, in lieu of such clause or provision that is held illegal, invalid, or unenforceable, there will be added, as a part of this Sale Contract, a clause or provision as similar in term and effect as such illegal, invalid, or unenforceable clause or provision as may be possible, legal, valid, and enforceable.

**23.2.** Article headings are for reference only and not intended to expand or restrict the scope or substance of the provisions of this Sale Contract. Any reference herein to an Article heading includes all relevant sections, subsections, and paragraphs within that Article.

**23.3.** Words used in the present tense also include the past and future tense, as the context requires.

**23.4.** Wherever used in this Sale Contract, the singular will include the plural, the plural will include the singular, and pronouns will be read as masculine, feminine or neuter, as the context requires.

**23.5.** The parties agree that this Sale Contract have been mutually agreed upon by them and no legal inference, presumption, principle, or other rule of draftsmanship or construction will be used in favor of or against either of them.

## ARTICLE XXIV – MISCELLANEOUS

**24.1.** Buyer certifies to be of legal age and have full capacity and competence to understand, enter into, execute, and deliver this Sale Contract.

**24.2.** If Buyer is purchasing the Property on behalf of an arm of government or business entity (i.e., corporation, limited liability company, etc.) ("artificial person"), Buyer will be personally liable under this Sale Contract until such time as the artificial person presents Seller with acceptable, written evidence of the artificial person's good standing in its state of formation, plus a duly-passed and executed resolution or similar written authority from its board of directors or other governing authority that authorizes the purchase of the Property and agrees for the artificial person to be bound by this Sale Contract.

**24.3.** This Sale Contract may be signed in multiple counterparts and each will be an original of this Sale Contract, with all counterparts constituting a single instrument.

**24.4.** A facsimile signature will be considered as valid as an original signature.

**24.5.** This Sale Contract and the incorporated Terms of Auction contain the entire undertaking between the parties regarding the Auction, the transaction contemplated, and all related dealings of the parties, and there are no oral or written agreements, inducements, promises, representations, or warranties other than those expressly set forth.

**24.6.** This Sale Contract supersedes any previous agreement, negotiation, or understanding between the parties regarding the transaction contemplated, and such have been merged here and will not survive execution of this Sale Contract.

**24.7.** No deletion, modification, supplement, or waiver of any term of this Sale Contract will be effective unless made in writing and executed by the parties with the same formality as this Sale Contract.

**24.8.** The failure of either party to insist upon the strict performance of any term of this Sale Contract will not be construed as a waiver of any subsequent default of the same or similar nature.

**24.9.** Each party had the opportunity to seek the independent advice of legal counsel of its choosing and each has either done so or has voluntarily decided to forgo such advice, with full understanding of the risk involved in this course with regard to the Property, Auction, Sale Contract, and this sale.

**24.10.** Each party acknowledges that it has received and read the Terms of Auction and this Sale Contract in their entirety, understands and fully accepts all of the terms contained, and has received an executed copy of this Sale Contract.

**24.11.** In addition to any other attachments, exhibits, or other documents or materials referenced herein, the following Attachments are attached hereto and incorporated herein by reference:

Exhibit A    -    Property Specific Disclosures
Attachment I    –    Agency Disclosure
Attachment II    –    TBD
Attachment III -    TBD

### *ARTICLE XXV – TIME OF THE ESSENCE*

**25.1.** Time is of the essence of this Sale Contract. Each party will fully perform all respective obligations herein at such times as to ensure that closing occurs on the date specified, or any mutually agreed-upon extension of that date.

### *ARTICLE XXVI – SURVIVAL*

**26.1.** Except for those terms and provisions relating to disclaimers, waivers, and indemnifications, the terms and conditions of this Sale Contract will be deemed merged into the deed transferring title from Seller to Buyer.

Daufuskie Island Property

Attorney (White) Seller (Yellow) JPK (Pink) Buyer (Goldenrod)

IN WITNESS WHEREOF, the parties being duly authorized and empowered have agreed to the terms herein and executed this Sale Contract intending to be legally bound.

