IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF SOUTH CAROLINA


Case No.: 09-00389-jw


**ORDER ON AUCTION CREDIT BID MATTERS, AND CONFIRMING
SUCCESSFUL CREDIT BIDDERS UPON CONCLUSION OF AUCTION**


The relief set forth on the following pages, for a total of 12 pages including this page, is hereby **ORDERED**.


**FILED BY THE COURT**
**11/08/2010**



/s/ John E. Waites

Chief US Bankruptcy Judge
District of South Carolina

Entered: 11/09/2010

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| In re: | Case No. 09-00389-jw |
| Daufuskie Island Properties, LLC aka<br>Daufuskie Island Resort and Breathe Spa, | Chapter 11 |
| Debtor. | |

**ORDER ON AUCTION CREDIT BID MATTERS, AND CONFIRMING
SUCCESSFUL CREDIT BIDDERS UPON CONCLUSION OF AUCTION**

These matters came before the Court in connection with the sale of assets of the bankruptcy estate by auction, pursuant to prior orders entered by the Court. The provisions for the auction included credit bidding by secured creditors,[1] and at the time of the auction certain issues arose regarding the credit bidding. In addition, the Trustee requested that the Court confirm the successful bidders upon the conclusion of the auction. The Court conducted a hearing on these matters on October 25, 2010 and October 27, 2010.

Several orders were entered to arrange for the auction. Upon motions filed by Robert C. Onorato, Trustee (the "Trustee") for the Chapter 11 bankruptcy estate (the "Estate") of Daufuskie Island Properties, LLC (the "Debtor"), the Court entered the Order (1) Authorizing the Sale of Substantially All Assets of the Estate at Auction Free and Clear of Liens, Claims, Encumbrances and Other Interests, and (2) Approving the

---

[1] The auction provisions allowed for two rounds of bidding. The first round was an offering of the property in its entirety to non-creditor bidders, with a reserve price. If the reserve price were not met by a qualified bidder, a second round of bidding was to occur, in which certain secured creditors were allowed to credit bid for the purchase of the collateral securing their claims, pursuant to 11 U.S.C. § 363(k).

2

<u>Assumption and Assignment of Certain Unexpired Executory Contracts and Leases</u> on May 7, 2010 (the "Auction Order"); the <u>Order Establishing Bidding and Other Provisions and Procedures in Connection with the Sale of Substantially All Assets of the Estate by Auction</u> on August 6, 2010 (the "Auction Procedures and Provisions Order"); and the <u>Order Authorizing Employment and Payment of Auctioneer, and Approving Auction Listing Agreement and Related Documents</u> on August 6, 2010 (the "Auctioneer Order"), pursuant to which the Trustee was authorized to employ J. P. King Auction Company, Inc. ("King") to conduct the auction. The Court also entered the <u>Order and Notice of Hearing on Auction</u> on September 3, 2010, scheduling a hearing on the results of the auction and any issues that might arise in connection with the auction.[2]

The Trustee and the creditors involved advised the Court that the auction commenced on October 21, 2010, as scheduled. In the first round of offering, for the property in its entirety, no qualified bidders made bids for the property, and the auction proceeded to the second round of offering, for credit bidding. However, the Trustee, King and the secured creditors involved agreed to continue the round of credit bidding to the hearing on October 25, 2010, for the Court to address certain issues that had arisen regarding the credit bidding.

The issues presented to the Court in connection with the auction were as follows: (1) the asserted right of William R. Dixon, Jr. ("Dixon") to credit bid; (2) the right of Bank of North Carolina ("BNC"), successor in interest to Beach First National Bank ("Beach First"), to decide not to credit bid for the purchase of its prepetition collateral; (3) the right of secured creditors other than BNC and AFG, LLC ("AFG") to credit bid;

---

[2] On October 22, 2010, the Court entered the <u>Amended Order and Notice of Re-Scheduled Hearing on Auction</u>, which merely changed the hour at which the hearing was scheduled to start.

3

(4) the manner in which the credit bidding would be conducted;[3] and (5) the responsibility for payment of the Auction Fee due to King. These issues are addressed below.

The Court verbally announced its rulings on the issues at the hearing on October 27, 2010,[4] and then proceeded with the round of credit bidding.