ADDRESS:                                SELLER:

                                        Signature    _____

                                        By           _____
                                                     Print Name

                                        Title        _____


                                        BUYER:

ADDRESS:                                Signature    _____
_____
                                        Print Name   _____
_____
                                        Social Security No.  _____

                                        Federal Tax ID No.  _____

                                        Phone No.  (Work)  _____

                                                  (Home)  _____

                                                  (Fax )  _____


                                        BUYER:

ADDRESS:                                Signature    _____
_____
                                        Print Name   _____
_____
                                        Social Security No.  _____

                                        Federal Tax ID No.  _____

                                        Phone No.  (Work)  _____

                                                  (Home)  _____

                                                  (Fax )  _____


J. P. King Auction Company, Inc.
Copyright 2010

Page 9 of 10

Daufuskie Island Property

Attorney (White) Seller (Yellow) JPK (Pink) Buyer (Goldenrod)

## EXHIBIT A

## PROPERTY SPECIFIC DISCLOSURES

Daufuskie Island Property

Attorney (White) Seller (Yellow) JPK (Pink) Buyer (Goldenrod)

**Bidder #**_____
*(To be assigned by J.P. King)*

**BUYER'S BROKER INCENTIVE PROGRAM
BROKER REGISTRATION FORM**

**DAUFUSKIE ISLAND PROPERTY
Daufuskie Island, South Carolina
Date/Time TBD**

**Broker Information
PLEASE PRINT CLEARLY**

BROKER/AGENT:_____

COMPANY NAME: _____

COMPANY ADDRESS: _____

CITY: _____ STATE: _____ ZIP CODE: _____

LICENSE NUMBER: _____ BROKER NUMBER: _____

HOME PHONE: _____ OFFICE PHONE: _____

CELL PHONE: _____ FAX NUMBER_____

EMAIL: _____

**Client (Buyer/Bidder) Information**

CLIENT: _____

ADDRESS: _____

CITY: _____ STATE: _____ ZIP CODE: _____

HOME PHONE: _____ OFFICE PHONE: _____

CELL PHONE: _____ FAX NUMBER_____

EMAIL: _____

**I would like to hear more about your services** *(add checkmark to indicate choice).*

Call me at these numbers about opportunities to _____buy property.
Call me at these numbers about opportunities to _____sell property.
Location and type of property to sell: _____
_____

_____I do not wish to be contacted by telephone on future opportunities.

**OPENING BID AMOUNTS**
Please refer to the Broker Participation Guidelines below for information and instructions.
The written Opening Bid(s) submitted for the Property is:

Written Opening Bid Amount            $_____

DAUFUSKIE ISLAND PROPERTY

## BROKER PARTICIPATION GUIDELINES

1.  A commission will be paid based on the following schedule to any licensed real-estate broker or agent (either herein "Recipient") who submits a Broker Registration Form according to the guidelines outlined below and whose client is the successful buyer of the subject property ("Client"). This Client must timely close on the property and must pay the *"total contract price,"* as defined in the contract for sale, for the property.

   A.  One and One-half Percent (1.50%) commission will be paid on the written Opening Bid Amount; and
   B.  Three-quarters of One Percent (0.75%) commission will be paid on the balance remaining between the written Opening Bid Amount shown on the Broker Registration Form and the final High Bid Amount.

2.  If no opening bid is written on the Broker Registration Form, then Three-quarters of One Percent (0.75%) of the final High Bid Amount of the property purchased by that Recipient's Client will be paid to Recipient as a commission.

3.  Recipient's commission cannot, under any circumstance, exceed One and One-half Percent (1.50%) of the High Bid Amount of the property purchased by that Recipient's Client.