## A. THE CREDIT BIDDING ISSUES

In addressing the credit bidding issues, the Court notes that the Auction Order, the Auction Procedures and Provisions Order and the Auctioneer Order contemplated credit bidding under 11 U.S.C. § 363(k) and include provisions detailing the credit bidding process that was to be used in the auction. The orders were entered after notice and hearings on the Trustee's motions seeking their entry. The attorney for the Trustee stated at the hearing on October 25 and 27, without dispute by any party, that the Auction Procedures and Provisions Order and the Auctioneer Order were not entered until three months after Auction Order due to the time taken to prepare the auction provisions, including in particular the credit bidding provisions, and to allow counsel for the secured creditors and the Official Committee of Unsecured Creditors (the "Creditors Committee") to comment on the provisions of the proposed orders prior to their submission to the Court. All of the parties to these credit bidding issues are deemed to have knowledge of the provisions of the Auction Order, the Auction Procedures and Provisions Order and the Auctioneer Order.

---

[3] The issue of the manner in which the credit bidding would be conducted consists of the manner of the offering of the property in the credit bid round of the auction, i.e., which properties would be offered.

[4] At the hearing on October 27, 2010, in announcing its rulings on the credit bid issues, the Court stated that the rulings were subject to the rulings made in this written order. The Court believes that the rulings stated in this order are consistent with the verbally stated rulings at the hearing.

### 1. **Dixon's Asserted Right to Credit Bid**

Dixon asserts that he should be allowed to credit bid to purchase the property on which he asserts a mortgage, pursuant to his filed proof of claim [Claim No. 116 on the Claims Register] in the amount of $34,692,660.58.[5]  Dixon also asserts that, in order to credit bid, he need not pay off all mortgages senior to his asserted mortgage, but only need pay the amount of the actual credit bids of senior mortgages. The Trustee, Carolina Shores, LLC ("Carolina Shores") and AFG maintain that Dixon cannot credit bid because his claim is disputed.  In addition, the Trustee, Carolina Shores, AFG, BNC and Tidelands Bank maintain that, if Dixon were allowed to credit bid, he would be required to pay all of the mortgages which are senior to his asserted mortgage.

The Court finds that cause exists to deny Dixon the right to credit bid at the auction. First, although the Auction Procedures and Provisions Order is more general in describing the right of "secured creditors" to credit bid, the Auctioneer Order specifically identifies four creditors, AFG, BNC, Tidelands Bank and Carolina Shores, as the secured creditors who will be allowed to credit bid. Notably, Dixon is not identified as an allowed credit bidder. Furthermore, although the requirement in the credit bid provisions for the payment of all post-petition loans in full by the credit bid purchasers may implicitly allow the post-petition lenders to credit bid (see section 3 below), Dixon is not a post-petition lender and no such implicit allowance exists as to him.

Second, Dixon's claim is disputed.  Both the Trustee and Carolina Shores filed adversary proceedings to invalidate and/or subordinate Dixon's asserted mortgage and

---

[5] Dixon subsequently amended his proof of claim on January 6, 2010 [Claim No. 116-2 on the Claims Register], to increase the total claim amount to $92,698,033.58.  The amended proof of claim identifies the secured portion of the claim as being in the amount of $33,709,887.24.

5

claim.  The Trustee sought to avoid the Dixon mortgage as a preference under 11 U.S.C. §§ 547(b) and 550 in Adversary Proceeding No. 09-80120-jw; Carolina Shores asserted numerous causes of action against Dixon, including for equitable subordination of his claim and mortgage, in Adversary Proceeding No. 09-80134-jw.  Although the Trustee agreed to voluntarily dismiss his adversary proceeding against Dixon without prejudice, he explains that the dismissal was simply to avoid possibly unnecessary legal costs in the litigation unless and until it were to be determined that value in property might exist for Dixon's asserted mortgage.  As for Carolina Shores' adversary proceeding, by Order and Judgment entered on February 25, 2010, the Court granted Carolina Shores summary judgment on its cause of action to establish that the Carolina Shores mortgage has priority over the Dixon mortgage.  The remaining causes of action in the Carolina Shores adversary proceeding are presently stayed pending further order, with leave to restore the case to the active roster on a date after November 1, 2010, pursuant to a "Reuben Order" entered on August 25, 2010.  Both the Trustee and Carolina Shores assert that they continue to dispute the Dixon mortgage.

Based on the assertions, and the adversary proceedings filed, the Court finds that the Dixon mortgage and claim are disputed, and thus Dixon is not eligible to credit bid his asserted mortgage to purchase property under 11 U.S.C. § 363(k).  See National Bank of Commerce of El Dorado v. McMullan (In re McMullan), 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996) (at sale, mortgagee not allowed to credit bid its claimed liens or security interest because the validity of its liens and security interests were unresolved).  See also In re Octagon Roofing, 123 B.R. 583, 592 (Bankr. N.D. Ill. 1991) (bank allowed to credit

6

bid conditioned upon the posting of an irrevocable letter of credit to protect the estate in the event the lien were later avoided).