4.  In order to be entitled to any commission, Recipient must fully perform each of the following steps:

   A.  Register a Client by filling out the Buyer's Broker Incentive Program Broker Registration Form in full, including the signature of the Client on the form.
   B.  **Submit the Buyer's Broker Incentive Program Broker Registration Form via mail to: J. P. King Auction Company, Inc. ("King"), 108 Fountain Ave., Gadsden, AL 35901 or via fax to (256) 546-3311 for receipt by King before the deadline of _____. (48 hours prior to auction date). Broker Registration Forms not received by King or arriving after the deadline will not be honored. Broker Registration Forms sent anywhere other than the above address or fax number will not be honored.**
   C.  **Bring to the auction a copy of this form, which must have been previously accepted and acknowledged in writing by King.**
   D.  Attend and register with the Client at the auction and encourage the Client to bid on the property.
   E.  Fully and timely comply with all of the guidelines outlined herein.

5.  **Recipient will not be eligible to receive any commission, as herein provided, on any sale where Recipient, or any person related to Recipient by blood or marriage, becomes the buyer of the subject property. Furthermore, Recipient will not be eligible to receive any commission, as herein provided, on any sale where Recipient, or any person related to Recipient by blood or marriage, is an attorney, employee, director, officer, shareholder, member, partner or other agent or representative of a corporation, limited liability company, partnership, or other entity of any kind, or a beneficiary or trustee of a trust, that becomes the buyer of the subject property. If requested by J.P. King, Recipient must promptly provide King with a sworn or affirmed affidavit acknowledging and confirming that Recipient is not disqualified by virtue of any one or more of the disqualifiers contained in this paragraph.**

6.  Recipient, by placing his or her signature below, certifies, agrees, and acknowledges that:

   A.  Recipient will not claim any exceptions to the procedures outlined in this document, unless made in writing and signed by Seller.
   B.  No oral registration of a Client will qualify Recipient for any commission whatsoever.
   C.  Recipient's commission provided for herein will be paid at the closing of the sale of the property(ies) purchased by the Client, after the purchase price has been paid in full. The escrow-closing agent will disburse this payment to Recipient.
   D.  Only the first registration of a prospective Client will be accepted and honored by King.

E. Recipient will hold harmless and indemnify King from any and all claims with regard to such commission due or paid.

F. Recipient will be paid a commission only as set forth under these guidelines and only as pertaining to the specific property(ies) being auctioned.

G. Recipient will not receive a commission without the signature of the Client on the Buyer's Broker Incentive Program form.

H. Recipient cannot participate in the Buyer's Broker Incentive Program and receive any commission in conjunction with any other co-brokerage or referral agreement between King and Recipient.

I. Recipient will represent the Client named above as his or her real-estate broker or agent.

J. Recipient is not a subagent of King and specifically represents that Recipient represents the Client as a buyer's real-estate broker or agent.

K. This form consists of three (3) pages and Recipient acknowledges receiving all three (3) pages.

7. Opening bids may be used to open the bidding at the auction. Opening bids will be taken in the order received. If the same written Opening bid amount is submitted by more than one bidder, the form first received by King, in its sole discretion, will have priority over any others with the same bid amount.

8. All opening bids must be submitted in total U.S. Dollar amounts.

9. Recipient's Client, by placing his or her signature below, certifies, agrees, and acknowledges that:

A. he or she has inspected the premises of the subject property;

B. King solely represents the Seller in this transaction and does not represent any bidder or buyer;

C. commission will be paid only to a Recipient representing a Client as acknowledged in this form; and

D. Recipient will hold harmless and indemnify King, King's broker(s) (if any), and Seller from any and all representations of every kind made by Recipient to any person or entity.

For further information or questions please call (800) 558-5464 or (256) 439-0170.