The Court holds that Dixon cannot credit bid his asserted mortgage under § 363(k), but, even if he were allowed to credit bid, he could not credit bid in the manner he proposes. In purchasing property by credit bid under § 363(k), the credit bidding creditor must pay the mortgages and liens (if any) which have priority senior to its mortgage. See In re Simpson Creek Development, Inc., Case No. 90-03836-WTB, slip op. at pages 17 and 24 (Bankr. D.S.C. 11/27/1991) ("In applying the Section 363(k) offset bid provision to the trustee's sale, a junior lienholder can offset bid its lien claim against the purchase price of the property only after all senior lien indebtedness on the particular property has been satisfied.").

### 2. BNC's Right to Decide Not to Credit Bid

The Trustee, the Creditors Committee and AFG took issue with BNC's indication that it might decide not to credit bid, notwithstanding the provisions of the Auction Procedures and Provisions Order and the Auctioneer Order designed to address BNC's expected credit bid under § 363(k). However, the Auction Order, the Auction Procedures and Provisions Order and the Auctioneer Order do not impose an obligation on BNC to credit bid, nor does § 363(k) require that BNC credit bid. BNC has the right to decide not to credit bid.

### 3. The Right of Other Secured Creditors to Credit Bid

Tidelands Bank stated its intention to credit bid its post-petition secured claims in the second round of the auction, which prompted BNC and AFG to raise the question of the right of other secured creditors to credit bid at the auction and how such credit

7

bidding would be conducted. The Auction Order and the Auction Procedures and Provisions Order state that secured creditors will have the right to credit bid under § 363(k), and the Auctioneer Order specifically states that AFG, BNC, Tidelands Bank and Carolina Shores may credit bid. Accordingly, Tidelands Bank is entitled to credit bid in the second round of the auction, as is Carolina Shores. In addition, the Auction Procedures and Provisions Order expressly states in the credit bid provisions that all authorized post-petition loans obtained by the Trustee are to be paid in full by the credit bid purchasers. By the requirement that the authorized post-petition loans must be fully paid by the credit bid purchasers, the provisions implicitly allow the post-petition lenders (BNC, as successor to Beach First, AFG, Tidelands Bank, and ZC Investments, LLC) to credit bid, to protect them in the event that junior secured creditors did not credit bid. Therefore, the Court finds that Tidelands Bank, Carolina Shores and ZC Investments, LLC ("ZCI") are entitled to credit bid in the second round of the auction.

### 4. The Manner in Which the Credit Bidding Is to be Conducted

The manner in which the credit bidding is to be conducted is defined in the Auction Procedures and Provisions Order and in the Auctioneer Order. The assets offered in the credit bid round of the auction are to be presented in two groupings of property: the property securing the prepetition claim of BNC, and the property securing AFG. Other property, most notably the Melrose Landing and the Bloody Point golf course and related properties, are excluded from the credit bid offering, as the orders provide that those assets are reserved for the Estate for use in payment of priority and non-priority unsecured creditors. Therefore, the credit bidding will be for the purchase of the BNC prepetition collateral, and for the purchase of the AFG collateral.

### 5. Responsibility for Payment of the Auction Fee Due to King

The final issue presented to the Court is whether the guaranteed minimum fee of King for the auction (the "Auction Fee") would be an obligation of the credit bid purchasers or the Estate. The Trustee asserts that the Auction Fee is an obligation of the credit bid purchasers, to be paid at the time of closing of their purchases. The three orders do not expressly state who is responsible for payment of the Auction Fee. However, the Trustee points to several provisions in the orders which he asserts support his position that the credit bid purchasers are responsible for the payment.

As noted by the Trustee, the Auctioneer Order addresses the payment of the Auction Fee as part of the sale, and references the King Auction Listing Agreement (the "ALA"), which is attached to the Auctioneer Order and incorporated by reference. The ALA provides that King is to be paid by the purchaser at the closing of the sale if the property were sold in the first round of the auction, and that, in the event the property is sold by credit bidding, the Auction Fee is to be paid within thirty days of the auction. The Auction Procedures and Provisions Order and the Auctioneer Order provide that the BNC prepetition collateral and the AFG collateral will be sold in the credit bid round of the auction, and indicate that the other assets (defined as the "Retained Property" in paragraph 6(b) of the Auction Procedures and Provisions Order) will not be sold in the second round of the auction,[6] but will be retained by the Estate for use in payment of unsecured claims, to the extent possible. The Trustee asserts that, in regard to these provisions, he would not have the ability to pay, and it was not contemplated that he

---

[6] Paragraph 6(b) of the Auction Procedures and Provisions Order provides, in pertinent part, that, "In the event that the properties securing AFG and the Beach First prepetition loan are sold to AFG and BNC by Credit Bid, the Retained Property will not be sold at the Auction, unless the Trustee receives a cash offer in an amount which, after consultation with the Creditors Committee, he believes to represent the highest and best value reasonably obtainable for such property."

would be able to pay, the Auctioneer Fee within the thirty day period, and that the only viable source of the payment would be the credit bid purchasers at closing. The Trustee also notes that the Auction Order provides that the costs of sale are to be taken from the sale proceeds prior to the payment of secured creditors, and he asserts that the Auction Fee is a cost of the sale.