BUYER/BIDDER SIGNATURE:_____    DATE:_____

BROKER/AGENT SIGNATURE:_____    DATE:_____

| FOR OFFICE USE ONLY: | | | |
|---|---|---|---|
| RECEIVED & ACKNOWLEDGED BY AUCTION INFORMATION _____/_____/_____ | | | |
| | INITIALS | DATE | TIME |

EXHIBIT
B

## EXHIBIT B - ALLOCATED VALUE PERCENTAGES

| Parcel Description | Mortgagees | Allocated Percentage | Notes |
|---|---|---|---|
| Administration & Employee Housing | Unencumbered | 1.31% | |
| (Maintenance, Gasoline Facilities, Garbage) | 1. Carolina Shores = $27,535,156<br>2. Bill Dixon = $30,000,000 | 1.31% | |
| Equestrian Center & Sportsman's Lodge | 1. AFG = $4,048,167<br>2. Carolina Shores = $27,535,156<br>3. Bill Dixon = $30,000,000 | 1.45% | |
| Silver Dew Land Parcel<br>Development of 25 Sites | Unencumbered | 3.34% | |
| Parcel C<br>Development of 14 Sites | Unencumbered | 1.89% | |
| Tennis Villa Site<br>30 Developmental Units | 1. AFG = $4,048,167<br>2. Carolina Shores = $27,535,156<br>3. Bill Dixon = $30,000,000 | 4.07% | |
| Melrose Inn - 52 Rooms on Approximately 4 acres Oceanfront | 1. AFG = $4,048,167<br>2. Carolina Shores = $27,535,156<br>3. Bill Dixon = $30,000,000 | 8.08% | |
| Inn South Parcel - 4 acres Oceanfront<br>36 Developmental Units | 1. AFG = $4,048,167<br>2. Carolina Shores = $27,535,156<br>3. Bill Dixon = $30,000,000 | 7.57% | |
| Inn North Parcel - 4 acres Oceanfront<br>36 Developmental Units | 1. AFG = $4,048,167<br>2. Carolina Shores = $27,535,156<br>3. Bill Dixon = $30,000,000 | 7.57% | |
| Easter Beach Village - Golf View, 2nd Row Ocean,<br>40 Developmental Units | 1. AFG = $4,048,167<br>2. Carolina Shores = $27,535,156<br>3. Bill Dixon = $30,000,000 | 7.81% | |
| Beach Club Site - Ocean and Sound Front<br>56 Developmental Units | Beach First = $6,147,173.39 | 16.10% | |

| Parcel Description | Mortgagees | Allocated Percentage | Notes |
|---|---|---|---|
| Oceanfront Cottages - four 4 bedroom - Unrenovated | 1. Beach First<br>2. Dixon | 3.03% | This is two of the four cottages |
| Oceanfront Cottages - four 4 bedroom - Unrenovated | Beach First = $6,147,173.39 | 3.03% | This is two of the four cottages |
| Oceanfront Cottage - 2-bedroom | 1. Beach First<br>2. Dixon | 0.83% | |
| Second Row Cottages - five 4-bedroom - Unrenovated | Beach First = $6,147,173.39 | 3.39% | This is three of the five cottages |
| Second Row Cottages - five 4-bedroom - Unrenovated | 1. AFG = $4,048,167<br>2. Carolina Shores = $27,535,156<br>3. Bill Dixon = $30,000,000 | 2.26% | This is two of the five cottages |
| Melrose Golf Course & Facilities | 1. AFG = $4,048,167<br>2. Carolina Shores = $27,535,156<br>3. Bill Dixon = $30,000,000 | 8.72% | |
| Island House Conference Center | 1. AFG = $4,048,167<br>2. Carolina Shores = $27,535,156<br>3. Bill Dixon = $30,000,000 | 3.98% | |
| Melrose Landing<br>Docks & Development Rights<br>30 Units - 10,000 square feet Commercial | Unencumbered | 7.26% | |
| Bloody Point Property | Unencumbered | 6.98% | |

| Percentage of Total Value of Carolina Shores' Collateral | Percentage of Total Value of AFG's Collateral | Percentage of Total Value of Beach First's Collateral | Percentage of Total Value of Unencumbered |
|---|---|---|---|
| 52.83% | 51.52% | 26.38% | 20.79% |