The provisions of the Auction Order and the Auction Procedures and Provisions Order make clear that one of the critical parts of the auction is the "carve-out" or setting aside of assets for use in payment, to the extent possible, of priority and non-priority unsecured creditors. Had a sale of the property occurred in the first round of the auction, a portion of the sale proceeds was to be set aside for unsecured creditors. Upon a failure of a sale in the first round of the auction, the credit bid provisions set aside the Retained Property, which is to be free and clear of liens other than the <u>ad valorem</u> taxes on it after the closing of the sale to the credit bid purchasers, to be available for the unsecured creditors. The over-arching design of the credit bid provisions is a mechanism for secured creditors to receive their collateral by payment of the post-petition loans and costs of sale, while leaving other property unencumbered (except for the property taxes on it) for unsecured creditors.

For these reasons, the Court finds that the provisions of the Auction Order, the Auction Procedures and Provisions Order and the Auctioneer Order should be construed to provide that the credit bid purchasers are responsible for payment of the Auction Fee to King at the closing of the sales to them, as a cost of sale.

## B. **THE CREDIT BIDDING**

Following the Court's announcement of its rulings on the above issues at the hearing on October 27, 2010, the Court conducted the second round of the auction, for credit bidding. The property offered for sale consisted of two groupings of property: the property securing the Beach First prepetition loan (now held by BNC) (the "BNC Collateral"), and the property securing AFG (the "AFG Collateral").

Tidelands Bank made the first credit bid, bidding (i) the amount of $630,000 for the BNC Collateral, and (ii) the amount of $230,000 for the AFG Collateral. ZCI next credit bid its post-petition loan, which, combined with the post-petition loans senior to it, resulted in a total of approximately $2,710,000, for both the BNC Collateral and the AFG Collateral. BNC next bid $1,600,000 for the BNC Collateral and $1,200,000 for the AFG Collateral.[7] AFG made the final credit bid, in the amount of $3,000,000 for the AFG Collateral. The Court inquired whether any of the parties would like to make another credit bid, and hearing none, closed the bidding.

Based upon the credit bidding occurring before it as the second round of the auction, the Court finds that BNC is the successful credit bidder for the BNC Collateral and that AFG is the successful credit bidder for the AFG Collateral.

At the conclusion of the auction, AFG and BNC advised the Court that they have agreed to divide evenly the payment of the amounts due for the post-petition loans and for the Auction Fee. However, they each reserved their right to review the amounts

---

[7] ZCI's credit bid was the only one not to allocate amounts to the BNC Collateral and the AFG Collateral. BNC's credit bid, totaling $2,800,000 for both groups of property, exceeded the ZCI bid amount, and it also provided for full payment of ZCI. Accordingly, the BNC credit bid is deemed to exceed the ZCI credit bid amount. ZCI did not dispute this result.

11

shown as due on the post-petition loans, and to contest amounts if they believe an improper amount is included in the total.

## **CONCLUSION AND ORDER OF SALE**

Based upon the foregoing, it is hereby ORDERED, ADJUDGED AND DECREED that:

1. The credit bidding issues presented to the Court are decided as stated above;

2. BNC is the successful credit bidder for the purchase of the BNC Collateral, pursuant to 11 U.S.C. § 363(k);

3. AFG is the successful credit bidder for the purchase of the AFG Collateral, pursuant to 11 U.S.C. § 363(k); and

4. The Trustee is authorized to proceed with the closing of the sale of the BNC Collateral to BNC and the sale of the AFG Collateral to AFG pursuant to the Auction Order and 11 U.S.C. § 363(f), which sales shall be, with the exception of any and all easements, covenants, conditions, restrictions and other matters of record (but not excepting the rights and interests of MCI under and pursuant to the Transfer Agreement and the Memorandum of Agreement)[8] relating to the BNC Collateral and the AFG Collateral, free and clear of all liens, claims, encumbrances and other interests.

AND IT IS SO ORDERED.

---

[8] The Transfer Agreement, the Memorandum of Agreement, and MCI are discussed in the Auction Order.